ACCEPTED
13-15-00342-CV
THIRTEENTH COURT OF APPEALS
CORPUS CHRISTI, TEXAS
10/5/2015 6:01:20 PM
Dorian E. Ramirez
CLERK

# No. 13-15-00342-CV

_____ FILED IN

13th COURT OF APPEALS
CORPUS CHRISTI/EDINBURG, TEXAS
10/5/2015 6:01:20 PM
DORIAN E. RAMIREZ
Clerk

## Court of Appeals
## Thirteenth District of Texas

_____

**COPANO NGL SERVICES, LLC**,

*Appellant*,

**v.**

**JOHN ASHCRAFT, INDIVIDUALLY AND AS TRUSTEE FOR THE JOHN ASHCRAFT FAMILY TRUST 2012**,

*Appellee*.

_____

*On Appeal from Cause No. 15-H-0082*
*23rd District Court, Matagorda County, Texas*
*Hon. Ben Hardin, Judge Presiding*

_____

**APPELLANT'S BRIEF**

_____

Charles R. "Skip" Watson, Jr.
  State Bar No. 20967500
  cwatson@lockelord.com
LOCKE LORD LLP
600 Congress Avenue, Suite 2200
Austin, Texas 78701
(512) 305-4700 (Telephone)
(512) 305-4800 (Facsimile)

Christopher Dove
  State Bar No. 24032138
  cdove@lockelord.com
Ken McKay
  State Bar No. 13690835
  kmckay@lockelord.com
A. Antroy Arreola
  State Bar No. 24006769
  aarreola@lockelord.com
Harry Holmes Thompson
  State Bar No. 24088527
  hthompson@lockelord.com
LOCKE LORD LLP
600 Travis Street, Suite 2800
Houston, Texas 77002
(713) 226-1200 (Telephone)
(713) 223-3717 (Facsimile)

**ATTORNEYS FOR APPELLANT**

| Parties to the Proceeding | Counsel |
|---|---|
| Copano NGL Services, LLC,<br>**Appellant** | Charles R. "Skip" Watson, Jr.<br>  State Bar No. 20967500<br>  cwatson@lockelord.com<br>LOCKE LORD LLP<br>600 Congress Avenue, Suite 2200<br>Austin, Texas 78701<br>(512) 305-4700 (Telephone)<br>(512) 305-4800 (Facsimile)<br><br>Christopher Dove<br>  State Bar No. 24032138<br>  cdove@lockelord.com<br>LOCKE LORD LLP<br>600 Travis Street, Suite 2800<br>Houston, Texas 77002<br>(713) 226-1200 (Telephone)<br>(713) 223-3717 (Facsimile)<br>  **Appellate Counsel**<br><br><br>Ken McKay<br>  State Bar No. 13690835<br>  kmckay@lockelord.com<br>A. Antroy Arreola<br>  State Bar No. 24006769<br>  aarreola@1ocke1ord.com<br>Harry Holmes Thompson<br>  State Bar No. 24088527<br>  hthompson@1ocke1ord.com<br>LOCKE LORD LLP<br>600 Travis Street, Suite 2800<br>Houston, Texas 77002<br>(713) 226-1200 (Telephone)<br>(713) 223-3717 (Facsimile)<br>  **Trial and Appellate Counsel** |

| Parties to the Proceeding | Counsel |
|---|---|
| John Ashcraft, Individually and as Trustee for the John Ashcraft Family Trust 2012,<br>**Appellee** | John T. McDowell<br>State Bar No. 13570850<br>jtm@houstontrialattorneys.com<br>Kacy J. Shindler<br>State Bar No. 24088407<br>ks@houstontrialattorneys.com<br>MCDOWELL WELLS, LLP<br>603 Avondale Street<br>Houston, Texas 77006<br>(713) 655-9595 (Telephone)<br>(713) 655-7868 (Facsimile)<br><br>Danny Shindler<br>dwshindler@sbcglobal.net<br>MCDOWELL WELLS, LLP<br>State Bar No. 18266200<br>2232 Avenue G<br>Bay City, Texas 77414<br>(979) 245-4666 (Telephone)<br>(979) 244-5342 (Facsimile)<br><br>Vincent L. Marable III<br>PAUL WEBB, P.C.<br>State Bar No. 12961600<br>trippmarable@sbcglobal.net<br>221 N. Houston<br>Wharton, Texas 77488<br>(979) 532-5331 (Telephone)<br>(979) 532-2902 (Facsimile)<br>**Trial and Appellate Counsel** |

TABLE OF CONTENTS

**Page**

Identity of Parties and Counsel ................................................................. ii

Index of Authorities ..............................................................................vi

Statement of the Case.............................................................................1

Statement Regarding Oral Argument ........................................................2

Issues Presented ....................................................................................2

Statement of Facts .................................................................................3

Summary of the Argument.......................................................................6

Brief of the Argument ............................................................................7

I.   Copano's Objections Were Timely Filed, Invoking the District
     Court's Jurisdiction..........................................................................7

     A. The statutes that frame jurisdiction tolled the time for filing
        objections...................................................................................7

     B. The deadline for making jurisdiction-triggering objections to the
        commissioner's award does not begin until the clerk complies with
        Section 21.049. ...........................................................................9

     C. Courts cannot vary the form of notice mandated by the Legislature
        for triggering the district court's jurisdiction. .........................10

     D. Liberal construction cannot rewrite the statute or its requirements. ........13

II.  Findings of Fact and Conclusions of Law Are Not Only Immaterial,
     They Are Erroneous..........................................................................15

Conclusion and Prayer .........................................................................17

Certificate of Compliance .....................................................................19

Certificate of Service ...........................................................................19

Appendix

1. Final Judgment without attachments (CR:151-53)

2. Findings of Fact & Conclusions of Law (SCR:17-22)

3. TEX. PROP. CODE § 21.018

4. TEX. PROP. CODE § 21.049

5. TEX. PROP. CODE § 21.061

**Page(s)**

**CASES**

*Am. Mut. Liability Ins. Co. v. Parker,*
144 Tex. 453, 191 S.W.2d 844 (Tex. 1945) ....................................................16

*Black v. Shor,*
443 S.W.3d 154 (Tex. App.—Corpus Christi-Edinburg 2013, pet. denied).........
....................................................................................................................16, 17

*Crown Life Ins. Co. v. Estate of Gonzalez,*
820 S.W.2d 121 (Tex. 1991) ..........................................................................13

*Few v. Charter Oak Fire Ins. Co.,*
463 S.W.2d 424 (Tex. 1971) ..........................................................................12

*First Nat'l Bank in Graham v. Sledge,*
653 S.W.2d 283 (Tex. 1983) ..........................................................................10

*Greater Houston P'ship v. Paxton,*
--S.W.3d--, No. 13-0745, 2015 WL 3978138 (Tex. June 26, 2015) .................14

*Guest v. Dixon,*
195 S.W.3d 687 (Tex. 2006) ..........................................................................13

*IKB Indus. (Nigeria) Ltd. v. Pro-Line Corp.,*
938 S.W.2d 440 (Tex. 1997) ......................................................................15, 17

*John v. State,*
826 S.W.2d 138 (Tex. 1992) ..........................................................................9, 10

*Oncor Elec. Delivery Co. v. Schunke,*
No. 04-13-00067-CV, 2013 WL 6672494 (Tex. App.—San Antonio Dec.
18, 2013, pet dism'd) ..................................................................................10, 15

*Roccaforte v. Jefferson County,*
341 S.W.3d 919 (Tex. 2011) ..........................................................................13

*Schepps v. Presbyterian Hosp. of Dallas,*
652 S.W.2d 934 (Tex. 1983) ..........................................................................10

*State v. Titan Land Dev., Inc.*,
    No. 01-14-00899-CV, 2015 WL 3637982 (Tex. App.—Houston [1st
    Dist.] June 11, 2015, pet. filed) ..............................................................14

*Tex. Dep't of Transp. v. A.P.I. Pipe and Supply, LLC*,
    397 S.W.3d 162 (Tex. 2013) ....................................................................9

CONSTITUTION AND STATUTES

TEX. PROP. CODE § 21.012 ............................................................................3

TEX. PROP. CODE § 21.014 ............................................................................3

TEX. PROP. CODE § 21.018 ....................................................................passim

TEX. PROP. CODE § 21.018(a) ......................................................................8

TEX. PROP. CODE § 21.049 ....................................................................passim

TEX. PROP. CODE § 21.061 ........................................................................5, 8

TO THE HONORABLE THIRTEENTH COURT OF APPEALS:

This appeal is from a judgment dismissing Appellant Copano NGL Services, LLC's appeal to district court from a special commissioners' condemnation award. It raises the critical issue of district court jurisdiction that turns on the proper application of a statute enacted to ensure the timeliness of objections filed to invoke jurisdiction over commissioners' decisions. That important issue arose in the following context:

## STATEMENT OF THE CASE

A pipeline constructed by Copano required land held by Appellee John Ashcraft, individually and as trustee of the John Ashcraft Family Trust 2012. (CR:4.) Copano's petition to condemn the land was assigned to the 23rd District Court of Matagorda County, Texas, the Honorable Ben Hardin presiding.

On April 21, 2015, the special commissioners' award was filed with the trial court, but it took until May 27 for the clerk to mail the notice in the manner required by TEXAS PROPERTY CODE § 21.049. (CR:29, 93.) Copano timely objected to the award on May 19. (CR:91.) But, Ashcraft moved for entry of judgment on the award, arguing that the May 19 objections were untimely and the trial court must adopt the Special Commissioners' award as its judgment. (CR:94.)

The trial court entered judgment on the award (CR:151), necessitating this appeal. (CR:205.)

## STATEMENT REGARDING ORAL ARGUMENT

Copano believes the mistaken statutory construction that resulted in the denial of jurisdiction over an administrative award for property taken by condemnation merits full discussion of the issues and opportunity to address this court's questions.

## ISSUES PRESENTED

The Supreme Court has consistently held that the Legislature enacted Section 21.049 of the Texas Property Code to toll the time prescribed by Section 21.018 for parties to file objections that trigger a district court's jurisdiction over an appeal from a special commissioners' decision in a condemnation.  It has also held that Section 21.049's specific requirement (that "[n]ot later than the next working day after the [commissioners'] decision is filed, the clerk shall send notice of the decision by certified or registered United States mail … to the parties in the proceeding, or to their attorneys of record") is "mandatory" and must be strictly complied with *before* the time for objections can begin to run.  The provision must be interpreted to promote, rather than limit, the parties' right to appeal.

> 1.  *Did the district court err in entering judgment on the special commissioners' award, and dismissing Copano's appeal, even though Copano's objections to the award were filed prior to 20 days after the clerk gave the requisite notice by certified mail?*

2

2.     *Can filing findings of fact and conclusions of law in the absence of an evidentiary hearing, disputed facts, or evidence, alter an error of law in dismissing an appeal from a commissioners' award for want of jurisdiction, and entering judgment on the award instead?*

### STATEMENT OF FACTS

This appeal presents a pure question of law: whether Copano timely filed its objections to the special commissioners' award. The facts forming the context for this legal question are straightforward.

The Copano Sweeny NGL Pipeline will transport natural gas liquids twenty-three miles from the Eagle Ford Shale to purchasers and processors in Sweeny, Texas. (CR:5-6.) Copano will own and operate the pipeline. (*Id.*) The pipeline required a narrow easement across Ashcraft's property that totaled about eight acres. (CR:7-9, 16.)

Copano and Ashcraft disagreed about the easement's value, so Copano exercised its power of eminent domain by filing a petition for condemnation under TEXAS PROPERTY CODE § 21.012. (CR:5.) The district court appointed special commissioners to value the easement as required by Tex. Prop. Code § 21.014. (CR:24.) On April 21, 2015, the special commissioners issued their award of well over a million dollars for the eight acre easement. (CR:31.)

The Texas Property Code sets forth what must happen next. Section 21.049 requires two things. *First*, the judge hearing the case must inform the clerk of the special commissioners' decision within one working day after the decision is filed. *Second*, the clerk must immediately mail notice of the award to the parties by certified or registered United States mail, return receipt requested:

> Not later than the next working day after the day the decision is filed, the clerk shall send notice of the decision by certified or registered United States mail, return receipt requested, to the parties in the proceeding, or to their attorneys of record, at their addresses of record.

TEX. PROP. CODE § 21.049. Here, the clerk's office failed to discharge that duty.

The duties are important because a party may appeal from the commissioners' findings by filing a statement of its objections under Texas Property Code § 21.018.

On the day the special commissioners issued their award, April 21, 2015, Copano electronically filed the award with the district clerk. (CR:29.) Copano specifically reminded the clerk of its duty to mail notice in the manner required by Texas Property Code § 21.049:

> In accordance with Section 21.049 of the Texas Property Code, **please issue notice of the date of entry of the Award of Special Commissioners, including a file stamped copy of the award, to the parties and their attorneys of record within one (1) day of this filing. Please issue this notice either today or tomorrow as directed by Section 21.049.** Please do not wait for Copano NGL Services LLC to deposit the amount of the Special Commissioners' Award, or the possession bonds.

(*Id.*)

But the clerk's office *did not* mail the award until May 27, 2015, more than a month later. (CR:93.)

Copano filed its objections early – on May 19, 2015. (CR:91.) Thus, the trial court should have proceeded to "try the case in the same manner as other civil causes," as required by Section 21.018(b).

But, notwithstanding Section 21.049 Ashcraft filed a Motion for Entry of Judgment claiming that the deadline for objections was actually May 18 under Section 21.018. (CR:94.) Ashcraft asserted that the district court had to "adopt the commissioners' findings as the judgment of the court" (*Id.*; *see* TEX. PROP. CODE § 21.061.) The motion for judgment dealt with the clerk's delay, which tolled the deadine for objections, by ignoring it. (CR:94.)

Copano's response pointed out that the Supreme Court held that a clerk's delay in mailing the notice tolls the deadline for objections, and that even actual notice of the award provides no exception to this mandatory tolling rule. (CR:118.) Nevertheless, the trial court entered judgment on the special commissioners' award. (CR:151.) Copano timely appealed. (CR:205.)

After Copano appealed to this Court, Ashcraft raised new and untested arguments about the effect of Copano's electronic filing of the special commissioners' award by proposing findings of fact and conclusions of law. (SCR:4-12.) Copano objected to the request because findings and conclusions may

not be entered in cases where no evidentiary hearing was held, and because Ashcraft sought to inject new legal theories *after* judgment was entered.  (SCR:23.)

The trial court did not hold an evidentiary hearing on Ashcraft's Motion for Entry of Judgment, nor did Ashcraft proffer evidence in support of its motion (CR:94), no doubt because the only material relevant "facts" are undisputed and ministerial – the date when the special commissioners' award was filed, the date when the clerk mailed that award to the parties, and the date Copano filed its objections.  (SCR:9.)  But the trial court signed the findings and conclusions proposed by Ashcraft, without changing a word.  (SCR:17.)

## SUMMARY OF THE ARGUMENT

The trial court denied Copano's statutory right of a trial *de novo* to appeal the special commissioners' condemnation award.  That error was based on the trial court's failure:

(i)     to follow Supreme Court precedent tolling the due date for filing jurisdiction-triggering objections to the award (that has guided litigants since 1992); and

(ii)    to understand that the Legislature enacts statutes containing mandatory provisions that set forth the precise type of notice that must be given to trigger district courts' jurisdiction over condemnation awards and the critical difference between their mandatory notice requirements and:

  − actual notice; or

  − notice of an e-filing.

6

Instead, the trial court wrongly determined that the Legislature's mandatory, party-neutral requirement that the clerks send notice by certified mail was enacted *solely* to benefit landowners.

That series of errors has denied Copano access to the courts and due process guaranteed by our Constitution and statutes, as consistently interpreted by our Supreme Court. It requires swift reversal.

## BRIEF OF THE ARGUMENT

Jurisdiction over a judicial review of an administrative determination – especially when it involves taking of and compensation for property – cannot be taken lightly. Here, the district court interpreted the Supreme Court's construction of a jurisdiction-tolling statute that was enacted to encourage appeals, to achieve the opposite result. It refused jurisdiction that the Legislature enacted a statute to ensure.

I. **Copano's Objections Were Timely Filed, Invoking the District Court's Jurisdiction.**

A. **The statutes that frame jurisdiction tolled the time for filing objections.**

The trial court's jurisdiction over a commissioners' award is governed by the following.

*First*, Section 21.049 requires two actions immediately upon the trial court's receipt of the commissioners' report containing their decision:

(i) "The judge of a court hearing a proceeding under this chapter shall inform the clerk of the court as to a decision by the special commissioners on the day the decision is filed or on the next working date after the day the decision is filed."

(ii) "Not later than the next working day after the day the decision is filed, *the clerk shall send notice* of the decision by certified or registered United States mail, return receipt requested, *to the parties* in the proceeding, *or to their attorneys* of record, at their addresses of record."

TEX. PROP. CODE § 21.049 (emphasis added).

*Second*, a party's written statement of its objections to the award "must be filed on or before the first Monday following the 20th day after the day the commissioners' file their findings with the court." TEX. PROP. CODE § 21.018(a). Timely notice by the clerk of the commissioners' decision in the form prescribed by the Legislature is therefore critical because the trial court must enter "the commissioners' findings as the judgment of the court" unless the parties timely object to the commissioners' report. TEX. PROP. CODE § 21.061.

The question of law that the district court got wrong is whether the clerk's failure to comply with Section 21.049's precise requirement of notice by certified mailing tolls the deadline in Section 21.018. The Supreme Court definitively has answered that question.

**B.** **The deadline for making jurisdiction-triggering objections to the commissioner's award does not begin until the clerk complies with Section 21.049.**

The Supreme Court has repeatedly answered the question by holding that the notice required by the Legislature in Section 21.049 is "mandatory." *John v. State*, 826 S.W.2d 138, 140 & n.3 (Tex. 1992). That means the "time to object" to the special commissioners' award "*is tolled until the clerk sends the required notice pursuant to section 21.049.*" *Id*. at 141 (emphasis added).

The requirement is mandatory for jurisdiction over appeals by all parties, even though *John* spoke in terms of tolling the time for the landowner's objections. The Court subsequently made it clear that the "time for making objections" that trigger the trial court's jurisdiction is tolled "if the *parties* are not given *proper* notice" as required by Section 21.049. *Tex. Dep't of Transp. v. A.P.I. Pipe and Supply, LLC*, 397 S.W.3d 162, 167 n.18 (Tex. 2013) (emphasis added) (citing *John*, 826 S.W.2d at 141 n.5). The Supreme Court has never varied from construing Section 21.049's clerk's notice by certified mail requirement as tolling the time allotted by the more general statute, Section 21.018, until the clerk sends "proper" notice in the form prescribed by the Legislature.

**C.** **Courts cannot vary the form of notice mandated by the Legislature for triggering the district court's jurisdiction.**

**1.** **Actual notice will not suffice.**

Courts are bound by the Legislature's requirement. Thus, not even *actual notice* by a clerk personally handing a party's attorney "a file-stamped copy of the notice" of the commissioners' decision will be allowed to substitute for Section 21.049's requirement that the clerk give notice by certified mail. *Oncor Elec. Delivery Co. v. Schunke*, No. 04-13-00067-CV, 2013 WL 6672494, *3 (Tex. App.—San Antonio Dec. 18, 2013, pet. dism'd).

A mandatory notice statute means that it must be strictly applied. *See Schepps v. Presbyterian Hosp. of Dallas*, 652 S.W.2d 934, 936-38 (Tex. 1983). By contrast, when a statute's notice requirement can be satisfied by actual notice, it says so. *See, e.g.*, *First Nat'l Bank in Graham v. Sledge*, 653 S.W.2d 283, 287 (Tex. 1983). Thus, actual knowledge of an award by an attorney filing it and receiving a file-stamped copy from the clerk will not satisfy the clerk's duty to give "proper" statutory notice by mailing the notice of decision as required by Section 21.049. *Oncor* at *3-4.

Equally important, in *Oncor* the court also recognized that parties are "entitled to rely on the rule articulated in *John*" in calculating the time for filing their objections to the award. *Id*. at *4. That has been the law since *John* was decided in 1992, and that is what Copano did here.

10

## 2. E-filing will not suffice.

*After* this appeal was filed, Ashcraft sought to raise an equally unavailing theory by going beyond the record for findings and conclusions regarding notice by e-filing. But if being handed a file-stamped copy of the award does not satisfy the clerk's "mandatory" duty to immediately give notice by certified mail, an electronic notice of filing will hardly suffice for proper compliance. Thus, the trial court's belated finding of notice by e-filing cannot save the judgment for three independent reasons.

*First*, the clerk's office, having been specifically cautioned of its duty to *mail* the award to the parties, performed that duty on May 27, 2015, indicating that the clerk's office *knew* that its duty had to be performed via the U.S. mail.

*Second*, there is no evidence that the commissioners' decision containing their award was "e-mailed" to Copano's counsel on April 21, or any other day. (Copano believes that a hearing would have established that the clerk has no record of emailing notice.)

And if "emailing" is referring to e-filing the award, there is again no evidence when or even if the file-marked award was electronically sent to Copano's counsel. Instead, the argument reflects a fundamental misunderstanding of the process, which, again, is not in the record:

11

Within minutes of e-filing the award, a "filing-submitted" reply transmits the fact of filing, but *not* a copy of what was filed. Thus, a file-stamp on a document subsequently *accepted* for filing does *not* mean the document was actually *returned* that day. The same procedure applies to a later "filing accepted" electronic reply, though it supplies a link to a file-stamped copy on the eFile.Texas.gov server.

Neither is of record, though Copano believes the trial court's electronic docket would show the "e-filing" was not "accepted" until May 1. That means that even if access to a link showed for the first time on May 1, that Copano's filing was "accepted" the availability of a link cannot substitute for the mandatory statutory requirement of certified mail. But even if a "filing accepted" notice could be substituted for the Legislature's mandatory certified mail notice provision (which it cannot), Copano's May 19 filing would be timely even under Ashcraft's belated theory.

*Third*, courts cannot by rule negate or alter statutory requirements enacted by the Legislature. The Supreme Court always recognizes that its rule-making power is limited to establishing rules and procedures "not inconsistent with the law of the State" by former Art. V, Sec. 25 of the Texas Constitution. Thus, "when a rule of the court conflicts with a legislative enactment, the rule must yield." *Few v. Charter Oak Fire Ins. Co.*, 463 S.W.2d 424, 425 (Tex. 1971).

As a result, neither Section 21.049's certified mailing requirement, nor its tolling of Section 21.018's filing deadline, can be repealed or altered by Rule 21's electronic filing and service provisions any more than Rule 21a's personal service provision could alter it.

Thus, Legislative tolling until mandatory statutory requirements are satisfied cannot be circumvented by hand delivery or service by access to e-filing links. The mandatory requirement of Section 21.049 was not satisfied until after Copano's objections were timely filed.

## D.  Liberal construction cannot rewrite the statute or its requirements.

Ultimately Ashcraft must rely on liberal construction in favor of the landowner to rewrite both the Legislature's clear notice by certified mail requirement in Section 21.049 and the Supreme Court's consistent interpretation of that requirement.  That argument for denying jurisdiction over Copano's appeal flounders in two fundamental ways.

*First*, the goal of liberal construction is to ensure that "the right of appeal should not be lost due to procedural technicalities."  *Roccaforte v. Jefferson County*, 341 S.W.3d 919, 924 (Tex. 2011) (citing *Guest v. Dixon*, 195 S.W.3d 687, 688 (Tex. 2006); *Crown Life Ins. Co. v. Estate of Gonzalez*, 820 S.W.2d 121-22 (Tex. 1991) (liberal construction requires "decisions of the courts of appeals turn on substance rather than procedural technicality")).

Ashcraft and the trial court missed the point of why statutes are liberally construed – to ensure jurisdiction over appeals, not to deny it. *See, e.g., State v. Texas Titan Land Dev., Inc.*, No. 01-14-00899-CV, 2015 WL 3637982, at *5 (Tex. App.—Houston [1st Dist.] June 11, 2015, pet. filed) (holding that under liberal construction, Section 21.018's time requirement is determined by the "mandatory" mailing requirement in Section 21.049, and may not logically reduce the State's time to object to an award, requiring reversal of the dismissal of the State's appeal).

Indeed, it makes no sense for a party benefitting from liberal construction designed to enable an appeal, to turn around and use it to prevent an appeal. Liberal construction cannot eliminate a tolling statute that grants a right of appeal to both parties.

*Second*, liberal construction "must remain grounded in the statute's language." *Greater Houston P'ship v. Paxton*, --S.W.3d--, No. 13-0745, 2015 WL 3978138, at *8 (Tex. June 26, 2015). It is not "tantamount to boundless reach." *Id*. at *12. Instead, like "any other extra-textual construct," liberal construction must yield to "plain and unambiguous language." *Id*.

That is what we have here – plain and unambiguous language requiring notice by certified mail to *all* "parties," that is consistently interpreted by the Supreme Court to require tolling the jurisdiction window for objecting to

commissioners' awards. The goals of the Legislature and the Court are the same –reaching the merits of a party's appeal of a condemnation award.

*To sum up*, Ashcraft is asking this Court to make law by ignoring Supreme Court holdings that the deadline for filing objections is tolled until the clerk complies with the mandatory provisions of Section 21.049 by giving notice by certified mail. Here as in *Oncor* the parties had every right to rely on both the Legislature's mandatory provision and Supreme Court precedent construing it. The district court erred in entering judgment on the commissioners' findings. It must be reversed so Copano can have its day in court.

## II. Findings of Fact and Conclusions of Law Are Not Only Immaterial, They Are Erroneous.

Rather than supporting Ashcraft's judgment, the trial court's immaterial and erroneous findings of fact and conclusions of law reveal instead that when jurisdiction is decided as a pure question of law, findings and conclusions cannot be made in the absence of evidentiary hearings, let alone absent evidence of disputed facts. They create a false illusion of resolving facts when none were heard or needed to be decided.

Thus, where the trial court renders judgment without an evidentiary hearing, "findings and conclusions have no purpose and should not be requested, made, or considered on appeal." *IKB Indus. (Nigeria) Ltd. v. Pro-Line Corp.*, 938 S.W.2d 440, 442-43 (Tex. 1997). "Therefore, even when the trial court receives evidence,

findings and conclusions are *only* appropriate if the trial court is called upon to determine questions of fact upon conflicting evidence." *Black v. Shor*, 443 S.W.3d 154, 166 (Tex. App.—Corpus Christi-Edinburg 2013, pet. denied) (emphasis added).

Ashcraft requested findings and conclusions after this appeal was perfected for the illegitimate purpose of raising new arguments to shore-up a teetering judgment. Ashcraft's motion for entry of judgment gave no explanation for why the clerk's delay had not tolled the objection deadline. (CR:94.) As recounted in Copano's objections,[1] Ashcraft's only argument had been that Copano's receipt of a hand-delivered paper copy was sufficiently similar to "certified or registered United States mail, return receipt requested" to prevent tolling. (CR:24.) *After* judgment was entered, Ashcraft apparently saw that its arguments cannot support its judgment. But proposing new findings and conclusions on equally unavailing arguments about the effect of Copano's electronic filing of the award cannot save this judgment. (*Id*.)

The entire purpose of that exercise was illegitimate. Texas law has long recognized that "an appellate court should not decide a case upon a theory different from that upon which it was pleaded and tried." *Am. Mut. Liability Ins. Co. v. Parker*, 144 Tex. 453, 460, 191 S.W.2d 844, 848 (Tex. 1945).

---

[1] The parties discussed the motion with the trial judge, but no evidentiary hearing was held, and no transcript was taken.

16

*In sum*, the findings and conclusions were improper and cannot support the trial courts' error of law in entering judgment and dismissing Copano's appeal. They must not be considered by this Court. *IKB*, 938 S.W.2d at 443; *Black*, 443 S.W.3d at 166. The erroneous judgment must be reversed.

## CONCLUSION AND PRAYER

The trial court was led into error that denied Copano its right to appeal the commissioners' decision to the district court. Copano's objections were timely filed both as a matter of law and of sound public policy enacted by the Legislature.

Accordingly, Appellant, Copano NGL Services, LLC, respectfully prays that the Honorable Court of Appeals reverse the judgment of the district court and remand for trial with Appellant receiving its costs at trial and on appeal, and all other relief it is entitled to receive consistent with the opinion of this Court.

Respectfully submitted,

**LOCKE LORD LLP**

By: /s/ Charles R. "Skip" Watson, Jr.
    Charles R. "Skip" Watson, Jr.
     State Bar No. 20967500
     cwatson@lockelord.com
    600 Congress Avenue, Suite 2200
    Austin, Texas 78701
    (512) 305-4700 (Telephone)
    (512) 305-4800 (Facsimile)

    Christopher Dove
     State Bar No. 24032138
     cdove@lockelord.com

Ken McKay
  State Bar No. 13690835
  kmckay@lockelord.com
A. Antroy Arreola
  State Bar No. 24006769
  aarreo1a@1ocke1ord.com
Harry Holmes Thompson
  State Bar No. 24088527
  hthompson@1ocke1ord.com
LOCKE LORD LLP
600 Travis Street, Suite 2800
Houston, Texas 77002
(713) 226-1200 (Telephone)
(713) 223-3717 (Facsimile)

**COUNSEL FOR APPELLANT**

## CERTIFICATE OF COMPLIANCE

I certify that this Appellant's Brief contains 3,201 words (excluding the sections excepted under Texas Rule of Appellate Procedure 9.4(i)(1)).

/s/ Charles R. "Skip"Watson, Jr.
Charles R. "Skip" Watson, Jr.

## CERTIFICATE OF SERVICE

I hereby certify that on October 5, 2015, a true and correct copy of the foregoing was served via EFileTx.Gov e-service upon the following:

Vincent L. Marable III
trippmarable@sbcglobal.net
PAUL WEBB, P.C.
221 N. Houston
Wharton, Texas 77488
(979) 532-5331 (Telephone)
(979) 532-2902 (Facsimile)

Danny Shindler
dwshindler@sbcglobal.net
MCDOWELL WELLS, LLP
2232 Avenue G
Bay City, Texas 77414
(979) 245-4666 (Telephone)
(979) 244-5342 (Facsimile)

John T. McDowell
jtm@houstontrialattorneys.com
Kacy J. Shindler
ks@houstontrialattorneys.com
MCDOWELL WELLS, LLP
603 Avondale Street
Houston, Texas 77006
(713) 655-9595 (Telephone)
(713) 655-7868 (Facsimile)

**Counsel for Appellee**

/s/ Charles R. "Skip" Watson, Jr.
Charles R. "Skip" Watson, Jr.

# No. 13-15-00342-CV

_____

# Court of Appeals
# Thirteenth District of Texas

_____

**COPANO NGL SERVICES, LLC**,

*Appellant,*

**v.**

**JOHN ASHCRAFT, INDIVIDUALLY AND AS TRUSTEE FOR
THE JOHN ASHCRAFT FAMILY TRUST 2012**,

*Appellee.*

_____

*On Appeal from Cause No. 15-H-0082
23rd District Court, Matagorda County, Texas
Hon. Ben Hardin, Judge Presiding*

---

**APPENDIX**

---

Tab

1. Final Judgment (CR:151-53)

2. Findings of Fact & Conclusions of Law (SCR:17-22)

3. TEX. PROP. CODE § 21.018

4. TEX. PROP. CODE § 21.049

5. TEX. PROP. CODE § 21.061

NO. 15-H-0082

| COPANO NGL SERVICES LLC, | § | IN THE DISTRICT COURT |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| V. | § | MATAGORDA COUNTY, TEXAS |
| | § | |
| JOHN ASHCRAFT, INDIVIDUALLY | § | |
| AND AS TRUSTEE FOR THE JOHN | § | |
| ASHCRAFT FAMILY TRUST | § | |
| | § | |
| *Defendant* | § | 23RD JUDICIAL DISTRICT |

## FINAL JUDGMENT

Be it remembered that John Ashcraft, Individually and as Trustee for the John Ashcraft 2012 Family Trust is the owner of the real property that Copano NGL Services LLC is condemning and acquiring under and by virtue of these condemnation proceedings. The permanent and temporary easements the subject of this proceeding are more specifically described in Copano's Original Petition for Condemnation and described in Exhibit "A" attached hereto (the "Easements").

The Award of Special Commissioners in this case was executed and signed by the three Special Commissioners on April 21, 2015. The Award of Special Commissioners was filed with the Matagorda County District Clerk by Copano on April 21, 2015. The Award of Special Commissioners is attached to this Final Judgment as Exhibit "B". The Award of Special Commissioners provides, in part, as follows:

> After hearing and considering such evidence, the undersigned Special Commissioners find, determine, and assess damages to be paid by Copano NGL Services LLC for this condemnation, according to the statute pertaining to assessment of such damages that is set forth at Section 21.042 of the Texas Property Code, in the total amount of: one million forty three thousand eight hundred thirty and no cents ($1,043,830.00) to Defendant.

No objections to the Award were filed on or before the first Monday following the 20th day after the Award was filed as mandated by Tex. Prop. Code § 21.018. Defendants John Ashcraft, Individually and as Trustee for the John Ashcraft 2012 Family Trust filed a Motion for Entry of Judgment. The Court, having considered the Motion for Entry of Judgment, Plaintiff's response and argument of counsel has determined that Defendants' Motion is meritorious and should be granted.

It is ORDERED, ADJUDGED and DECREED that the findings in the Award of Special Commoners are adopted as the judgment of this court.

It is further ORDERED, ADJUDGED and DECREED that the Award of Special Commissioners be recorded with this judgment in the minutes of this court.

It is ORDERED, ADJUDGED and DECREED that Defendants, John Ashcraft, Individually and as Trustee for the John Ashcraft 2012 Family Trust, have judgment against and recover from Copano NGL Services LLC, the sum of one million forty three thousand eight hundred and thirty dollars ($1,043,830.00), which shall bear post-judgment interest at 5% compounded annually beginning on the date this judgment is signed.

It is ORDERED, ADJUDGED and DECREED that Copano NGL Services LLC, recover from the Defendants, John Ashcraft, Individually and as Trustee for the John Ashcraft 2012 Family Trust, a fifty-foot (50') wide non-exclusive permanent right-of-way and temporary easement more specifically described in Exhibit "A" attached hereto, in and to that certain property situated in Matagorda County, Texas described in the incorporated Award of Commissioners, and the same is vested in Copano NGL Services LLC.

It is ORDERED, ADJUDGED and DECREED that all costs of court are taxed against Copano NGL Services, LLC, plaintiff. All writs and process as may be necessary in the

enforcement and collection of this judgment and the costs of court may issue.

This is a final, appealable judgment.

SIGNED _____June 24_____, 2015.

_____
JUDGE PRESIDING

*filed with the Court on 6-24-15*

APPROVED AS TO FORM:

**McDowell Wells, LLP**

/s/John T. McDowell
John T. McDowell
SBN 13570850
jtm@houstontrialattorneys.com
Kacy J. Shindler
SBN 24088407
ks@houstontrialattorneys.com
603 Avondale Street
Houston, Texas 77006
Telephone: (713) 655-9595
Facsimile: (713) 655-7868

Danny Shindler
SBN: 18266200
dwshindler@sbcglobal.net
2232 Avenue G
Bay City, TX 77414
Telephone: 979-245-4666
Facsimile: 979-244-5342

PAUL WEBB, P.C.
Vincent L. Marable III
State Bar No. 12961600
221 N. Houston
Wharton, Texas 77488
Telephone: (979) 532-5331
Facsimile: (979) 532-2902
**ATTORNEYS FOR DEFENDANTS**
**John Ashcraft, Individually and as**
**Trustee of the John Ashcraft 2012 Family Trust**

**FILED**
at 4:48 o'clock p. M.

JUN 2 4 2015

Jamie C. Bludau
Clerk of District Court Matagorda Co., Texas
By_____ DEPUTY

3

FILED
at /0:20 o'clock ___ M.
AUG 1 0 2015

Jamie C. Bludau,
Clerk of District Court Matagorda Co., Texas
by _____ DEPUTY

| | |
|---|---|
| COPANO NGL SERVICES LLC, | IN THE DISTRICT COURT OF |
| Plaintiff, | |
| V. | MATAGORDA COUNTY, TEXAS |
| JOHN ASHCRAFT, INDIVIDUALLY AND AS TRUSTEE FOR THE JOHN ASHCRAFT FAMILY TRUST 2012, | |
| Defendants. | 23RD JUDICIAL DISTRICT |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

On June 24, 2015, this Court signed a final judgment in favor of Defendants John Ashcraft, Individually and as Trustee for the John Ashcraft Family Trust 2012 ("Ashcraft"). Ashcraft requested that this Court make findings of fact and conclusions of law on July 9, 2015. The final judgment rendered by this Court on June 24, 2015, was made in accordance with Section 21.061 of the Texas Property Code, following a hearing conducted on June 15, 2015. The findings of fact made by this Court are based on stipulations of the parties at the June 15, 2015, hearing conducted in this case and this Court's judicial notice of the district clerk's file in this matter.

## I. FINDINGS OF FACT

1. Plaintiff COPANO NGL SERVICES LLC ("Copano"), filed via e-file its Petition for Condemnation on March 4, 2015.

2.   An Order Appointing Special Commissioners was signed on March 16, 2015.

3.   An Order Striking Special Commissioner and Replacing With First Alternate was signed on April 1, 2015.

4.   On April 21, 2015, the Special Commissioners made an award to Ashcraft of one million forty-three thousand eight hundred thirty dollars ($1,043,830.00).

5.   Copano offered to file the award of the Special Commissioners with the district clerk.

6.   Copano filed the Special Commissioners' Award with the district clerk via e-file on April 21, 2015.

7.   Copano received notice of its filing electronically on April 21, 2015, from the Matagorda County District Clerk.

8.   Copano had notice of the filing of the Special Commissioners' award on April 21, 2015.

9.   The Matagorda County District Clerk sent notice of the decision by the Special Commissioners to Copano and Ashcraft by e-mail on April 21, 2015, and Copano and Ashcraft received such e-mail notice on April 21, 2015.

10.  Copano filed its objection to the Special Commissioners' Award on May 19, 2015.

11.  Ashcraft filed Defendants' Motion for Entry of Judgment on June 9, 2015, asserting that Defendants were entitled to judgment in accordance with Section 21.049 of the Texas Property Code because no timely objection was made to the findings of the Special Commissioners by May 18, 2015.

2

## II.   CONCLUSIONS OF LAW

1.   Section 21.018(a) of the Texas Property Code fixes the objections deadline to the findings of the Special Commissioners as "the first Monday following the 20th day after the commissioners file their findings with the court."

2.   The statutory deadline to file timely objections to the findings of the Special Commissioners was May 18, 2015. See Tex. Prop. Code Section 21.018.

3.   No party filed a timely objection to the findings of the Special Commissioners.

4.   Copano admitted to notice of the filing of the Special Commissioners' award with the Matagorda County District Clerk and to knowledge of the statutory deadline to file objections to the findings of the Special Commissioners.

5.   Copano did not timely file an objection to the findings of the Special Commissioners by May 18, 2015, and intentionally waited until after May 18, 2015, to file its objection, to see if Ashcraft intended to object to the findings of the Special Commissioners.

6.   The timely filing of objections to the findings of the Special Commissioners converts an "administrative" matter into a judicial one. City of Tyler v. Beck, 196 S.W.3d 784, 786 (Tex. 2006).

7.   Without timely objections to the findings of the Special Commissioners, the trial court does not have jurisdiction to entertain an "appeal" of the Special Commissioners' award and must instead terminate the case by rendering judgment "on the award" as a matter of ministerial duty. Pearson v. State, 315 S.W.2d 935, 938 (Tex. 1958).

8.   The Legislature has codified this principle in Property Code Section 21.061: "If no party in a condemnation proceeding files timely objections to the findings of the special commissioners, the

3

judge of the court that has jurisdiction of the proceeding shall adopt the commissioners' findings as the judgment of the court." Tex. Prop. Code Section 21.061. (emphasis supplied)

9. Sections 21.018(a) and 21.061 of the Texas Property Code limit the jurisdiction of the trial court when timely objections are not filed.

10. The Legislature has chosen not to create any statutory exceptions to the operation of Sections 21.018(a) and 21.061.

11. Texas Property Code Section 21.049 provides as follows:

> Not later than the next working day after the day the [Special Commissioners'] decision is filed, the clerk shall send notice of the decision by certified or registered United States mail, return receipt requested, to the parties in the proceeding, or to their attorneys of record, at their addresses of record.

12. The Legislature enacted Section 21.049 to ensure that landowners received notice of the triggering event to file objections to the findings of the Special Commissioners. See John v. State, 826 S.W.2d 138, 140-41 (Tex. 1992).

13. Section 21.049 is not designed to alter the operation of Sections 21.018 and 21.061, but instead to ensure that landowners know when the period has started in order to object. See id.

14. Given Section 21.049's limited purpose, the Supreme Court has recognized only one circumstance in which Section 21.049 alters the operation of the jurisdiction-limiting provisions in Sections 21.018 and 21.061.

15. When landowners receive no notice of the filing of a Special Commissioners' award, their objections deadline is tolled until the court clerk sends notice. John, 826 S.W.2d at 140.

4

16.  "When a statute provides the method by which notice shall be given in a particular instance, the notice provision must be followed with <u>reasonable</u> strictness." <u>John</u>, 826 S.W.2d at 141 n. 4. (emphasis supplied)

17.  The notice of the award of the Special Commissioners provided by the Matagorda County District Clerk by e-mail on April 21, 2015, followed Section 21.049 with reasonable strictness. <u>See Roccaforte v. Jefferson Cnty.</u>, 341 S.W.3d 919, 926-27 (Tex. 2011) (holding that hand-delivered notice satisfies a statute's notice requirement even when the statute's plain language requires notice by certified or registered mail); <u>First Nat'l Bank in Graham v. Sledge</u>, 653 S.W.2d 283, 287 (Tex. 1983) (holding "the method of delivery is immaterial" whenever "notice is actually received"); <u>Schepps v. Presbyterian Hosp. of Dallas</u>, 652 S.W.2d 934, 936 (Tex. 1983) ("Provisions [of a notice statute] which are not of the essence of the thing to be done, but which are included for the purpose of promoting the proper, orderly and prompt conduct of business, are not generally regarded as mandatory.").

18.  A notice statute calling for delivery by registered or certified mail can be satisfied by an alternative method of service. <u>Washington v. Related Arbor Court, LLC</u>, 357 S.W.3d 676, 681 (Tex. App.–Houston [14th Dist.] 2011, no pet.) ("[S]tatutory notice requirements may be satisfied by a method of service other than the prescribed statutory method when the recipient acknowledges receipt and therefore has the actual notice the statutory requirement is intended to guarantee."); <u>Goforth v. Bradshaw</u>, 296 S.W.3d 849, 851 (Tex. App.–Texarkana 2009, no pet.) (expert reports sent by regular mail within statutory deadline, which defendants acknowledged receiving, were timely served even though statute required the documents to be served through registered or certified mail); <u>Spiegel v. Strother</u>, 262 S.W.3d 481, 486 (Tex. App.–Beaumont 2008, no pet.) (holding the same when plaintiff sent an expert report by priority mail rather than registered or certified mail and the expert acknowledged timely receipt of the mailing); <u>Wesco Distrib., Inc. v. Westport Grp., Inc.</u>, 150 S.W.3d 553, 559 (Tex. App.–Austin 2004, no pet.) (holding that even

5

21

when a notice requirement "plays a critical role in achieving the purposes of [a] statute," "technical defects" in method of service are "excused by substantial compliance"); Netherland v. Wittner, 662 S.W.2d 786, 787 (Tex. App.–Houston [14ᵗʰ Dist.] 1983, writ ref'd n.r.e.) (holding proper notice was delivered despite registered-mail requirement when appellant admitted actual notice of trial setting by phone call and unregistered mail); Hill v. W.E. Brittain, Inc., 405 S.W.2d 803, 807 (Tex. Civ. App.–Fort Worth 1966, no writ) (holding variance in method of service was immaterial because service actually occurred).

19. E-mail notice of the award of the Special Commissioners to Copano and Ashcraft by the Matagorda County District Clerk on April 21, 2015, complied with Texas Property Code Section 21.049.

20. Texas Rule of Civil Procedure 21(f)(10) provides as follows: "(10) Electronic Notices From the Court. The clerk may send notices, orders, or other communications about the case to the party electronically. A court seal may be electronic."

Date: _____August 10_____, 2015

_____
DISTRICT JUDGE PRESIDING

Vernon's Texas Statutes and Codes Annotated
Property Code (Refs & Annos)
Title 4. Actions and Remedies
Chapter 21. Eminent Domain (Refs & Annos)
Subchapter B. Procedure (Refs & Annos)

V.T.C.A., Property Code § 21.018

§ 21.018. Appeal From Commissioners' Findings

Currentness

(a) A party to a condemnation proceeding may object to the findings of the special commissioners by filing a written statement of the objections and their grounds with the court that has jurisdiction of the proceeding. The statement must be filed on or before the first Monday following the 20th day after the day the commissioners file their findings with the court.

(b) If a party files an objection to the findings of the special commissioners, the court shall cite the adverse party and try the case in the same manner as other civil causes.

**Credits**

Acts 1983, 68th Leg., p. 3501 ch. 576, § 1, eff. Jan. 1, 1984.

V. T. C. A., Property Code § 21.018, TX PROPERTY § 21.018
Current through the end of the 2015 Regular Session of the 84th Legislature

**End of Document**                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Property Code (Refs & Annos)
    Title 4. Actions and Remedies
      Chapter 21. Eminent Domain (Refs & Annos)
        Subchapter C. Damages and Costs (Refs & Annos)

V.T.C.A., Property Code § 21.049

§ 21.049. Notice of Decision of Special Commissioners

Currentness

The judge of a court hearing a proceeding under this chapter shall inform the clerk of the court as to a decision by the special commissioners on the day the decision is filed or on the next working day after the day the decision is filed. Not later than the next working day after the day the decision is filed, the clerk shall send notice of the decision by certified or registered United States mail, return receipt requested, to the parties in the proceeding, or to their attorneys of record, at their addresses of record.

**Credits**
Added by Acts 1984, 68th Leg., 2nd C.S., ch. 18, § 1(d), eff. Oct. 2, 1984.

V. T. C. A., Property Code § 21.049, TX PROPERTY § 21.049
Current through the end of the 2015 Regular Session of the 84th Legislature

**End of Document**                                     © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
   Property Code (Refs & Annos)
      Title 4. Actions and Remedies
         Chapter 21. Eminent Domain (Refs & Annos)
            Subchapter D. Judgment

V.T.C.A., Property Code § 21.061

§ 21.061. Judgment on Commissioners' Findings

Currentness

If no party in a condemnation proceeding files timely objections to the findings of the special commissioners, the judge of the court that has jurisdiction of the proceeding shall adopt the commissioners' findings as the judgment of the court, record the judgment in the minutes of the court, and issue the process necessary to enforce the judgment.

**Credits**

Acts 1983, 68th Leg., p. 3507, ch. 576, § 1, eff. Jan. 1, 1984.

V. T. C. A., Property Code § 21.061, TX PROPERTY § 21.061

Current through the end of the 2015 Regular Session of the 84th Legislature

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.



HYPERLINKED MATERIAL

NO. _____

| | | |
|---|---|---|
| COPANO NGL SERVICES LLC, | § | IN THE DISTRICT COURT |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| | § | |
| vs. | § | |
| | § | OF MATAGORDA COUNTY, TEXAS |
| | § | |
| JOHN ASHCRAFT, INDIVIDUALLLY | § | |
| AND AS TRUSTEE OF THE JOHN | § | |
| ASHCRAFT FAMILY TRUST 2012, | § | Matagorda County - 23rd District Court |
| | § | |
| *Defendant.* | § | _____ JUDICIAL DISTRICT |

## ORDER APPOINTING SPECIAL COMMISSIONERS

BE IT REMEMBERED that on this day came to be heard Copano NGL Services LLC,

Plaintiff, who has filed this action with the District Clerk of Matagorda County, Texas, in order

to commence a condemnation proceeding to condemn certain property in the above-styled

proceeding. The Court being of the opinion that Special Commissioners should be appointed for

such proceeding, and it is further appearing that:

Name: Lindsey Thompson        Phone: (979) 323 - 8868

Name: Joe Crane        Phone: (979) 245 - 2043

Name: John Dickerson        Phone: (979) 245 - 0717

(the "Special Commissioners") are three disinterested real property owners who reside in

HOU:0027719 00001:1778330.1

**SCANNED**

Matagorda County, Texas, who are qualified to serve as Special Commissioners herein;

FURTHER, the Court being of the opinion that two alternates should be appointed for such proceeding, and it is further appearing that the following are two disinterested real property owners who reside in Matagorda County, Texas and who are qualified to serve as special commissioners hereby appoints the following as alternate Special Commissioners, who shall act as Special Commissioners in the event one or more of the foregoing Special Commissioners are struck or unable to serve:

Name: _Steven Heard_   Phone: _(979) 479-5501_

Name: _Lee Weathers_   Phone: _(979) 843-5969_

(the "Alternates"); and it is therefore

ORDERED, ADJUDGED AND DECREED that the said Special Commissioners herein above named be, and the same are hereby appointed, Special Commissioners (or one or more of the Alternates if need be) to promptly schedule a hearing at the earliest practical time following twenty (20) days after this appointment and assess damages occasioned by the condemnation of the property at issue in the above-styled proceeding.

SIGNED this _16_ day of _March_, 2015.

_____
JUDGE PRESIDING

FILED
at 10:5_ o'clock _A_ M.

MAR 16 2015

Jamie C. Bludau
Clerk of District Court, Matagorda Co., Texas
By_____ DEPUTY

HOU..0027719/00001:1778330v1

Filed 4/21/2015 4:43:12 PM
Jamie C. Bludau
District Clerk
Matagorda County, Texas
Stephanie Wurtz, Deputy

600 Travis, Suite 2800
Houston, Texas 77002
Telephone: 713-226-1200
Fax: 713-223-3717
www.lockelord.com

Ken McKay
Direct Telephone: 713-226-1127
Direct Fax: 713-229-2592
kmckay@lockelord.com

April 21, 2015

*VIA E-FILE*

Mary Peck Schubert
23rd District Clerk Office
Matagorda County, Texas
111 E. Locust, Room 404
Angleton, Texas 77515

Re: **Cause Number 15-H-0082, *Copano NGL Services LLC v. John Ashcraft, individually and as trustee for the John Ashcraft Family Trust, 2012,* in the 23rd Judicial District of Matagorda County, Texas.**

Dear Ms. Schubert:

Enclosed please find the following documents to be filed in the above-referenced matter:

- Award of Special Commissioners;

- Order on Accrued Costs and Possession Bonds

In accordance with Section 21.049 of the Texas Property Code, **please issue notice of the date of entry of the Award of Special Commissioners, including a file stamped copy of the award, to the parties and their attorneys of record within one (1) day of this filing. Please issue this notice either today or tomorrow as directed by Section 21.049.** Please do not wait for Copano NGL Services LLC to deposit the amount of the Special Commissioners' Award, or the possession bonds. For your convenience, a list containing the contact information for the parties and their attorneys of record is attached to Exhibit A to the Order on Accrued Costs and Possession Bonds.

Additionally, please transmit the enclosed Order on Accrued Costs and Possession Bonds to Judge Ben Hardin for his signature.

I have included an additional copy of these documents. Please file the originals in your customary manner, file stamp the copies and return them to the person delivering the documents.

Thank you for your time and attention to this matter, and please feel free to contact me if you have any questions or concerns.

Very truly yours,

Kenneth E. McKay

cc:    Daniel W. Shindler
2232 Ave G
Bay City, Texas 77414

John T. McDowell
Kacy J. Shindler
McDowell Wells, LLP
603 Avondale Street
Houston, Texas 77006

## NO. 15-H-0082

| | | |
|---|---|---|
| **COPANO NGL SERVICES LLC,** | § | **IN THE DISTRICT COURT OF** |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **vs.** | § | **MATAGORDA COUNTY, TEXAS** |
| | § | |
| **JOHN ASHCRAFT, INDIVIDUALLY** | § | |
| **AND AS TRUSTEE FOR THE JOHN** | § | |
| **ASHCRAFT FAMILY TRUST 2012,** | § | |
| | § | |
| *Defendant.* | § | **23rd JUDICIAL DISTRICT** |

## OBJECTION TO AWARD OF COMMISSIONERS

Copano NGL Services LLC, Plaintiff in this condemnation proceeding, objects to the award of the special commissioners appointed to assess the damages resulting from the condemnation described in the award on the following grounds:

The special commissioners failed to apply the correct measure of damages in determining adequate compensation, which resulted in an award in excess of fair market value of the property interests taken and the damages suffered by the remainder.

WHEREFORE, Plaintiff respectfully prays that the Court issue a citation for Defendant John Ashcraft, in his individual capacity and in his capacity as Trustee for the John Ashcraft Family Trust 2012, and try this case based upon the objections stated herein in the same manner as other civil causes and that upon trial and hearing, Plaintiff may be awarded all such relief to which it may show itself justly entitled, either at law or in equity.

HOU:0027719/00001:1788656v3

Respectfully submitted,

LOCKE LORD LLP

Kenneth E. McKay
State Bar No. 13690835
A. Antroy Arreola
State Bar No. 24006769
Harry Holmes Thompson
State Bar No. 24088527
2800 JPMorgan Chase Tower
600 Travis Street
Houston, Texas 77002
(713) 226-1200 (Telephone)
(713) 223-3717 (Facsimile)

**ATTORNEYS FOR COPANO NGL
SERVICES LLC**

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document has been served on the parties listed below via regular mail, certified mail, return receipt requested, e-mail, or facsimile on this 19th day of May, 2015.

John McDowell
McDowell Wells, LLP
603 Avondale Street
Houston, Texas 77006

Daniel W. Shindler
2232 Ave G
Bay City, Texas 77414

Kenneth E. McKay

-2-

HOU:0027719/00001:1788656v3



# Jamie C. Bludau
# District Clerk
Matagorda County, Texas
1700 7th St., Room 307
Bay City, Texas 77414-5092
(979) 244-7621

May 27, 2015

John Ashcraft
PO Box 1371
Van Vleck, TX 77482-1371

Re:    Cause Number 15-E-0082, Copano NGL Services LLC v. John Ashcraft:

Dear : John Ashcraft

Enclosed please find the following documents:

- Award of Special Commissioners

Jamie C. Bludau, District Clerk

cc:      Kenneth McKay
          2800 JP Morgan Chase Tower
          600 Travis Street
          Houston, TX 77022
          John T. McDowell
          603 Avondale Street
          Houston, TX 77006

Enclosures (1)

NO. 15-H-0082

| COPANO NGL SERVICES LLC, | § | IN THE DISTRICT COURT OF |
|---|---|---|
| Plaintiff, | § | |
| | § | |
| | § | |
| vs. | § | MATAGORDA COUNTY, TEXAS |
| | § | |
| | § | |
| JOHN ASHCRAFT, INDIVIDUALLY | § | |
| AND AS TRUSTEE FOR THE JOHN | § | |
| ASHCRAFT FAMILY TRUST 2012, | § | |
| | § | |
| Defendants. | § | 23RD JUDICIAL DISTRICT |

## DEFENDANTS' MOTION FOR ENTRY OF JUDGMENT

TO THE HONORABLE JUDGE OF SAID COURT:

COME NOW, John Ashcraft, Individually and as Trustee for the John Ashcraft Family Trust 2012, Defendants, and files this Motion for Entry of Judgment, respectfully showing unto the Court the following:

## I.   UNDERLYING FACTS

Plaintiff Copano NGL Services, LLC, filed its Original Petition on or about March 4, 2015. Copano allegedly seeks to construct a twenty-three (23) mile pipeline from near Markham, Texas, to Old Ocean, Texas, to transport natural gas liquids from the Eagle Ford Shale to purchasers and processors in Sweeny, Brazoria County, Texas.

On April 21, 2015, Defendants were awarded one million forty three thousand eight hundred and thirty dollars ($1,043,830.00) by the Special Commissioners. That same day, April 21, 2015, Plaintiff filed the Award of Special Commissioners with the Court pursuant to Section 21.049 of the Texas Property Code.

Plaintiff filed an objection to the Special Commissioners' Award on May 19, 2015.

## II.    ARGUMENT AND AUTHORITIES

Plaintiff's Objection is untimely; therefore Defendants are entitled to Judgment on the Special Commissioners' Award.  "If no party in a condemnation proceeding files timely objections to the findings of the special commissioners, the judge of the court that has jurisdiction of the proceeding shall adopt the commissioners' findings as the judgment of the court…" Tex. Property Code Sec. 21.061

The deadline to file an objection to a Special Commissioners' Award is "on or before the first Monday following the 20th day after the day the commissioners file their findings with the court." Tex. Property Code Sec. 21.018. The special commissioner's award was filed on April 21, 2015. Under section 21.018, the deadline to file an objection to the award was on or before May 18, 2015. Plaintiff did not file its objection until *after* May 18, 2015.

WHEREFORE, PREMISES CONSIDERED, Defendants, John Ashcraft, Individually and as Trustee for the John Ashcraft Family Trust 2012, respectfully requests that the Court adopt the commissioners' findings as the judgment of the Court, and for such other and further relief, both special and general, at law or in equity, as Defendants may be entitled to receive.

Respectfully submitted,

**McDowell Wells, LLP**

*/s/ Kacy Shindler*
John T. McDowell
SBN 13570850
jtm@houstontrialattorneys.com
Kacy J. Shindler
SBN 24088407
ks@houstontrialattorneys.com
603 Avondale Street
Houston, Texas 77006
Telephone: (713) 655-9595
Facsimile: (713) 655-7868

**PAUL WEBB, P.C.**
Vincent L. Marable III
State Bar No. 12961600
221 N. Houston
Wharton, Texas 77488
Telephone: (979) 532-5331
Facsimile: (979) 532-2902


Danny Shindler
SBN: 18266200
dwshindler@sbcglobal.net
2232 Avenue G
Bay City, TX 77414
Telephone: 979-245-4666
Facsimile: 979-244-5342

**ATTORNEYS FOR DEFENDANTS**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served on all counsel of record in compliance with the Texas Rules of Civil Procedure, this **9th** day of **June, 2015**.

Kenneth E. McKay                                              ***Via Email and Facsimile***
Locke Lord LLP
2800 JPMorgan Chase Tower, 600 Travis
Houston, TX 77002
kmckay@lockelord.com
Direct Fax: 713-229-2592

*/s/ Kacy Shindler*
Kacy Shindler

443 S.W.3d 154
Court of Appeals of Texas,
Corpus Christi–Edinburg.

Paul BLACK, et al., Appellants,

v.

Toby SHOR and Seashore Investments
Management Trust, Appellees.

No. 13–11–00413–CV.  |  April 18,
2013.  |  Rehearing Overruled May 24, 2013.

**Synopsis**
**Background:** Investment firm and affiliated business entities filed motion to confirm arbitration award of $31 million on claims for breach of contract and fraud against joint owner and manager of various companies and properties in which firm and entities had invested. The County Court at Law No. 3, Nueces County, John Martinez, J., granted motion. Joint owner appealed.

**Holdings:** The Court of Appeals, Benavides, J., held that:

[1] owner successfully preserved other grounds for vacatur that were not included in the timely motion to vacate;

[2] that firm had transferred its partnership interests to another business entity during pendency of arbitration did not render arbitration panel without authority to issue award to the then existing entities;

[3] trial court was under no obligation to prepare findings of fact or conclusions of law for the sake of confirming an arbitration award;

[4] public policy underlying the recognition of a partner's ability to terminate a partnership was not so fundamental or compelling as to provide grounds to vacate arbitration award;

[5] any error in awarding firm duplicative tort and contract recovery did not demonstrate manifest disregard of the law or gross mistake as was necessary to vacate arbitration award; and

[6] firm partner was entitled to attorney fee award even though the firm as a business entity was named party.

Affirmed.

West Headnotes (29)

**[1]** **Alternative Dispute Resolution**
 Arbitration favored;  public policy

**Alternative Dispute Resolution**
 Scope and Standards of Review

25T  Alternative Dispute Resolution
25TII  Arbitration
25TII(A)  Nature and Form of Proceeding
25Tk113  Arbitration favored;  public policy
25T  Alternative Dispute Resolution
25TII  Arbitration
25TII(H)  Review, Conclusiveness, and Enforcement of Award
25Tk366  Appeal or Other Proceedings for Review
25Tk374  Scope and Standards of Review
25Tk374(1)  In general
Arbitration is strongly favored and judicial review of an arbitration award is extraordinarily narrow.

1 Cases that cite this headnote

**[2]** **Alternative Dispute Resolution**
 Appeal or Other Proceedings for Review

25T  Alternative Dispute Resolution
25TII  Arbitration
25TII(H)  Review, Conclusiveness, and Enforcement of Award
25Tk366  Appeal or Other Proceedings for Review
25Tk367  In general
Subjecting arbitration awards to judicial review adds expense and delay, thereby diminishing the benefits of arbitration as an efficient, economical system for resolving disputes.

Cases that cite this headnote

**[3]** **Alternative Dispute Resolution**
 Presumptions and Burden of Proof

**Alternative Dispute Resolution**

🔑 Construction and operation in general

25T   Alternative Dispute Resolution
25TII   Arbitration
25TII(G)   Award
25Tk337   Presumptions and Burden of Proof
25Tk338   In general
25T   Alternative Dispute Resolution
25TII   Arbitration
25TII(H)   Review, Conclusiveness, and Enforcement of Award
25Tk379   Construction and operation in general

An arbitration award is given the same effect as a judgment of last resort and all reasonable presumptions are indulged in favor of the award and none against it.

1 Cases that cite this headnote

**[4]**   **Alternative Dispute Resolution**
🔑 Scope and Standards of Review

25T   Alternative Dispute Resolution
25TII   Arbitration
25TII(H)   Review, Conclusiveness, and Enforcement of Award
25Tk366   Appeal or Other Proceedings for Review
25Tk374   Scope and Standards of Review
25Tk374(1)   In general

The appellate court reviews a trial court's decision to vacate or confirm an arbitration award de novo, and the appellate court reviews the entire record.

1 Cases that cite this headnote

**[5]**   **Alternative Dispute Resolution**
🔑 Scope and Standards of Review

25T   Alternative Dispute Resolution
25TII   Arbitration
25TII(H)   Review, Conclusiveness, and Enforcement of Award
25Tk366   Appeal or Other Proceedings for Review
25Tk374   Scope and Standards of Review
25Tk374(1)   In general

Although the appellate court reviews de novo a trial court's judgment confirming an arbitration award, it gives strong deference to the arbitrator with respect to issues properly left to the arbitrator's resolution.

2 Cases that cite this headnote

**[6]**   **Alternative Dispute Resolution**
🔑 Scope and Standards of Review

25T   Alternative Dispute Resolution
25TII   Arbitration
25TII(H)   Review, Conclusiveness, and Enforcement of Award
25Tk366   Appeal or Other Proceedings for Review
25Tk374   Scope and Standards of Review
25Tk374(1)   In general

Review of a trial court's judgment confirming an arbitration award focuses on the integrity of the process, not the propriety of the result.

1 Cases that cite this headnote

**[7]**   **Alternative Dispute Resolution**
🔑 Harmless error

25T   Alternative Dispute Resolution
25TII   Arbitration
25TII(H)   Review, Conclusiveness, and Enforcement of Award
25Tk366   Appeal or Other Proceedings for Review
25Tk374   Scope and Standards of Review
25Tk374(8)   Harmless error

While judicial review to determine whether an arbitrator correctly applied the law to the facts is generally limited, the parties, by their contract, may agree to allow for judicial review of an arbitration award for reversible error.

Cases that cite this headnote

**[8]**   **Alternative Dispute Resolution**
🔑 Presentation and reservation of grounds of review

25T   Alternative Dispute Resolution
25TII   Arbitration
25TII(H)   Review, Conclusiveness, and Enforcement of Award
25Tk366   Appeal or Other Proceedings for Review
25Tk371   Presentation and reservation of grounds of review

Joint owner and manager of companies and properties who filed a timely motion to vacate

$31-million arbitration award within 90-day limitations period following issuance of award successfully preserved other grounds for vacatur that were not included in the timely motion to vacate; while the Arbitration Act (TAA) provided a clear 90-day limitations period within which to file the motion to vacate an arbitration award, there was no concomitant requirement for the motion to vacate to include all grounds that would be raised for vacatur prior to trial court's ruling on the motion. V.T.C.A., Civil Practice & Remedies Code § 171.088(b).

1 Cases that cite this headnote

**[9]** **Alternative Dispute Resolution**
 Time for proceeding

25T Alternative Dispute Resolution
25TII Arbitration
25TII(H) Review, Conclusiveness, and Enforcement of Award
25Tk360 Impeachment or Vacation
25Tk363 Motion to Set Aside or Vacate
25Tk363(4) Time for proceeding

Based on the plain language of the Arbitration Act (TAA), the Legislature intended the 90-day period in which a party must move to vacate an award to be a limitations period after which a party cannot ask a court to vacate an arbitration award. V.T.C.A., Civil Practice & Remedies Code § 171.088.

1 Cases that cite this headnote

**[10]** **Alternative Dispute Resolution**
 Presentation and reservation of grounds of review

25T Alternative Dispute Resolution
25TII Arbitration
25TII(H) Review, Conclusiveness, and Enforcement of Award
25Tk366 Appeal or Other Proceedings for Review
25Tk371 Presentation and reservation of grounds of review

A party seeking to vacate an arbitration award must present any grounds for doing so to the trial court, otherwise, those complaints are waived on appeal. Rules App.Proc., Rule 33.1.

2 Cases that cite this headnote

**[11]** **Alternative Dispute Resolution**
 Time for proceeding

25T Alternative Dispute Resolution
25TII Arbitration
25TII(H) Review, Conclusiveness, and Enforcement of Award
25Tk360 Impeachment or Vacation
25Tk363 Motion to Set Aside or Vacate
25Tk363(4) Time for proceeding

Filing a motion to vacate an arbitration award after confirmation of the award constitutes waiver.

Cases that cite this headnote

**[12]** **Alternative Dispute Resolution**
 Nature and Extent of Authority

25T Alternative Dispute Resolution
25TII Arbitration
25TII(E) Arbitrators
25Tk228 Nature and Extent of Authority
25Tk229 In general

That investment firm had transferred its partnership interests to another business entity during pendency of arbitration proceedings did not render arbitration panel without authority to issue award to the then existing entities, in action for breach of contract and fraud against joint owner and manager of various companies and properties in which firm and entities had invested; the arbitration agreement was written in manner as to encompass affiliated entities and both sides to the dispute stipulated that all parties were properly before the arbitration panel and that all claims would be definitively resolved by the arbitrators based on the stipulation between the parties.

Cases that cite this headnote

**[13]** **Alternative Dispute Resolution**
 Agreement or submission as determinative

25T Alternative Dispute Resolution
25TII Arbitration
25TII(E) Arbitrators
25Tk228 Nature and Extent of Authority

**25Tk230** Agreement or submission as determinative

The authority of arbitrators is derived from the arbitration agreement and is limited to a decision of the matters submitted therein either expressly or by necessary implication.

Cases that cite this headnote

**[14]** **Alternative Dispute Resolution**
🔑 Proceedings

**25T** Alternative Dispute Resolution
**25TII** Arbitration
**25TII(H)** Review, Conclusiveness, and Enforcement of Award
**25Tk353** Confirmation or Acceptance by Court
**25Tk357** Proceedings

Trial court was under no obligation to prepare findings of fact or conclusions of law for the sake of confirming an arbitration award in proceedings in which no evidence was adduced by the parties at the hearing on the motion to confirm the arbitration award; trial court did not make determinations of fact based on conflicting evidence, as that function had been subsumed in the arbitration process by the arbitrators. Vernon's Ann.Texas Rules Civ.Proc., Rules 296, 297.

Cases that cite this headnote

**[15]** **Trial**
🔑 Necessity for request

**Trial**
🔑 Form and requisites of request

**388** Trial
**388X** Trial by Court
**388X(B)** Findings of Fact and Conclusions of Law
**388k392** Requests for Findings
**388k392(1)** Necessity for request
**388** Trial
**388X** Trial by Court
**388X(B)** Findings of Fact and Conclusions of Law
**388k392** Requests for Findings
**388k392(3)** Form and requisites of request

The term "tried," as used in rule requiring trial courts, when properly requested, to prepare findings of fact in cases "tried" in the district court or county court without a jury, includes the disposition of a case rendered after an evidentiary hearing before the trial court upon conflicting evidence. Vernon's Ann.Texas Rules Civ.Proc., Rule 296.

Cases that cite this headnote

**[16]** **Trial**
🔑 Duty to Make in General

**388** Trial
**388X** Trial by Court
**388X(B)** Findings of Fact and Conclusions of Law
**388k388** Duty to Make in General
**388k388(1)** In general

When a judgment is rendered as a matter of law, findings and conclusions have no purpose and should not be requested or considered on appeal.

Cases that cite this headnote

**[17]** **Trial**
🔑 Duty to Make in General

**388** Trial
**388X** Trial by Court
**388X(B)** Findings of Fact and Conclusions of Law
**388k388** Duty to Make in General
**388k388(1)** In general

Even when the trial court receives evidence, findings and conclusions are only appropriate if the trial court is called upon to determine questions of fact upon conflicting evidence. Vernon's Ann.Texas Rules Civ.Proc., Rules 296, 297.

Cases that cite this headnote

**[18]** **Trial**
🔑 Necessity for request

**Trial**
🔑 Form and requisites of request

**388** Trial
**388X** Trial by Court
**388X(B)** Findings of Fact and Conclusions of Law
**388k392** Requests for Findings
**388k392(1)** Necessity for request

388   Trial

388X   Trial by Court

388X(B)   Findings of Fact and Conclusions of
Law

388k392   Requests for Findings

388k392(3)   Form and requisites of request

Rules requiring trial courts, when properly requested, to prepare findings of fact in cases tried in the district court or county court without a jury do not impose any duty on the trial court to file findings and conclusions when there has been no trial; thus, when there has been no determination of questions of fact based on conflicting evidence, there is no error in the trial court's failure to file findings and conclusions. Vernon's Ann.Texas Rules Civ.Proc., Rules 296, 297.

Cases that cite this headnote

[19]   **Alternative Dispute Resolution**
        Conformity to public policy

25T   Alternative Dispute Resolution

25TII   Arbitration

25TII(G)   Award

25Tk312   Conformity to public policy

Public policy underlying the recognition of a partner's ability to terminate a partnership was not so fundamental or compelling as to provide grounds to vacate arbitration award, in dispute between investment firm and joint owner and manager of various companies and properties in which firm and entities had invested; joint owner's arguments that his companies and properties were entitled to termination of the partnership were disputed by firm and the issue was submitted to the arbitrators, and, even if the arbitrators were wrong, a mere error, if any, did not necessarily implicate a violation of public policy.

Cases that cite this headnote

[20]   **Alternative Dispute Resolution**
        Conformity to public policy

25T   Alternative Dispute Resolution

25TII   Arbitration

25TII(G)   Award

25Tk312   Conformity to public policy

To support vacatur of an arbitration award, a public policy concern must be well defined and dominant and not derived from general considerations of supposed public interests.

Cases that cite this headnote

[21]   **Alternative Dispute Resolution**
        Mistake or Error

        **Alternative Dispute Resolution**
        Error of judgment or mistake of law

25T   Alternative Dispute Resolution

25TII   Arbitration

25TII(G)   Award

25Tk327   Mistake or Error

25Tk328   In general

25T   Alternative Dispute Resolution

25TII   Arbitration

25TII(G)   Award

25Tk327   Mistake or Error

25Tk329   Error of judgment or mistake of law

Any error in awarding investment firm duplicative tort and contract recovery did not demonstrate manifest disregard of the law or gross mistake as was necessary to vacate arbitration award; the arbitration panel gave serious consideration to the parties' contentions, evidence, and arguments, and nothing in the record suggested the panel made its decision in bad faith or that it failed to exercise honest judgment.

1 Cases that cite this headnote

[22]   **Alternative Dispute Resolution**
        Error of judgment or mistake of law

25T   Alternative Dispute Resolution

25TII   Arbitration

25TII(G)   Award

25Tk327   Mistake or Error

25Tk329   Error of judgment or mistake of law

Manifest disregard of the law of the sort necessary to vacate an arbitration award is a very narrow standard of review; it is more than error or misunderstanding of the law, but is instead an error that must be obvious and capable of being readily and instantly perceived by the average person qualified to serve as an arbitrator.

Cases that cite this headnote

**[23]** **Alternative Dispute Resolution**
  ⚷ Error of judgment or mistake of law

25T   Alternative Dispute Resolution
25TII   Arbitration
25TII(G)   Award
25Tk327   Mistake or Error
25Tk329   Error of judgment or mistake of law

Manifest disregard of the law of the sort necessary to vacate an arbitration award is established upon showing that the arbitrator recognized a clearly governing principle and ignored it; in other words, the issue is not whether the arbitrator correctly interpreted the law, but whether the arbitrator, knowing the law and recognizing that the law required a particular result, simply disregarded the law.

Cases that cite this headnote

**[24]** **Alternative Dispute Resolution**
  ⚷ Presumptions

25T   Alternative Dispute Resolution
25TII   Arbitration
25TII(H)   Review, Conclusiveness, and Enforcement of Award
25Tk366   Appeal or Other Proceedings for Review
25Tk374   Scope and Standards of Review
25Tk374(5)   Presumptions

It is appellants' burden to demonstrate the arbitrator manifestly disregarded the law.

Cases that cite this headnote

**[25]** **Alternative Dispute Resolution**
  ⚷ Mistake or Error

25T   Alternative Dispute Resolution
25TII   Arbitration
25TII(G)   Award
25Tk327   Mistake or Error
25Tk328   In general

"Gross mistake" is conceptually analogous to manifest disregard of the law, for purposes of challenging an arbitration award; it is a mistake that implies bad faith or a failure to exercise

honest judgment and results in a decision that is arbitrary and capricious.

1 Cases that cite this headnote

**[26]** **Alternative Dispute Resolution**
  ⚷ Consistency and reasonableness; lack of evidence

25T   Alternative Dispute Resolution
25TII   Arbitration
25TII(G)   Award
25Tk324   Consistency and reasonableness; lack of evidence

A judgment rendered after honest consideration given to conflicting claims, no matter how erroneous, is not arbitrary and capricious for purposes of challenging arbitration award.

Cases that cite this headnote

**[27]** **Alternative Dispute Resolution**
  ⚷ Mistake or Error

**Alternative Dispute Resolution**
  ⚷ Error of judgment or mistake of law

25T   Alternative Dispute Resolution
25TII   Arbitration
25TII(G)   Award
25Tk327   Mistake or Error
25Tk328   In general
25T   Alternative Dispute Resolution
25TII   Arbitration
25TII(G)   Award
25Tk327   Mistake or Error
25Tk329   Error of judgment or mistake of law

The doctrines of manifest disregard of the law and gross mistake do not extend to mere mistakes of fact or law; judicial review of an arbitration award is so limited that even a mistake of fact or law by the arbitrator in the application of substantive law is not a proper ground for vacating an award.

1 Cases that cite this headnote

**[28]** **Alternative Dispute Resolution**
  ⚷ Mistake or Error

25T   Alternative Dispute Resolution
25TII   Arbitration
25TII(G)   Award

25Tk327 Mistake or Error

25Tk328 In general

The trial court should not overturn an arbitration award rendered after honest consideration given to claims and defenses presented to it, no matter how erroneous.

Cases that cite this headnote

**[29] Alternative Dispute Resolution**

 Costs

25T Alternative Dispute Resolution

25TII Arbitration

25TII(F) Arbitration Proceedings

25Tk269 Costs

Individual investment firm partner was entitled to attorney fee award even though the firm as a business entity was named party, in arbitration dispute between firm and companies in which firm had invested; arbitration agreement was written in manner as to encompass affiliated parties and entities and both sides to the dispute stipulated that all parties were properly before the arbitration panel, and, by statute, parties could seek recovery for attorney fees in claims for breach of an oral or written contract. V.T.C.A., Bus. & C. § 27.01.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*158** Kevin W. Grillo, Pena & Grillo, PLLC, Corpus Christi, Alan B. Daughtry, Doyle Raizner LLP, Houston, Ben C. Broocks, Austin, for Appellants.

Jean C. Frizzell, John S. Black, Billy Berryhill, Reynolds, Frizzell, Black, Houston, Ron Barroso, Corpus Christi, Richard D. Daly, Houston, Robin C. Gibbs, Jeff Cotner, Houston, for Appellees.

Before Justices GARZA, BENAVIDES and PERKES.

**OPINION**

Opinion by Justice BENAVIDES.

Appellants, Paul Black, PBF Investments, Ltd., BNP Holdings, Ltd., BNP Commercial Properties, Ltd., Pagenergy Company, LLC, TSE Equities I LLC, TSE Equities Company, Ltd., BNP Management LLC, and 500 Water Street Property LLC, appeal from the judgment of the trial court affirming an arbitration award rendered against them and in favor of Seashore Investments Management Trust ("Seashore") through its trustee, Toby Shor (collectively "appellees"). We affirm. [1]

[1] By separate opinion issued this same date, the Court vacated in part, and reversed and remanded in part, three post-judgment turnover orders issued on the judgment subject to appeal herein. *See Black v. Shor.,* Nos. 13–11–00570–CV & 13–11–00715–CV, 2013 Tex.App. LEXIS —— (Tex.App.-Corpus Christi Apr. 18, 2013, no pet. h.).

**I. BACKGROUND**

Seashore was created in 2001 for the purpose of investing in various oil and gas and commercial property companies owned and managed by Paul Black. Kenton McDonald was the original trustee for Seashore. Seashore and Black entered into several agreements pertaining to the terms of the investment, including an Agreement Regarding Termination of **\*159** Joint Ownership, a Restructure Agreement, and an Indemnity Agreement. Through the trust, Shor, the grantor for Seashore, made substantial investments in the Black group of companies. In 2007, Shor succeeded McDonald as trustee of Seashore and began investigating the financial relationships of the companies.

After concluding that appellants had committed misfeasance with regard to Seashore's investments, Shor brought suit against appellants for injunctive relief and pre-arbitration discovery in Nueces County Court at Law Number One. Shor alleged that the agreements between the parties provided for arbitration and that the assets and records of the jointly owned companies had to be preserved to protect the right to a meaningful arbitration. The trial court appointed a special master to assist in the pre-arbitration process. In response to the allegations against them, appellants sought sanctions against Shor, sent Seashore a "termination notice" seeking to dissolve their relationship with it, and participated in a mediation led by the court-appointed special master. Subsequently, appellants filed a separate lawsuit against Seashore in County Court at Law Number Three for an alleged breach of the Agreement Regarding Termination.

Under the terms of the arbitration agreements between the parties, these matters were ultimately submitted to arbitration before a panel of three arbitrators in accordance with the Commercial Arbitration Rules of the American Arbitration Association. After months of pre-arbitration discovery and motions practice, the arbitration hearing was held from June 2, 2010 to June 15, 2010. In its detailed, ten-page award, the arbitration panel awarded Seashore "substantial relief" and denied the Black parties' claims "in their entirety." Specifically, the panel concluded that Black "intentionally and over a lengthy period of years, extracted millions of dollars from the jointly-owned entities for his own personal use and benefit." The panel awarded Seashore approximately $31,000,000 for its claims for breach of contract, breach of fiduciary duty, and fraud. The award states, in part:

> In 2001, Seashore invested in a group of companies run by Paul Black and PBF Investments, Limited ("PBF") consisting mainly of limited partnerships in the real estate and oil and gas businesses, with Paul Black directly or indirectly holding majority interests in and controlling the general partners, and Seashore holding minority and limited partnership interests.... Paul Black, BNP Management, LC, Pagenergy Company, LLC and other Paul Black-owned or controlled entities stood in a fiduciary relationship to Seashore.

> The evidence presented at the Arbitration Hearing clearly and convincingly established that Paul Black treated the entities jointly-owned with Seashore as his own without regard for Seashore's rights and interests. In particular, the evidence established that Paul Black, intentionally and over a lengthy period of years, extracted millions of dollars from the jointly-owned entities for his own personal use and benefit. Paul Black transferred substantial sums of money to companies wholly owned by himself. He used company credit cards of the jointly-owned entities to pay personal expenses, and instructed company employees to transfer funds from the business as necessary to prevent his personal checking account to be overdrawn. He made other improper transfers. He continued to make transfers for his own benefit even after some of his improper transfers and expenditures were discovered and he had signed a written agreement expressly prohibiting such transfers in the future. Mr. Black continued **\*160** to make such transfers even when the entities lacked funds to pay their own creditors and obligations. As a fiduciary, Mr. Black had the burden to establish the fairness of all such transactions; based on the evidence presented at

the Arbitration hearing, he failed to do so. Mr. Black's claims of implicit permission from Seashore and/or its trustee to engage in such self-dealings were contradicted by the evidence presented and belied by the written agreements between the Parties. The preponderance of the credible evidence established that Mr. Black, individually, and through PBF and the entities he controlled, violated fiduciary and other duties owed to Seashore and breached the agreements with Seashore. [Appellants], on the other hand, failed to establish entitlement to any of the relief they sought.

> For these reasons, as discussed in greater detail below, we award [appellees] substantial relief on their claims asserted herein and deny [appellants'] claims in their entirety.

The award further details, inter alia, that appellants failed to make payments to appellees under promissory notes and guarantees; breached fiduciary duties to appellees "by wrongly taking and permitting or effecting excessive distributions from the jointly-owned entities [and] making improper transfers and misusing company funds;" "engaged in fraud and fraudulently induced Seashore to make an initial and subsequent investments in the jointly-owned entities" through promissory notes and other agreements; and "hid or attempted to hide transfers to benefit Mr. Black." The arbitration panel also concluded that the "type of misconduct proven in this case is precisely the sort of misbehavior Texas law seeks to deter by permitting awards of exemplary damages in appropriate cases" and awarded $5 million in punitive damages based on "a persisted pattern of willful, intentional, malicious conduct and grossly negligent conduct on the part of Mr. Black toward Seashore over an extended period of time," for which the panel concluded that Mr. Black was "personally liable."

In County Court at Law Number One, Seashore moved to confirm the arbitration award, whereas appellants moved to vacate the award in County Court at Law Number Three. These cases were ultimately consolidated. The arbitration award was affirmed by judgment rendered by County Court at Law Number Three on April 6, 2011. This appeal ensued.

Appellants raise six issues on appeal: (1) the judgment and arbitration award should be vacated and set aside because the award is made to Seashore, which is not a legal entity, and the time for correcting the award has passed; (2) the judgment should be reversed because after modifying the award and the judgment, the trial court failed to issue findings of fact and conclusions of law to find a clerical error and

that judge is no longer on the bench, precluding supplemental findings now; (3) the award on the "so-called" tort claims, which are related to the partnership interests, should be reversed and rendered because Seashore had transferred its partnership interest to the Toby Shor 2004 Grantor Retained Annuity Trust ("Toby Shor 2004 GRAT"), which was not a party to the arbitration; (4) the judgment and award should be set aside and remanded to a different arbitration panel because the panel failed to give effect to the termination of the partnership, and the allocation of liabilities and offsets in a termination requires a new arbitration proceeding; (5) the judgment and award should be reformed to eliminate duplicative tort and contract recovery, including amounts that were awarded for appellants' breach of the promissory notes underlying **\*161** the transactions between appellants and appellees, or alternatively, reject any tort recovery outright for appellants' failure to pay the promissory notes; and (6) the award of attorney's fees to Shor should be reversed and rendered because she was not a prevailing party and there is no other basis for awarding her fees.[2]

[2] Black filed a post-submission brief in this case on March 19, 2013, almost six weeks after oral argument in this cause. Appellees have filed a motion to strike the post-submission brief, or, in the alternative only, grant them leave to file a responsive brief. Black filed a response to the motion to strike his post-submission brief. Appellees contend that the post-submission brief should be struck because: Black did not seek leave of Court to file the brief; it is a "blatant attempt to re-argue the entire case;" it is untimely; it includes materials outside the appellate record; and it raises arguments and cites authorities that were not contained in appellants' original briefing. We may permit a party to amend or supplement a brief "whenever justice requires." TEX.R.APP. P. 38.7; *see also Standard Fruit & Vegetable Co., Inc. v. Johnson,* 985 S.W.2d 62, 65 (Tex.1998) (appellate court has discretion whether to allow filing of amended or supplemental brief in interest of justice). However, new or additional issues raised in a reply brief or post-submission brief are untimely and will not be considered absent express permission from the appellate court allowing the new or additional issues. *See Garrett v. State,* 220 S.W.3d 926, 928–29 (Tex.Crim.App.2007); *Collin Cnty. v. Hixon Family P'ship, Ltd.,* 365 S.W.3d 860, 877 (Tex.App.-Dallas 2012, pet. denied); *Rogers v. City of Fort Worth,* 89 S.W.3d 265, 284 (Tex.App.-Fort Worth 2002, no pet.); *Haynes v. McIntosh,* 776 S.W.2d 784, 788 (Tex.App.-Corpus Christi 1989, writ denied). Moreover, we do not consider attachments to briefs that were not part of the trial court record and are not formally included in the appellate record. *Guajardo v. Conwell,* 46 S.W.3d 862, 864 (Tex.2001); *In re Guardianship of Winn,* 372 S.W.3d 291, 297 (Tex.App.-Dallas 2012, no pet.); *Paselk v. Rabun,* 293 S.W.3d 600, 612 n. 12 (Tex.App.-Texarkana 2009, pet. denied); *WorldPeace v. Comm'n for Lawyer Discipline,* 183 S.W.3d 451, 465 n. 23 (Tex.App.-Houston [14th Dist.] 2005, pet. denied). After due consideration of the foregoing law and the length of time that this appeal has been pending, we allow the filing of Black's post-submission brief, but limit our consideration of that brief to those issues previously raised in the original briefs and the documents properly presented in the appellate record. Thus, appellees' motion to strike is granted in part, and denied in part. The motion is GRANTED insofar as our consideration of the post-submission brief is circumscribed as described herein and DENIED as to all other relief sought.

## II. STANDARD OF REVIEW

**[1] [2] [3] [4] [5] [6]** Arbitration is strongly favored by Texas law, and judicial review of an arbitration award is extraordinarily narrow. *See E. Tex. Salt Water Disposal Co., Inc. v. Werline,* 307 S.W.3d 267, 271 (Tex.2010) (citing *Prudential Sec. Inc. v. Marshall,* 909 S.W.2d 896, 898 (Tex.1995); *CVN Group, Inc. v. Delgado,* 95 S.W.3d 234, 238 (Tex.2002)); *see also In re Guardianship of Cantu de Villarreal,* 330 S.W.3d 11, 17 (Tex.App.-Corpus Christi 2010, no pet.). "Subjecting arbitration awards to judicial review adds expense and delay, thereby diminishing the benefits of arbitration as an efficient, economical system for resolving disputes." *CVN Group, Inc.,* 95 S.W.3d at 238. An arbitration award is given the same effect as a judgment of last resort and all reasonable presumptions are indulged in favor of the award and none against it. *Id.* Accordingly, we review a trial court's decision to vacate or confirm an arbitration award de novo, and we review the entire record. *Xtria L.L.C. v. Int'l Ins. Alliance Inc.,* 286 S.W.3d 583, 591 (Tex.App.-Texarkana 2009, pet. denied); *In re Guardianship of Cantu de Villarreal,* 330 S.W.3d at 17; *see Centex/Vestal v. Friendship W. Baptist Church,* 314 S.W.3d 677, 683 (Tex.App.-Dallas 2010, pet. denied); **\*162** *GJR Mgmt. Holdings, L.P. v. Jack Raus, Ltd.,* 126 S.W.3d 257, 262 (Tex.App.-San Antonio 2003, pet. denied). Although we review de novo a trial court's judgment confirming an arbitration award, we give "strong deference to the arbitrator with respect to issues properly left to the arbitrator's resolution." *Xtria L.L.C.,* 286 S.W.3d at 591; *see Centex/Vestal,* 314 S.W.3d at 683. Our review focuses on the integrity of the process, not the propriety of the result. *Ancor Holdings, LLC v. Peterson, Goldman & Villani, Inc.,* 294

S.W.3d 818, 826 (Tex.App.-Dallas 2009, no pet.); *Women's Reg'l Healthcare, P.A. v. FemPartners of N. Tex., Inc.,* 175 S.W.3d 365, 367–68 (Tex.App.-Houston [1st Dist.] 2005, no pet.).

 **[7]**  While judicial review to determine whether an arbitrator correctly applied the law to the facts is generally limited under the Texas Arbitration Act, the parties, by their contract, may agree to allow for judicial review of an arbitration award for reversible error. *See Nafta Traders, Inc. v. Quinn,* 339 S.W.3d 84, 97 (Tex.2011). In this case, the parties' agreements do not contain any provisions allowing for an expanded judicial review of the arbitrator's decision, so our review is limited to determining whether the matters the arbitrator decided were within the scope of the parties' agreements to arbitrate. *See id.*

## III. TEXAS ARBITRATION ACT OR FEDERAL ARBITRATION ACT

In the arbitration clauses that engendered these proceedings, the parties did not specify whether the Federal Arbitration Act ("FAA") or the Texas Arbitration Act ("TAA") applies. *See* 9 U.S.C. §§ 1–16 (West 2009) (FAA); TEX. CIV. PRAC. & REM.CODE ANN. §§ 171.001–.098 (West 2011) (TAA). Although similar, the two arbitration schemes are not identical with regard to the review of arbitration awards. *See Ewing v. Act Catastrophe–Tex. L.C.,* 375 S.W.3d 545, 549 (Tex.App.-Houston [14th Dist.] 2012, pet. denied). *Compare* 9 U.S.C. §§ 10, 11, *and Hall Street Assocs., L.L.C. v. Mattel, Inc.,* 552 U.S. 576, 578, 128 S.Ct. 1396, 170 L.Ed.2d 254 (2008) (holding that grounds stated in the FAA for vacating or modifying an arbitration award are exclusive), *with* TEX. CIV. PRAC. & REM.CODE ANN. §§ 171.088, 171.091, *and E. Tex. Salt Water Disposal Co., Inc.,* 307 S.W.3d at 282 n. 7 (noting that court of appeals held that the arbitration award could be set aside under common law for fraud, misconduct, or gross mistake, but "express[ing] no opinion on this issue"), *and Callahan & Assocs. v. Orangefield Indep. Sch. Dist.,* 92 S.W.3d 841, 844 (Tex.2002) ("assuming without deciding" that a party could attack an arbitration award on the common law ground of gross mistake, but concluding that the failure to award any damages did not constitute gross mistake).

On appeal, because the parties have not taken a position on this issue, but have instead variously referred to different sections of the TAA, we will apply the TAA to this case. Under the Texas arbitration scheme, section 171.088(a) of the Texas Civil Practice and Remedies Code provides the following statutory grounds for which a trial court "shall" vacate an arbitration award:

> (1) the award was obtained by corruption, fraud, or other undue means;
>
> (2) the rights of the party were prejudiced by:
>
>> (A) evident partiality by an arbitrator appointed as a neutral arbitrator;
>>
>> (B) corruption in an arbitrator; or
>>
>> (C) misconduct or willful misbehavior of an arbitrator;
>
> (3) the arbitrator:
>
>> (A) exceeded his powers;
>>
>> (B) refused to postpone the hearing after a showing of sufficient cause for the postponement;
>>
>> **\*163**  (C) refused to hear evidence material to the controversy;
>>
>> (D) conducted the hearing, contrary to sections 171.044–.047 of the civil practice and remedies code, in a manner that substantially prejudiced the rights of a party; or
>
> (4) there was no agreement to arbitrate, the issue was not adversely determined in a proceeding under [statutes to compel arbitrations], and the party did not participate in the arbitration hearing without raising the objection.

*See* TEX. CIV. PRAC. & REM.CODE ANN. § 171.088(a) (West 2011).

## IV. PRESERVATION OF ERROR

 **[8]**  We first address appellees' contention that "none of the issues on appeal were adequately preserved." According to appellees, appellants failed to timely file a motion to vacate the arbitration award on any of the grounds raised in this appeal. Appellees contend section 171.088(b) of the Texas Civil Practice and Remedies Code required appellants to file a motion to vacate within 90 days of receiving the award. *See id.* § 171.088(b) (West 2011). Given that appellants received notice of the award on August 18, 2010, appellants timely filed such a motion on November 16, 2010; however, that motion identified only one ground for vacating the award:

that the panel exceeded its authority by deciding an issue regarding a subordination agreement involving entities who were not parties to the arbitration agreements. Appellants did not raise other rationales for vacatur of the award until after 90 days had passed when, on November 24, 2010, they filed their motion for a take-nothing judgment, and on May 5, 2011, when they filed a motion for new trial. Appellees essentially contend that appellants were required to expressly raise all grounds for vacatur within the 90–day period allotted for filing a motion to vacate.

 [9]  The TAA provides, "[o]n application of a party, the court shall vacate an award" where certain specified conditions are met. *Id.* § 171.088(a)(1). The party must make its application under subsection (a)(1) "not later than the 90th day after the date the grounds for the application are known or should have been known." *Id.* § 171.088(b). The plain language of section 171.088 shows that "the legislature intended the 90–day period ... to be a limitations period after which a party cannot ask a court to vacate an arbitration award." *New Med. Horizons II, Ltd. v. Jacobson,* 317 S.W.3d 421, 428 (Tex.App.-Houston [1st Dist.] 2010, no pet.). However, while the statute provides a clear limitations period within which to file the motion to vacate, the statute does not concomitantly require the motion to vacate to include all grounds that will be raised for vacatur. In this regard, we note that the TAA contains no specific form requirements for the application to vacate. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 171.088; *Sydow v. Verner, Liipfert, Bernhard, McPherson & Hand,* 218 S.W.3d 162, 172 (Tex.App.-Houston [14th Dist.] 2007, no pet.). There appear to be no policy or efficiency reasons to require a separate, formal application, so long as the party informs the court and the opposing party of the desire to have the award vacated. *Sydow,* 218 S.W.3d at 172.

 [10]    [11]    It is abundantly clear that a party seeking to vacate an arbitration award must present any grounds for doing so to the trial court, otherwise, those complaints are waived on appeal. *See* TEX.R.APP. P. 33.1; *Ewing,* 375 S.W.3d at 549; *Kline v. O'Quinn,* 874 S.W.2d 776, 790–91 (Tex.App.-Houston [14th Dist.] 1994, writ denied) (op. on reh'g). It is also clear that filing a motion to vacate after confirmation **\*164** of the award constitutes waiver. *See, e.g., GJR Mgmt. Holdings, L.P.,* 126 S.W.3d at 260; *Hamm v. Millennium Income Fund, L.L.C.,* 178 S.W.3d 256, 269 (Tex.App.-Houston [1st Dist.] 2005, pet. denied). However, appellees cite no authority for the proposition that the trial court may not consider grounds for vacatur that are raised following a timely filed motion to vacate and before

judgment. We conclude that appellants did not fail to preserve the issues in this appeal by failing to raise them within the ninety-day period for filing a motion to vacate. *See Sydow,* 218 S.W.3d at 171. Accordingly, we proceed to address the merits of the appeal.

### V. PARTIES

 [12]    By their first and third issues, appellants attack the arbitration award on grounds that it was rendered in favor of entities or parties who were not properly before the arbitration panel. Appellants' first issue contends that the judgment and arbitration award should be vacated and set aside because the award is made to Seashore, which is not a legal entity, and the time for correcting the award has passed. The third issue asserts that the award on the "so-called" tort claims, which are related to the partnership interests, should be reversed and rendered because Seashore had transferred its partnership interest to the Toby Shor 2004 GRAT, which was not a party to the arbitration. Appellants' arguments under these issues focus on jurisdiction and standing.

Although appellants do not expressly complain that the arbitrators "exceeded their powers" in determining that Seashore or the Toby Shor 2004 GRAT had justiciable interests, the underlying basis for their argument that the trial court had no jurisdiction over these entities is the contention that the arbitration panel exceeded its powers. Accordingly, we interpret appellants' real complaint to be that the arbitration panel exceeded its powers in determining that it had jurisdiction over these parties or that they had standing to pursue claims against appellants.

 [13]    The Texas Supreme Court has stated that "the authority of arbitrators is derived from the arbitration agreement and is limited to a decision of the matters submitted therein either expressly or by necessary implication." *Gulf Oil Corp. v. Guidry,* 160 Tex. 139, 327 S.W.2d 406, 408 (1959). Therefore, we turn our attention to the arbitration agreements at issue.

The "Agreement Regarding Termination of Joint Ownership" ("Agreement") refers to the parties thereto as including, inter alia, "Seashore Investment Management Trust, Kenton E. McDonald, trustee ('Seashore')," and states that "the undersigned" agree to set forth agreements for the provisions for the termination of their joint ownership of the businesses. The Agreement defines "the undersigned" as,

inter alia, "Seashore, Toby Shor[,] and entities controlled by Seashore or Toby Shor [which] are sometimes collectively referred to as the 'Seashore Group.' " The Agreement includes a dispute resolution provision as follows:

Dispute Resolution. If a dispute ("Dispute") arises between the parties hereto regarding the meaning of this Agreement, or an alleged breach thereof, the parties agree to resolve the Dispute through the mediation and arbitration procedures described below in lieu of litigation.

....

Arbitration. If the parties are not successful in resolving the dispute through [alternative dispute resolution], then the parties agree that the Dispute shall be settled by arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association, and **\*165** judgment upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction. The costs of the arbitration shall be allocated as determined by the arbitrator.

A separate agreement between the parties, the "Restructure Agreement," defines the parties as including "Kenton E. McDonald, Trustee of Seashore Investment Management Trust ('Seashore')." This Restructure Agreement also provides a dispute resolution procedure including an arbitration provision that is substantially identical to the one in the Agreement.

At arbitration, both sides to this dispute stipulated that all parties were properly before the arbitration panel and all claims would be definitively resolved by the arbitrators. The stipulation entered by the parties provides as follows:

The parties to this arbitration hereby stipulate to the arbitrability of, and submit to arbitration, all claims raised in the pleadings to date of all parties listed in the caption above. All parties in such caption agree and stipulate that they and all other such parties are properly before the Arbitration Panel, and that the Panel has power, authority, and jurisdiction to issue an award binding as to all parties. They agree further that a reasoned award is sufficient, and that such award need

not include formal findings of fact and conclusions of law.

The caption, or style, includes "Toby Shor and Seashore Investment Management Trust" who are identified as respondents, counter-claimants, and third-party claimants.

The arbitration award defines the parties in relevant part as follows:

The term "Respondents" is used herein to refer to Toby Shor, individually, and Seashore Investments Management Trust ("Seashore"). Seashore is a grantor trust created in September 2000. Initially, Ms. Shor was the grantor and beneficiary. Her then husband, Kenton McDonald, served as trustee. Following Ms. Shor's divorce from Mr. McDonald in 2007, Ms. Shor became the trustee also.

In the instant case, appellants' arguments under their first issue focus on the fact that the arbitration award issued by the arbitration panel expressly awarded damages to "Seashore Investments Management Trust"; however, the final judgment, which expressly incorporated the arbitration award verbatim and by attachment, awarded damages to "Seashore, through Toby Shor as Trustee." In their third issue, appellants contend that the arbitration panel lacked jurisdiction to award damages to Seashore on various partnership-related claims because Seashore had previously transferred its partnership interests to the Toby Shor 2004 GRAT.

The arbitration clauses in the Agreement and Restructure Agreement are broad and encompass disputes regarding the meaning of the agreements or any alleged breaches thereof. The party definitions in these agreements are also quite broad. Under a broad arbitration clause, "a dispute between the parties to the contract concerning the ownership of a claim arising from the contract is just as arbitrable as a dispute concerning the merits of the claim itself." *Island on Lake Travis, Ltd. v. Hayman Co. Gen. Contractors,* 834 S.W.2d 529, 532 (Tex.App.-Austin 1992, writ granted, judgm't vacated w.r.m.); *see Hisaw & Assocs. Gen. Contrs., Inc. v. Cornerstone Concrete Sys.,* 115 S.W.3d 16, 19–20 (Tex.App.-Fort Worth 2003, pet. denied) ("We hold that the arbitration clause gave the arbitration panel the power to make the determination as to whether Cornerstone, as opposed

to Chatham, was the properly named party, and that the trial **\*166** court correctly confirmed the arbitration panel's award."). Accordingly, based on the stipulation between the parties and the foregoing law, we conclude that the arbitration panel correctly ascertained and determined the parties before it. Moreover, we note that the issue regarding whether Seashore had transferred interests to the Toby Shor 2004 GRAT was a matter expressly submitted to the arbitrators.

We overrule appellants' first and third issues.

## VI. FINDINGS OF FACT AND CONCLUSIONS OF LAW

 **[14]**    In their second issue, appellants contend that the judgment should be reversed because, after modifying the award in the judgment, the trial court failed to issue findings of fact and conclusions of law to correct a clerical error, and that judge is no longer on the bench, precluding supplemental findings now. In this regard, appellants contend that the arbitration panel awarded damages to Seashore, whereas the trial court's judgment, which recited and incorporated the arbitration award, rendered judgment "for Seashore Investments Management Trust through its trustee Toby Shor ('Seashore')."

 **[15]**    Pursuant to Rules 296 and 297 of the Texas Rules of Civil Procedure, a trial judge must, when properly requested, prepare findings of fact in cases tried in the district court or county court without a jury. *See* TEX.R. CIV. P. 296 (providing that "in any case tried in the district or county court without a jury, any party may request the court to state in writing its findings of fact and conclusions of law"); *Id.* R. 297 (specifying the timetable for filing findings of fact and conclusions of law and the procedure for filing a notice of past due findings of fact and conclusions of law). Rule 296 gives "a party a right to findings of fact and conclusions of law finally adjudicated after a conventional trial on the merits before the court." *IKB Indus. (Nigeria) Ltd. v. Pro–Line Corp.,* 938 S.W.2d 440, 442 (Tex.1997). In other cases, findings and conclusions are "proper, but a party is not entitled to them." *Id.; see GE Capital Corp. v. ICO, Inc.,* 230 S.W.3d 702, 710–11 (Tex.App.-Houston [14th Dist.] 2007, pet. denied). The term "tried" for the purposes of rule 296 includes the disposition of a case rendered after an evidentiary hearing before the trial court upon conflicting evidence. *See R.H. v. Smith,* 339 S.W.3d 756, 761 (Tex.App.-

Dallas 2011, no pet.); *Puri v. Mansukhani,* 973 S.W.2d 701, 708 (Tex.App.-Houston [14th Dist.] 1998, no pet.)

 **[16]**    **[17]**    When a judgment is rendered as a matter of law, findings and conclusions have no purpose and should not be requested or considered on appeal. *IKB Indus. (Nigeria) Ltd.,* 938 S.W.2d at 443. Therefore, even when the trial court receives evidence, findings and conclusions are only appropriate if the trial court is called upon to determine questions of fact upon conflicting evidence. *Ford v. City of Lubbock,* 76 S.W.3d 795, 796–98 (Tex.App.-Amarillo 2002, no pet.); *Port Arthur Indep. Sch. Dist. v. Port Arthur Teachers Ass'n,* 990 S.W.2d 955, 958 (Tex.App.-Beaumont 1999, pet. denied); *see also K2M3, LLC v. Cocoon Data Holding Pty. Ltd.,* No. 13–11–00194–CV, 2012 WL 2469705, at *2–3, 2012 Tex.App. LEXIS 5203, at *9–10 (Tex.App.-Corpus Christi June 28, 2012, pet. denied) (mem. op.).

 **[18]**    Because Rules 296 and 297 do not impose any duty on the trial court to file findings and conclusions when there has been no trial—that is to say, when there has been no determination of questions of fact based on conflicting evidence—there is no error in the trial court's failure to file **\*167** findings and conclusions. *See Waterman S.s. Corp. v. Ruiz,* 355 S.W.3d 387, 428 (Tex.App.-Houston [1st Dist.] 2011, pet. denied); *In re Estate of Davis,* 216 S.W.3d 537, 542 (Tex.App.-Texarkana 2007, pet. denied); *Niehaus v. Cedar Bridge, Inc.,* 208 S.W.3d 575, 579 n. 5 (Tex.App.-Austin 2006, no pet.).

Based upon the foregoing, we conclude that the trial court did not err in failing to make findings and conclusions. In the instant case, the trial court proceedings regarding the arbitration award were heard in the same manner and on the same notice as a motion in a civil case. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 171.093 (West 2011). Specifically, no evidence was adduced by the parties at the hearing on the motion to confirm the arbitration award. The trial court did not make determinations of fact based on conflicting evidence; rather, that function was subsumed in the arbitration process by the arbitrators. Accordingly, we overrule appellants' second issue. *See Waterman S.s. Corp.,* 355 S.W.3d at 428; *see also Wiggins v. S. Energy Homes of Tex., Inc.,* No. 05–06–00769–CV, 2007 WL 2875357, at *1–2, 2007 Tex.App. LEXIS 7900, at *3–4 (Tex.App.-Dallas Oct. 4, 2007, no pet.) (mem. op.) (concluding that the trial court did not err in failing to issue findings and conclusions in proceedings regarding an arbitration award); *Baker Hughes Oilfield Operations, Inc. v. Hennig Prod. Co.,*

164 S.W.3d 438, 442 (Tex.App.-Houston [14th Dist.] 2005, no pet.) (reviewing trial court's summary judgment affirming an arbitration award).

## VII. PUBLIC POLICY

[19] By their fourth issue, appellants contend that the judgment and award should be set aside and remanded to a different arbitration panel because the panel failed to give effect to the termination of the partnership and the allocation of liabilities and offsets that would result from a partnership termination. In connection with this issue, appellants argue that as "matter of public policy in this state," appellants were absolutely entitled to terminate their partnership relationships, and that the judgment and award failed to give effect to the legal termination of the partnership and the allocation of liability and indemnity that would be triggered by such a termination. Appellants contend that "[s]imply put, people cannot be forced to remain partners. The arbitration decision fails to recognize this important public policy decision for Texas."

[20] Public policy is not listed as a ground for vacatur under the TAA. For purposes of this opinion, we assume, without deciding, that a public policy concern is a valid ground to set aside an arbitration award. The Texas Supreme Court has previously held that an arbitration award cannot be set aside on public policy grounds except in an "extraordinary case" in which the award "clearly violates carefully articulated, fundamental policy." *CVN Group, Inc.,* 95 S.W.3d at 239. To support vacatur of an arbitration award, a public policy concern must be "well defined and dominant" and not derived "from general considerations of supposed public interests." *Id.* at 239–40 (quoting *United Paperworkers Int'l Union v. Misco, Inc.,* 484 U.S. 29, 44, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987)); *see Lee v. Daniels & Daniels,* 264 S.W.3d 273, 278 (Tex.App.-San Antonio 2008, pet. denied).

Appellants' arguments regarding their alleged right to terminate the partnerships were submitted to, and heard by, the arbitration panel. The panel concluded, inter alia:

> Although [appellants] allege a breach of the Termination Agreement[,] they **\*168** failed to prove by a preponderance of the credible evidence that any breach actually occurred. Rather, the evidence established that although there was an agreement by [appellees] with respect to termination, [appellees] raised legitimate

questions about what should be terminated, when it should happen [,] and how it should be done. Even Mr. Black admitted there was no deadline to accomplish termination. Moreover, [appellants'] conduct before and after the notice of termination, and their refusal to provide necessary information, excused performance of that agreement by [appellees] and thwarted any ability to terminate.

> In addition to the failure to prove breach, [appellants] failed to prove that the alleged breaches caused any actual, recoverable damages or actually precluded [appellants] from hedging. [3] The causal connection between the alleged breach and the damages claimed was so tenuous that it established no causal connection at all. In addition, the damages claimed were impermissibly speculative, requiring, among other things, an assumption that [appellants] would have successfully engaged in physical hedging in the gas market. Such assumptions were not proven by the evidence presented. Accordingly [appellants'] claims for breach of the Termination Agreement claims are denied and [appellants] shall take nothing on those claims.

3    "Hedging" is a method used to protect one's investment or an investor against loss by making balancing or compensating contracts or transactions. See http://www.oxforddictionaries.com/hedge (last visited March 21, 2013).

> [Appellants'] request for an order directing termination and division of property also is denied. The Bankruptcy Court proceeding and other events and activities have progressed to such a stage that a termination order would not be fair, fully-effective[,] or meaningful at this time. Moreover, most of the relief requested is not warranted under the Termination Agreement or otherwise. Accordingly, the request for an order directing termination and division of property is denied.

Although appellants cite case law for the proposition that there are no restrictions on a partner's ability to terminate a partnership, *see Bohatch v. Butler & Binion,* 977 S.W.2d 543, 545–46 (Tex.1998), appellants provide no authority for the proposition that such ability is a well-defined, fundamental public policy. *See CVN Group, Inc.,* 95 S.W.3d at 239. Appellants' arguments that they were entitled to termination of the partnership were disputed by appellees and the issue was submitted to the arbitrators. Appellants contend that the arbitrators were wrong; but a mere error, if any, does not

necessarily implicate a violation of public policy. *See id.* We overrule appellants' fourth issue.

## VIII. DAMAGES

 [21]   By their fifth issue, appellants contend that the judgment and award should be reformed to eliminate duplicative tort and contract recovery. Appellants assert that the arbitrators' finding of fraud in connection with appellants' breach of the promissory notes constitutes a manifest disregard of the law. Appellants further contend that the arbitration award violates the one-satisfaction rule by awarding damages for both tort and contract breaches, thereby awarding a double recovery for the same injury, and that the tort and fraud recoveries are subsumed within the recovery on the notes.

 [22]   [23]   [24]   Manifest disregard is a very narrow standard of review. **\*169** *Xtria L.L.C.,* 286 S.W.3d at 594; *Home Owners Mgmt. Enters., Inc. v. Dean,* 230 S.W.3d 766, 768–69 (Tex.App.-Dallas 2007, no pet.). It is more than error or misunderstanding of the law. *Xtria L.L.C.,* 286 S.W.3d at 594. Instead, the error must be "obvious and capable of being readily and instantly perceived by the average person qualified to serve as an arbitrator." *Id.* Under this standard, the arbitrator recognizes a clearly governing principle and ignores it. *Id.* In other words, the issue is not whether the arbitrator correctly interpreted the law, but whether the arbitrator, knowing the law and recognizing that the law required a particular result, simply disregarded the law. *Id.; Pheng Invs., Inc. v. Rodriquez,* 196 S.W.3d 322, 332 (Tex.App.-Fort Worth 2006, no pet.)). It is appellants' burden to demonstrate the arbitrator manifestly disregarded the law. *Xtria L.L.C.,* 286 S.W.3d at 594; *Tanox, Inc. v. Akin, Gump, Strauss, Hauer & Feld, L.L.P.,* 105 S.W.3d 244, 253 (Tex.App.-Houston [14th Dist.] 2003, pet. denied).

 [25]   [26]   Gross mistake is conceptually analogous to manifest disregard. *See Int'l Bank of Commerce v. Int'l Energy Dev. Corp.,* 981 S.W.2d 38, 48 (Tex.App.-Corpus Christi 1998, pet. denied). A gross mistake is a mistake that implies bad faith or a failure to exercise honest judgment and results in a decision that is arbitrary and capricious. *Xtria L.L.C.,* 286 S.W.3d at 598; *Werline v. E. Tex. Salt Water Disposal Co.,* 209 S.W.3d 888, 898 (Tex.App.-Texarkana 2006), *aff'd,* 307 S.W.3d 267, 268 (Tex.2010); *Teleometrics Int'l, Inc. v. Hall,* 922 S.W.2d 189, 193 (Tex.App.-Houston [1st Dist.] 1995, writ denied). A judgment rendered after honest consideration

given to conflicting claims, no matter how erroneous, is not arbitrary and capricious. *Xtria L.L.C.,* 286 S.W.3d at 598.

 [27]   We note that the doctrines of manifest disregard and gross mistake do not extend to mere mistakes of fact or law. Judicial review of an arbitration award "is so limited that even a mistake of fact or law by the arbitrator in the application of substantive law is not a proper ground for vacating an award." *Centex/Vestal,* 314 S.W.3d at 683; *Xtria L.L.C.,* 286 S.W.3d at 591; *Universal Computer Sys., Inc. v. Dealer Solutions, L.L.C.,* 183 S.W.3d 741, 752 (Tex.App.-Houston [1st Dist.] 2005, pet. denied).

 [28]   It is clear from the record from the arbitration hearing and the panel's lengthy written decision that the arbitration panel gave serious consideration to the parties' contentions, evidence, and arguments. Nothing in the record suggests the panel made its decision in bad faith or that it failed to exercise honest judgment. The trial court should not overturn an arbitration award rendered after honest consideration given to claims and defenses presented to it, no matter how erroneous. *See Xtria L.L.C,* 286 S.W.3d at 598; *Werline,* 209 S.W.3d at 898. Accordingly, we hold the trial court did not err in denying the motion to vacate on this ground. We overrule appellants' fifth issue.

## IX. ATTORNEY'S FEES

 [29]   In their sixth issue, appellants contend that the award of attorney's fees to Shor should be reversed and rendered because she was not a prevailing party and there is no other basis for awarding her fees. According to appellants, Shor did not recover individually on any cause of action.

The parties agreed to arbitrate in accordance with the Commercial Arbitration Rules of the American Arbitration Association, and those rules allow the recovery of attorneys' fees "if all parties have requested such an award." AAA Comm. R. 43(d). The record from the arbitration hearing **\*170** indicates that the parties had requested attorneys' fees. Moreover, the TAA provides that arbitrators "shall award attorney's fees as additional sums required to be paid under the award only if the fees are provided for: (1) in the agreement to arbitrate; or (2) by law for a recovery in a civil action in the district court on a cause of action on which any part of the award is based." TEX. CIV. PRAC. & REM.CODE ANN. § 171.048(c). By statute, Texas allows recovery for attorney's fees in claims for breach of an oral or written

contract. *See id.* § 38.001(8) (West 2008). Texas also allows the recovery of attorney's fees for statutory fraud. *See* TEX. BUS. & COM.CODE ANN. § 27.01 (West 2009).

In this case, the arbitrator's award of fees is authorized by law. *See Centex/Vestal,* 314 S.W.3d at 687. Moreover, to the extent that appellants' arguments under this issue focus on the allegation that Shor was not a proper party to the arbitration or to receive an award, we have already addressed these issues and need not address them further in connection with this issue. *See* TEX.R.APP. P. 47.1, 47.4. We overrule issue six.

### X. CONCLUSION

Having overruled each of appellants' issues, we affirm the judgment of the trial court.

### All Citations

443 S.W.3d 154

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

463 S.W.2d 424
Supreme Court of Texas.

Mary Frances FEW et vir, Petitioners,

v.

The CHARTER OAK FIRE
INSURANCE COMPANY, Respondent.

No. B—2276.   |   Jan. 27, 1971.

Injured worker, joining her husband pro forma, sued insurer for workmen's compensation benefits as result of injury. The 115th District Court, Wood, County, Looney E. Lindsey, J., rendered judgment for plaintiffs, and the insurer appealed. The Tyler Court of Civil Appeals, Twelfth Supreme Judicial District, Dunagan, C.J., 456 S.W.2d 156, reversed judgment and remanded for retrial. The injured worker brought error. The Supreme Court, Pope, J., held that under statutes, injured worker properly sued without joining her husband for recovery of workmen's compensation benefits, notwithstanding Rule of Civil Procedure which provides that persons having joint interest shall be made parties, but that where injured worker was being furnished by insurer with physician and medical services and the worker without notice to the insurer changed doctors, and the insurer informed the worker that the treatment was unauthorized and asked that she return to physician it had provided, the insurer was not liable for services rendered by the second doctor.

Judgment of Court of Civil Appeals reversed; trial court judgment modified and affirmed.

West Headnotes (5)

**[1]    Husband and Wife**
   👉 Damages for injuries to husband or wife

   205   Husband and Wife
   205VII   Community Property
   205k260   Damages for injuries to husband or wife
   Where injured worker and her husband had been married for many years prior to her accident and they were married at time of workmen's compensation proceeding, workmen's compensation award was community property.

5 Cases that cite this headnote

**[2]    Courts**
   👉 Construction and application of particular rules

   106   Courts
   106II   Establishment, Organization, and Procedure
   106II(F)   Rules of Court and Conduct of Business
   106k85   Operation and Effect of Rules
   106k85(3)   Construction and application of particular rules
   When Rule of Civil Procedure on joinder of parties established pursuant to limited power vested in Supreme Court by state Constitution to establish rules of procedure not inconsistent with law of state conflicts with legislative enactment, the rule must yield. Vernon's Ann.St.Const. art. 5, § 25; Vernon's Ann.Civ.St. arts. 1731a, § 2, 4621, 4626; Rules of Civil Procedure, rule 39(a).

29 Cases that cite this headnote

**[3]    Husband and Wife**
   👉 Parties

   205   Husband and Wife
   205VII   Community Property
   205k270   Actions
   205k270(5)   Parties
   Under statutes, injured worker properly sued without joining her husband for recovery of workmen's compensation benefits, notwithstanding Rule of Civil Procedure which provides that persons having joint interest shall be made parties. V.T.C.A., Family Code, §§ 4.04, 5.22; Vernon's Ann.Civ.St. arts. 4621, 4626; Rules of Civil Procedure, rule 39.

16 Cases that cite this headnote

**[4]    Workers' Compensation**
   👉 Employer's failure to provide or waiver of right to provide as permitting employee's securing services elsewhere

   413   Workers' Compensation
   413IX   Amount and Period of Compensation
   413IX(H)   Medical or Other Expenses
   413IX(H)1   In General

413k973 Enforcement or Preservation of Right to Expenses

413k976 Employer's failure to provide or waiver of right to provide as permitting employee's securing services elsewhere

Where injured worker was being furnished by insurer with physician and medical services and the worker without notice to the insurer changed doctors, and the insurer informed the worker that the treatment was unauthorized and asked that she return to physician it had provided, the insurer was not liable for services rendered by the second doctor. Vernon's Ann.Civ.St. art. 8306, § 7.

9 Cases that cite this headnote

**[5]** **Pretrial Procedure**
　🔑 Effect

307A Pretrial Procedure
307AII Depositions and Discovery
307AII(G) Requests for Admissions
307Ak481 Effect
　　(Formerly 127k128 Discovery)

Where insurer pursuant to Rule of Civil Procedure providing for request for admission of facts and of genuineness of documents made admission that it had paid or agreed to pay bill for services rendered by certain doctor, the insurer was bound by the admission and liable for the services rendered. Rules of Civil Procedure, rule 169.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*424** Smith Johnson & McDowell, William McDowell, Sulphur Springs, Woodrow H. Edwards, Mount Vernon, for petitioners.

**\*425** Ramey, Brelsford, Flock, Devereux & Hutchins, Donald Carroll and Mike Hatchell, Tyler, for respondent.

**Opinion**

POPE, Justice.

Mary Frances Few, joining her husband pro forma, sued Charter Oak Fire Insurance Company for total and permanent incapacity suffered in the course of her employment with Safeway Grocery in Mineola, Texas. The trial court awarded judgment for the plaintiffs, naming botrh Mary Frances and her husband in the judgment. The court of civil appeals, with a divided court, reversed the judgment for plaintiffs and remanded the cause for re-trial, holding that the husband was an indispensable party and that he was not joined as a real party. That court held also that the trial court erred in awarding plaintiffs damages for certain medical services furnished Mary Frances Few by her private physician when there was no proof that the insurer failed, refused, or neglected to furnish necessary medical services. 456 S.W.2d 156. It is our opinion that the court incorrectly decided the first of these issues but correctly decided the other. The judgment of the court of civil appeals is reversed and judgment is here rendered modifying the trial court's judgment and, as modified, affirming that judgment.

Plaintiff says that we should reverse the judgment of the court of civil appeals because (1) the husband was not an indispensable party under the recently enacted Articles 4621 and 4626, [1] (2) the defendant waived any defect in parties by failing to object to the non-joinder, and (3) her husband was actually made a real party. The first reason stated above is a correct one, so we need not discuss the other two.

[1]　All Statutory references are to Vernon's Texas Civil Statutes. Articles 4621 and 4626 were carried forward into the Family Code by the 61st Legislature as Articles 5.22 and 4.04 respectively.

**[1]** Mary Frances Few and her husband, Milburn Few, had been married for many years prior to her accident on June 20, 1968, and they are still married. For this reason her workmen's compensation award was their community property. Pickens v. Pickens, 125 Tex. 410, 83 S.W.2d 951, 953 (1935). Community ownership may also be called a joint ownership. Dillard v. Dillard, 341 S.W.2d 668 (Tex.Civ.App.1961, writ ref. n.r.e.); Hitchcock v. Cassel, 275 S.W.2d 205 (Tex.Civ.App.1955, writ ref. n.r.e.). Rule 39, Texas Rules of Civil Procedure, as it was worded at the time of the trial, [2] provided that persons having a joint interest shall be made parties. It was this rule which prompted the court of civil appeals to hold that the wife's husband was an indispensable party. The court relied upon our recent opinion in Petroleum Anchor Equipment Co., Inc. v. Tyra, 406 S.W.2d 891, 892—893 (Tex.1966), in which we applied Rule 39. In that case we held that persons who hold a joint

interest shall or must be made parties and are indispensable parties.

[2]    The rule was changed, effective January 1, 1971.

 **[2]**    If only Rule 39 were involved in the case before us, our decision would be controlled by our earlier decision in Petroleum Anchor. However, we are now faced with two relevant statutes enacted by the legislature. Article V, Sec. 25, of the Texas Constitution, Vernon's Ann.St. vests in the Supreme Court the power to establish rules of procedure 'not inconsistent with the law of the State.' Legislative authority for this power is found in Article 1731a, Sec. 2. Rule 39 was established pursuant to this power. As the constitutional provision indicates, this is a limited power; and when a rule of the court conflicts with a legislative enactment, the rule must yield. Missouri, K. & T.R. Co. v. Beasley, 106 Tex. 160, 155 S.W. 183 (1913), rehearing denied, 106 Tex. 160, 160 S.W. 471.

Articles 4621 and 4626 are the statutes which control this case. Enacted by the  **\*426**  60th Legislature and effective January 1, 1968, they provided:
Art. 4621. * * * During marriage each spouse shall have sole management, control and disposition of that community property which he or she would have owned if a single person, including (but not limited to) his or her personal earnings, the revenues from his or her separate property, the recoveries for personal injuries awarded to him or her, and the increase, mutations and revenues of all property subject to his or her sole management, control and disposition; the earnings of an unemancipated minor are subject to the management, control and disposition of the parents or parent having custody of the minor; if community property subject to the sole management, control and disposition of one spouse is mixed or combined with community property subject to the sole management, control and disposition of the other spouse, the mixed or combined community property is subject to the joint management, control and disposition of the spouses unless the spouses otherwise provide; any other community property is subject to the joint management, control, and disposition of the husband and wife.

Art. 4626. * * * 'A spouse may sue and be sued without the joinder of the other spouse. When claims or liabilities are joint and several, the spouses may be joined under the rules relating to joinder of parties generally.'

Articles 4621 and 4626 were designed to correct an anomalous situation concerning the rights of a Texas wife. Almost from the beginning of Texas history, the right of a wife to own property has been recognized, but it has taken more than a century to give the wife managerial powers over that which she owns.

The Constitution of 1836 recognized the community property system of Mexico and Spain and on January 20, 1840, the Fourth Congress of the Republic determined to follow that system in matters of marital property. 2 Gammel Laws of Texas 177—178 (1840). The system has proved to be much fairer in its recognition of the wife's rights of ownership than that afforded her by the common law. 1 de Funiak, Principles of Community Property, Sec. 3 (1943).

The common law had visited upon a wife an intolerable state of civil disability both in owning and managing property. As expressed by Vaughn, that system 'suspended the wife's legal existence during the marriage, or at least consolidated it into that of the husband.' Vaughn, The Policy of Community Property and Inter-Spousal Transactions, 19 Bay.L.Rev. 20, 48—49 (1967). At common law, the husband and wife were one, and the husband was that one. Murphy v. Coffey, 33 Tex. 508 (1870). The woman's legal existence, according to Blackstone, was merged into that of her husband, 'under whose wing, protection, and cover, she performs everything; and is therefore called in our law-French, a feme covert, and is said to be under the protection and influence of her husband, her baron, or lord, and her condition during her marriage is called her coverture. * * * If the wife be injured in her person or her property, she can bring no action for redress without her husband's concurrence, and in his name, as well as her own. * * *' Erlich's Blackstone, pp. 83, 84 (1959).

The Republic treated the wife's right to manage her property differently from her right to own that property. The same act of the Fourth Congress which recognized the community property system of ownership, took from the wife any powers to manage what she owned and gave the sole management of the wife's property to the husband. 2 Gammel, Laws of Texas 178 (1840). It has been the law of Texas for more than a century that, except in limited situations, only the husband could bring suit for community recoveries arising out of a wife's loss of earning capacity. Roberts v. Magnolia Petroleum Co., 142 S.W.2d 315 (Tex.Civ.App.1940,  **\*427** writ ref., (135 Tex. 289, 143 S.W.2d 79)); Loper v. Western U. Teleg. Co., 70 Tex. 689, 8 S.W. 600 (1888; Gallagher v. Bowie, 66 Tex. 265, 17 S.W. 407 (1886); Ezell v. Dodson,

60 Tex. 331 (1883); Murphy v. Coffey, supra; Firence Footwear Co. v. Campbell, 406 S.W.2d 516, 411 S.W.2d 636 (Tex.Civ.App.1967, writ ref. n.r.e.); Urban v. Field, 137 S.W.2d 137 (Tex.Civ.App.1940, no writ).

Seventy years ago Judge Ocie Speer deplored the situation which recognized the wife's equality of ownership, yet denied that equality with respect to a wife's management of what she owned. He wrote:

> The foolish fiction that her existence is merged in that of her husband has given way to the more enlightened recognition of her identity as an individual, and her consequent capacity to own property, to make contracts, and to sue and be sued. Yet, as though fearing serious consequences of much moment, it has not altogether removed her fetters, but is slowly, yet surely, tending, through the course of legislative acts and judicial interpretations, toward the enlargement of her rights and powers, which will in time culminate in a proper recognition of all her civil rights. Speer, The Law of Married Women in Texas, Sec. 25 (1901).

Efforts to rectify the wife's inferior legal powers as the manager of her property have been infrequent; and over-broad corrective legislation changing the definition of community property has been stricken down on constitutional grounds. See Huie, Sec. 11, Commentary-Community Property Law, 13 Vernon's Tex.Stats., p. 39; Northern Texas Traction Co. v. Hill, 297 S.W. 778 (Tex.Civ.App.1927, writ ref.).

The disabilities of coverture remained as a remnant of the common law until 1967. During the intervening years, the wife in fact was still covert; her husband was still lord and baron. The 60th Legislature, in enacting Articles 4621 and 4626, avoided the constitutional difficulties arising from an attempt to modify legislatively the constitutional definition of community property. These statutes leave undisturbed the definition of community property, but more clearly define the managerial rights of each spouse. Article 4621 gave the injured spouse powers to manage that community which she would have owned if a single person, including recoveries for personal injuries. Article 4626 authorized the wife to sue without joining her husband, but it also provided that in the case of joint and several claims, the spouses 'may be joined under the rules relating to joinder of parties generally.'

 [3]    Charter Oak argues that Rule 39(a) is the rule of joinder to which Article 4626 referred in its phrase 'under the rules relating to the joinder of parties generally.' However, the statute, unlike Rule 39(a) is permissive in terms. It is our opinion that the legislature, in using permissive terms, was recognizing that while the spouses' ownership interest in certain property may be joint, the managerial interest in the same property would be several. The legislature surely did not intend by the use of the phrase 'may be joined' in Article 4626 to take away the sole managerial authority which it had just established in Article 4621. In terms of the facts presently before us, Mr. Few would be a proper party to the suit because of his ownership interest in the workmen's compensation benefit. Howevr, he was not an indispensable party in view of his wife's sole managerial interest in the benefit. See, 23 Sw.L.J. 55 (1969); 22 Sw.L.J. 132 (1968). We hold that Mary Frances Few properly sued without joining her husband for the recovery of workmen's compensation benefits arising out of her own injury.

The court of civil appeals cited and relied upon its earlier decision in General Insurance Company of America v. Casper, 426 S.W.2d 606 (Tex.Civ.App.1968, writ ref. n.r.e.). In a per curiam opinion we held that the court of civil appeals correctly reversed the judgment of the trial court on the grounds that there was no **\*428** joinder of the plaintiff's husband in a suit to recover workmen's compensation benefits. See, 431 S.W.2d 311. We held, however, that the case did not present a question of fundamental error as stated by the court of civil appeals, since the error was preserved in the trial court. That case arose under Articles 4621 and 4626 as enacted by the 58th Legislature in 1963. Those earlier statutes were unlike those we have in this case and they did not give the wife sole management over her community.

 [4]    The trial court also rendered judgment against Charter Oak for $808 medical services which plaintiff received from Doctors Thomas and Jones. Charter Oak was furnishing plaintiff with a physician and medical services when the plaintiff, without notice to the insurer, changed doctors. When the insurer learned that she was using doctors other than the one whom they had provided, it informed plaintiff that the treatment was unauthorized and asked that she return to the physician they had provided.

 [5]    Section 7, Article 8306, Vernon's Tex.Civ.Stats., provides that an employee will not be entitled to recover any amount expended or incurred by him for medical aid 'unless

the association or subscriber shall have had notice of the injury and shall have refused, failed or neglected to furnish (medical services) within a reasonable time. * * *' There is no evidence that Charter Oak refused, failed, or neglected to furnish medical services as required by Section 7, Article 8306. We hold that the insurer is not liable for the services rendered by Dr. Jones, and the trial court should not have allowed recovery for the sum paid or owing to him. Charter Oak was liable, however, for the services rendered by Dr. Thomas in the sum of $63 because it made an admission

pursuant to Rule 169 that it had paid or agreed to pay that bill. Charter Oak is bound by its admission.

We reverse the judgment of the court of civil appeals, and modify the judgment of the trial court by reducing plaintiffs' recovery by $745. As thus modified, the trial court's judgment is affirmed.

**All Citations**

463 S.W.2d 424

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 3978138
Supreme Court of Texas.

Greater Houston Partnership, Petitioner,

v.

Ken Paxton, Texas Attorney General;
and Jim Jenkins, Respondents.

No. 13–0745   |   Argued March 25, 2015
|   OPINION DELIVERED: June 26, 2015

**Synopsis**

**Background:** Private nonprofit organization that received public funds from city pursuant to quid pro quo contract brought action against Attorney General seeking declaratory judgment that it was not "government body" within meaning of Texas Pubic Information Act. Petitioner whose records request organization denied intervened. The District Court, Travis County, 98th Judicial District, Scott H. Jenkins, J., entered judgment for Attorney General and ordered disclosure of records requested. Organization appealed, and Austin Court of Appeals, 407 S.W.3d 776, affirmed. Petition for review was granted.

**[Holding:]** The Supreme Court, Guzman, J., held that private organization was not "supported in whole or in part by public funds," and thus, was not "government body," within meaning of TPIA.

Reversed and rendered.

Boyd, J., filed dissenting opinion in which Johnson and Willett, JJ., joined.

West Headnotes (15)

**[1]**     **Records**
 👉 Agencies or custodians affected

326   Records
326II   Public Access
326II(B)   General Statutory Disclosure Requirements
326k51   Agencies or custodians affected

Nonprofit organization that received public funds for services provided to city under quid pro quo contract, which services were designed enhance economic development, was not "supported in whole or in part by public funds," and thus, was not "government body," within meaning of Texas Public Information Act (TPIA); funds received from city constituted compensation for services rendered under contract, organization received only small portion of its annual revenues from contract, organization would still continue to operate and perform same services without public funds. Tex. Gov't Code Ann. § 552.003(1)(A).

Cases that cite this headnote

**[2]**     **Records**
 👉 Judicial enforcement in general

326   Records
326II   Public Access
326II(B)   General Statutory Disclosure Requirements
326k61   Proceedings for Disclosure
326k63   Judicial enforcement in general

Whether an entity is a "governmental body" whose records are subject to disclosure under the Texas Public Information Act (TPIA) presents a matter of statutory construction that the appellate court reviews de novo. Tex. Gov't Code Ann. § 552.003(1)(A).

Cases that cite this headnote

**[3]**     **Statutes**
 👉 Language and intent, will, purpose, or policy
    **Statutes**
 👉 Plain Language;  Plain, Ordinary, or Common Meaning

361   Statutes
361III   Construction
361III(A)   In General
361k1078   Language
361k1080   Language and intent, will, purpose, or policy
361   Statutes
361III   Construction

361III(B)  Plain Language;  Plain, Ordinary, or Common Meaning

361k1091  In general

When interpreting a statute, the court's primary objective is to ascertain and give effect to the Legislature's intent without unduly restricting or expanding the act's scope, and the court seeks that intent first and foremost in the plain language of the text.

1 Cases that cite this headnote

**[4]**  **Statutes**
  🗝 Undefined terms

**Statutes**
  🗝 Context

361  Statutes
361III  Construction
361III(D)  Particular Elements of Language
361k1123  Undefined terms
361  Statutes
361III  Construction
361III(E)  Statute as a Whole;  Relation of Parts to Whole and to One Another
361k1153  Context

Undefined terms in a statute are typically given their ordinary meaning, but if a different or more precise definition is apparent from the term's use in the context of the statute, the court will apply that meaning.

1 Cases that cite this headnote

**[5]**  **Statutes**
  🗝 Undefined terms

**Statutes**
  🗝 Construing together;  harmony

361  Statutes
361III  Construction
361III(D)  Particular Elements of Language
361k1123  Undefined terms
361  Statutes
361III  Construction
361III(E)  Statute as a Whole;  Relation of Parts to Whole and to One Another
361k1155  Construing together;  harmony

A court will not give an undefined term a meaning that is out of harmony or inconsistent with other terms in the statute; therefore, even if an undefined term has multiple meanings, the

court recognizes and applies only the meanings that are consistent with the statutory scheme as a whole.

1 Cases that cite this headnote

**[6]**  **Statutes**
  🗝 In general;  factors considered

**Statutes**
  🗝 Extrinsic Aids to Construction

361  Statutes
361III  Construction
361III(C)  Clarity and Ambiguity;  Multiple Meanings
361k1103  Resolution of Ambiguity;  Construction of Unclear or Ambiguous Statute or Language
361k1104  In general;  factors considered
361  Statutes
361III  Construction
361III(F)  Extrinsic Aids to Construction
361k1171  In general

When interpreting a statute, the court will only resort to rules of construction or extrinsic aids when a statute's words are ambiguous.

Cases that cite this headnote

**[7]**  **Statutes**
  🗝 Liberal or strict construction

361  Statutes
361III  Construction
361III(A)  In General
361k1069  Liberal or strict construction

When interpreting a statute, liberal-construction objectives do not permit a construction of the act untethered from its statutory moorings.

Cases that cite this headnote

**[8]**  **Statutes**
  🗝 Context

361  Statutes
361III  Construction
361III(E)  Statute as a Whole;  Relation of Parts to Whole and to One Another
361k1153  Context

Meanings of statutory terms cannot be determined in isolation but must be drawn from

the context in which they are used; the court must therefore analyze the reasonableness of each definition in light of the statutory context.

Cases that cite this headnote

**[9]    Records**
&#9758; Agencies or custodians affected

326   Records
326II   Public Access
326II(B)   General Statutory Disclosure Requirements
326k51   Agencies or custodians affected

For a private entity to be "sustained" by public funds, which would render the entity a "government body" subject to the Texas Public Information Act (TPIA) suggests the existence of a financially dependent relationship between the governmental body and a private entity or its subdivision redolent of that between a parent and child or principal and agent; however, financial dependence need not be absolute. Tex. Gov't Code Ann. § 552.003(1)(A).

Cases that cite this headnote

**[10]    Records**
&#9758; Agencies or custodians affected

326   Records
326II   Public Access
326II(B)   General Statutory Disclosure Requirements
326k51   Agencies or custodians affected

A private entity "supported" by public funds, which would qualify the entity as a "government body" subject to the Texas Public Information Act (TPIA), would not just receive government funds; it would require them to operate in whole or in part. Tex. Gov't Code Ann. § 552.003(1)(A).

Cases that cite this headnote

**[11]    Statutes**
&#9758; Associated terms and provisions; noscitur a sociis

361   Statutes
361III   Construction

361III(E)   Statute as a Whole; Relation of Parts to Whole and to One Another
361k1159   Associated terms and provisions; noscitur a sociis

The canon of statutory construction known as "noscitur a sociis" —"it is known by its associates"—holds that the meaning of a word or phrase, especially one in a list, should be known by the words immediately surrounding it.

Cases that cite this headnote

**[12]    Statutes**
&#9758; Language

361   Statutes
361III   Construction
361III(A)   In General
361k1078   Language
361k1079   In general

Even a liberal construction of a statute must remain grounded in the statute's language.

1 Cases that cite this headnote

**[13]    Records**
&#9758; Agencies or custodians affected

326   Records
326II   Public Access
326II(B)   General Statutory Disclosure Requirements
326k51   Agencies or custodians affected

Determining whether a private entity partially funded with public funds qualifies as a "governmental body" subject to the Texas Public Information Act (TPIA) will likely require case-specific analysis and a close examination of the facts. Tex. Gov't Code Ann. § 552.003(1)(A).

Cases that cite this headnote

**[14]    Statutes**
&#9758; Associated terms and provisions; noscitur a sociis

361   Statutes
361III   Construction
361III(E)   Statute as a Whole; Relation of Parts to Whole and to One Another
361k1159   Associated terms and provisions; noscitur a sociis

The canon of statutory construction "noscitur a sociis" that a word or phrase, especially one in a list, should be known by the words immediately surrounding it, cannot be used to render express statutory language meaningless.

Cases that cite this headnote

[15] **Statutes**

👉 Superfluousness

361 Statutes
361III Construction
361III(E) Statute as a Whole; Relation of Parts to Whole and to One Another
361k1156 Superfluousness

When interpreting a statute, the court will generally attempt to avoid treating statutory language as surplusage.

Cases that cite this headnote

On Petition for Review from the Court of Appeals for the Third District of Texas. Honorable Scott H. Jenkins, Judge.

**Attorneys and Law Firms**

Bill Aleshire, Aleshire Law PC, Jennifer S. Riggs, Riggs Aleshire & Ray, Austin, TX, Lynne Liberato, Polly B. Fohn, Haynes and Boone LLP, Houston, TX, for Petitioner.

Charles Roy, Daniel T. Hodge, First Asst. Attorney General, David A. Talbot Jr., Consumer Protection, David C. Mattax, James Edward Davis, Kimberly L. Fuchs, Matthew H. Frederick, Assistant Solicitor General, Warren Kenneth Paxton Jr., Office of the Attorney General, Rosalind L. Hunt, Office of Attorney General, Administrative Law Division, Austin, TX, Eric Lyf Yollick, Yollick Law Firm, P.C., The Woodlands, TX, for Respondents.

**Opinion**

JUSTICE GUZMAN delivered the opinion of the Court, in which CHIEF JUSTICE HECHT, JUSTICE GREEN, JUSTICE LEHRMANN, JUSTICE DEVINE, and JUSTICE BROWN joined.

**\*1** The question presented here is whether a private entity operating like a chamber of commerce is a "governmental body" subject to public disclosure of its private business

affairs under the Texas Public Information Act. In seeking to promote the public's legitimate interest in transparent government, the Act imposes considerable disclosure obligations on "governmental bod[ies]." Importantly, the statutory definition of "governmental body" extends only to "the part, section, or portion of an organization, corporation, commission, committee, institution, or agency that spends or *that is supported in whole or in part by public funds*." *See*TEX. GOV'T CODE § 552.003(1)(A)(xii) (emphasis added). This operates to prevent nominally private entities whose work might otherwise qualify them as de facto public agencies from circumventing the Act's disclosure requirements. This case requires us to decide whether the term "supported" encompasses private entities contracting at arm's length with the government to provide general and specific services or whether the term properly includes only those entities that could not perform similar services without public funds and, are thus, sustained—in whole or part—by such funds.

When a private entity enters into a contract and receives government funds in exchange for its services, the entity's right to conduct its affairs confidentially may be in tension with the public's right to know how government funds are spent. Transparency, openness, and accountability in the government are all of fundamental importance. However, these important policy objectives cannot extinguish the privacy rights properly belonging to private business entities in Texas. By liberally authorizing public access to government records while simultaneously shielding private business from unwarranted interference, the Legislature carefully balanced these conflicting interests. Mindful of the delicate equilibrium between these equally compelling concerns, we conclude that the term "supported," which helps define the breadth of the Act, unambiguously includes only those entities at least partially sustained by public funding. Because the statutory language is unambiguous, we need not consider the accuracy or vitality of the test articulated in *Kneeland v. National Collegiate Athletic Ass'n,* 850 F.2d 224 (5th Cir. 1988), which the Attorney General's Open Records Division has traditionally applied to private entities in cases involving open-record requests.

Here, Greater Houston Partnership, a nonprofit corporation providing economic-development services to the City and other clients pursuant to quid pro quo contracts, contests whether it is a "governmental body" in whole or in part. Applying *Kneeland,* the Attorney General and lower courts held that it is. We hold, however, that Greater Houston

Partnership is not a "governmental body" under the Texas Public Information Act because it is not wholly or partially sustained by public funds; we therefore reverse the court of appeals' judgment and render judgment for Greater Houston Partnership.

## I. Factual and Procedural Background

**\*2** Greater Houston Partnership (GHP) is a private, nonprofit corporation that promotes regional economic growth and an attractive business climate for a ten-county area centered around Houston, Texas. GHP's stated purpose is to enhance economic prosperity, facilitate business relocation and expansion, encourage international outreach initiatives, and provide strategic planning to advocate for "the improvement of commercial, industrial, agricultural, civic, and cultural affairs" in the Houston region. In furtherance of this objective, GHP provides consulting, event planning, and marketing services (including advertising and market research) to its roughly 2,100 member companies on a contractual basis. GHP also hosts numerous networking and professional development events, including several weekly GHP Council meetings on topics relevant to the regional economy. GHP operates on an annual budget of approximately $11.7 million, and these funds emanate primarily from membership revenue. In short, GHP functions much like thousands of chambers of commerce across the nation that promote municipal and regional economies.

Consistent with its business model, GHP contracted to provide consulting, event planning, and marketing services to the City of Houston, pursuant to an "Agreement for Professional Services." GHP and the City signed similar agreements annually for several years, including 2007 and 2008, the time periods at issue here. The contracts included a "Scope of Services" exhibit that delineated, under general headers, the specific services that GHP would provide to the City. Under these contracts, GHP received quarterly payments in arrears contingent upon the City's approval of performance reports detailing the particular services GHP provided in that quarter. If GHP failed to deliver the contracted-for services to the City's satisfaction, the contracts authorized the City to pay GHP for the portion of services satisfactorily rendered. Notably, however, the two contracts differed in one significant respect: the 2008 contract expressly provided that "[n]othing in this Agreement shall be construed to imply that [GHP] is subject to the Texas Public Information Act."

The instant suit arose from a May 2008 request Houston-area resident Jim Jenkins submitted to GHP in which he sought "a copy of the check register for [GHP] for all checks issued for the year 2007." Jenkins grounded his request in the Texas Public Information Act (TPIA), claiming that "[p]ublic records show that [GHP] is an organization that spends or that is supported in whole or in part by public funds," and GHP is, therefore, "subject to the Public Information Act in the same manner as a governmental body." SeeTEX. GOV'T CODE § 552.003(1)(A)(xii) (defining "governmental body" for purposes of the TPIA).

GHP objected to Jenkin's request and did not disclose the information. GHP acknowledged it received public funds from the City but disagreed it qualified as a "governmental body" under the TPIA because the public funds were compensation for vendor services provided pursuant to an arm's-length contract with the City. The City's annual payments under the contract amounted to less than 8% of GHP's total annual revenue; member contributions, on the other hand, totaled more than 90% of its revenue. GHP further noted that of the roughly 2,100 companies that comprise its membership, only four could be described as governmental bodies. Refusing to disclose the requested information, GHP referred the matter to the Texas Attorney General as required under the TPIA. *See id.* §§ 552.301(a), .307.

In an informal letter ruling, the Attorney General's Open Records Division agreed with Jenkins, and concluded that GHP was a "governmental body" subject to the TPIA's disclosure requirements specifically with respect to the 2007 contract with the City. [1] Tex. Att'y Gen. OR2008–16062; *see also*TEX. GOV'T CODE § 552.306. In reaching this conclusion, the Attorney General determined that GHP's operations were "supported" by the City because: (1) GHP provided vague and indefinite services to the City aimed at advancing the City's overall economic development; (2) GHP and the City shared a common purpose and objective centered around the City's economy; and (3) GHP provided services traditionally supplied by the government. Tex. Att'y Gen. OR2008–16062.

[1]     GHP did not claim any exemptions from mandatory disclosure and only challenged that it is a governmental body subject to the TPIA in the first instance.

**\*3** In response to the Attorney General's informal ruling, GHP filed a declaratory-judgment action against the Attorney General seeking a declaration that: (1) the Attorney General

lacked jurisdiction over the dispute and (2) even if jurisdiction was proper, GHP was not a "governmental body" under the TPIA. *See* TEX. GOV'T CODE §§ 552.3215(e), .321, .325(a). Shortly after GHP filed suit, Jenkins filed an additional request seeking a copy of GHP's 2008 "disbursement registers and/or check registers," including the number, date, payee name, amount, and purpose. Noting that GHP had already filed suit regarding the 2007 check-register request, the Attorney General closed the second request without a finding and directed the trial court to resolve the dispute. Jenkins intervened in the lawsuit shortly thereafter. *See id.* § 552.325 (authorizing a requestor to intervene in the suit).

After a bench trial, the trial court found GHP was a "governmental body" supported by public funds and ordered disclosure of the 2007 and 2008 check registers.[2] The trial court determined that:

- GHP received public funds to provide economic development and promotion services for or on behalf of the City;

- GHP and the City shared the common purpose of economic development and promotion; and

- An agency-type relationship was created between GHP and the City of Houston.

[2] The sole witness was Tracye McDaniel, GHP's executive vicepresident and chief operating officer. Documentary evidence included: six other contracts between GHP and other governmental bodies executed after 2008; the contracts between the City and GHP for fiscal years 2007, 2008, and 2009; GHP's Articles of Incorporation; Jenkins's requests for the 2007 and 2008 check registers; all four quarterly performance reports GHP submitted to the City in 2007; and performance reports GHP submitted to other governmental bodies in 2007 and 2010.

The court of appeals agreed with the trial court and affirmed its judgment, albeit over a strongly worded dissent. 407 S.W.3d at 786, 787. Finding the phrase "supported in whole or in part by public funds" ambiguous, the lower court relied on an extra-textual analytical construct known as the *Kneeland* test to conclude GHP qualified as a governmental body under the TPIA.[3] *Id.* at 782–83. The dissent criticized the court's reliance on the *Kneeland* test, finding the statutory context unambiguously dictated only the narrow construction of "supported" as applied to a private entity. *Id.* at 788 (Jones, C.J., dissenting).

[3] Derived from a handful of nascent open-records rulings, the *Kneeland* test originated in a 1986 case considering whether the National Collegiate Athletic Association and Southwest Athletic Conference were "supported in whole or in part by public funds" under the TPIA's predecessor statute. *See Kneeland v. Nat'l Collegiate Athletic Ass'n,* 650 F.Supp. 1047 (W.D.Tex.1986), *rev'd,* 850 F.2d 224 (5th Cir. 1988). "Finding no dispositive Texas jurisprudence on this issue," the Fifth Circuit "closely examine[d] the opinions of the Texas Attorney General" and discovered "helpful signs, albeit mixed signals, in the [Attorney General] opinions." *Id.* at 228. Despite a rather tepid endorsement, and without considering the statutory language, the court identified and applied "three distinct patterns of analysis in opinions interpreting [the funding-source element] of the Act" to private entities. *Id.* Those "patterns of analysis" provided the foundation for what became the three-pronged *Kneeland* test.

On appeal to this Court, GHP advances three principal reasons why it is not a "governmental body" under the TPIA. First, GHP contends the phrase "supported ... by public funds" unambiguously excludes the City's payments to GHP. Second, even if the language is ambiguous, the Court should reject the *Kneeland* test because it is unclear and not grounded in the statutory language. Third, GHP argues it is not "supported ... by public funds" even under the *Kneeland* test. The Attorney General disputes all three points. First, it contends that GHP plainly qualifies as a "governmental body" under the TPIA; limiting the statute's reach to entities that exist solely to carry out government functions would frustrate its purpose of openness, and GHP is "supported" by public funds. Second, the *Kneeland* test is not only the relevant framework in which to evaluate the TPIA's application to otherwise private entities, the Legislature has effectively endorsed the *Kneeland* test.[4] Third, the court of appeals properly applied the three *Kneeland* elements to GHP, a "governmental body" subject to regulation under the TPIA.

[4] The Legislature has amended the TPIA several times without materially altering the funding-source element of the "governmental body" definition. *See* Act of May 29, 1995, 74th Leg., R.S., ch. 1035, § 2, 1995 Tex. Gen. Laws 5127, 5128; *see also* Act of May 20, 1991, 72nd Leg., R.S., ch. 306, § 5, 1991 Tex. Gen. Laws 1340, 1341–42; Act of May 17, 2001, 77th Leg., R.S., ch. 633, § 2, 2001 Tex. Gen. Laws 1194, 1194–95; Act of April 23, 1999, 76th Leg., R.S., ch. 62, § 18.24, 1999 Tex. Gen.

Laws 127, 403; Act of May 24, 2001, 77th Leg., R.S., ch. 1004, § 2, 2001 Tex. Gen. Laws 2186, 2187; Act of May 20, 2003, 78th Leg., R.S., ch. 1276, § 9.014, 2003 Tex. Gen. Laws 4158, 4218.

**\*4** We granted GHP's petition for review to determine the proper scope of the funding source element of the TPIA's "governmental body" definition.

## II. Discussion

### A. Background Law

The Legislature enacted the Texas Open Records Act in 1973 to increase government transparency in the wake of public scandals, including a massive stock-fraud imbroglio known as the Sharpstown scandal. [5] In 1993, the Open Records Act was recodified without substantive revision as the Texas Public Information Act. [6] Currently codified in Chapter 552 of the Texas Government Code, the TPIA's stated policy objectives are to provide accountability and transparency in government by establishing mechanisms to foster public access to government records. *See* TEX. GOV'T CODE §§ 552.001–.353. Importantly, an entity's disclosure obligations under the TPIA hinge on whether it is in fact a "governmental body."

[5]      *See* Act of May 19, 1973, 63rd Leg., R.S., ch. 424, § 1–16, 1973 Tex. Gen. Laws 1112, 1112–18 (codified at TEX. REV. CIV. STAT. art. 6252–17a); *see generally Mutscher v. State,* 514 S.W.2d 905, 910–11 (Tex.Crim.App.1974) (summarizing events of Sharpstown scandal).

[6]      Act of May 4, 1993, 73rd Leg., R.S., ch. 268, § 1, 1993 Tex. Gen. Laws 583, 986 (codified at TEX. G OV'T CODE §§ 552.001–.353).

The TPIA defines a "governmental body" as one of twelve different types of entities. *See id.* § 552.003(1)(A). Most of the entities listed in section 552.003(1)(A) are identified quite precisely; for example, a "school district board of trustees" is statutorily defined as a "governmental body." *Id.* § 552.003(1)(A)(v). Others are more amorphous, including the section at issue here, which subjects "the part, section, or portion of an organization, corporation, commission, committee, institution, or agency that spends or that is supported in whole or in part by public funds" to the TPIA. *Id.* § 552.003(1)(A)(xii). The crux of our inquiry in this case is the meaning of

"supported in whole or in part by public funds." The proper scope of this phrase is significant because the consequences of being characterized as a governmental body are considerable. The most obvious is that under section 552.221 of the Texas Government Code, a "governmental body" must promptly produce "public information" on request unless an exemption from disclosure applies and is timely asserted. [7] *See id.* §§ 552.101–.123, .221; *see also Tex. Comptroller of Pub. Accounts v. Att'y Gen. of Tex.,* 354 S.W.3d 336, 341–48 (Tex.2010) (construing an exemption under the TPIA). The term "public information" broadly includes "information that is collected, assembled, or maintained under a law or ordinance or in connection with the transaction of official business" either: (1) "by a governmental body" or (2) "for a governmental body and the governmental body owns the information or has a right of access to it." TEX. GOV'T CODE § 552.002(a).

[7]      To claim an exemption, a governmental body must, within ten business days after receiving a request, submit a written statement to the Attorney General explaining why the information should be withheld and request an Attorney General opinion. TEX. GOV'T CODE § 552.301(a), (b). If the Attorney General rules that the Act does not exempt the information from required disclosure, the governmental body must make it available to the requesting party or seek a judicial determination that the information does not have to be disclosed. *Id.* §§ 552.3215(e), .324, .325(a); *see also City of Garland v. Dall. Morning News,* 22 S.W.3d 351, 356 (Tex.2000). If the governmental body refuses to disclose the requested information, the Attorney General may seek to compel disclosure through a mandamus proceeding. TEX. GOV'T CODE § 552.321.

### B. Statutory Construction

**\*5** **[1]** **[2]** **[3]** **[4]** **[5]** **[6]** GHP argues that as a private entity, it is not subject to the TPIA's disclosure requirements because it does not qualify as a "governmental body" under the statute's plain language. GHP therefore contends that it is entitled to seek the privacy protections typically afforded to nongovernmental entities. Determining whether GHP is a "governmental body" whose records are subject to disclosure under the TPIA presents a matter of statutory construction that we review de novo. *City of Garland v. Dall. Morning News,* 22 S.W.3d 351, 357 (Tex.2000). When interpreting a statute, our primary objective is to ascertain and give effect to the Legislature's intent without unduly restricting or expanding

the Act's scope. *City of Lorena v. BMTP Holdings, L.P.,* 409 S.W.3d 634, 641 (Tex.2013). We seek that intent first and foremost in the plain meaning of the text. *Id.*; *see also Tex. Lottery Comm'n v. First State Bank of DeQueen,* 325 S.W.3d 628, 635 (Tex.2010). "Undefined terms in a statute are typically given their ordinary meaning, but if a different or more precise definition is apparent from the term's use in the context of the statute, we apply that meaning." *TGS–NOPEC Geophysical Co. v. Combs,* 340 S.W.3d 432, 439 (Tex.2011). "However, we will not give an undefined term a meaning that is out of harmony or inconsistent with other terms in the statute." *State v. $1,760.00 in U.S. Currency,* 406 S.W.3d 177, 180 (Tex.2013). Therefore, even if an undefined term has multiple meanings, we recognize and apply only the meanings that are consistent with the statutory scheme as a whole. *Id.* at 180–81. We only resort to rules of construction or extrinsic aids when a statute's words are ambiguous. *Entergy Gulf States, Inc. v. Summers,* 282 S.W.3d 433, 437 (Tex.2009). Finally, in construing the TPIA, we are mindful of the legislative mandate that the TPIA be "liberally construed in favor of granting a request for information." TEX. GOV'T CODE § 552.001(b).

As an initial matter, we observe the parties' agreement that GHP is a "governmental body" only if it, or a "part, section, or portion" of it "is supported in whole or in part by public funds." It is likewise undisputed that GHP receives "public funds."[8] The parties disagree, however, on the meaning and application of the statutory phrase, "supported in whole or in part by." GHP argues that the TPIA cannot reasonably be interpreted to apply to privately-controlled corporations that perform services under quid pro quo government contracts. According to GHP, the Legislature unambiguously intended "supported in whole or in part by public funds" to identify entities that were created or exist to carry out government functions and whose existence are maintained in whole or in part with public funds. Conversely, the Attorney General declares the statutory language ambiguous because it could reasonably be read to apply to any contract between the government and a private entity. We agree with GHP.

[8] "Public funds" refers to the "funds of the state or of a governmental subdivision of the state." TEX. GOV'T CODE § 552.003(5).

[7] "Supported" is an undefined term with multiple and varied dictionary definitions. However, only two of the definitions are even remotely possible as applied to the TPIA and only one of those definitions is reasonable when the statute is considered as a whole. Reading the definition of "governmental body" in its contextual environment—as we are bound to do—reveals that the TPIA applies only to entities acting as the functional equivalent of a governmental body that are "sustained" at least in part, by public funds. In reaching this conclusion, we remain ever mindful of the statute's liberal-construction clause. But liberal-construction objectives do not permit a construction of the Act untethered from its statutory moorings.

Familiar interpretive guides and established canons of construction inform our reading of section 552.003(1)(A)(xii). In determining the meaning of "supported ... by public funds," we begin, as we must, with the statute's plain language. *Tex. Lottery Comm'n,* 325 S.W.3d at 635. Common English words frequently have a number of dictionary definitions, some quite abstruse and esoteric, others more comprehensible and commonplace. *See, e.g.,$1,760.00 in U.S. Currency,* 406 S.W.3d at 180–81 (noting that "novelty" has multiple dictionary definitions). Not surprisingly, "supported," the key term here, is subject to at least six disparate definitions in its verb form alone, with many of those including more nuanced sub-definitions. *See*WEBSTER'S THIRD NEW INT'L DICTIONARY 2297 (2002). By reading the term in context, however, we can narrow the universe of possible definitions to the most apposite. *See TGS–NOPEC Geophysical Co.,* 340 S.W.3d at 439.

**\*6** **[8]** As always, we are cognizant of the "fundamental principle of statutory construction and indeed of language itself that words' meanings cannot be determined in isolation but must be drawn from the context in which they are used." *Id.* at 441. We must therefore analyze the reasonableness of each definition in light of the statutory context. *See Jaster v. Comet II Const., Inc.,* 438 S.W.3d 556, 562 (Tex.2014); *see also R.R. Comm'n v. Tex. Citizens for a Safe Future & Clean Water,* 336 S.W.3d 619, 628 (Tex.2011) ( "We generally avoid construing individual provisions of a statute in isolation from the statute as a whole."). The statute's first contextual clue emerges from the words immediately surrounding "supported." To avoid disharmony with the rest of the statute, "supported" must bear reference to "public funds," so it is clear that non-monetary definitions of "supported" make little sense in context. *See*WEBSTER'S THIRD NEW INT'L DICTIONARY 921 (2002) (defining "funds" as "available pecuniary resources"). Applying this limitation, we winnow the field down to two potential meanings for "supported," both of which are faithful to the statutory context:

(1) to pay the costs of: maintain; to supply with the means of maintenance (as lodging, food or clothing) or to earn or furnish funds for maintaining; or

(2) to provide a basis for the existence or subsistence of: serve as the source of material or immaterial supply, nourishment, provender, fuel, raw material, or sustenance of.

*See* WEBSTER'S THIRD NEW INT'L DICTIONARY 2297 (2002); *accord* BLACK'S LAW DICTIONARY 1668 (10th ed. 2009) (defining the term "support" to mean "[s]ustenance or maintenance"). In statutory context, "supported" must thus mean sustenance, maintenance, or both.

Another contextual clue derives from the Act's purpose. The statutory context indicates that all section 552.001(a) entities are either the government or its functional equivalent. First, the statute provides the public with "complete information about the affairs of government and the official acts of public officials and employees." TEX. GOV'T CODE § 552.001(a). The stated purpose of permitting access to this information is to allow the public to "retain control over the instruments they have created." *Id.* A reasonable definition of "supported" must be compatible with this stated purpose. The statute also specially defines the term "governmental body." In defining that term, the Legislature carefully omitted any broad reference to private entities, instead including private entities insofar as they are "supported ... by public funds." *Compare id. with* FLA. STAT. § 119.011(2). In light of this omission, which we presume the Legislature purposefully selected, the scope of the term "governmental body," as applied to private entities, must be filtered through the Act's purpose and function of allowing access to instrumentalities of government. Thus, the Act only applies to private entities acting as the functional equivalent of the government. *See TGS–NOPEC Geophysical Co.,* 340 S.W.3d at 439.

Defining "supported" to mean "maintenance" is untenable because doing so risks sweeping any private entity that received any public funds within the definition of a "governmental body." *See* 407 S.W.3d at 781 (citing *Tex. Ass'n of Appraisal Dists., Inc. v. Hart,* 382 S.W.3d 587, 591–92 (Tex.App.–Austin 2012, no pet.)). To resurrect the example provided by the court of appeals, if we equate "supported" with supplying an entity with a means by which the entity can pay for necessities, then even a paper vendor with hundreds of clients would qualify as a "governmental body" merely by virtue of getting paid for selling office

supplies to a single state office. *See* 407 S.W.3d at 781. Every company must expend funds to stay in business; it would be impossible to conclude that any business compensated for providing goods or services to a governmental entity pursuant to a quid pro quo contract was not using public funds to pay for necessities. Thus, any entity doing business with the government would be a "governmental body."

**\*7** "Quid pro quo" means "[a]n action or thing that is exchanged for another action or thing of more or less equal value." *See* BLACK'S LAW DICTIONARY 1443 (10th ed. 2009). As the dissent agrees, the Legislature did not intend for the statute to reach entities involved in quid pro quo transactions with the government, and it is undisputed that a fair reading of the statute cannot countenance such a result. 407 S.W.3d at 789. We reject any reading of "supported" that would injudiciously apply public transparency laws to private businesses merely because they receive public funds under a contract with the government. Accordingly, the "maintenance" definition of "supported" is not textually viable.

**[9]  [10]** In contrast, defining "supported" as "sustenance" ensures that only an entity, or its "part, section or portion," whose existence is predicated on the continued receipt of government funds would qualify as a "governmental body." Among the meanings of "sustain" are "to cause to continue; to keep up; to carry or withstand; to nourish; to prevent from sinking or giving way." *See* WEBSTER'S THIRD NEW INT'L DICTIONARY 2304 (2002); *see also* BLACK'S LAW DICTIONARY 1676 (10th ed. 2009) (defining "sustain" to mean "to nourish and encourage"). Applying this construction, the universe of private entities constituting governmental bodies is obviously more circumscribed because only a small segment of private entities could fairly be considered to be sustained by the government. To be "sustained" by public funds suggests the existence of a financially dependent relationship between the governmental body and a private entity or its subdivision redolent of that between a parent and child or principal and agent. Financial dependency need not be absolute, however. Rather, the government could be one of several contributing sources. But sustenance implies that if the government ceased to provide financial support, the entity would be unable to meet its financial obligations. Unquestionably, a private entity would qualify under a financially dependent construction of "supported" if it could not pursue its mission and objectives without the receipt of public funds, even if that funding only partially financed the entity's endeavors. In short, an

entity "supported" by public funds would not just receive government funds; it would require them to operate in whole or in part.[9] If we construe "supported ... by public funds" in this manner, we must conclude GHP is not "supported" by public funds because it receives only a small portion of its revenue from government contracts. And even if these government contracts were eliminated, it could continue to operate given the substantial revenue derived from other non-governmental sources. Moreover, GHP could and would continue to promote the greater Houston economy to advance its own interests and those of its more than 2,000 non-government members. GHP, in sum, does not require public funds and thus, is not sustained by public funds.

[9]   It is possible, of course, that a portion of a private entity could be sustained by public funds even where the private entity, as a whole, is not. In such instances, if the department or division is sustained by public funds, the division may be subject to the TPIA's disclosure obligations. Here, GHP did not segregate funds, and it argued that such segregation would be logistically impossible.

[11]  Because only one definition fits the statutory context, we conclude that "supported ... by public funds" must be appropriately defined to only include those entities "sustained" by public funds—thereby ensuring that the statute encompasses only those private entities dependent on the public fisc to operate as a going concern. Although not dispositive, our conclusion is reinforced by the fact that this construction of the term "supported" is consistent with the scope and nature of the eleven other types of entities more clearly described as a "governmental body" in the same provision. *See* TEX. GOV'T CODE § 552.003(1)(A). The canon of statutory construction known as *noscitur a sociis* —"it is known by its associates"—holds that the meaning of a word or phrase, especially one in a list, should be known by the words immediately surrounding it. *See* *TGS– NOPEC Geophysical Co.,* 340 S.W.3d at 441. We rely on this principle to avoid ascribing to one word a meaning so broad that it is incommensurate with the statutory context. Accordingly, in evaluating the breadth of "supported in whole or in part by public funds," we may consider the scope of the enumerated categories preceding it. *See* *Fiess v. State Farm Lloyds,* 202 S.W.3d 744, 750–51 (Tex.2006). Of the eleven other examples of a "governmental body" listed in the statutory definition of the term, two stand out as arguably the most analogous to a private nonprofit like GHP. Thus, we briefly consider each in comparison.

**\*8**  First, the statute expressly identifies as a "governmental body" the governing board of a nonprofit water supply or wastewater service corporation that is organized under Chapter 67 of the Texas Water Code and exempt from ad valorem taxation under the Texas Tax Code. *See* TEX. GOV'T CODE § 552.003(1)(A)(ix). A nonprofit corporation of this type is authorized to engage in several traditional governmental functions, such as the right to build and operate water- and waste-treatment facilities and sell water to political subdivisions, private entities, or individuals. *See* TEX. WATER CODE § 67.002. Additionally, depending on the size of the county it serves, a nonprofit water or waste-water service provider may even establish and enforce "customer water conservation practices" through the assessment of "reasonable penalties as provided in the corporation's tariff." *See id.* § 67.011(a)(5), (b). By virtue of their special powers and privileges, these nonprofit utility operators essentially function as quasi-public corporations servicing the public. *See* *Garwood Irr. Co. v. Williams,* 243 S.W.2d 453, 456 (Tex.Civ.App.–Galveston 1951, writ ref'd n.r.e.).

The second potentially private "governmental body" identified in the statute is a nonprofit corporation eligible to receive federal funding, in the form of block grants, for anti-poverty programs at the state level. TEX. GOV'T CODE § 552.003(1)(A)(xi). Under this federal initiative, a nonprofit may receive funds if it demonstrates "expertise in providing training to individuals and organizations on methods of effectively addressing the needs of low-income families and communities" through a detailed application process.[10] 42 U.S.C. § 9913(c)(2) (2012); *see also* OFFICE OF CMTY. SERVS., U.S. DEP'T OF HEALTH & HUMAN SERVS., COMMUNITY SERVICES BLOCK GRANT STATE AND ELIGIBLE ENTITY TECHNICAL ASSISTANT SERVICES 16–17(2015) (listing eligibility requirements).[11] A section 552.003(i)(A)(xi) "governmental body" must be "authorized by this state to serve a geographic area of the state." *See* TEX. GOV'T CODE § 552.003(1)(A)(xi). This requirement presupposes that the nonprofit has a close working relationship with the state government. *See* 10 TEX. ADMIN. CODE § 5.211 (requiring an authorized nonprofit to submit monthly performance reports to the state agency monitoring the program).

[10]   The federal program is codified at 42 U.S.C. §§ 9901-9926 (2012) and is administered by the U.S.

Department of Health and Human Services Office of Community Service. *See* 42 U.S.C. § 9912 (2012).

11      Available at http://www.acf.hhs.gov/grants/open/foa/files/HHS-2015-ACF-OCS-ET-1007_1.pdf.

The foregoing examples describe ostensibly private entities deputized by the government to provide services traditionally considered governmental prerogatives or responsibilities. Thus, although nominally private, each is in fact acting as a quasi-public entity performing a core governmental function. There is a significant difference between an entity of this nature and one like GHP, and our construction of "supported in whole or in part by public funds" reflects as much by capturing only those entities acting as the functional equivalent of the government. *See Fiess,* 202 S.W.3d at 751.

 [12]  Our construction of the term "supported" remains faithful to the TPIA's liberal-construction clause. *See* TEX. GOV'T CODE § 552.001(b) ("This chapter shall be liberally construed in favor of granting a request for information."). We have consistently recognized this clause expresses an important statement of legislative purpose, and we continue to adhere to it today. *See, e.g.,City of* Garland, 22 S.W.3d at 364 ("Unlike the [Freedom of Information Act], our Act contains a strong statement of public policy favoring public access to governmental information and a statutory mandate to construe the Act to implement that policy and to construe it in favor of granting a request for information."). Still, even a liberal construction must remain grounded in the statute's language and cannot overwhelm contextual indicators limiting public intrusion into the private affairs of nongovernmental entities. [12]

12      There is little to support the view that open-records laws were envisioned as tools to pry open the sensitive records of private entities or to function as a private discovery tool. *See N.L.R.B. v. Robbins Tire & Rubber Co.,* 437 U.S. 214, 242, 98 S.Ct. 2311, 57 L.Ed.2d 159 (1978) (describing the Freedom of Information Act). Instead, we have recognized:

> The Texas Legislature promulgated the TPIA with the express purpose of providing the public "complete information about the affairs of government and the official acts of public officials and employees." The Act is aimed at preserving a fundamental tenet of representative democracy: "that the government is the servant and not the master of the people." At its core, the TPIA reflects the public policy that the people of Texas "insist on

> remaining informed so that they may retain control over the instruments they have created."
> *Jackson v. State Office of Admin. Hearings,* 351 S.W.3d 290, 293 (Tex.2011) (citations omitted).

 **\*9**  **[13]**  In sum, we define "supported in whole or in part by public funds" to include only those private entities or their sub-parts sustained, at least in part, by public funds, meaning they could not perform the same or similar services without the public funds. If GHP (as a private entity that receives government funds even while not being supported by them) presents the hard case, entities on the ends of the spectrum—those that receive no government money, and those that receive only government money—will obviously present much more straightforward questions. Determining whether a partially funded entity qualifies as a "governmental body" will likely require case-specific analysis and a close examination of the facts. Nonetheless, we recognize as a general proposition that an entity, like GHP, that does not depend on any particular revenue source to survive—public or private—is not sustained even in part by government funds.

### C. Other Jurisdictions

While our construction of the TPIA is supported by a plain-meaning reading of the statute, an examination of similar open-records statutes from other jurisdictions is also instructive. In states where open-records acts apply to entities "supported in whole or in part by public funds," our sister courts have unanimously construed the phrase to exclude, as a general matter, private entities receiving public funds pursuant to quid pro quo agreements without regard to whether such an agreement is the entity's only funding source. *See, e.g.,Indianapolis Convention & Visitors Ass'n, Inc. v. Indianapolis Newspapers, Inc.,* 577 N.E.2d 208, 214 (Ind.1991) ("In situations involving a *quid pro quo,* that is, measured goods or services given in exchange for payment based on identifiable quantities of goods or services, a private entity would not be transformed into a public entity because it would not be maintained and supported by public funds."); *Weston v. Carolina Research & Dev. Found.,* 303 S.C. 398, 401 S.E.2d 161, 165 (1991) ("[T]his decision does not mean that the [open-records act] would apply to business enterprises that receive payment from public bodies in return for supplying specific goods or services on an arms length basis."); *Adams Cnty. Record v. Greater N.D. Ass'n,* 529 N.W.2d 830, 836 (N.D.1995) ("When there is a bargained-for exchange of value, a *quid pro quo,* the entity is not supported by public funds."). Additionally, even in those

states whose open-records acts fail to define "governmental body" or an equivalent term, our sister courts still narrowly construe the statute to include only private entities that have a relationship so intertwined with the government that they are the "functional equivalent of a governmental agency." *Memphis Publ'g Co. v. Cherokee Children & Family Servs., Inc.,* 87 S.W.3d 67, 78–79 (Tenn.2002); *see also State ex rel. Oriana House, Inc. v. Montgomery,* 110 Ohio St.3d 456, 854 N.E.2d 193, 198–99 (2006).

Recognizing the right of private businesses to conduct their affairs autonomously, at least one court has adopted a presumption that a private entity is not subject to an open-records request absent clear and convincing evidence that the private entity is the functional equivalent of a governmental body. *See, e.g.,State ex rel Oriana House, Inc.,* 854 N.E.2d at 200. In Florida, the only state whose statute expressly includes private entities, the Florida Supreme Court narrowly interpreted its open-records act to exclude private entities merely providing professional services to a governmental body. *See News & Sun–Sentinel Co. v. Schwab, Twitty & Hanser Architectural Group, Inc.,* 596 So.2d 1029, 1031 (Fla.1992) (construing FLA. STAT. § 119.011(2)). In fact, of those states with similar statutes, we have not encountered one that has construed an open-records act to include a private entity providing specific and measurable vendor services to a governmental body, even if that entity receives public funds. We find it difficult to ignore this interpretative uniformity, especially considering the gravitas of the interests at stake.

**\*10** Our plain-meaning construction also comports with federal precedent interpreting the federal analogue—the Freedom of Information Act (FOIA). *See Tex. Comptroller of Pub. Accounts,* 354 S.W.3d at 342 (noting that because the Legislature modeled the TPIA on the FOIA, federal precedent is persuasive in construing the Act). Under the FOIA, "agency," the federal equivalent of "governmental body," is defined to include:

> any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government (including the Executive Office of the President), or any independent regulatory agency.

5 U.S.C. § 552(f)(1) (2012). In interpreting this broad language, the United States Supreme Court held that a private entity receiving federal funding is considered a "government controlled corporation" and subject to FOIA disclosure requirements only if the private entity is also subjected to "extensive, detailed, and virtually day-to-day supervision" by the government. *Forsham v. Harris,* 445 U.S. 169, 180, 100 S.Ct. 977, 63 L.Ed.2d 293 (1980). The federal supervision must be "substantial ... and not just the exercise of regulatory authority necessary to assure compliance with the goals of the federal grant." *Id.* at 180 n.11, 100 S.Ct. 977. Thus, narrowly defining "supported in whole or in part by public funds" under Texas law is consistent with the approach of other jurisdictions featuring similar acts and the United States Supreme Court's interpretation of the federal act on which the TPIA is based.

### D. Response to the Dissent

 **[14]** We briefly address some of the contentions in the dissenting opinion. Regarding statutory construction, there is little disagreement about the guiding principles and relevant canons involved here, and we agree, of course, that the canon of *noscitur a sociis*"cannot be used to render express statutory language meaningless." Op. at —— (Boyd, J., dissenting). We disagree as to the proper implementation of the canon, however. The dissent asserts that the first eleven definitions of "governmental body" in the TPIA should be cabined off from the twelfth definition of that term because the twelfth definition "uses specific language, inherently different than the language of the other definitions." *Id.* at ——. The dissent, thus, argues that the nature of the first eleven definitions cannot inform the twelfth. We disagree. All twelve are definitions of governmental bodies, and given that the twelfth definition is the most open-ended, blinders would be required to construe it in isolation from its statutory predecessors. Separating the definitions in this way would not only be artificial, it would also deprive us of a key source of insight into the parameters of the more expansive twelfth definition.

More significant, however, is the dissent's suggestion that the statute is ambiguous. The dissent, building on this imprudent reading, would look to Attorney General decisions and the *Kneeland* test for "further guidance." *Id.* at ——. In canvassing the landscape of informal Attorney General rulings and divining instruction therefrom, the dissent resurrects *Kneeland* 's questionable methodology, which did the same. And as that court itself noted, even if "[o]ne may have no quarrel with the formulae,""the direction given is a mite uncertain." *Kneeland,* 850 F.2d at 228. The dissent finds *Kneeland* "persuasive" but we do not reach

that analysis because of our determination that the statutory language unambiguously excludes GHP from qualifying as a "governmental body." Nonetheless, we think it worth brief pause to note *Kneeland* 's questionable foundation, as it—along with the raft of informal Attorney General rulings that bookend the decision—constitute the "forty years of legal interpretations" that we supposedly ignore in today's opinion. [13] Slip Op. at 3 (Boyd, J., dissenting). But many of these rulings were informal and, as such lack any precedential value. Put simply, the weight of this legal authority is considerably less august than the dissent's formulation implies.

[13]  The *Kneeland* test gained prominence by happenstance rather than design. It derived from a single federal district court opinion based on five conclusory Attorney General opinions written without any attempt to construe the statutory language. After *Kneeland* issued, the Attorney General adopted the test without further analysis. Thereafter, the lower courts used the *Kneeland* test out of deference to the Attorney General, also without scrutinizing the test in light of the statutory text and legislative intent embodied therein. We decline to defer to a test created without consideration of the statutory language.

**\*11**  While the dissent purports to rehabilitate *Kneeland,* its revised test is at best a partial improvement. The revised test makes it virtually impossible for an entity that provides intangible deliverables, such as consulting, advertising, or legal services, to satisfy the "specific and measurable services" prong of the test. The dissent portrays GHP as sharing only broad, amorphous goals with the City. Yet, the "broad" contract language referenced by the dissent actually refers to GHP's more general overarching objectives (essentially, these statements of objectives function as titles under which specific obligations of the contract are delineated). Each broad objective is followed by a list of specific services GHP promised to provide to achieve those objectives. For example, GHP was hired "to identify new business opportunities, secure economic incentives and increase outreach and recruitment activities to the region's targeted key industries to strengthen the City of Houston as a competitive place to do business." In furtherance of that objective, GHP is contractually obligated to develop business relationships with the top twenty-five companies not currently headquartered in the City; create and implement a business-retention program to provide quick responses to companies in the City; and arrange and host ten recruiting trips, or "Signature Events," for Houston-based executives to

visit target companies and pitch them on the City's business advantages. These services are specific and measurable and are the sort of quid pro quo exchanges typical of a vendor services contract in that industry.

Thus, we do not believe that the monetary payments due to GHP under the 2007 and 2008 agreements are "general or unrestricted payment[s] provided to subsidize or underwrite the entity's activities" rather than "specific measurable services." *Id.* at ——. Even the dissent admits that some—but not all—of GHP's activities qualify as "specific measurable services," so the disagreement here is more a matter of degree than anything else.

The dissent's revised test would also require that "the funds be intended to promote a purpose, interest, or mission that the governmental and private entities share and would both pursue even in the absence of their contractual relationship." *Id.* at ——. The dissent posits that a law firm may share a broad goal with a client, but the firm's interest remains "transaction specific" in a way that GHP's engagement is not. *Id.* at ——. At the risk of quibbling, we dispute that this metaphorical dividing line is nearly that clear or marked. Many law firms are hired not merely for a specific litigation matter but rather to provide more enduring and wide-ranging counsel. And more importantly, while the dissent takes for granted that GHP and the City's interests are perfectly aligned (and presumably always will be), that assumption is debatable. For instance, although the vast majority of cities presumably welcome financial investment, growth can prove politically divisive—just witness the debates over gentrification that grip many major cities experiencing explosive economic expansion. Regardless, the point is that GHP is hardly the auxiliary and mirror of the City that the dissent portrays it to be, and the proposed revision of the *Kneeland* test will not significantly clarify this confused area of the law.

 **[15]**  The dissent also contends that "the Court writes the words 'in part' completely out of the statutory definition." *Id.* at ——. Nothing so drastic is occurring here. The statute's "in part" language may envision a multi-division entity that does business with the government, but not uniformly and not across all units. For instance, one can conceptualize a subdivision of a large corporation wholly funded by government contracts; nevertheless, because the subdivision is only a small part of the large organization, the government business forms a relatively small portion of the corporation's total revenue. In this scenario, the organization

may be said to be supported "in part" by public funds. Moreover, there may be more overlap between "in part" and the neighboring statutory language than the dissent allows. While we generally attempt to avoid treating statutory language as surplusage, "there are times when redundancies are precisely what the Legislature intended." *In re Estate of Nash,* 220 S.W.3d 914, 917–18 (Tex.2007); *see also In re City of Georgetown,* 53 S.W.3d 328, 336 (Tex.2001) (noting that statutory redundancies may mean that "the Legislature repeated itself out of an abundance of caution, for emphasis, or both"). Regardless of whether such drafting caution is at work here, the point remains that there are a host of possible explanations addressing the dissent's concerns.

### III. Conclusion

**\*12** Amidst all the argument attempting to classify GHP as a governmental body, it is worth recalling precisely what GHP is not: GHP is not a government agency, nor is it a quasi-public agency specifically listed under the Texas Government Code as a "governmental body." GHP does not rely on its government contracts to sustain itself as a going concern; as all parties acknowledge, the government funds it receives constitute a relatively minuscule portion of GHP's annual budget. The only way GHP can qualify as a "governmental body," then, is if it can be said to be "supported in whole or in part by public funds."

GHP, like countless chambers of commerce nationwide, provides marketing, consulting, and event-planning services to the City and other clients pursuant to quid pro quo contracts. Like the lobbying shops and law firms that also populate the State payroll, GHP shares many common objectives with the City, but without more, such shared interests can hardly transform a service provider into a government appendage. A private entity engaged in economically delicate work should not be subjected to invasive disclosure requirements merely because it counts the government as one client among many. Transparency is a real concern, to be sure, and the TPIA's liberal-construction mandate reflects the depth of this interest. But liberal construction is not tantamount to boundless reach. Yet, even if not directly subject to disclosure obligations under the TPIA, GHP's transactions with the government are hardly in a black box; the City—which is indisputably a "governmental body"—must disclose information regarding its contractors, including GHP.

Applying the TPIA's plain and unambiguous language, we hold that GHP is not "supported in whole or in part by public funds" and thus is not a "governmental body" under the TPIA. Because the relevant provisions of the TPIA are unambiguous, we do not apply the analysis outlined in *Kneeland v. National Collegiate Athletic Ass'n,* 850 F.2d 224 (5th Cir. 1988), nor any other extra-textual construct. We therefore reverse the court of appeals' judgment and render judgment for Greater Houston Partnership.

JUSTICE BOYD filed a dissenting opinion, in which JUSTICE JOHNSON and JUSTICE WILLETT joined.

JUSTICE BOYD, joined by JUSTICE JOHNSON and JUSTICE WILLETT, dissenting.

Forty-two years ago, the Texas Legislature passed what has become "widely regarded as the strongest and most successful open government law in the country." [1] Just three years later, in this Court's first opinion addressing the new Texas Open Records Act, [2] we confirmed that it is the Legislature's policymaking role to balance "the public's right of access" against "potential abuses of the right," and the Court's role is merely "to enforce the public's right of access given by the Act." *Indus. Found. of the S. v. Tex. Indus. Accident Bd.,* 540 S.W.2d 668, 675 (Tex.1976). Balancing these interests, the Legislature decided that the Act should apply to "the part, section, or portion" of any "organization [or] corporation ... that is supported in whole or in part by public funds." TEX. GOV'T CODE § 552.003(1)(A)(xii). That may be bad policy, or it may be good policy, but it is *the* policy of Texas, and this Court's only task is to enforce it.

[1]   *City of Dall. v. Abbott,* 304 S.W.3d 380, 395 n.5 (Tex.2010) (Wainwright, J., dissenting); *see also* CHARLES L. BABCOCK ET AL., OPEN GOVERNMENT GUIDE: OPEN RECORDS AND MEETINGS LAWS IN TEXAS 1–2 (6th ed. 2011) (describing Texas Public Information Act as "among the strongest in the nation" and "among the most liberal in the United States"), *available at* http://www.rcfp.org/rcfp/orders/docs/ogg/TX.pdf.

[2]   Act of May 19, 1973, 63d Leg., R.S., ch. 424, 1973 Tex. Gen. Laws 1112–18 (codified at TEX. REV. CIV. STAT. art. 6252–17a). In 1993, the Legislature codified the Act in the Texas Government Code and renamed it the Texas Public Information Act. Act of May 4, 1993, 73d Leg., R.S., ch. 268, § 1, secs. 552.001–.353, 1993 Tex. Gen.

Laws 583, 594–607 (codified at TEX. G OV'T CODE §§ 552.001–.353).

**\*13** To enforce the Legislature's policy choice in this case, we must decide what it means for a "part, section, or portion" of a corporation to be "supported in whole or in part by public funds." *See id.* The Court adopts the narrowest construction possible, identifying two requirements that appear nowhere in the statute's language. The Court's all-or-nothing construction is irreconcilable with the provision's express inclusion of a "part, section, or portion" of an entity that is "supported in whole *or in part* by public funds." *See id.*(emphasis added). Striving to be faithful to the Act's plain language, mindful of its express mandate that courts construe it liberally in favor of access to information, and respectful of the many prior decisions of the Texas Attorneys General charged with interpreting and enforcing the Act, I would hold that a "part, section, or portion" of a private organization or corporation is "supported in whole or in part by public funds" and thus a "governmental body" if it (1) receives public funds, (2) not as compensation or consideration paid in exchange for "specific goods" or "specific measurable services," but as a general or unrestricted payment provided to subsidize or underwrite the entity's activities, and (3) those activities promote a purpose, interest, or mission that the governmental and private entities share and would each pursue even in the absence of their contractual relationship. Because the evidence establishes all three of these elements in this case, I would hold on this record that the Greater Houston Partnership is a governmental body. Because the Court holds otherwise, I respectfully dissent.

## I.

### Background

This case presents a single question of statutory construction: what does the Texas Public Information Act mean when it refers to a "part, section, or portion" of an entity that is "supported in whole or in part by public funds"? *Id.* Purporting to rely on "[f]amiliar interpretive guides and established canons of construction,"*ante* at ——, the Court discards over forty years of legal interpretations and announces a brand new interpretation that, at best, reflects the Court's concerns instead of the Legislature's language. In light of the Court's analysis, and to place the issue in perspective, I begin by highlighting the Act's relevant requirements, the reasons for its enactment, prior constructions of the language

at issue, and the evidence here regarding the Partnership and its support.

## A. Requirements of the Act

The Public Information Act requires the "officer for public information of a governmental body" [3] to "promptly produce public information" upon request. TEX. GOV'T CODE § 552.221(a). "Public information" means information "that is written, produced, collected, assembled, or maintained under a law or ordinance or in connection with the transaction of official business," either (1) "by a governmental body;" (2) "for a governmental body" if the governmental body owns the information, has a right of access to it, or "spends or contributes public money for the purpose of writing, producing, collecting, assembling, or maintaining the information;" or (3) "by an individual officer or employee of a governmental body in the officer's or employee's official capacity and the information pertains to official business of the governmental body." *Id.*§ 552.002(a). "Information is in connection with the transaction of official business if the information is created by, transmitted to, received by, or maintained by an officer or employee of the governmental body in the officer's or employee's official capacity, or a person or entity performing official business or a governmental function on behalf of a governmental body, and pertains to official business of the governmental body." *Id.*§ 552.002(a-1).

[3]  An "officer for public information" is the governmental body's chief administrative officer (or, in the case of a county, an elected county officer), and the head of each department within the governmental body is the officer's agent for purposes of complying with the Act. TEX. GOV'T CODE §§ 552.201–.202.

The Act does not require a governmental body to produce public information that is "considered to be confidential by law, either constitutional, statutory, or by judicial decision." *Id.* § 552.101. The Act itself provides numerous other exceptions to its disclosure requirement, which include, among other things, certain personnel records, *id.* § 552.102, litigation records, *id.* § 552.103, information that "would give advantage to a competitor or bidder,"*id.* § 552.104, attorney-client information, *id.* § 552.107, trade secrets and commercial financial information, *id.* § 552.110, personal and family information of governmental employees, *id.* § 552.117(a), and "information [that] relates to economic development negotiations involving a governmental body

and a business prospect that the governmental body seeks to have locate, stay, or expand in or near the territory of the governmental body,"*id.* § 552.131(a). The Act does not allow a governmental body to unilaterally decide for itself whether it can withhold requested information. Instead, a governmental body that wishes to withhold information in response to a request must ask the Attorney General to decide whether the information fits within one of the Act's exceptions. *Id.*§ 552.301(a).

**\*14** It is difficult to overstate the Attorney General's role in this process. The Act assigns to the Attorney General the duty to "maintain uniformity in the application, operation, and interpretation" of the Act and authorizes the Attorney General to "publish any materials, including detailed and comprehensive written decisions and opinions, that relate to or are based on this chapter." *Id.* § 552.011. Upon receipt of a governmental body's request for a decision, the Attorney General considers comments and arguments from any interested person, *id.* § 552.304(a), and then must "promptly render a decision" on whether the requested information is within one of the Act's exceptions, *id.*§ 552.306(a); *see also id.*§ 552.306(b) (requiring the Attorney General to issue "a written opinion" and provide a copy to the requestor). Through its Open Records Division, the Attorney General's Office issues thousands of open records letter rulings every year, including more than 23,000 in 2014, and it is on pace to surpass that number this year. [4] If a governmental body fails to request an Attorney General decision when and as required, the requested information "is presumed to be subject to required public disclosure and must be released unless there is a compelling reason to withhold the information." *Id.* § 552.302.

[4]     *See Open Records Letter Rulings (ORLs),*OFFICE OF THE ATT'Y GEN. OF TEX. , www.texasattorneygeneral.gov/open/index_orl.php (last visited June 22, 2015). Texas law authorizes the Attorney General to announce legal determinations in various forms. The Government Code, for example, authorizes the Attorney General to provide "a written opinion" to certain governmental officials addressing "a question affecting the public interest or concerning the official duties of the requesting person." TEX. GOV'T CODE § 402.042(a). The Attorney General's determinations under this authority are commonly referred to as "attorney general opinions" and are named numerically using the initials of the issuing Attorney General as a prefix. *See About Attorney General Opinions,*OFFICE OF THE ATT'Y GEN. OF

TEX. , www.texasattorneygeneral.gov/opinion/about-attorney-general-opinions (last visited June 22, 2015). In addition, the Public Information Act authorizes and requires the Attorney General to issue a "decision," in the form of a "written opinion," announcing whether a governmental body may withhold information in response to a request under the Act. TEX. GOV'T CODE §§ 552.301(a), .306(a), (b). Pursuant to this authority, Attorneys General sometimes issue "open records decisions," which "are formal opinions relating to the Public Information Act" that "usually address novel or problematic legal questions and are signed by the Attorney General." *See Open Records Decisions (ORDS),*OFFICE OF THE ATT'Y GEN. OF TEX. , www.texasattorneygeneral.gov/og/open-records-decisions-ords (last visited June 22, 2015). These decisions are named numerically using the initials "ORD" as a prefix. *See id.* More often, Attorneys General have resolved open records questions by issuing "open records letter rulings," which "[u]nlike Open Records Decisions, [are] informal letter rulings ... applicable only to the specific documents and circumstances surrounding them[.]" *See Open Records Letter Rulings (ORLs),*OFFICE OF THE ATT'Y GEN. OF TEX. , www.texasattorneygeneral.gov/open/index_orl.php (last visited June 22, 2015). These rulings are named numerically using the initials "OR" and the year of issuance as a prefix. *See id.* Through the years, Texas Attorneys General have utilized all three methods to address open records issues, including the issue of what constitutes a "governmental body" under the Act.

If a governmental body refuses to request an Attorney General decision or refuses to produce public information or information that the Attorney General has determined is public and not excepted from disclosure, the Attorney General or a requestor may file suit for a writ of mandamus compelling the governmental body to make the information available. *Id.*§ 552.321. Conversely, a governmental body may file suit against the Attorney General, seeking declaratory relief from compliance with the Attorney General's decision. *Id.* § 552.324(a). In that suit, however, a governmental body can only rely on exceptions it asserted when it requested the Attorney General's decision, unless the exception is based on a federal law requirement or involves another person's property or privacy interests. *Id.* § 552.326(a), (b).

**\*15** The Act's requirements apply only to a "governmental body," which the Act defines to mean:

(i) a board, commission, department, committee, institution, agency, or office that is within or is created by the executive or legislative branch of state government and that is directed by one or more elected or appointed members;

(ii) a county commissioners court in the state;

(iii) a municipal governing body in the state;

(iv) a deliberative body that has rulemaking or quasi-judicial power and that is classified as a department, agency, or political subdivision of a county or municipality;

(v) a school district board of trustees;

(vi) a county board of school trustees;

(vii) a county board of education;

(viii) the governing board of a special district;

(ix) the governing body of a nonprofit corporation organized under Chapter 67, Water Code, that provides a water supply or wastewater service, or both, and is exempt from ad valorem taxation under Section 11.30, Tax Code;

(x) a local workforce development board created under Section 2308.253;

(xi) a nonprofit corporation that is eligible to receive funds under the federal community services block grant program and that is authorized by this state to serve a geographic area of the state; and

(xii) the part, section, or portion of an organization, corporation, commission, committee, institution, or agency that spends or that is supported in whole or in part by public funds[.]

*Id.* § 552.003(1)(A)(i)–(xii). The question here is whether the Greater Houston Partnership is "supported in whole or in part by public funds," and thus a "governmental body" under part (xii). "Public funds" means "funds of the state or of a governmental subdivision of the state." *Id.* § 552.003(5).

**B. Reasons for the Act**

The Public Information Act is unique in its extensive explanation of the policies that led to its enactment. As the Court explains, the Legislature first adopted the Act in response to the "Sharpstown scandal." *Ante* at ——. The Act begins by expressing the "fundamental philosophy" that "government is the servant and not the master of the people" and "the policy of this state that each person is entitled, unless otherwise expressly provided by law, at all times to complete information about the affairs of government and the official acts of public officials and employees." TEX. GOV'T CODE § 552.001(a). While the people of Texas have delegated governing authority to public employees, they "do not give their public servants the right to decide what is good for the people to know and what is not good for them to know." *Id.* Because "[t]he people insist on remaining informed so that they may retain control over the instruments they have created," the Act expressly provides that it "shall be liberally construed to implement this policy." *Id.* Courts must construe the Act's provisions "in favor of disclosure of requested information." *Jackson v. State Office of Admin. Hearings,* 351 S.W.3d 290, 293 (Tex.2011); *see also* TEX. GOV'T CODE § 552.001(b) ("This chapter shall be liberally construed in favor of granting a request for information.").

**C. Prior Constructions of the Act**

**\*16** Pursuant to their responsibility to "maintain uniformity in the application, operation, and interpretation" of the Act, TEX. GOV'T CODE § 552.011, Texas Attorneys General have issued numerous opinions addressing whether private entities—including several chambers of commerce and similar organizations—were "supported in whole or in part by public funds." Respecting the Attorney General's unique role, courts have given deference to Attorney General interpretations and applications, most notably the Fifth Circuit in *Kneeland v. National Collegiate Athletic Ass'n,* 850 F.2d 224, 228 (5th Cir. 1988).

**1. Pre-*Kneeland* Attorney General Decisions**

In 1973, shortly after the Act became effective, the Attorney General's very first open records decision addressed the statutory language we address today and concluded that a private bank was not "supported in whole or in part by public funds" merely because it received and held deposits of public funds. Tex. Att'y Gen. ORD–1 (1973). Six years later, the Attorney General concluded that an organization very similar to the Partnership—a private, nonprofit corporation

chartered to promote the interests of the Dallas–Fort Worth metropolitan area—was a governmental body under the Act. Tex. Att'y Gen. ORD–228 (1979). Pursuant to a contract, the City of Fort Worth paid the corporation $80,000 to "[c]ontinue its current successful programs and implement such new and innovative programs as will further its corporate objectives and common City's interests and activities" over a three-year period. *Id.* The Attorney General concluded that, by using the phrase "supported in whole or in part," the Legislature "did not intend to extend the application of the Act to private persons or businesses simply because they provide specific goods or services under a contract with a governmental body." *Id.* But this contract did not "impose a specific and definite obligation on the [corporation] to provide a measurable amount of service in exchange for a certain amount of money as would be expected in a typical arms-length contract for services between a vendor and purchaser." *Id.* Thus, not every "contract with a governmental body causes the records of a private contractor to be open," but a private entity is supported by public funds, and is thus a "governmental body," when the public funds are "used for the general support of the [entity] rather than being attributable to specific payment for specific measurable services." *Id.*

Three years later, the Attorney General relied on ORD–228 to find that another chamber-of-commerce-like organization—a private, nonprofit entity created to promote manufacturing and industrial development in the Bryan area—was a governmental body because the City of Bryan's contractual payment of $48,000 was like an "unrestricted" grant, rather than payment for specific measurable services. Tex. Att'y Gen. ORD–302 (1982) (noting that the situation was "virtually identical" to that in ORD–228). That same year, the Attorney General concluded that a private medical service provider for the Amarillo Hospital District was not a governmental body under the Act because the parties' contract prescribed specific measurable services, including ambulance services, for which the provider received a monthly sum "equal to the difference between cash receipts and approved operating expenditures of the ambulance service." Tex. Att'y Gen. ORD–343 (1982).

The following year, the Attorney General determined that a proposed athletic conference consisting of member universities would be a governmental body under the Act because each university would pay an upfront "membership fee" and subsequent annual fees that would be used for the conference's "general support ... rather than being attributable to specific payments for specific measurable services." Tex.

Att'y Gen. Op. No. JM–116 (1983) (quoting Tex. Att'y Gen. ORD–228). The conference's constitution stated one of its purposes was to aid members in incorporating intercollegiate athletics within their educational programs and to "place and maintain such athletics under the same administrative and academic control." *Id.* The constitution did not identify any specific, measurable services that the conference would provide in exchange for the public funds. *Id.*

**\*17** The Attorney General later determined that a private high school and a private nonprofit water supply corporation were not governmental bodies because neither of them received any public funds. Tex. Att'y Gen. Op. Nos. JM–154 (1984), JM–596 (1986). Then, in 1987, the Attorney General concluded that a volunteer fire department was a governmental body under the Act because fire protection is "traditionally provided by governmental bodies," volunteer fire departments have "strong affiliations with public agencies," and the contract provided the department with funds "to carry on its duties and responsibilities," which the Attorney General considered to be for its "general support." Tex. Att'y Gen. Op. No. JM–821 (1987). The Attorney General stated that the "test" for whether an entity is a governmental body under the Act "cannot be applied mechanically" and that the "precise manner of funding is not the sole dispositive issue." *Id.* Instead, the Attorney General considered "[t]he overall nature of the relationship," and concluded "a contract or relationship that involves public funds and that indicates a common purpose or objective or that creates an agency-type relationship" will bring the private entity within the Act's definition of governmental body. *Id.*

### 2. *Kneeland v. NCAA*

In 1988, the Fifth Circuit was asked whether the National Collegiate Athletic Association (NCAA) and the former Southwest Conference (SWC), which received public funds from several Texas public universities, were "supported in whole or in part by public funds" and thus "governmental bodies" under the Act. *Kneeland,* 850 F.2d at 228. In addressing this issue, the Court expressly based its analysis on the Attorneys General's prior decisions, noting that "[t]he usual deference paid to formal opinions of state attorneys general is accentuated in this case because the Texas Legislature has formally invited its Attorney General to interpret the Act when asked to do so." *Id.* at 228–29. Construing the statute's language and extrapolating principles from the Attorneys General's decisions, the Court cobbled together the following criteria—now known as the

"*Kneeland* test"—for determining whether a private entity is "supported ... by public funds" and thus a governmental body under the Act:

- "The Act does not apply to 'private persons or businesses simply because they provide specific goods or services under a contract with a government body.' " *Id.* at 228 (quoting Tex. Att'y Gen. ORD–1).

- "[A]n entity receiving public funds becomes a governmental body under the Act, unless its relationship with the government imposes 'a specific and definite obligation ... to provide a measurable amount of service in exchange for a certain amount of money as would be expected in a typical arms-length contract for services between a vendor and purchaser.' "*Id.* (quoting Tex. Att'y Gen. Op. No. JM–821, which quotes Tex. Att'y Gen. ORD–228).

- "[A] contract or relationship that involves public funds and that indicates a common purpose or objective or that creates an agency-type relationship between a private entity and a public entity will bring the private entity within the ... definition of a 'governmental body.' " *Id.* (quoting Tex. Att'y Gen. Op. No. JM–821).

- "[S]ome entities, such as volunteer fire departments, will be considered governmental bodies if they provide 'services traditionally provided by governmental bodies.' " *Id.* (quoting Tex. Att'y Gen. Op. No. JM–821).

Based on these principles and the Attorneys General's decisions from which they were drawn, the *Kneeland* court held that the NCAA and SWC were not governmental bodies under the Act. *Id.* at 230–31. With respect to the NCAA, the court concluded that the universities "receive[d] a *quid pro quo,* in sufficiently identifiable and measurable quantities of services," in exchange for the public funds they paid to the NCAA. *Id.* at 230. Similarly, the court concluded that the SWC provided "specific and guageable services which negate[d] the general support element required for a governmental body designation." *Id.* at 231.

### 3. Post-*Kneeland* Attorney General Decisions

Attorneys General have had several opportunities to address the issue since *Kneeland,* and in doing so have adopted the federal court's synopsis of the principles from their prior decisions. A few years after *Kneeland,* the Attorney General concluded that a private commission created by the San Antonio Chamber of Commerce to coordinate the annual Fiesta celebration was not a governmental body. Tex. Att'y Gen. ORD–569 (1990). The city designated the commission as its "official agency" responsible for planning, coordinating, and financially supporting the festival and gave the commission the right, subject to necessary approvals, to lease city-owned premises, obtain permits for parades and concession stands along parade route, grant permission to place seating along parade route, and assign its permit and lease rights to other entities sponsoring the event. *Id.* The Attorney General nevertheless concluded that the commission was not a governmental body because it did not receive any public funds. *Id.* ("The threshold question is whether the commission receives any funds from the City of San Antonio."). The Attorney General rejected the argument that money the commission received from the sale of tickets for seating along the parade route was "public funds" because the money would otherwise have been paid to the city. *Id.* ("By requiring the commission to get a permit for erecting bleachers and limiting the charge per seat, the city is not granting public funds to the commission, nor do the charges for seats constitute funds of the city.").

**\*18** In 1992, the Attorney General concluded that the Dallas Museum of Art was a governmental body under the Act, even though it received 85% of its revenue from private sources. Tex. Att'y Gen. ORD–602 (1992). The city owned some of the artwork at the museum, owned and maintained the premises housing the museum, and paid the museum's utilities, half of the museum employees' salaries, and a pro rata portion of the insurance premiums. *Id.* The museum admitted that it received public funds but argued that it received the funds in exchange for "known, specific, and measurable services" as opposed to general support. *Id.* Relying on *Kneeland* and the prior decisions, the Attorney General disagreed, concluding that while the city received "valuable services in exchange for its obligations" to the museum, those "highly specialized, unique services" could not be "known, specific, or measurable," and the city thus instead provided funds for the museum's general support. *Id.* The Attorney General nevertheless held that the museum was not required to disclose the requested records because only the part of the museum supported by public funds was a governmental body, and the records related to a collection the museum owned as part of its permanent collection, not to the part of the museum for which the city provided "direct support." *Id.* (noting the city's ownership of the building in which the collection was housed and its payment of a portion of the overhead expenses was "tangential" and "insufficient

to bring documents relating to the collection within the scope of the act").

Again addressing chamber-of-commerce-type entities, the Attorney General conducted a similar analysis in holding that the Arlington Chamber of Commerce and the Arlington Economic Development Foundation were governmental bodies under the Act. *See* Tex. Att'y Gen. ORD–621 (1993). The foundation admitted that it received public funds but argued that it did so in exchange for specific, measurable services. *Id.* The Attorney General disagreed, concluding that while the city received "valuable services in exchange for the public funds," the agreement failed "to impose on the foundation a specific and definite obligation to provide a measurable amount of services in exchange for a certain amount of money, as one would expect to find in a typical arms-length contract." *Id.* The Attorney General concluded that the chamber of commerce was also a governmental body, even though it received public funds through the foundation rather than from the city directly. *Id.*

Eight years later, the Attorney General reached the same result with respect to the Round Rock Chamber of Commerce, observing that its contract with the City of Round Rock neither restricted the chamber's use of the public funds it received nor imposed any "specific and definite obligation to provide a measurable amount of services in exchange for a certain amount of money, as one would expect to find in a typical arms-length contract." Tex. Att'y Gen. OR2001–4849 (2001).

And a few years after that, the Attorney General held that the Greater Houston Partnership itself was a governmental body under the Act, under a similar analysis. Tex. Att'y Gen. OR2004–4221 (2004). The Partnership specified in its request for an Attorney General's ruling that the requested records related to a project being handled by a specific part of the Partnership, the Economic Development Division. At that time, different contracts governed the Partnership's relationship with the City of Houston. Examining those contracts' provisions—including one that obligated the Partnership to "support the efforts of the University of Houston Small [B]usiness Development Center in the conduct of the Director Business Assistance Program, designed to assist and promote the efforts of local businesses and entrepreneurs to form new business ventures or to expand existing business ventures"—the Attorney General determined that, "[a]lthough ... the city is receiving valuable services in exchange for its obligations under this

contract, the [Partnership] has not sufficiently demonstrated that the nature of the services it provides are known, specific, or measurable." *Id.* "Consequently," the Attorney General concluded, "the [Partnership's] records concerning its *operations that are directly supported by governmental bodies* are subject to the Act as public information." *Id.* (emphasis added).

In addition to arguing that it was not a governmental body, the Partnership alternatively relied on the Act's exceptions to disclosure for certain economic development information and for certain email addresses. *See id.*; TEX. GOV'T CODE §§ 552.131 (excepting certain information relating to economic development negotiations), 552.137 (excepting certain email addresses). The Attorney General agreed in part and disagreed in part, instructing the Partnership to release some but not all of the documents submitted to the Attorney General for review. *See* Tex. Att'y Gen. OR2004–4221.

**\*19** In 2007, the Attorney General again relied on *Kneeland* and the distinction between use of public funds for "general support" as opposed to payment for "specific and measurable services" to conclude that a family planning service provider that contracted with the Department of State Health Services was a governmental body under the Act. Tex. Att'y Gen. OR2007–06167 (2007). Similarly, in 2011, the Attorney General decided that channel Austin, a nonprofit corporation that contracted with the City of Austin "to manage the equipment, building, resources, and the three channels for Public Access," received public funds as an "unrestricted grant" for its "general support rather than payment for specific services." Tex. Att'y Gen. OR2011–17967 (2011).

In a 2008 formal opinion, the Attorney General observed, consistent with the *Kneeland* test, that it is sometimes significant that the private entity has a "common purpose or objective or one that creates an agency-type relationship" with the governmental entity, or that it performs services "traditionally provided by governmental bodies." Tex. Att'y Gen. Op. No. GA–666 (2008). But the Attorney General explained that the "primary test" is "whether the entity receives public funds for the general support of its activities, rather than using those funds to perform a specific and definite obligation." *Id.* (determining that an association of appraisal districts, which received membership fees from governmental entities in exchange for promoting "effective and efficient functioning and administration of appraisal districts in Texas," was a governmental body). Four years later, the Attorney General held that a health services provider

was a governmental body under the Act because the contract language evidenced a "common purpose or objective between the health service and the district such that an agency-type relationship [wa]s created." Tex. Att'y Gen. OR2012–11220 (2012) (considering contract in which the parties agreed "to cooperate to provide services to the residents of Nacogdoches County who are in need of service avoiding duplication of services when possible" and "to refer patients for services, as needed, and in doing so will provide documentation for patient records when needed").

### D. The Partnership's "Support"

With the statute's language and these prior decisions in mind, I turn to the facts at issue here. The Greater Houston Partnership is a private nonprofit corporation that functions as a chamber of commerce to promote job creation, increased trade, and capital investment in the greater Houston area. For many years, including 2007 and 2008, the Partnership entered into an annual "Agreement for Professional Services" with the City of Houston, in which the Partnership agreed to perform certain marketing, research, and promotional services designed "to increase investment in, and to improve the economic prosperity of Houston and the Houston Airport System." [5] The contracts required that the scope of the Partnership's services "support the goals, visions, and objectives outlined in *the Partnership's* Strategic Plan."(Emphasis added). In exchange for these services, the City agreed to pay the Partnership a lump sum amount of $196,250.00 per quarter. The City's payments constituted less than 8% of the Partnership's total annual revenue, 90% of which came from dues the Partnership's members paid.

[5]    The Local Government Code authorizes municipalities to contract with private entities like the Partnership "for the administration of a program" to promote "local economic development and to stimulate business and commercial activity in the municipality." TEX. LOC. GOV'T CODEE § 380.001.

 **\*20**  The services agreements specified that the Partnership was an independent contractor, but they also gave the City certain rights to participate in and control some of the Partnership's activities. Among other things, the Partnership agreed to coordinate its efforts with the directors of the City's Department of Convention & Entertainment Facilities, Department of Planning and Development, and the Houston Airport System (the Directors); to submit quarterly progress reports "describing in detail services performed"; to provide

any other reports the Directors request; to produce any non-confidential records the City Attorney requires to evaluate the Partnership's compliance with the contract; and to inform the City of any claims arising out of the Partnership's failure to pay its employees, subcontractors, or suppliers. The contracts granted the City "full membership and exclusive benefits as a General Partner" of the Partnership, which included membership in the Partnership's policy-level committees, but prohibited the City from participating on any of the Partnership's governing boards.

The 2008 agreement differs from the 2007 agreement in several respects. While the 2007 agreement required the Partnership to "implement a program" to increase investments in the Houston area, the 2008 agreement required the Partnership to provide "specific, measurable services" to increase investments. While the 2007 contract permitted the City to require the Partnership to terminate any employee or subcontractor whose work the Directors deemed unsatisfactory, the 2008 contract only required the Partnership to "consider removing" any such employee or subcontractor. And unlike the 2007 agreement, the 2008 agreement stated that the City's payments were solely for services rendered and were not intended as general support for the Partnership's other activities, and expressly provided that nothing in the agreement shall be construed to imply that the Partnership is subject to the Texas Public Information Act.

In May 2008, [6] Houston-area resident Jim Jenkins submitted a Public Information Act request to the Partnership, asking that it provide him with "a copy of the check register ... for all checks [the Partnership] issued for the year 2007," including "for each check issued: check number, check date, payee name, and check amount." Jenkins later submitted a second request, seeking the same information for all checks the Partnership issued in 2008. The Partnership refused to provide the requested information, and instead asked the Attorney General to decide whether the Partnership is a "governmental body" subject to the Public Information Act. The Partnership did not assert that only "a part, section, or portion" of the Partnership is "supported in whole or in part by public funds," as it had successfully argued in 2004. *See* Tex. Att'y Gen. OR2004–4221. Nor did it assert that any information in the check register was not "public information" or that one of the Act's exceptions applied, as it had also asserted in 2004. *See id.* Instead, the Partnership relied solely on its contention that it is not a governmental body under the Act.

[6]    The Partnership and City executed the 2008 services agreement in August 2008, a few months after receiving Jenkin's first request for information, which may explain the differences we have described between the 2007 and 2008 agreements.

Consistent with its 2004 ruling, the Attorney General's Open Records Division ruled that the Partnership is a governmental body and must comply with the Act's requirements. Tex. Att'y Gen. OR2008–16062 (2008). The Partnership filed suit against the Attorney General to challenge the ruling, and Jenkins intervened. The trial court agreed with the Attorney General and held that the Partnership is a governmental body under the Act. The Partnership appealed, and the court of appeals affirmed, with one justice dissenting. 407 S.W.3d 776. We initially denied the Partnership's petition for review, but we later granted its motion for rehearing and its petition, to address when a private entity may qualify as a governmental body under the Act.

## II.

### "Supported in Whole or In Part"

 **\*21**   The issue here is whether the Greater Houston Partnership is "supported in whole or in part by public funds" and is thus a "governmental body" under the Act.[7] The interpretation of the Act presents questions of law. *City of Garland v. Dall. Morning News,* 22 S.W.3d 351, 357 (Tex.2000). In light of the Act's strong policy in favor of disclosure, a party seeking to withhold requested information bears the burden of proving that the information is not subject to disclosure under the Act. *See Thomas v. Cornyn,* 71 S.W.3d 473, 488 (Tex.App.–Austin 2002, no pet.)(holding that "a governing body should bear the burden of proving in a judicial proceeding that an exception to disclosure applies").

[7]    Although the Partnership has previously argued that requested records related solely to its Economic Development Division, *see*Tex. Att'y Gen. OR2004– 4221 (2004), it has made no similar effort to identify or limit the Act to any particular sections or divisions in this case. Our issue is therefore whether the Partnership, as a whole, is "supported in whole or in part by public funds," and not whether any particular "part, section, or portion" of the Partnership is.

The Partnership makes three arguments as to why it is not a "governmental body" under the Public Information Act.

First, the Partnership contends the phrase "supported ... by public funds" unambiguously does not include the City's contractual payments to the Partnership. Next, the Partnership argues, even if the language is ambiguous, the Court should reject the *Kneeland* test because it is unclear and not grounded in the statutory language. Third, if the Court does adopt the *Kneeland* test, the Partnership argues it is not "supported ... by public funds" even under that test. The Court agrees with the Partnership's first argument—that the statute unambiguously does not apply to the Partnership—but also notes its displeasure with the *Kneeland* test. I disagree. I would hold that the statute is ambiguous, adopt but clarify the *Kneeland* test, and conclude that under that test the Partnership "is supported in whole or in part by public funds."

### A. The Court's Interpretation

The Court begins its analysis by noting that the term "supported" can have several different meanings. *Ante* at __. Because "supported by" in the clause at issue refers specifically to "public funds," the Court concludes that the Act focuses solely on monetary support. *Ante* at __. The Court then proceeds to identify two different requirements that must each exist for a private entity to receive monetary "support," which I will refer to as the "sustenance" requirement and the "functional equivalent" requirement. *Ante* at ___ (agreeing with Partnership's contention that definition only includes "entities that were created or exist to carry out government functions and whose existence are maintained in whole or in part with public funds"). Although the Court asserts that it is simply applying a "plain language" approach to construing the statute, *ante* at ___, and is not relying on any "extra-textual analytical construct," *ante* at ___, neither of the Court's two requirements appears anywhere in the statute's language. I do not agree that the Act's language "unambiguously" supports the judicial insertion of either requirement into its definition of a "governmental body."

### 1. The "Sustenance" Requirement

Addressing the first requirement, the Court says "supported" can mean (and here must mean) "sustenance, maintenance, or both." *Ante* at __. The Court provides this as the "maintenance" definition of "supported": "to pay the costs of: maintain; to supply with the means of maintenance (as lodging, food or clothing) or to earn or furnish funds for maintaining[.]" *Ante* at __ (quoting WEBSTER'S THIRD NEW INT'L DICTIONARY 2297 (2002)). The Court then

concludes that "supported" cannot mean "maintenance" in this context because otherwise the definition would include "any private entity that received any public funds," and "even a paper vendor with hundreds of clients would qualify as a 'governmental body' merely by virtue of selling office supplies to a single state office." *Ante* at __.

**\*22** In contrast to the "maintenance" definition, the Court gives this "sustenance" definition of "supported": "to provide a basis for the existence or subsistence of: serve as the source of material or immaterial supply, nourishment, provender, fuel, raw material, or sustenance of." *Ante* at __ (quoting WEBSTER'S THIRD NEW INT'L DICTIONARY at 2297). The Court thus distinguishes between the "maintenance" meaning of "supported" and the "sustenance" meaning of "supported" and concludes that in the context of the Act, "supported by" can only mean the latter, so the Act applies only to private entities "sustained, at least in part, by public funds, meaning they would not perform the same or similar services without public funds." *Ante* at __.

Although the Court reads far more into these two definitions of "support" than I find there, as explained below, I generally agree that the term "support" must refer here to monies paid as general funds to sustain the recipient, rather than funds paid as consideration for specific goods or services. But the Court goes far beyond that principle today, and holds that an entity is "supported in whole or in part by public funds" only if the entity cannot survive without those funds. As a result, the Court writes the words "in part" completely out of the statutory definition. To be sure, the Court creates the appearance that it is actually enforcing the statute as written by referring to the "supported ... in part" language several times in its opinion:

- "requires us to decide whether the term 'supported' encompasses private entities ... sustained—in whole *or in part* —by [public] funds,"*ante* at ___ (emphasis added);

- " 'supported' ... unambiguously includes only those entities *at least partially* sustained by public funding,"*ante* at __ (emphasis added);

- "[the Partnership] is not wholly or *partially* sustained by public funds,"*ante* at ___ (emphasis added);

- "the [Act] applies only to entities acting as the functional equivalent of a governmental body that are 'sustained'

*at least in part,* by public funds,"*ante* at __ (emphasis added); and

- "we define 'supported in whole or *in part* by public funds' to include only those private entities or their sub-parts sustained, *at least in part,* by public funds,"*ante* at ___ (emphases added).

But despite these lip-service payments to the statute's language, the Court repeatedly holds that an entity (or any part, section, or portion of an entity) that receives public funds as sustenance (as opposed to maintenance) is not a governmental body unless it cannot survive and pursue its mission without those funds:

- "defining 'supported' as 'sustenance' ensures that only an entity, or its 'part, section or portion,' whose existence is predicated on the continued receipt of government funds would qualify as a 'governmental body,' "*ante* at __;

- "[t]o be 'sustained' by public funds suggests the existence of a financially dependent relationship between the governmental body and a private entity or its subdivision,"*ante* at __;

- "a private entity would qualify under a financially dependent construction of 'supported' if it could not pursue its mission and objectives without the receipt of public funds, even if that funding only partially financed the entity's endeavors. In short, an entity 'supported' by public funds would not just receive government funds; it would require them to operate in whole or in part,"*ante* at __;

- "[the Partnership] is not 'supported' by public funds because it receives only a small portion of its revenue from government contracts[, a]nd even if these government contracts were eliminated, it could continue to operate given the substantial revenue derived from other non-governmental sources,"*ante* at ___;

**\*23** - "the statute encompasses only those private entities dependent on the public fisc to operate as a going concern,"*ante* at ___; and

- "An entity ... that does not depend on any particular revenue source to survive—public or private—is not sustained even in part by government funds,"*ante* at __.

The Court thus holds that a private entity that receives public funds can be a governmental body under the Act only if

it cannot "survive" or "exist" or "pursue its mission and objectives" without those public funds, even if those funds are just "one of several contributing sources." I disagree. An entity that is "sustained" (as the Court uses that word) by funds it receives from several different sources is sustained "in part" by the funds from each of those sources, even if it could survive and pursue its mission without the funds from any one source. The Court asserts that "sustenance implies that if the government ceased to provide financial support, the entity would be unable to meet its financial obligations." *Ante* at ___. But even if that were true,[8] "sustenance *in part*" implies the exact opposite. If "part" of an entity's "sustenance" comes from one source, it is "sustained *in part*" by that source even if it could survive without that part.

[8]     The Court fails to identify any dictionary that defines "supported" to mean financially dependent upon for its very existence. *See ante* at ___. While there are many definitions of "support" that refer to "sustenance or maintenance" or even "*a* basis for the existence or subsistence of," *see ante* at ___ (emphasis added), none of the definitions require an absolute dependence, and in any event, the statute's definition expressly excludes such a requirement by referring to support "in part."

The Court attempts to justify its "surviv[al]" requirement by suggesting that the statute's " 'in part' language may envision a multi-division entity that does business with the government, but not uniformly and not across all units." *Ante* at ___. "For instance," the Court explains, if a "large corporation" has a "subdivision" that "is wholly funded by government contracts," but the government funds are only "a relatively small portion of the corporation's total revenue," the corporation "may be said to be supported 'in part' by public funds." *Ante* at ___. This illustration confuses the statute's reference to "supported in part" with its reference to the "part, section, or portion" of an entity. The statute provides that the "part, section, or portion" of an entity is a governmental body if it is "supported in whole or in part by public funds." TEX. GOV'T CODE § 552.003(1)(A)(xii). The Court is correct that, if one subdivision of a large corporation is "supported in whole ... by public funds," then the corporation itself is "supported ... in part by public funds." But the statute permits the corporation to limit the Act's application to the subdivision by showing that only that subdivision (i.e., that "part, section, or portion" of the corporation) is "supported in whole or in part" by public funds. The illustration the Court "conceptualize[s]" has nothing to do with the Court's "surviv[al]" requirement.

**\*24** A relevant illustration is this: even if only 5% of the funds that support the Court's hypothetical corporate subdivision were public funds, the subdivision would still be "supported *in part*" by those funds, and would thus be a governmental body under the Act's plain language. An entity "supported ... in part by public funds" is a governmental body, regardless of whether it could "survive" or "pursue its mission" without those funds. *See id.* The Court's construction reads this language out of the Act by requiring the whole of the entity to live or die by the public fisc.

**2. The "Functional Equivalent" Requirement**

The Court also holds that an entity is not "supported in whole or in part by public funds" unless it is "acting as the functional equivalent of a governmental body,"*ante* at ___, and providing "services traditionally considered governmental prerogatives or responsibilities,"*ante* at ___. As with its first requirement, the Court does not derive this requirement from the statutory definition at issue. Subsection (xii) expressly identifies several types of entities that typically are not public (or governmental) entities, including an "organization," a "committee," an "institution," and—importantly, here—a "corporation." The Act says such private entities are governmental bodies if they are "supported in whole or in part by public funds," not if they are acting as the "functional equivalent" of a governmental body or performing traditional government responsibilities. TEX. GOV'T CODE § 552.003(1)(A)(xii). The Court, however, asserts three bases for imposing this requirement: (1) the Act's "stated purpose"; (2) the statute's omission of "any broad reference to private entities"; and (3) the "scope and nature of the eleven other types of entities more clearly described as a 'governmental body' in the same provision,"*ante* at ___. I do not agree that any of these justifies writing the Court's "functional equivalent" requirement into the statute.

First, the Court suggests that requiring a private entity to be the "functional equivalent" of a governmental body is necessary to ensure that our construction of "supported" is "compatible with" the Act's "stated purpose." *Ante* at ___ This "stated purpose," the Court explains, is to provide the public with "complete information about the affairs of government and the official acts of public officials and employees" to "allow the public to 'retain control over the instruments they have created.' " *Ante* at ___ (quoting TEX. GOV'T CODE § 552.001(a)). Although the Court makes no effort to explain why this purpose necessitates or implies the "functional equivalent" requirement, I presume

the Court finds hidden meaning in the purpose statement's reference to the "affairs of *government,*" the "acts of *public* officials and employees," and the "*instruments...* created," as if the words I have emphasized exclude any purpose to require disclosure of information held by a private entity. But to emphasize a different word, the statute's purpose is to provide "*complete* information" about those affairs, acts, and instruments. The Legislature may have believed that the only way to ensure the public has "complete" information about what their government is doing is to treat some private entities as governmental bodies under the Act. Whatever we may presume about what the Legislature may have "believed," what the Legislature "said" was that "governmental body" includes any entity "supported in whole or in part by public funds," not any entity that is the "functional equivalent" of a governmental body.

**\*25** As a second reason for requiring a private entity to be the "functional equivalent" of a governmental body, the Court asserts that the definition does not include "any broad reference to private entities." *Ante* at ___.[9] Assuming that the Legislature "carefully omitted" any such "broad reference," and presuming that the Legislature "purposefully selected" this omission, the Court concludes that the definition, "as applied to private entities, must be filtered through the Act's purpose and function of allowing access to instrumentalities of government," and thus "only applies to private entities acting as the functional equivalent of the government." *Ante* at ___. Respectfully, I fail to follow the Court's logic. It might be logical to conclude from the omission of any "broad reference" to private entities that the Legislature did not intend to include *all* private entities as "governmental bodies." But it is illogical to conclude that the omission of a "broad reference" somehow indicates which private entities the Legislature intended to include and which it did not. And it is simply preposterous to conclude that the omission somehow indicates that they intended to include "only those entities acting as the functional equivalent of the government." *Ante* at ___. We need not engage in such sophistry, because the statute tells us which private entities the Legislature intended to include as governmental bodies: those that are "supported in whole or in part by public funds." TEX. GOV'T CODE § 552.003(1)(A)(xii). The Court finds support for its judicially created functional equivalent test only by manufacturing a "broad reference" to stack upon its misconstruction of the Act's "stated purpose."

[9] This assertion is simply wrong. The very definition at issue "broadly refers" to private entities by using a

string of particularly broad terms to reference private entities of all types: "the part, section, or portion of an organization, corporation, commission, committee, institution, or agency that spends or is supported in whole or in part by public funds[.]" TEX. GOV'T CODE § 552.001(1)(A)(xii). The "omission" on which the Court relies simply does not exist.

For the third (though "not dispositive") reason for requiring a private entity to be the "functional equivalent" of a governmental body, the Court relies on the "canon of statutory construction known as *noscitur a sociis.*" *Ante* at ___. This canon provides "that a word is known by the company it keeps." *Fiess v. State Farm Lloyds,* 202 S.W.3d 744, 750 (Tex.2006) (quoting *Gustafson v. Alloyd Co.,* 513 U.S. 561, 575, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995)). It "directs that similar terms be interpreted in a similar manner,"*TGS– NOPEC Geophysical Co. v. Combs,* 340 S.W.3d 432, 441 (Tex.2011), but there is no similarity between the words in definition (xii)—an "organization" or "corporation" that is "supported in whole or in part by public funds"—and those in the preceding definitions. If definition (xii) provided "general" language, following "specific and particularized enumerations" in the first eleven definitions, then we would "treat the general words as limited and apply them only to the same kind or class of [things] as those expressly mentioned." *City of San Antonio v. City of Boerne,* 111 S.W.3d 22, 29 (Tex.2003). But definition (xii) uses specific language, inherently different than the language of the other definitions, and thus refers to something specific, not just a catch-all to conclude the preceding definitions. Under *noscitur a sociis,* we should look to the words "immediately surrounding" the phrase "supported by," which include the words "public funds" and, importantly, "in whole *or in part* " (which the Court ignores). *See*BLACK'S LAW DICTIONARY 1224 (10th ed. 2014) (defining *noscitur a sociis* as "a canon of construction holding that the meaning of an unclear word or phrase, esp. one in a list, should be determined by the words immediately surrounding it").

Even if the Court were applying the doctrine of *noscitur a sociis* correctly here, that doctrine cannot be used to render express statutory language meaningless. "If ... the specific terms exhaust the class of items enumerated in the statute, it must be presumed that any generic term that follows must refer to items transcending the class, since a contrary construction 'would contravene the more important rule of construction that all words are to be given effect.' " *Shipp v. State,* 331 S.W.3d 433, 437 (Tex.Crim.App.2011) (quoting 2A NORMAN J. SINGER & J.D. SHAMBIE SINGER,

SUTHERLAND STATUTORY CONSTRUCTION § 47:21 at 390–91 (7th ed.2007)); *see also Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue,* 271 S.W.3d 238, 256 (Tex.2008) ("The Court must not interpret the statute in a manner that renders any part of the statute meaningless or superfluous."); *City of San Antonio,* 111 S.W.3d at 29 (rejecting construction that would render some statutory language unnecessary and citing *Spence v. Fenchler,* 107 Tex. 443, 180 S.W. 597, 601 (1915), for the proposition that "[i]t is an elementary rule of construction that, when possible to do so, effect must be given to every sentence, clause, and word of a statute so that no part thereof be rendered superfluous or inoperative"). We must "read the statute contextually," *Office of Att'y Gen.,* 422 S.W.3d at 629, considering the relevant language in the context of the statute as a whole, rather than as "isolated provisions," *TGS–NOPEC Geophysical,* 340 S.W.3d at 439, and endeavoring to "giv[e] effect to every word, clause, and sentence,"*In re Office of Att'y Gen.,* 422 S.W.3d 623, 629 (Tex.2013), so that none of the language is rendered superfluous, *see Crosstex Energy Servs., L.P. v. Pro Plus, Inc.,* 430 S.W.3d 384, 390 (Tex.2014). Because the Court's construction renders the phrase "in whole or *in part* " meaningless, I do not agree that definition (xii) includes "organizations" and "corporations" only if they "function as quasi-public" entities. *Ante* at ——.

## B. A More Accurate Interpretation

 **\*26**  If a statute's words are susceptible to two or more reasonable interpretations, and we "cannot discern legislative intent in the language of the statute itself," the statute is ambiguous, and we may rely on applicable canons of statutory construction. *Tex. Lottery Comm'n v. First State Bank of DeQueen,* 325 S.W.3d 628, 639 (Tex.2010). I would conclude that the words "supported by" are ambiguous in this context, and would thus grant deference to the Attorneys General's long-standing construction of the Act's definition of a "governmental body." *See Combs v. Health Care Servs. Corp.,* 401 S.W.3d 623, 629–30 (Tex.2013) (stating that we grant deference to construction of agency that is charged with enforcement of statute if statute is ambiguous, agency interpretation results from formal proceedings, and interpretation is reasonable). Though not controlling, I would consider the Attorney General constructions to be persuasive, particularly in light of the responsibility the Legislature has given the Attorney General for "interpreting" and promoting uniformity in the application of the Act. *See* TEX. GOV'T CODE § 552.011; *see also City of Dall. v. Abbott,* 304 S.W.3d 380, 384 (Tex.2010) (observing that Attorneys General's

interpretations of Public Information Act are persuasive but not controlling). But I would also clarify the *Kneeland* test to provide greater simplicity and guidance.

## 1. Ambiguity

The Court and the parties agree that not every private entity that contracts with the government and receives payments of public funds is "supported ... by public funds." More specifically, they agree with the Attorneys General's conclusion that an ordinary, arms-length transaction between a private party and a governmental entity does not render the private party a "governmental body" under the Act. They agree that something more is required, but they dispute whether that something is present here. I too agree that something more is required, but I conclude that the statute is ambiguous as to what that something is. [10]

[10]   The Court argues that "governmental body" should not include every single vendor who sells a product or service to the government in a *quid pro quo* transaction, and cites authority from other jurisdictions to support this contention. This is, of course, a straw man argument, as everyone in the case agrees that we cannot construe the term that broadly. But merely because one extreme construction is available that would lead to an (arguably) absurd result does not mean that every less extreme construction within the range from narrowest to broadest possible constructions is unreasonable. Moreover, no one argues that the Partnership is merely an ordinary vendor under the contracts at issue here.

The phrase "supported by" can have multiple common, ordinary meanings, including:

1. To carry the weight of, exp. from below.

2. To maintain in position so as to keep from falling, sinking, or slipping.

3. To be able to bear: WITHSTAND.

4. To keep from failing or yielding during stress.

5. To provide for, by supplying with money or necessities. <*support* a large family>

6. To furnish corroborating evidence for <*support* a witness's testimony>

7. To aid the cause of by approving, favoring, or advocating <*support* for a political candidate>

8. To endure: tolerate.

9. a. To act (a part or role). b. To act in a secondary or subordinate role to (a leading performer).

WEBSTER'S II NEW COLLEGE DICTIONARY 1108 (1995).

I agree with the Court that most of these definitions do not apply in this statutory context, which limits "support" to a function that can be performed by money. *See TGS– NOPEC Geophysical,* 340 S.W.3d at 441 (using statutory context to eliminate inapplicable meanings of a word in the statute). An ordinary reader could construe some of the broader definitions to include financial "support": e.g., public funds could "carry the [financial] weight of" an entity. *See* WEBSTER'S II NEW COLLEGE DICTIONARY at 1108. In context, the most relatable definition is "[t]o provide for, by supplying with money or necessities." *Id.* The Partnership relies on this common meaning and argues that, just as a person "pays" an employee but "supports" a family member, the City "paid" rather than "supported" the Partnership. But even this definition of "support" does not resolve the statute's ambiguity because the statute requires only that the entity be supported "in whole or *in part* " by public funds. TEX. GOV'T CODE § 552.003(1)(A)(xii) (emphasis added).

**\*27** As the Court notes, in the broadest sense, virtually any income from public funds could reasonably be considered to "provide for" the Partnership "in part" by supplying it with money, even if the City pays the money in exchange for specific goods or services rendered. *Ante* at ——; *see also Tex. Ass'n of Appraisal Dists., Inc. v. Hart,* 382 S.W.3d 587, 591–92 (Tex.App.–Austin 2012, no pet.)(observing that the dictionary definitions of "support" are "so broad and varied that any private entity that receives any public funds can be said to be, at least in part, 'supported' by those public funds," yet all authorities have agreed that "simply receiving public funds does not make a private entity a 'governmental body' under the [Act]"). The same problem results from the Court's definition of "supported" to mean "to provide a basis for the existence or subsistence of." *Ante* at ——. At least "in part," the City's payments for chamber-of-commerce services provide a reason for the Partnership's existence and enable it to "pursue its mission," and the City's payments for those services constitute at least a "part" of the revenue that sustains the Partnership. *See ante* at ——. I would conclude that the Act's reference to entities that are "supported in whole or in

part by public funds" is ambiguous, and thus turn to existing precedents—and specifically Attorney General decisions and the *Kneeland* test—or further guidance. [11]

[11]  A statute is ambiguous if two or more plausible constructions are reasonable. *Tex. Lottery Comm'n,* 325 S.W.3d at 639. The Court finds the phrase "supported in whole or in part by public funds" unambiguous, although it suggests that two of the dictionary definitions ("sustenance" and "maintenance") are "remotely possible." *Ante* at ——. The Court pursues a backwards approach to the ambiguity analysis: it relies on context, purpose, and canons of construction first to exclude every possible meaning of the word "supported" except two, then to exclude all but the most narrow of those two "possible" definitions, and then declares that the term is "unambiguous" because there's only one "reasonable" definition." I find the term ambiguous because, even in context and considering the statute's purpose, it is susceptible to more than one reasonable meaning, and I thus turn to canons of construction and persuasive authorities for assistance in determining what the statute's actual language must mean.

## 2. A Clarified *Kneeland* Test

Although this Court has not previously construed the Act's "supported by" language, the Fifth Circuit has in *Kneeland,* and Attorneys General have since consistently relied on the *Kneeland* test as the governing standard. The Partnership urges us to reject the *Kneeland* test, asserting that it "has no basis in the statutory text" and leaves too much uncertainty in the law. The Attorney General counters that the *Kneeland* test "satisfies the legislature's intent[ ] to shed light on the affairs of government" and "provides a workable framework for determining whether an entity is a governmental body under the [Act] because it treats entities functioning as governmental bodies as such while eliminating vendors providing goods and services through arms-length contracts from the definition."

I would conclude that the *Kneeland* test and its related precedent offer persuasive, though not controlling, legal authority. *See Christus Health Gulf Coast v. Aetna, Inc.,* 237 S.W.3d 338, 343 & n.8 (Tex.2007) (noting that Fifth Circuit precedent is persuasive but not binding on this Court) (citing *Penrod Drilling Corp. v. Williams,* 868 S.W.2d 294, 296 (Tex.1993)). The test is founded on deference to the Attorneys General's interpretations of the Act, which are likewise persuasive but not controlling. *See City of Dall.,* 304 S.W.3d

at 384. The Court complains that the *Kneeland* test has a "questionable foundation," noting that even the *Kneeland* court acknowledged that its explanation of its holding was "a mite uncertain." *Ante* at —— (quoting *Kneeland,* 850 F.2d at 224). But as the Court notes, it is the "direction given" in *Kneeland* that the court described as "uncertain," not the "foundation" on which the court relied. Although the court acknowledged that its description of the test was less than clear, "[o]ne may have no quarrel with the formulae" it adopted. *Kneeland,* 850 F.2d at 228. I would take this opportunity to clarify the *Kneeland* test by articulating three basic requirements for determining whether a private entity that provides services to or for the government and is paid with public funds is "supported in whole or part by public funds" and is thus a governmental body under the Act.

### a. Receipt of Public Funds

**\*28** First, to be "supported by" public funds, a private entity must at least "receive" public funds, so an entity that does not receive public funds is not a governmental body under this provision. Thus, while the Attorney General was cognizant in JM–821 that the role of a volunteer fire department is one "traditionally provided by governmental bodies," this fact, standing alone, is not enough. *See* Tex. Att'y Gen. Op. No. JM–821. Arguably, at least, the private high school in JM–154, the water supply corporation in JM–596, and the Fiesta planning commission in ORD–569 also provided services "traditionally provided by governmental bodies." *See* Tex. Att'y Gen. ORD–569; Tex. Att'y Gen. Op. Nos. JM–154, JM–596. But because they did not receive public funds, they were not governmental bodies under part (xii). *See* TEX. GOV'T CODE § 552.003(1)(A)(xii). As the Attorney General recognized, "[t]he threshold question is whether the [private entity] receives any funds from the [public fisc]." Tex. Att'y Gen. ORD–569; *see also* Tex. Att'y Gen. OR2013–09038 (determining that El Paso Zoological Society that received no public funds was not a governmental body).

### b. Support, Not Consideration

Everyone agrees, however, that merely "receiving" public funds does not equate to being "supported by" those funds. Governmental entities regularly purchase a wide variety of goods and services from private vendors, including everything from legal pads to legal services, and I agree that such vendors are generally not "supported ... by public

funds" as a result of such transactions, at least as the Act uses that term. Thus, a private entity that receives public funds in exchange for assuming an "obligation to provide a measurable amount of service in exchange for a certain amount of money as would be expected in a typical arms-length contract for services between a vendor and purchaser" is not "supported by" those public funds, and is not a governmental body under the Act. *CareFlite v. Rural Hill Emergency Med. Servs., Inc.,* 418 S.W.3d 132, 141–42 (Tex.App.–Eastland 2012, no pet.)(holding that medical service provider was not a governmental body); *see also Hart,* 382 S.W.3d at 595 (holding that association of appraisal districts was not a governmental body).

A second requirement for a private entity to be "supported ... by public funds," then, should be that the private entity must receive public funds not as compensation or consideration paid in exchange for "specific goods" or "specific measurable services," but as a general or unrestricted payment provided to subsidize or underwrite the private entity's activities. *See* Tex. Att'y Gen. Op. No. GA–666; *compare* Tex. Att'y Gen. ORD–228 (concluding that commission was governmental body because it received public funds "used for [its] general support"); Tex. Att'y Gen. ORD–302 (concluding that promoter of manufacturing and industrial development was governmental body because it was provided "unrestricted" grant of public funds); Tex. Att'y Gen. Op. No. JM–116 (concluding that athletic association was governmental body because it was provided public funds to be "used for [its] 'general support ... rather than being attributable to specific payments for specific measurable services' "), *with* Tex. Att'y Gen. ORD–343 (concluding that ambulance service provider was not governmental body because it was paid specific amounts to cover specific, measurable services provided under service contract).

This requirement would most easily be met when a governmental entity provides a "grant" to promote the private entity's activities, but it may also be met when the governmental entity "pays" the private entity to provide services to or for the governmental entity or its constituents. The terminology that the parties choose to use should not be determinative. A key factor in the context of a service contract like those at issue here would be whether the relationship between the service provider and the governmental entity is the kind of "*quid pro quo* " relationship common in the service industry, *see Kneeland,* 850 F.2d at 230, or whether the relationship is something more akin to a governmental body outsourcing governmental services to a private entity,

*see*Tex. Att'y Gen. ORD–228, ORD–302; *see also Hart,* 382 S.W.3d at 595 (observing that association of appraisal districts did not perform services traditionally performed by governmental bodies and instead provided services under conditions similar to what would be expected in typical arm's-length transaction).

 **\*29**  In this context, I note that the Attorney General's ruling here should have come as no surprise to the Partnership, as Attorneys General have repeatedly concluded that chambers of commerce, *see*Tex. Att'y Gen. Nos. ORD–621 (Arlington Chamber of Commerce), OR2001–4849 (Round Rock Chamber of Commerce), chambers-of-commerce-like entities, *see*Tex. Att'y Gen. ORD–228 (entity chartered to promote interest of Dallas–Fort Worth metropolitan area), ORD–302 (entity promoting manufacturing and industrial development around City of Bryan), and even the Partnership itself, *see*Tex. Att'y Gen. OR2004–4221, are governmental bodies under the Act. But these conclusions are based on a "fact-specific" analysis of the contract and context of each case. *See Kneeland,* 850 F.2d at 228; *see also CareFlite,* 418 S.W.3d at 138 ("The answer to the [governmental-body] inquiry depends upon the circumstances of each case."). As the Attorney General has confirmed, a chamber of commerce that is not "supported in whole or in part by public funds" is not a governmental body under the Act. *See*Tex. Att'y Gen. OR2015–05495 (2015) (finding Central Fort Bend Chamber of Commerce is not governmental body because it only received public funds as membership fees paid for specific measurable services).

With regard to this second requirement, I would not dictate that the public funds equal a particular amount or percentage of the entity's total revenue, nor would I mandate that the entity require those funds for its existence or survival. The Act defines "governmental body" to include "the part, section, or portion" of an entity that is "supported in whole or in part by public funds." TEX. GOV'T CODE § 552.003(1)(A)(xii). Thus, public funds could make up only a small portion of an entity's total revenues and yet provide general support, and even the sole support, for a particular part, section, or portion of the entity, or support "in part" of the entity as a whole. *See*Tex. Att'y Gen. ORD–602 (holding that city provided general support to museum even though public funds constituted only 15% of total revenue, but only portion of museum that received "direct support" was a governmental body). Under this construction of the Act, that part, section, or portion of the entity is a governmental body under the Act, even if the rest of the entity is not. *See id.* In short,

because the statute includes the "part, section, or portion" of entities that are supported "in part" by public funds, it is the nature of the public funds (as support or sustenance and not as compensation or consideration), and not the amount or percentage of the public funds, that matters.

### c. A Shared Common Purpose

Finally, to ensure that the funds are received as a general or unrestricted payment to subsidize or underwrite the private entity's activities, a third requirement should be that the funds be intended to promote a purpose, interest, or mission that the governmental and private entities share and would both pursue even in the absence of their contractual relationship. The mere existence of an "agency-type relationship" or a "common purpose or objective," or even the fact that the service is one "traditionally provided by governmental bodies," should not be sufficient by itself to meet this third requirement. *See*Tex. Att'y Gen. Op. No. GA–666; *Kneeland,* 850 F.2d at 228–29.[12] It is not unusual for an arms-length services vendor to take on an agency-type role for its customer, or for a governmental agency to enter into an arms-length contract for government services that the agency itself traditionally provides, and contracting parties will ordinarily share at least the common objective of effectuating the obligations and purposes of their contract. In ORD–343, for example, the Amarillo Hospital District and its ambulance service provider shared the common goal of the contract: providing the people of Amarillo with emergency transportation to local hospitals. *See*Tex. Att'y Gen. ORD–343. But such relationships do not necessarily result in the governmental body "supporting" the private entity.

[12]  *See also*CareFlite, 418 S.W.3d at 142 ("[W]e have not found [ ] any authority, primary or persuasive, that stands for the proposition that, if a private entity and a governmental body share a common purpose or objective, the private entity is automatically a governmental body for purposes of the [Act]. Neither are we aware of any like authority when an entity provides services traditionally provided by governmental bodies.").

 **\*30**  Instead, I would hold that a supportive relationship exists when the parties share a true "identity of interests" that each of them has beyond any particular transaction or finite series of transactions between them. *See Kneeland,* 850 F.2d at 228–29 ("[T]here apparently is some common purpose or objective between the association and the universities, or they

would not be drawn to each other, but there is no real identity of interest and neither may be considered the agent of the other."). The volunteer fire department in JM–821 provides an example of this more extensive "identity of interests" relationship. *See* Tex. Att'y Gen. Op. No. JM–821. There, the private entity and the governmental entity each independently had the purpose of protecting citizens and property from fires and other hazards, and the governmental entity promoted the private entity's pursuit of that purpose by providing "general support." *See id.*

I would thus distinguish between (1) a situation in which a private entity contractually undertakes a governmental entity's objectives because the governmental entity agrees to pay for those services, and (2) a situation in which a private entity and a governmental entity that each independently have the same purpose or interest, and thus an "identity of interest," contractually agree to pursue that interest in cooperation and using public funding. *See Kneeland,* 850 F.2d at 228–29. For example, when a governmental entity hires a law firm to represent it in litigation, the firm and the government share interests and objectives specific to the firm's representation of that entity, but they do not necessarily have an "identity of interests." Although both the firm and the client may desire and jointly pursue the same outcome from the representation, the firm's interest in achieving that outcome is transaction specific: the law firm takes on that goal because the client pays it to do so, and but for the client-attorney relationship, the law firm generally has no stake in the outcome of the litigation. [13]

[13]  Contrary to the Court's concern, this distinction would apply as effectively when the government contracts with a private firm to "provide more enduring and wide-ranging counsel" as it would when it hires a firm to handle a specific matter. *See ante* at ——. In either case, the third requirement (common purpose) typically would not be met because it is not part of the law firm's mission or purpose to achieve the specific objectives that the government hires it to achieve, other than to fulfill its obligation to its client. But if the government paid funds to a special interest firm whose mission as a firm was to protect the environment, or promote a pro-life agenda, or increase health care for children, for example, this third requirement might be satisfied if the purpose of the government's payment was to "support" the firm's efforts to accomplish that mission. If the second requirement were also satisfied (i.e., the government paid the funds to subsidize or underwrite the firm's efforts, rather than as

consideration for specific, measurable services), the firm would be a governmental body under the Act.

In summary, then, I would clarify the *Kneeland* test and hold that a private entity (or a part, section, or portion thereof) is "supported in whole or in part by public funds," and is thus a governmental body under the Public Information Act, if (1) the private entity receives public funds; (2) it does so not as compensation or consideration made in exchange for "specific goods" or "specific measurable services," but as a general or unrestricted payment provided to subsidize or underwrite the private entity's activities; and (3) the funds provided are intended to promote a purpose, interest, or mission that the governmental and private entities share and would each pursue even in the absence of their contractual relationship.

### III.

### Application to the Partnership

**\*31**  The Partnership, which undisputedly received public funds, asserts that its agreements with the City were arm's-length, *quid pro quo* contracts that only obligated it to perform specific and measurable services. The Attorney General disagrees, contending that the Partnership was "paid a certain amount of money on a quarterly basis to accomplish a broad range of goals designed to promote the City." The Court agrees with the Partnership. Under the facts of this record, I would conclude that the Partnership meets all three requirements for being "supported ... by public funds."

### A. Payments to Subsidize the Partnership's Activities

The parties do not dispute, and I agree, that some of the provisions in the Partnership's contracts with the City imposed specific and definite obligations on the Partnership to provide a measurable amount of service. The court of appeals also agreed, but found that the Partnership's "major obligations under the contract are not specific, definite, or tied to a measurable amount of service for a certain amount of money." 407 S.W.3d at 784. The court provided these examples of the Partnership's indefinite obligations to:

- [i]dentify new business opportunities, secure economic incentives and increase outreach and recruitment activities to the region's targeted key industries to

strengthen the City of Houston as a competitive place to do business;

• partner with the airport system to recruit, relocate, and expand business which supports the master plan, and to identify business incentives available in both public and private sectors;

• make its research capabilities available to the City of Houston's convention and entertainment facilities department and its convention and visitor's bureau for marketing reports;

• support and coordinate with HAS to develop new air routes, stimulate increased international trade and business for Houston companies;

• promote HAS stories in international markets and highlight HAS efforts to provide airports allowance for expansion and ease of transportation;

• "coordinate on matters of mutual interest" before the U.S. Congress, federal agencies, the Texas Legislature, and Texas agencies; and

• assist the City of Houston's mayor, should she ask for help, with "advancing various Economic Development and Marketing Initiatives."

*Id.* at 784. In light of these provisions, the court of appeals concluded that it could not "say that overall the contract here imposes specific and definite obligations on [the Partnership] to provide a measurable amount of services to the City of Houston in exchange for a certain amount of money, as would be expected in a typical arms-length contract for services between a vendor and purchaser." *Id.*

The Partnership contends, and the Court apparently agrees, that its contractually mandated performance reports provide the missing specifics for the broader obligations on which the court of appeals relied. The Partnership also asserts that some of its contractual obligations are necessarily vague because "in the context of intangible deliverables it would be nearly impossible to provide greater details." For example, the contracts require the Partnership to "make its research capabilities available on request to" the City of Houston's convention and entertainment facilities department and its convention and visitor's bureau "to facilitate the creation of professional, sophisticated marketing reports," but the City cannot predict all of the groups that might approach it during the course of a year with an interest in the

convention center. The Partnership also takes issue with the court of appeals' observation that the Partnership does not perform its obligations "in exchange for a certain amount of money," as the Partnership is paid a set amount on a quarterly basis "regardless of whether or how much it does in furtherance of the contract's goals." According to the Partnership, "this observation fails to acknowledge or appreciate that all payments under the contracts are made 'in arrears and are contingent upon receipt and approval' " of the Partnership's performance reports.

**\*32** I agree with the court of appeals that while some of the services the Partnership provides under the contracts are specific and measurable, the major obligations are broad and open-ended. Although the performance reports may identify specific services that the Partnership performed in fulfilling those general promises, these after-the-fact reports of services the Partnership decided to provide do not impose a contractual obligation on the Partnership to provide those specific services. And although the contracts provide that the City's quarterly payments to the Partnership are "contingent upon receipt and approval by the Director of [the] written progress reports in accordance with Article III(C)," that article merely authorizes the Director to require reports and to determine their format and content; it does not authorize the Director to dictate what services must be provided or included in the report or otherwise narrow the Partnership's broad discretion to decide the types and amounts of services to provide. Finally, the fact that it might be difficult or impossible for the contracts to provide greater detail about some of the "intangible deliverables" does not weigh in favor of treating those provisions as if they called for "specific, measurable services" when they do not. In ORD–602, the Attorney General recognized that the "highly specialized, unique services" the museum provided to the City of Dallas could not be "known, specific, or measurable," but the Attorney General still concluded that the museum was, in part, a governmental body under the Act. *See* Tex. Att'y Gen. ORD–602 (1992).

As the court of appeals pointed out, the contracts at issue do not tie the City's payments to the Partnership to discrete services or measurable amounts of service. Instead, the City paid the Partnership a flat fee of $196,250 per quarter, regardless of whether, or how, or how extensively the Partnership made efforts to "identify new business opportunities, secure economic incentives, and increase outreach and recruitment activities to the region's targeted key industries to strengthen Houston as a competitive place

to do business." The absence of an identifiable link between the services provided and the payment due, when considered in conjunction with the lack of specificity and measurability in many of the contract's service requirements, demonstrates that the City paid the Partnership public funds to subsidize, underwrite, and support the Partnership's activities.

It is true that public funds make up only a small "part" of the Partnership's support. But when an entity, or "part, section, or portion" of an entity, receives public funds for its general support, the entity has broad discretion to use those funds as it sees fit to accomplish its goals, and the entity shares those goals with a public entity that would otherwise use the funds to accomplish those goals itself, the entity, or that "part, section, or portion" of the entity, is "supported in whole or in part by public funds." This does not mean that the public has a right to know how the Partnership spends all of its funds, but the Partnership has made a tactical decision here not to provide information about where the public funds go within the Partnership or how the public funds are spent, so that we could limit its duty to produce records under the Act to "records concerning its *operations that are directly supported by governmental bodies,*" as the Attorney General has done for the Partnership in the past. *See* Tex. Att'y Gen. OR2004–4221 (emphasis added).

Finally, as noted, the 2008 services agreement included language specifying that the City's funds were "solely for services rendered under this Agreement and are not intended to support [the Partnership] in any of its activities not specifically set forth in this Agreement." But the determination of this issue must depend on the actual nature of the services and payment obligations under the contract. The 2008 contract's conclusory statements that the contract does not render the Partnership a governmental body and that the contract payments are not for general support do not make it so. Just as a governmental body cannot avoid the Act's requirements by promulgating rules, *see Indus. Found. of the S.,* 540 S.W.2d at 677, it cannot do so by contractually agreeing that the Act does not apply. Otherwise, every entity contracting with the government would shield itself from the Act simply by stating in the contract that it is not a governmental body. In light of the broad, open-ended services the Partnership agreed to perform under these contracts, I would conclude that the second requirement is met.

## B. Identity of Interests

**\*33** I now consider whether the City's funds were intended to promote a purpose, interest, or mission that the City and the Partnership share and would each pursue even in the absence of their contractual relationship. The evidence here readily establishes that this requirement is met. Independent from any contract with the City, the Partnership exists to promote job creation, increased trade, and capital investment in the greater Houston area. As the Court agrees, even without the City's contract, the Partnership "could and would continue to promote the greater Houston economy to advance its own interests and those of its more than 2,000 non-government members." *Ante* at ——. The City contracted with the Partnership because the City independently shares those same interests. The City did not pay the Partnership to provide services merely to promote the City's individual objectives, but to promote objectives that the City and the Partnership share. In fact, the contracts required that the scope of the Partnership's services "support the goals, visions, and objectives outlined in *the Partnership's* Strategic Plan." (Emphasis added.) The interest the City and Partnership share does not arise solely out of the parties' contractual relationship—both parties independently share these objectives. The City has an inherent motive to promote its own financial interests, and promotion of the City's economic development was a primary focus of the Partnership's purpose.

Under these circumstances, I would hold that the Partnership was "supported in whole or in part by public funds" so as to fall within the definition of a "governmental body" under the Public Information Act. *See* TEX. GOV'T CODE § 552.003(1)(A)(xii).

## IV.

### Policymaking

Although the Court acknowledges the Act's instruction that we construe it liberally in favor of a request for information, *see id.* § 552.001(b), the Court chooses to adopt the most narrow construction of "supported" possible, because a broader construction would permit "public intrusion into the private affairs of non-governmental entities,"*ante* at ——, "pry open the sensitive records of private entities,"*ante* at —— n.12, and subject the Partnership to "invasive disclosure requirements," *ante* at ——. Even if we could construe the Act according to our preferred results rather than the text of the statute (which we cannot, or at least, should not), I find

the Court's concerns to be not nearly as troubling as the Court suggests.

What the Court fails to acknowledge is that the Act protects the Partnership's "sensitive records," but the Partnership elected not to seek that protection. The Act expressly excepts from disclosure all information that is "confidential by law, either constitutional, statutory, or by judicial decision." TEX. GOV'T CODE § 552.101. Even if the information is not confidential by law, the Act still excepts it from disclosure if, for example, it constitutes the Partnership's commercial or financial information and (as the Court assumes) its disclosure would cause the Partnership "substantial competitive harm." *Id.* § 552.110(b). In fact, as the Court recently held, the Act excepts the information if its release would even just "give advantage to a competitor." *See Boeing Co. v. Paxton,* No. 12–1007, ––– S.W.3d ––––, –––– (Tex. June 19, 2015) (construing TEX. GOV'T CODE § 552.104). And particularly apropos to the Partnership's activities, the Act specifically excepts certain "information [that] relates to economic development negotiations involving a governmental body and a business prospect that the governmental body seeks to have locate, stay, or expand in or near the territory of the governmental body." TEX. GOV'T CODE § 552.131(a). The Partnership did not assert any of these exceptions in this appeal. In fact, it did not assert any exceptions at all, even though it has successfully asserted exceptions in the past. *See*Tex. Att'y Gen. OR2004–4221. Nor did it ever contend that only a "part, section, or portion" of the Partnership is supported by public funds, even though it successfully made that assertion in the past as well. *See id.*

The Partnership contends that the court of appeals' decision represents a "vast overexpansion of the Public Information Act to reach private business information that the public has no inherent or legitimate right to know." In response, the Attorney General asserts that the Partnership's construction of the statute would permit governmental bodies to evade public scrutiny by contracting with private entities to carry out government business. "If governmental bodies can shield information from public scrutiny by outsourcing their business to private companies," the Attorney General contends, "the purpose of the [Act] is frustrated." In short, each party warns that the other's proposed construction will have dire consequences, either destroying private entities' ability to keep their private information private or undermining the people's right to know what their

government is doing. The Partnership asserts, "The stakes are tremendous." [14]

[14] We have also received amicus briefs from several chambers of commerce arguing that the court of appeals' holding, if allowed to stand, will be "catastrophic" for chambers of commerce in Texas and will render them "wholly unable to function."

 **\*34**  I am not convinced that the effect of our determination would or must be as drastic as either party, or the Court, suggests. Although the Court concludes that the Partnership is not a governmental body, the Act still empowers the public to require the City to disclose all "information that is written, produced, collected, assembled, or maintained" by or for the City "under a law or ordinance or in connection with the transaction of official business." TEX. GOV'T CODE § 552.002(a)(1) (defining "public information"). This extends to not only the City's service agreements with the Partnership and all reports and other information the Partnership provided to the City under those contracts, but also all information the Partnership collects, assembles, or maintains for the City "in connection with the transaction of official business," if the City "owns," "has a right of access to," or "spends or contributes public money for the purpose of writing, producing, collecting, assembling, or maintaining the information." *Id.* § 552.002(a). Even if the requested information is not in the City's actual possession, the Act still provides broad access to the Partnership's information related to "the transaction of official business." *Id.*

Conversely, if the Court concluded, as I do, that the Partnership is a governmental body, the Partnership could still protect its confidential and commercially sensitive information by relying on the Act's numerous exceptions. In addition, the Partnership could assert (as it has previously asserted), that only a particular "part, section, or portion" of the Partnership is supported in whole or in part by public funds, and only that "part, section, or portion" is required to disclose information in response to a public information request. *See id.*§ 552.003(1)(A)(xii); *see also*Tex. Att'y Gen. OR2004–4221 (concluding that "the [Partnership's] records concerning its *operations that are directly supported by governmental bodies* are subject to the Act as public information") (emphasis added). In its appeal to this Court, however, the Partnership does not assert any exceptions, does not contend that only a particular "part, section, or portion" of the Partnership was supported by public funds, and has made no other effort to protect the information in its check registers, other than to claim it is not a governmental

body. It is a risky litigation strategy, and the Court should not let it motivate us to misinterpret the Act for fear that the Partnership's confidential financial information would otherwise be disclosed.

In any event, regardless of whether the effects will be as drastic as the Court, the Partnership, or the Attorney General suggest, our job is to interpret and apply the statute as written, not to rewrite it to achieve the policy outcomes they or we may prefer. *See In re Tex. Dep't of Family & Protective Servs.,* 210 S.W.3d 609, 614 (Tex.2006) ("It is not the Court's task to choose between competing policies addressed by legislative drafting. We apply the mandates in the statute as written.") (citation omitted). [15]

[15] *See also F.F.P. Operating Partners, L.P. v. Duenez,* 237 S.W.3d 680, 690 (Tex.2007) ("[W]e do not pick and choose among policy options on which the Legislature has spoken. 'Our role ... is not to second-guess the policy choices that inform our statutes or to weigh the effectiveness of their results; rather, our task is to interpret those statutes in a manner that effectuates the Legislature's intent.' ") (quoting *McIntyre v. Ramirez,*

109 S.W.3d 741, 748 (Tex.2003)) (alteration in *F.F.P. Operating Partners,* 237 S.W.3d at 690).

## V.

### Conclusion

I would hold that the Greater Houston Partnership was supported in whole or in part by public funds and would thus agree with the Attorney General, the trial court, and the court of appeals that the Partnership is a governmental body for purposes of Jenkins's public information requests. The Partnership has not argued that only a particular "part, section, or portion" of the Partnership received public funds, or that any of the information at issue falls within one of the Act's exceptions to required disclosure. I would therefore affirm the court of appeals' judgment requiring the Partnership to disclose its 2007 and 2008 check registers pursuant to the Public Information Act.

### All Citations

--- S.W.3d ----, 2015 WL 3978138, 58 Tex. Sup. Ct. J. 1362

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

**Declined to Extend by**    Odessa Texas Sheriff's Posse, Inc. v. Ector County,    Tex.App.-Eastland,    October 26, 2006

938 S.W.2d 440
Supreme Court of Texas.

IKB INDUSTRIES (Nigeria) Limited, Petitioner,

v.

PRO–LINE CORPORATION, Respondent.

No. 95–0703.    |    Jan. 31, 1997.

Corporation brought breach of contract and other claims against second corporation. The 298th District Court, Dallas County, Adolph Canales, J., dismissed action with prejudice based on first corporation's abuse of discovery process. Following denial of its request for findings of fact and conclusions of law, first corporation appealed. The Court of Appeals, Whittington, J., 901 S.W.2d 568, dismissed appeal as untimely. On application for writ of error, the Supreme Court, Hecht, J., held that: (1) in case tried without a jury, request for findings of fact and conclusions of law extends time for perfecting appeal when such findings may be useful for appellate review, and (2) request in present case extended appellate deadlines because judgment was not rendered as matter of law, but involved resolution of disputed factual matters apart from the filings.

Application for writ of error granted; judgment of Court of Appeals reversed; case remanded.

Baker, J., filed a dissenting opinion.

West Headnotes (5)

**[1]    Appeal and Error**
　　🗝 Extension of Time

30    Appeal and Error
30VII    Transfer of Cause
30VII(A)    Time of Taking Proceedings
30k352    Extension of Time
30k352.1    In general
Plaintiff's request for findings of fact and conclusions of law following dismissal of case as "death penalty" sanction for discovery abuse extended from 30 to 90 days the time

for perfecting appeal, where judgment was not rendered as matter of law, but involved resolution of disputed factual matters apart from the filings. Vernon's Ann.Texas Rules Civ.Proc., Rule 215; Rules App.Proc., Rule 41(a)(1).

28 Cases that cite this headnote

**[2]    Appeal and Error**
　　🗝 Extension of Time

30    Appeal and Error
30VII    Transfer of Cause
30VII(A)    Time of Taking Proceedings
30k352    Extension of Time
30k352.1    In general
Not every case finally adjudicated without a jury trial is "case tried without a jury" within meaning of appellate rule under which, in case tried without a jury, timely filed request for findings of fact and conclusions of law extends deadline for perfecting appeal from 30 days to 90 days after judgment is signed; for example, request for findings in case concluded by summary judgment does not extend appellate deadlines. Rules App.Proc., Rule 41(a)(1).

73 Cases that cite this headnote

**[3]    Trial**
　　🗝 Duty to Make in General

388    Trial
388X    Trial by Court
388X(B)    Findings of Fact and Conclusions of Law
388k388    Duty to Make in General
388k388(1)    In general
　　(Formerly 228k392(1))
Purpose of rule under which, in any case tried in district or county court without a jury, any party may request court to state in writing its findings of fact and conclusions of law is to give a party a right to findings and conclusions finally adjudicated after a conventional trial on the merits before the court. Vernon's Ann.Texas Rules Civ.Proc., Rule 296.

58 Cases that cite this headnote

**[4]    Appeal and Error**

👉 Extension of Time

30 Appeal and Error

30VII Transfer of Cause

30VII(A) Time of Taking Proceedings

30k352 Extension of Time

30k352.1 In general

Extension of period for perfecting appeal when party requests findings of fact and conclusions of law in case tried without a jury serves purpose of allowing trial court time to state basis for its judgment so that a party may determine whether to appeal; that purpose is served whenever such findings may be useful for appellate review, as when case has been dismissed for discovery abuse. Vernon's Ann.Texas Rules Civ.Proc., Rule 215; Rules App.Proc., Rule 41(a)(1).

25 Cases that cite this headnote

**[5]** **Appeal and Error**

👉 Extension of Time

30 Appeal and Error

30VII Transfer of Cause

30VII(A) Time of Taking Proceedings

30k352 Extension of Time

30k352.1 In general

Request for findings of fact and conclusions of law in case tried without a jury does not extend the time for perfecting appeal of a judgment rendered as a matter of law, where findings and conclusions can have no purpose and should not be requested, made, or considered on appeal; however, when such findings may be useful for appellate review, timely filed request extends appellate deadline from 30 days to 90 days after entry of judgment. Rules App.Proc., Rule 41(a)(1).

116 Cases that cite this headnote

**Attorneys and Law Firms**

**\*440** Robert H. Westerburg, Dallas, for petitioner.

Robert R. Gibbons, Dallas, for respondent.

**\*441** Before PHILLIPS, C.J., and GONZALEZ, CORNYN, ENOCH, SPECTOR, OWEN and ABBOTT, JJ.

**Opinion**

HECHT, Justice.

 **[1]** Here, the sole question is whether requesting findings of fact and conclusions of law following dismissal of a case as a sanction for discovery abuse extends the time for perfecting appeal under Rule 41(a)(1) of the Texas Rules of Appellate Procedure. The court of appeals answered no. 901 S.W.2d 568. Under the circumstances of this case, as we explain, we disagree.

IKB Industries (Nigeria) Limited sued Pro–Line Corporation. Pro–Line moved to dismiss IKB's action as a sanction for discovery abuse. *See* TEX.R. CIV. P. 215. After a hearing, for which there is no statement of facts, the district court granted the motion, struck IKB's pleadings, and dismissed the action with prejudice. The court's judgment recites that the court considered "the Court's file—including all pleadings, affidavits, and deposition excerpts filed with the Court (and of which the Court takes judicial notice) *and … . the testimony* and argument *of counsel.*" (Emphasis added.) The judgment contains seven pages of findings that the court made, as the judgment recites, "from the evidence before it".

Notwithstanding these findings, IKB filed a request for findings of fact and conclusions of law, referencing Rule 296 of the Texas Rules of Civil Procedure. Rule 296 states in part:

> In any case tried in the district or county court without a jury, any party may request the court to state in writing its findings of fact and conclusions of law. Such request ... shall be filed within twenty days after judgment is signed....

IKB's request was filed eight days after the dismissal order was signed. The district court did not respond to IKB's request.

A timely filed request for findings of fact and conclusions of law extends the deadline for perfecting appeal from 30 to 90 days after the judgment is signed "in a case tried without a jury." TEX.R.APP. P. 41(a)(1). Since IKB filed a cost bond 49 days after the dismissal order was signed, IKB perfected appeal only if its request for findings and conclusions extended the deadline for doing so from 30 to 90 days—that is, only if the case was "tried without a jury" within the meaning of Rule 41(a)(1).

 **[2]**    Not every case finally adjudicated without a jury trial is "a case tried without a jury" within the meaning of Rule 41(a)(1). For instance, we held in *Linwood v. NCNB Texas,* 885 S.W.2d 102, 103 (Tex.1994), that a request for findings in a case concluded by summary judgment does not extend appellate deadlines. The reason is not that a summary judgment proceeding is in no sense a trial. On the contrary, we have held that "[a] summary judgment proceeding is a trial within the meaning of Rule 63" of the Texas Rules of Civil Procedure, which governs amendment of pleadings. *Goswami v. Metropolitan Sav. & Loan Ass'n,* 751 S.W.2d 487, 490 (Tex.1988). True, a "summary judgment proceeding is not a conventional trial but rather an exception to the usual and traditional form of procedure wherein witnesses are heard in open court and documentary evidence is offered and received in evidence." *Richards v. Allen,* 402 S.W.2d 158, 160 (Tex.1966). But this distinction was not the basis for our decision in *Linwood.*

Instead, *Linwood* takes a functional approach to Rule 41(a)(1). It holds, not that a summary judgment is not a trial within the meaning of the rule, but that "findings of fact and conclusions of law have no place in a summary judgment proceeding". *Linwood,* 885 S.W.2d at 103. The reason findings and conclusions "have no place" in a summary judgment proceeding is that for summary judgment to be rendered, there cannot be a "genuine issue as to any material fact", TEX.R. CIV. P. 166a(c), and the legal grounds are limited to those stated in the motion and response, *Stiles v. Resolution Trust Corp.,* 867 S.W.2d 24, 26 (Tex.1993). In other words, if summary judgment is proper, there are no facts to find, and the legal conclusions have already been stated in the motion and response. The trial court should not make, and an appellate court cannot consider, findings of fact in connection with a summary judgment. Because a request for findings **\*442** and conclusions following summary judgment can have no purpose, should not be filed, and if filed, should be ignored by the trial court, such a request should not extend appellate deadlines. *Linwood* rejects a broad construction of Rule 41(a)(1) that would cause the filing of a request for findings and conclusions to extend the time for perfecting appeal in every case adjudicated without a jury.

The most restrictive construction of Rule 41(a)(1) would not allow a request for findings and conclusions to extend the time for perfecting appeal unless the request was proper under Rule 296—that is, "[i]n any case tried in the district or county court without a jury". Our approach to applying this language, similar to the language of Rule 41(a)(1), has also been functional. A party is not entitled to findings of fact and conclusions of law following summary judgment, *Linwood,* 885 S.W.2d at 103, judgment non obstante veredicto, *Fancher v. Cadwell,* 159 Tex. 8, 314 S.W.2d 820, 822 (1958), or judgment after directed verdict, *Ditto v. Ditto Investment Co.,,* 158 Tex. 104, 309 S.W.2d 219, 220 (1958), again, not because these adjudications are in no sense trials. Indeed, judgment non obstante veredicto is rendered after a full trial and verdict. Rather, a party is not entitled to findings and conclusions in such instances because judgment must be rendered as a matter of law. Were there facts to find the three judgments we have listed are the only ones to which Rule 296 does not apply. The point is simply that Rule 296, like Rule 41(a)(1), is not governed by a definition of the word, "trial", common to both, but by their respective purposes.

The problem with a restrictive construction of Rule 41(a)(1) —not allowing a party's request for findings and conclusions to extend the time for perfecting appeal unless the party is entitled to findings and conclusions under Rule 296—is that it conflicts with the purpose of Rule 41(a)(1). This is because the purposes of Rule 296 and Rule 41(a)(1) are not identical.

 **[3]**    The purpose of Rule 296 is to give a party a right to findings of fact and conclusions of law finally adjudicated after a conventional trial on the merits before the court. In other cases findings and conclusions are proper, but a party is not entitled to them. For example, in a case like this one in which judgment is rendered as a sanction for discovery abuse, findings for imposing sanctions may be helpful, and we have encouraged their use. *TransAmerican Nat. Gas Corp. v. Powell,* 811 S.W.2d 913, 919 n. 9 (Tex.1991); *Chrysler Corp. v. Blackmon,* 841 S.W.2d 844, 852 (Tex.1992). But we do not require them for two reasons. One is practical: they are often unnecessary, and requiring them in every case would unduly burden trial courts. As we explained in *Blackmon:*

> [W]e do not wish to unnecessarily burden our trial courts by requiring them to make written findings in all cases in which death penalty sanctions are imposed. First, the benefit of the trial court's explanation in the record of why it believes death penalty sanctions are justified may be sufficient to guide the appellate court. Second, written findings are not needed in the vast majority of relatively uncomplicated

cases or even more complex cases involving only a few issues pertinent to the propriety of death penalty sanctions. We doubt that findings in such cases would meaningfully assist appellate review.

841 S.W.2d at 852. The other reason findings are not required whenever they may be useful is that appellate courts are not obliged to give them the same level of deference. A legally correct judgment based on findings of fact made after a trial on the merits cannot be set aside on appeal if the findings are supported by sufficient evidence. *Harris County Flood Control Dist. v. Shell Pipe Line Corp.,* 591 S.W.2d 798, 799 (Tex.1979). An order imposing discovery sanctions, on the other hand, may be reversed for an abuse of discretion even if findings and evidence support it. *Blackmon,* 841 S.W.2d at 852–853. There is less reason to require findings when they are not as binding on appeal.

 **[4]**     The purpose of Rule 41, on the other hand, is to prescribe the time for perfecting appeal. The deadline is 30 days after the judgment is signed, unless extended by the filing of a motion for new trial or of a request for findings and conclusions in a case tried without a jury. The first exception affords  **\*443**  the trial court time to consider and decide the motion. The second exception allows the trial court time to state the basis for its judgment so that a party may determine whether to appeal. Often, perhaps usually, the decision to appeal is not controlled by the court's findings and conclusions; nevertheless, the purpose of Rule 41(a)(1) is to allow time for the court to make them and the parties to consider them. The purpose of the second exception is served not only when findings are required by Rule 296, but whenever they may be useful for appellate review—as when a case has been dismissed for discovery abuse.

Allowing a request for findings and conclusions to extend the deadline for perfecting appeal when a party is not entitled to findings and conclusions under Rule 296 does not impair the purpose of Rule 296. However, not to allow such a request to extend appellate deadlines *does* impair the purpose of Rule 41(a)(1) by depriving a party of a statement of the basis of the trial court's ruling to allow the party to determine whether to appeal. A restrictive construction of Rule 41(a)(1) thus conflicts with the core rationale of *Linwood*—that the rule should be construed to accomplish its purpose.

 **[5]**     To summarize: A request for findings of fact and conclusions of law does not extend the time for perfecting

appeal of a judgment rendered as a matter of law, where findings and conclusions can have no purpose and should not be requested, made, or considered on appeal. Examples are summary judgment, judgment after directed verdict, judgment non obstante veredicto, default judgment awarding liquidated damages, dismissal for want of prosecution without an evidentiary hearing, dismissal for want of jurisdiction without an evidentiary hearing, dismissal based on the pleadings or special exceptions, and any judgment rendered without an evidentiary hearing. A timely filed request for findings of fact and conclusions of law extends the time for perfecting appeal when findings and conclusions are required by Rule 296, or when they are not required by Rule 296 but are not without purpose—that is, they could properly be considered by the appellate court. Examples are judgment after a conventional trial before the court, default judgment on a claim for unliquidated damages, judgment rendered as sanctions, and any judgment based in any part on an evidentiary hearing.

In the present case, although sanctions were imposed largely on the basis of discovery requests and responses that are a matter of record and indisputable, there appears to be a factual dispute over IKB's explanations for its alleged discovery abuse. The trial court's extensive findings themselves indicate a resolution of disputed factual matters apart from the filings included in the transcript. Applying the rule we have adopted, we hold that IKB's request for findings and conclusions extended the deadline for perfecting appeal. Thus, the court of appeals erred in dismissing the appeal.

The dissent argues that whether a request for findings extends the time for perfecting appeal should depend upon the standard of review. By this standard, a request for findings following dismissal for discovery abuse, as in this case, would not extend the time for appeal even though we have encouraged trial courts to make these findings, and they can be considered on appeal. Moreover, it sometimes happens that the standard of review has not been finally determined. *Ruiz v. Conoco, Inc.,* 868 S.W.2d 752, 757–758 (Tex.1993). Thus the standard the dissent would apply is less certain than the one we adopt.

Accordingly, the Court grants IKB's application for writ of error and without hearing oral argument reverses the judgment of the court of appeals and remands the case to that court for a consideration of other issues raised.  TEX.R.APP. P. 170.

BAKER, Justice, dissenting.

Today the Court holds that a timely request for findings of fact and conclusions of law extends the time for perfecting appeal when findings and conclusions are required by Rule 296, or when they are not required by Rule 296 but are not without purpose—that is, they could properly be considered by the appellate court. The Court opines that its new rule does not conflict with the core rationale of *Linwood*—which is a functional approach that rejects a broad construction of **\*444** Rule 41(a)(1) that would allow the filing of a request for findings and conclusions to extend the time for perfecting appeal in every case adjudicated without a jury. *See Linwood v. NCNB of Texas,* 876 S.W.2d 393 (Tex.App.—Dallas), *rev'd on other grounds,* 885 S.W.2d 102 (Tex.1994).

I respectfully disagree. The rule the Court adopts continues to unduly complicate, rather than simplify, the issue raised in this case. In my view, the rule the Court adopts:

- Is in fact contrary to *Linwood's* functional approach to construing Rule 41(a)(1);

- Requires the appellate court to review the entire record to accurately determine if the evidentiary hearing did in fact involve the trial court's resolution of discrete fact issues outside the scope of the pleadings, motions, documents, and arguments of counsel;

- Ignores appellate standards of review that establish whether the trial court must resolve discrete fact questions, and the impact these standards of review have upon a particular appeal; and

- Adds delay to many appeals—an additional sixty days —when the judicial system is under fire from the legal community and the general public for the inordinate time—and concomitant costs—it takes to process a controversy through the system.

I believe a more appropriate and more workable rule is that whether a request for findings of fact and conclusions of law extends the time to appeal depends upon the standard of review that applies to the particular appeal. In my view, this rule would:

- Support *Linwood's* functional approach to construing Rule 41(a)(1);

- Permit the parties to determine immediately whether findings and conclusions are necessary to the appeal and therefore necessary to request and extend the time to perfect the appeal;

- Permit the appellate court to determine immediately— without the necessity of reviewing the entire record— whether the request for findings and conclusions extends the time to perfect the appeal; and

- Avoid additional delays in processing and disposing of many appeals.

## I. REQUESTS FOR FINDINGS OF FACT

Rule 41(a)(1) clearly relates to Rule 296. *See* TEX.R.APP. P. 41(a)(1) and TEX.R. CIV. P. 296. Rule 296 only entitles a party to findings of fact and conclusions of law in cases tried in district or county court without a jury. *Chavez v. Housing Auth. of El Paso,* 897 S.W.2d 523, 525 (Tex.App. —El Paso 1995, writ denied). A court tries a case when there is an evidentiary hearing upon conflicting evidence. *Linwood,* 876 S.W.2d at 395; *Chavez,* 897 S.W.2d at 525. Accordingly, findings of fact are appropriate only when the court is deciding fact issues. *Chavez,* 897 S.W.2d at 525. Where the court rules without determining discrete fact questions, requests for finding of fact and conclusions of law are neither appropriate nor effective for extending appellate deadlines. *WISD Taxpayers Ass'n v. Waco Indep. Sch. Dist.,* 912 S.W.2d 392, 394 (Tex.App.—Waco 1996, no writ); *Chavez,* 897 S.W.2d at 525–26. Findings specifically tied to an appropriate legal standard are the only type of findings that can be truly beneficial to appellate review. *Chrysler Corp. v. Blackmon,* 841 S.W.2d 844, 853 (Tex.1992).

## II. PRINCIPAL APPELLATE STANDARDS OF REVIEW

### A. ABUSE OF DISCRETION

Under an abuse of discretion standard, the appellate court reviews the entire record to determine if the trial court acted arbitrarily and unreasonably, and thus abused its discretion. *Morrow v. H.E.B., Inc.,* 714 S.W.2d 297, 298 (Tex.1986). The reviewing court may not reverse the trial court for an abuse of discretion because it disagrees with the trial court's decision

so long as that decision is within the trial court's discretionary authority. *Beaumont Bank v. Buller,* 806 S.W.2d 223, 226 (Tex.1991); *Downer v.* **\*445** *Aquamarine Operators, Inc.,* 701 S.W.2d 238, 242 (Tex.1985).

Under an abuse of discretion standard of review, the appellate court does not review factual issues decided by the trial court under legal or factual sufficiency standards. *Crouch v. Tenneco, Inc.,* 853 S.W.2d 643, 649 (Tex.App.—Waco 1993, writ denied). Under an abuse of discretion standard of review, legal and factual sufficiency claims are not independent, reversible grounds of error, but rather merely factors to consider in assessing whether the trial court abused its discretion. *Buller,* 806 S.W.2d at 226. Under an abuse of discretion standard of review, findings of fact and conclusions of law are neither appropriate nor required. *Crouch,* 853 S.W.2d at 649.

An abuse of discretion does not exist if the trial court bases its decision on conflicting evidence and some evidence supports the trial court's decision. *See Ruiz v. Conoco, Inc.,* 868 S.W.2d 752, 758 (Tex.1993). An abuse of discretion does not exist if some evidence in the record shows the trial court followed guiding rules and statutes. *Crouch,* 853 S.W.2d at 649.

### B. EVIDENTIARY STANDARD OF REVIEW

Legal and factual sufficiency of the evidence standards of review govern appeals of nonjury trials on the merits. *Blackmon,* 841 S.W.2d at 852; Hall, *Standards of Appellate Review in Civil Appeals,* 21 ST. MARY'S L.J. 865, 919–20 (1990). When a party appeals from a nonjury trial, it must complain of specific findings and conclusions of the trial court, because a general complaint against the trial court's judgment does not present a justiciable question. *Fiduciary Mortgage Co. v. City Nat'l Bank,* 762 S.W.2d 196, 204 (Tex.App.—Dallas 1988, writ denied). Accordingly, findings of fact and conclusions of law are mandatory for a party to file to avoid the onerous presumptions that apply in an appeal from a nonjury trial. When an appellant does not request or file findings and conclusions by the trial court, the appellate court presumes the trial court found all fact questions in support of its judgment, and the reviewing court must affirm that judgment on any legal theory finding support in the pleadings and evidence. *Point Lookout West, Inc. v. Whorton,* 742 S.W.2d 277, 278 (Tex.1987).

If the appellant does not challenge the trial court's findings of fact, when filed, these facts are binding upon both the party and the appellate court. *Wade v. Anderson,* 602 S.W.2d 347, 349 (Tex.Civ.App.—Beaumont 1980, writ ref'd n.r.e.). Accordingly, it is incumbent for the appellant to attack the findings by appropriate legal and factual sufficiency points of error. *Lovejoy v. Lillie,* 569 S.W.2d 501, 504 (Tex.Civ.App.—Tyler 1978, writ ref'd n.r.e.).

In an appeal of a nonjury trial, findings are specifically and meaningfully tied to appropriate standards of appellate review and are therefore truly beneficial to appellate review. *See Blackmon,* 841 S.W.2d at 853.

### III. DISMISSAL AS A DISCOVERY SANCTION

The appellate standard of review of a trial court order dismissing a case as a discovery sanction is abuse of discretion. *Blackmon,* 841 S.W.2d at 852; *TransAmerican Nat. Gas Corp. v. Powell,* 811 S.W.2d 913, 919 n. 9 (Tex.1991). Findings are neither appropriate nor required under an abuse of discretion standard. *Crouch,* 853 S.W.2d at 649. Findings are not tied to the appellate standard of review and are not necessarily beneficial to appellate review. Accordingly, under the rule I propose, I would hold that findings and conclusions did not extend the appellate timetable in this case. I would affirm the court of appeals' judgment dismissing the appeal and deny the writ.

### IV. CONCLUSION

The Court asserts that the rule it adopts is better than the one I propose because it sometimes happens that the appellate standard of review has not been finally determined. Thus, the Court concludes that the standard I would apply is less certain than the one it adopts. I beg to differ again.

There is a substantial body of statutory and case law that establishes appellate standards of review. Moreover, the bench and bar are fortunate to have available two excellent **\*446** law review articles that put this body of law together for ready reference. *See generally* Hall, *Standards of Appellate Review in Civil Appeals,* 21 ST. MARY'S L.J. 865 (1990) and Hall, *Revisiting Standards of Review in Civil Appeals,* 24 ST. MARY'S L.J. 1045 (1993). "The law prescribing the standard of review to a particular ruling is complex but relatively well settled." Hecht, *Forward:*

*Revisiting Standards of Review in Civil Appeals,* 24 ST. MARY'S L.J. 1041, 1041 (1993).

Today the Court needlessly establishes a new standard when existing standards will better solve the problem. I respectfully dissent.

**All Citations**

938 S.W.2d 440, 40 Tex. Sup. Ct. J. 273

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

**Declined to Extend by**    State v. Titan Land Development Inc.,
Tex.App.-Hous. (1 Dist.),    June 11, 2015

826 S.W.2d 138
Supreme Court of Texas.

Paul F. JOHN, Lillie John and John's
Welding & Construction, Inc., Petitioners,

v.

The STATE of Texas, Respondent.

No. D–1557.    |    Feb. 26, 1992.    |
Rehearing Overruled April 22, 1992.

Landowners appeal from judgment of the District Court No. 274, Guadalupe County, Fred Moore, J., entered in eminent domain proceeding. The San Antonio Court of Appeals affirmed, and landowners applied for writ of error. The Supreme Court held that landowner's time to object to special commissioner's award in condemnation proceeding is tolled until clerk sends notice to landowner pursuant to statute requiring clerk to send notice by next working day indicating condemnation award.

Reversed and remanded.

West Headnotes (6)

**[1]      Eminent Domain**
        Objections and Exceptions

   148   Eminent Domain
   148III   Proceedings to Take Property and Assess
   Compensation
   148k225   Assessment by Commissioners,
   Appraisers, or Viewers
   148k235   Objections and Exceptions
   Landowner's time to object to special commissioner's award in condemnation proceeding is tolled until clerk sends notice to landowner pursuant to statute requiring clerk to send notice by next working day indicating condemnation award. V.T.C.A., Property Code § 21.049.

   5 Cases that cite this headnote

**[2]      Eminent Domain**
        Strict Compliance with Statutory
Requirements

   148   Eminent Domain
   148III   Proceedings to Take Property and Assess
   Compensation
   148k167   Statutory Provisions and Remedies
   148k167(4)   Strict Compliance with Statutory
   Requirements
   Procedures set forth in condemnation statute must be strictly followed and its protections liberally construed for benefit of landowner. V.T.C.A., Property Code § 21.049.

   15 Cases that cite this headnote

**[3]      Eminent Domain**
        Filing Report and Notice

   148   Eminent Domain
   148III   Proceedings to Take Property and Assess
   Compensation
   148k225   Assessment by Commissioners,
   Appraisers, or Viewers
   148k234   Report and Findings or Award
   148k234(5)   Filing Report and Notice
   Statute requiring clerk of court to send notification of special commissioner's decision in condemnation proceeding no later than next working day after day of decision is mandatory because it is part of the statutory scheme authorizing eminent domain actions and is designed to protect landowner. V.T.C.A., Property Code § 21.049.

   12 Cases that cite this headnote

**[4]      Notice**
        Requisites and Sufficiency of Formal
Notice in General

   277   Notice
   277k9   Requisites and Sufficiency of Formal
   Notice in General
   When statute provides method by which notice shall be given in particular instance, notice provision must be followed with reasonable strictness.

   4 Cases that cite this headnote

**[5]** **Action**

    Change of Character or Form

**Eminent Domain**

    Objections and Exceptions

13 Action

13II Nature and Form

13k36 Change of Character or Form

148 Eminent Domain

148III Proceedings to Take Property and Assess Compensation

148k225 Assessment by Commissioners, Appraisers, or Viewers

148k235 Objections and Exceptions

Filing timely objections in condemnation proceeding invokes jurisdiction of trial court and transforms administrative proceeding into pending cause. V.T.C.A., Property Code § 21.049.

4 Cases that cite this headnote

**[6]** **Eminent Domain**

    Objections and Exceptions

148 Eminent Domain

148III Proceedings to Take Property and Assess Compensation

148k225 Assessment by Commissioners, Appraisers, or Viewers

148k235 Objections and Exceptions

If objections are not timely filed in condemnation proceeding, trial court can only perform its ministerial function and render judgment based on special commissioner's award. V.T.C.A., Property Code § 21.049.

11 Cases that cite this headnote

**Attorneys and Law Firms**

**\*139** Bennie Bock, II, New Braunfels, Laura Cavaretta, and Paul M. Green, San Antonio, for petitioners.

George R. Jennings, and Mark Heidenheimer, Austin, for respondent.

**Opinion**

PER CURIAM.

 **[1]** This is a condemnation case. At issue is whether landowners are entitled to notice providing an opportunity to timely object after a condemnation award is filed with the trial court. The court of appeals held that Paul F. John, Lillie John and John's Welding & Construction Inc. (collectively "the Johns") did not file timely objections to the condemnation award because the timetable for objecting to the award starts with the filing of the award, not the sending or receiving of notice. A majority of this court holds that, in a condemnation proceeding, the parties' time to object to the special commissioners' award is tolled until the clerk sends the required notice pursuant to section 21.049 of the Texas Property Code.

The state commenced an eminent domain action to condemn the property owned by the Johns. At the special commissioners' hearing, on March 28, 1990, the Johns received an award for the value of their property. On April 2, 1990, the special commissioners' award was filed with the trial court. On April 3, 1990, the clerk should have sent notice to the Johns informing them that the commissioners' award had been filed with the trial court. *See* Tex. Prop.Code § 21.049 (providing that the clerk shall send notice to the parties in the proceeding, by the next working day, indicating that the condemnation award had been filed with the trial court). On April 25, 1990, the clerk finally sent the required notice to the Johns. Two days later, on April 27, 1990, the Johns filed their objections to the award and demanded a trial to determine the value of the property.

The trial court held that it did not have jurisdiction to consider the merits of the case without timely objections and could only perform its ministerial function of entering judgment based upon the commissioners' award. *See* Tex. Prop.Code § 21.018(a) (providing that objections to the condemnation award must be filed on or before the Monday next following the twentieth day after the day the commissioners file their findings with the court). The court of appeals affirmed the judgment of the trial court on the basis that the Johns did not file timely objections. To support that result, the court of appeals compared section 21.049 of the Texas Property Code to rule 239a of the Texas Rules of Civil Procedure which governs default judgments. [1] The notice requirement of rule 239a has been considered directory, rather than mandatory. *See Petro–Chemical Transport, Inc. v. Carroll,* 514 S.W.2d

240, 244–45 (Tex.1974) (the clerk's failure to send required notice does not affect the **\*140** finality of the judgment but such a failure may be a predicate for bill of review); *see also Bloom v. Bloom,* 767 S.W.2d 463, 468 (Tex.App.—San Antonio 1989, writ denied) (the clerk's failure to provide the required notice, pursuant to rule 239a, does not constitute reversible error). Thus, reasoning that section 21.049 is likewise directory, the court of appeals held that the clerk's failure to comply with the notice provision does not toll the timetable for objecting to the commissioners' award.

1     Rule 239a of the Texas Rules of Civil Procedure provides, in part, that "[i]mediately upon the signing of the judgment, the clerk shall mail written notice thereof to the party against whom the judgment was rendered...."

 **[2]**    Contrary to the court of appeals' analysis, the notice requirements of section 21.049 of the Texas Property Code and rule 239a of the Texas Rules of Civil Procedure are not analogous. Default judgments are distinguishable for two reasons. First, rule 239a specifically states that "failure to comply with the provisions of the rule shall not affect the finality of the judgment." Tex.R.Civ.P. 239a. Thus, unlike section 21.049 of the Texas Property Code, the notice requirement is directory by the express language of rule 239a. [2] Second, in a condemnation action, the landowner is given a single opportunity to recover damages for the taking of his property by the state for the public benefit. *Coastal Indust. Water Auth. v. Celanese Corp. of Am.,* 592 S.W.2d 597, 599 (Tex.1979). As a result, the procedures set forth in the condemnation statute must be strictly followed and its protections liberally construed for the benefit of the landowner. *See Rotello v. Brazos County Water Control & Improvement Dist.,* 574 S.W.2d 208, 212 (Tex.Civ.App.—Houston [1st Dist.] 1978, no writ). *See also Coastal Indust. Water Auth.,* 592 S.W.2d at 599; *Walling v. State,* 394 S.W.2d 38, 40 (Tex.Civ.App.—Waco 1965, writ ref'd n.r.e.).

2     When a defaulting party does not receive any actual or official notice, rule 306a(4) of the Texas Rules of Civil Procedure provides a limited extension of time before the judgment becomes final and the trial court loses its plenary power. After that limited extension of time has lapsed, the clerk's failure to send notice will not affect the finality of the judgment. Tex.R.Civ.P. 239a.

 **[3]**    One such procedure is section 21.049 of the Texas Property Code, which mandates that:

> [N]ot later than the next working day after the day the decision [by the

special commissioners] is filed, the clerk shall send notice of the decision by certified or registered United States mail, return receipt requested, to the parties in the proceeding, or to their attorneys of record, at their addresses of record.

Tex.Prop.Code § 21.049. In contrast to rule 239a, this section must be construed as mandatory because it is part of the statutory scheme authorizing eminent domain actions and it is designed to protect the landowner. Moreover, since the language of the statute is clear and unambiguous, it should be enforced as written, giving its terms their usual and ordinary meaning, and without resorting to the rules of construction. *See Balios v. Texas Dep't of Pub. Safety,* 733 S.W.2d 308, 310 (Tex.App.—Amarillo 1987, writ ref'd). [3] Therefore, in condemnation cases, the clerk must comply with the notice provisions.

3     The state argues that the notice provision of section 21.049 is directory rather than mandatory because Senator McFarland stated, during the floor debate on the revised property code, that this bill is "a nonsubstantive codification." 2nd and 3rd Reading of Senate Bill 49 on the Senate Floor, p. 2, 1. 23–24. In 1983, during the first called session, the Legislature amended art. 3265 § 5 to require notice to the parties, by the next working day, indicating that the condemnation award had been filed with the trial court. Act of June 19, 1983, H.B. No. 1118, § 5, 68th Legislature, 1st C.S., ch. 838, 1983 Tex.Gen.Laws 4766. During the second call of the same session, the legislature incorporated this change into the Property Code. Act of 1984, S.B. 49, § 1(d), 68th Legislature, 2nd C.S., ch. 18, 1984 Tex.Gen.Laws 95 (codified as Tex.Prop.Code § 21.049.) Thus, the substantive change occurred prior to the 1984 codification.

    Furthermore, the express language of the statute states that the clerk "shall" send notice to the parties in the condemnation proceeding. Shall "is an imperative term, by ordinary meaning, and requires the performance of the act to be performed. Thus, it should be treated as a mandatory term, unless it is apparent that the legislature intended otherwise." *Balios v. Texas Dep't of Pub. Safety,* 733 S.W.2d 308, 310 (Tex.App.—Amarillo 1987, writ ref'd) (citations omitted).

 **[4]**   **[5]**   **[6]**   In light of section 21.049 of the Texas Property Code, the court of appeals **\*141** incorrectly applied *Dickey v. City of Houston,* 501 S.W.2d 293 (Tex.1973) which held

that a landowner who received notice of the condemnation was charged with the duty to "take cognizance" of subsequent acts of the commissioners including making an award, returning it to the trial court, and having the trial court enter the judgment unless timely objections were filed. *Id. at 294.* After *Dickey,* the legislature passed this mandatory provision, Tex.Prop.Code § 21.049, which supplanted the holding in *Dickey* and required the clerk to send notice to the landowner, by the next working day, confirming that the condemnation award had been filed with the trial court. Thus, notice of the condemnation hearing is not sufficient notice that the landowners' time to object to the condemnation award has begun to run. In the case at bar, the clerk failed to notify the Johns that the special commissioners' award had been filed with the court until after the deadline to object had passed. [4] As a result, the Johns' time to object to the special commissioners' award is tolled until the clerk sends the required notice pursuant to section 21.049 of the Texas Property Code. [5]

---

[4] When a statute provides the method by which notice shall be given in a particular instance, the notice provision must be followed with reasonable strictness. *See Rotello v. Brazos County Water Control & Improvement Dist.,* 574 S.W.2d 208, 212 (Tex.Civ.App.—Houston [1st

Dist.] 1978, no writ). By sending notice to the Johns after their time to object had lapsed, the clerk failed to follow the notice requirement with reasonable strictness.

[5] Filing timely objections invokes the jurisdiction of the trial court and transforms the administrative proceeding into a pending cause. *Pearson v. State,* 159 Tex. 66, 315 S.W.2d 935, 937 (1958); *see Seiler v. Intrastate Gathering Corp.,* 730 S.W.2d 133, 137 (Tex.App.—San Antonio 1987, no writ). If objections are not filed timely, the trial court can only perform its ministerial function and render judgment based upon the commissioner's award. *See Pearson,* 315 S.W.2d at 938. However, the clerk's failure to send notice tolls the landowner's time to object. Therefore, in the case at bar, the trial court had jurisdiction to consider the merits of the case because the Johns filed timely objections. *Cf. Packer v. Fifth Court of Appeals,* 764 S.W.2d 775 (Tex.1989).

Accordingly, pursuant to Tex.R.App.P. 170, without hearing oral argument, a majority of this court grants the Johns' application for writ of error, reverses the judgment of the court of appeals, and remands the cause to the trial court for further proceedings consistent with this opinion.

**All Citations**

826 S.W.2d 138

---

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 6672494
Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR
DESIGNATION AND SIGNING OF OPINIONS.

**MEMORANDUM OPINION**
Court of Appeals of Texas,
San Antonio.

ONCOR ELECTRIC DELIVERY
COMPANY LLC, Appellant
v.
James Milton James Milton SCHUNKE, Appellee.

No. 04–13–00067–CV. | Dec. 18, 2013.

**Synopsis**
**Background:** Electric company filed a condemnation
petition. Special commissioners awarded landowner
$367,000.00 in damages for the condemnation of his
land. Landowner filed a motion seeking judgment on the
commissioners' award. The 35th Judicial District Court,
Mills County, Stephen Ellis, J., concluded that company's
objections to commissioners' award were untimely filed,
granted landowner's motion, and rendered judgment on the
commissioners' award. Company appealed.

**[Holding:]** The Court of Appeals, Karen Angelini, J.,
held that company's time to file objections to the special
commissioners' damages award was tolled until the trial court
clerk mailed the notice of decision to company, as required
by condemnation statute.

Reversed and remanded.

West Headnotes (2)

**[1]** **Eminent Domain**
   &#128273; Objections and exceptions

148 Eminent Domain
148III Proceedings to Take Property and Assess
Compensation
148k225 Assessment by Commissioners,
Appraisers, or Viewers

148k235 Objections and exceptions
Electric company's time to file objections
to the special commissioners' damages award
to landowner in condemnation action was
tolled until the trial court clerk mailed the
notice of decision to company, as required by
condemnation statute, and because the trial court
clerk never mailed the notice as required by
statute, company's time to file objections to
the commissioners' award was tolled. V.T.C.A.,
Property Code § 21.049.

Cases that cite this headnote

**[2]** **Eminent Domain**
   &#128273; Filing report and notice

148 Eminent Domain
148III Proceedings to Take Property and Assess
Compensation
148k225 Assessment by Commissioners,
Appraisers, or Viewers
148k234 Report and Findings or Award
148k234(5) Filing report and notice
Where attorney for electric company gave the
notice of special commissioners' decision to
the trial court clerk, who filed the notice and
handed company's attorney a file-stamped copy
of the notice, the act of handing file-stamped
copy of the notice of decision to one of
company's attorneys did not satisfy the clerk's
mandatory duty to mail the notice to the parties or
their attorneys pursuant to condemnation statute.
V.T.C.A., Property Code § 21.049.

Cases that cite this headnote

From the 35th Judicial District Court, Mills County, Texas,
Trial Court No. 11–04–6278, Stephen Ellis, Judge.

**Attorneys and Law Firms**

Joann N. Wilkins, Lance Cooper Travis, Burford & Ryburn,
Dallas, TX, for Appellant.

Luke Ellis, Jons, Marrs, Ellis, and Hodge, LLP, Austin, TX,
for Appellee.

Sitting: KAREN ANGELINI, Justice, MARIALYN
BARNARD, Justice, REBECA C. MARTINEZ, Justice.

Oncor Elec. Delivery Co. LLC v. Schunke, Not Reported in S.W.3d (2013)

2013 WL 6672494

## MEMORANDUM OPINION

Opinion by KAREN ANGELINI, Justice.

**\*1** Oncor Electric Company LLC appeals from a judgment rendered on a special commissioners' award in a condemnation case. We conclude the trial court erred in rendering judgment on the commissioners' award. We therefore reverse and remand for further proceedings.

## BACKGROUND

A condemnation action begins as an administrative proceeding and, if necessary, may be converted to a judicial proceeding. *City of Tyler v. Beck,* 196 S.W.3d 784, 786 (Tex.2006). To begin a condemnation action, a condemning entity files a petition in the appropriate trial court. *Id.;State v. Garland,* 963 S.W.2d 95, 97 (Tex.App.-Austin 1998, pet. denied). The trial court then appoints special commissioners, who conduct a hearing and determine just compensation. *Beck,* 196 S.W.3d at 786; *Garland,* 963 S.W.2d at 97.Any party to a condemnation action may object to the commissioners' award by filing written objections with the court. *Beck,* 196 S.W.3d at 786; *Garland,* 963 S.W.2d at 97.If any party timely files objections, the commissioners' award is vacated and the administrative proceeding becomes a judicial proceeding.*Beck,* 196 S.W.3d at 786; *Garland,* 963 S.W.2d at 97.However, if no objections are filed, or if objections are untimely filed, the trial court does not acquire jurisdiction beyond its ministerial duty to render judgment on the commissioners' award. *Garland,* 963 S.W.2d at 97 (citing *Pearson v. State,* 159 Tex. 66, 315 S.W.2d 935, 938 (1958)).

In this case, Oncor filed a condemnation petition in the district court in Mills County, Texas. In its petition, Oncor sought to condemn land owned by James Milton Schunke. The district court appointed special commissioners, who heard the case and decided to award Schunke $367,000.00 in damages for the condemnation of his land. Oncor filed the commissioners' award and a notice of the commissioners' decision with the trial court clerk on September 26, 2011. The notice of decision instructed the trial court clerk to mail, by certified or registered mail, a copy of the notice to Schunke's and Oncor's attorneys of record. On September 28, 2011, the trial court clerk mailed a copy of the notice of decision to Schunke's attorneys of record, but she did not mail a copy of the notice of

decision to Oncor's attorneys of record. Oncor filed objections to the commissioners' award on October 19, 2011.

Thereafter, Schunke filed a motion seeking judgment on the commissioners' award. In the motion, Schunke argued the trial court was required to render judgment on the commissioners' award because Oncor failed to file its objections in a timely manner. According to Schunke, Oncor's objections were due on October 17, 2011, which was the first Monday following the twentieth day after the commissioners' award was filed with the trial court clerk.

The trial court held a hearing on Schunke's motion. At the hearing, a trial court clerk testified that the notice of the commissioners' decision was not sent to Oncor in the manner specified by the property code. Nevertheless, Schunke argued that the clerk's failure to send the notice of decision to Oncor in the manner specified by the property code did not toll Oncor's time for filing objections because the relevant property code provisions were designed to protect landowners rather than condemning entities. Schunke further argued that Oncor had actual notice of the filing of the notice of decision. In response, Oncor argued its objections were not untimely because the property code required the clerk to mail the notice of decision to the parties or their attorneys of record and the clerk failed to do so. Furthermore, Oncor claimed that it relied on the law stating that the time for filing objections was tolled until the clerk mailed the notice of decision to the parties or their attorneys of record. The trial court concluded Oncor's objections were untimely filed, granted Schunke's motion, and rendered judgment on the commissioners' award. Oncor appealed.

## DISCUSSION

**\*2** On appeal, Oncor argues its objections were timely filed and therefore the trial court erred in rendering judgment on the commissioners' award. Two provisions of the Texas property code are central to the issue presented in this appeal. The first provision, section 21.049, states:

> The judge of a court hearing a proceeding under this chapter shall inform the clerk of the court as to a decision by the special commissioners on the day the decision is filed or on the next working day after the day the decision is filed. Not later than the

Oncor Elec. Delivery Co. LLC v. Schunke, Not Reported in S.W.3d (2013)

2013 WL 6672494

next working day after the day the decision is filed, the clerk shall send notice of the decision by certified or registered United States mail, return receipt requested, to the parties in the proceeding, or to their attorneys of record, at their addresses of record.

TEX. PROP.CODE ANN. § 21.049 (West 2000). The second provision, section 21.018, states:

(a) A party to a condemnation proceeding may object to the findings of the special commissioners by filing a written statement of the objections and their grounds with the court that has jurisdiction of the proceeding. The statement must be filed on or before the first Monday following the 20th day after the day the commissioners file their findings with the court.

(b) If a party files an objection to the findings of the special commissioners, the court shall cite the adverse party and try the case in the same manner as other civil causes.

TEX. PROP.CODE ANN. § 21.018 (West 2003).

These provisions were construed by the Texas Supreme Court in *John v. State,* 826 S.W.2d 138 (Tex.1992).Section 21.049 requires the trial court clerk to mail the notice of decision to the parties not later than the next working day after the day the decision is filed. TEX. PROP.CODE ANN. § 21.049. In *John,* the trial court clerk failed to mail the notice of the commissioners' decision to the landowners in the time period specified in the statute. 826 S.W.2d at 139.Instead, the clerk mailed the notice twenty-two days late, which was after the time for filing objections had passed under section 21.018(a).*Id.* Two days after the clerk mailed the notice of decision, the landowners filed their objections. *Id.* The Texas Supreme Court held that the landowners' objections were timely filed because the time to object to the commissioners' award was tolled until the clerk mailed the notice of decision as required under section 21.049. *Id.* The Texas Supreme Court construed section 21.049 as mandatory, concluding that "in condemnation cases, the clerk must comply with the notice provisions."*Id.* at 140. In reaching its holding, the Texas Supreme Court noted that when a statute provides the method by which notice shall be given in a particular instance, the notice provision must be followed with reasonable strictness. *Id.* at 141 n. 4 (citing *Rotello v. Brazos Cnty. Water Control and Improvement Dist. No. 1,* 574 S.W.2d 208, 212 (Tex.App.-Houston [1st Dist.] 1978,

no writ), *disapproved of on other grounds by**State v. Bristol Hotel Asset Co.,* 65 S.W.3d 638, 642 (Tex.2001)).

**\*3** **[1]** Here, it is undisputed that the trial court clerk never sent notice to Oncor as required by section 21.049. A deputy clerk testified that one of Oncor's attorneys gave her the notice of decision for filing, she filed the notice of decision, and handed the attorney a file-stamped copy of the notice. The clerk also testified that she mailed a copy of the notice of decision to Schunke's attorney, but she never mailed a copy to Oncor's attorney because it was her understanding that she did not need to mail the notice to the condemning entity. The clerk further testified that no one else in her office mailed a copy of the notice to Oncor because it would have been noted in the file.

Applying *John* to these facts, we conclude Oncor's time to file objections to the commissioners' award was tolled until the trial court clerk mailed the notice of decision as required by section 21.049. *See John,* 826 S.W.2d at 139 ("A majority of this court holds that, in a condemnation proceeding, the parties' time to object to the special commissioners' award is tolled until the clerk sends the required notice pursuant to section 21.049 of the Texas Property Code."); *Garland,* 963 S.W.2d at 101 (holding that the timetable for filing objections begins when the commissioners' decision is filed with the trial court, subject to tolling if proper notice is not sent). Because the trial court clerk never mailed the notice as required under section 21.049, Oncor's time to file objections to the commissioners' award was tolled.

**[2]** Despite the rule articulated in *John,* Schunke claims that Oncor's objections were untimely filed. Schunke argues that *John* does not apply to this case because Oncor had actual notice of the filing of the notice of the commissioners' decision. Specifically, Oncor's lawyer gave the notice of decision to the trial court clerk, who filed the notice and handed Oncor's attorney a file-stamped copy of the notice. [1] We disagree with Schunke's assertion that the act of handing a file-stamped copy of the notice of decision to one of Oncor's attorneys satisfied the clerk's mandatory duty to mail the notice to the parties or their attorneys under section 21.049. Section 21.049, which makes no mention of actual notice, specifies the manner in which notice is to be provided, stating "the clerk shall send notice of the decision by certified or registered United States mail, return receipt requested, to the parties in the proceeding, or to their attorneys of record, at their addresses of record."*See*TEX. PROP.CODE ANN. § 21.049. As the Texas Supreme Court stated in *John,* the

Oncor Elec. Delivery Co. LLC v. Schunke, Not Reported in S.W.3d (2013)

2013 WL 6672494

requirements set out in section 21.049 must be followed with reasonable strictness. *John,* 826 S.W.2d at 141 n. 4.

1    Apparently, the practice of a party filing the notice of decision on behalf of the commissioners is not unusual. A similar practice was described in *State v. Garland,* 963 S.W.3d 95, 99 (Tex.App.-Austin 1998, no pet.)("We are informed ... that a representative of the condemnor typically offers to carry out the actual filing of the document, and that such offer is usually accepted by the commissioners. We see no reason why the commissioners may not authorize another person, including a party to the proceeding, to fulfil[l] this responsibility.").

Schunke next argues this case warrants a departure from the rule articulated in *John* because the clerk failed to send notice to the condemning entity as opposed to the landowner. Schunke points out that *John* was based in part on the principle that condemnation statutes are to be liberally construed for the benefit of the landowner. *Id.* at 140.However, *John* was also based on the principle that statutes that are clear and unambiguous must be enforced as written. *Id.* ("Moreover, since the language of the statute is clear and unambiguous, it should be enforced as written, giving its terms their usual and ordinary meaning, and without resorting to the rules of construction."). Notably, section 21.049 does not direct the clerk to mail the notice to the landowner only. Rather, section 21.049 expressly requires the clerk to mail the notice "to the *parties* in the proceeding, or to *their* attorneys of record."*See*TEX. PROP.CODE ANN. § 21.049 (emphasis added).

 **\*4** Schunke further argues that Oncor's objections were untimely because Oncor failed to satisfy the requisites for

equitable tolling and because Oncor judicially admitted that the commissioners' award was filed with the clerk on September 26, 2011. We find these arguments unconvincing. First, under the rule articulated in *John,* Oncor was not required to satisfy the requirements for equitable tolling. Second, any admission concerning the date the commissioners' award was filed does not change the fact that the time to file objections was tolled until the clerk mailed notice to the parties or their attorneys as required by section 21.049.

In sum, the clerk's act of handing a file-stamped copy of the notice of decision to one of Oncor's attorneys did not satisfy the clerk's duty to mail the notice of decision as required by section 21.049. Moreover, Oncor was entitled to rely on the rule articulated in *John,* which provides that the time for filing objections to the commissioners' award is tolled until the clerk mails notice to the parties or their attorneys as required by section 21.049. *See* 826 S.W.2d at 139.

## CONCLUSION

The trial court erred in concluding Oncor's objections were untimely filed and in rendering judgment on the commissioners' award. Because Oncor's objections were timely filed, the administrative condemnation proceeding was converted to a judicial condemnation proceeding. Therefore, the trial court's judgment is REVERSED, and this case is REMANDED to the trial court for further proceedings.

**All Citations**

Not Reported in S.W.3d, 2013 WL 6672494

---

KeyCite Yellow Flag - Negative Treatment

**Distinguished by** In re Bliss & Glennon, Inc., Tex.App.-Hous. (1 Dist.),
January 7, 2014

341 S.W.3d 919
Supreme Court of Texas.

Larry ROCCAFORTE, Petitioner,

v.

Jefferson COUNTY, Respondent.

No. 09–0326. | Argued Oct. 14,
2010. | Decided April 29, 2011.

**Synopsis**

**Background:** Former chief deputy constable brought §
1983 wrongful termination action against county, county
constable, and county employees. After jury returned a
verdict in favor of former chief with respect to the claims
against constable, the 136th District Court, Jefferson County,
Milton G. Shuffield, J., granted county's plea to jurisdiction,
and former chief brought interlocutory appeal. While
interlocutory appeal was pending, the District Court rendered
final judgment against constable. Constable appealed, and
former chief cross-appealed. The Beaumont Court of Appeals
affirmed in part, reversed in part, and rendered judgment
that former chief take nothing. In the interlocutory appeal,
the Beaumont Court of Appeals, 281 S.W.3d 230, modified
the dismissal order to reflect that the dismissal was without
prejudice and affirmed the order as modified. Former chief
petitioned for review.

**Holdings:** The Supreme Court, Jefferson, C.J., held that:

[1] even if court erred in rendering final judgment after it had
issued a stay in proceedings, former chief waived such error;

[2] Court of Appeals would treat interlocutory appeal that was
pending when trial court issued a final judgment as an appeal
from the final judgment;

[3] provision in statute requiring notice of suit against county
via mail was not a jurisdictional requirement; and

[4] provision in statute requiring notice of suit against county
via mail was satisfied by hand-delivery of notice.

Reversed and remanded.

Willett, J., concurred in part and filed opinion.

West Headnotes (5)

[1]     **Appeal and Error**
          Judgment

30   Appeal and Error
30V   Presentation and Reservation in Lower Court
of Grounds of Review
30V(B)   Objections and Motions, and Rulings
Thereon
30k223   Judgment
Even if court erred in rendering final judgment
after it had issued a stay in proceedings
pending an interlocutory appeal by plaintiff,
former chief deputy constable waived such
error in wrongful termination action brought by
former chief deputy constable against county
and other constable; trial court's final judgment
was voidable, rather than void, and former chief
deputy constable failed to object to entry of final
judgment.

4 Cases that cite this headnote

[2]     **Appeal and Error**
          Nature and grounds of right

30   Appeal and Error
30IV   Right of Review
30IV(A)   Persons Entitled
30k136   Nature and grounds of right
The right of appeal should not be lost due to
procedural technicalities.

1 Cases that cite this headnote

[3]     **Appeal and Error**
          Interlocutory Proceedings Brought Up in
General

30   Appeal and Error
30XVI   Review
30XVI(B)   Interlocutory, Collateral, and
Supplementary Proceedings and Questions

30k869 On Appeal from Final Judgment

30k870 Interlocutory Proceedings Brought Up in General

30k870(1) In general

Court of Appeals would treat interlocutory appeal that was pending when trial court issued a final judgment as an appeal from the final judgment; claims against defendant that were subject matter of interlocutory appeal were not severed prior to entry of final judgment, defendant remained a party to the underlying proceeding, and final judgment implicitly modified the interlocutory order, which merged with it. Rules App.Proc., Rule 27.3.

16 Cases that cite this headnote

[4] Counties

Notice, Demand, or Presentation of Claim

104 Counties

104XII Actions

104k211 Conditions Precedent

104k213.5 Notice, Demand, or Presentation of Claim

104k213.5(1) In general

Provision in statute governing local government providing that, upon motion by the defendant, an action against a county or county official must be dismissed if plaintiff failed to provide written notice via mail to the county judge or district attorney, was not a jurisdictional requirement. V.T.C.A., Local Government Code § 89.0041.

4 Cases that cite this headnote

[5] Counties

Service or presentation; timeliness

104 Counties

104XII Actions

104k211 Conditions Precedent

104k213.5 Notice, Demand, or Presentation of Claim

104k213.5(2) Service or presentation; timeliness

Statute requiring that a plaintiff filing suit against a county or county official must provide notice of suit via mail to county judge or district attorney was satisfied by hand-delivery of notice, rather than delivery by mail, in wrongful termination action brought by former chief deputy constable

against county and other constable. V.T.C.A., Local Government Code § 89.0041.

5 Cases that cite this headnote

**Attorneys and Law Firms**

**\*920** Laurence W. Watts, Watts & Associates, P.C., Missouri City, TX, Brandon David Mosley, Cowan & Lemmon, LLP, Houston, TX, for Larry Roccaforte.

Thomas F. Rugg, District Attorney's Office, First Assistant—Civil Div., Steven L. Wiggins, Jefferson County District Attorney Office, Thomas E. Maness, Criminal District Attorney, Beaumont, TX, for Jefferson County.

Todd K. Sellars, Dallas County Assistant Attorney, Dallas, TX, for Amicus Curiae Dallas County, Texas.

**Opinion**

Chief Justice JEFFERSON delivered the opinion of the Court, joined by Justice HECHT, Justice WAINWRIGHT, Justice MEDINA, Justice GREEN, Justice JOHNSON, Justice GUZMAN, and Justice LEHRMANN, and joined by Justice WILLETT as to parts I through III.

The Local Government Code requires a person suing a county to give the county judge and the county or district attorney notice of the claim. TEX. LOC. GOV'T CODEE § 89.0041. The plaintiff provided that notice here, but did so by personal service of process, rather than registered or certified mail as the statute contemplates. We conclude that when the requisite county officials receive timely notice enabling them to answer and defend the claim, the case should not be dismissed. Because the court of appeals concluded otherwise, we reverse its judgment and remand the case to the trial court for further proceedings.

**I. Background**

Former Chief Deputy Constable Larry Roccaforte sued Jefferson County and Constable Jeff Greenway, alleging that his wrongful termination deprived him of rights guaranteed by the Texas Constitution. Roccaforte personally served County Judge Carl Griffith with the suit, and fifteen days later, the County (represented by the district attorney) and Constable Greenway answered, denying liability. The County propounded written discovery requests, deposed Roccaforte,

and presented County officials for depositions. The County also filed a plea to the jurisdiction, asserting that Roccaforte did not give requisite notice of the suit. *See* TEX. LOC. GOV'T CODEE § 89.0041. Roccaforte disagreed, arguing that the statute applied only to contract claims. Alternatively, he argued that 42 U.S.C. § 1983 preempted the notice requirements and that he substantially complied with them in any event.

Although the trial court indicated that it would sustain the County's plea and sever those claims from the underlying case, it did not immediately sign an order doing so. In the meantime, Roccaforte tried his claims against Greenway. A jury returned a verdict in Roccaforte's favor. Afterwards, the trial court signed an order granting the County's jurisdictional plea. The order did not sever the claims from the underlying case. Roccaforte then pursued this interlocutory appeal. His notice of appeal stated that "[p]ursuant to Civ. P. Rem.Code § 51.014(b), all proceedings are **\*921** stayed in the trial court pending resolution of the appeal." But the proceedings were not stayed.

In the underlying case, Greenway moved for judgment notwithstanding the verdict, which the trial court granted as to Roccaforte's property interest and First Amendment retaliation claims but denied as to Roccaforte's claimed violation of his liberty interest. Roccaforte moved for entry of judgment. Notwithstanding the statutory stay referenced in Roccaforte's notice of appeal, the trial court rendered judgment for Roccaforte and awarded damages, attorney's fees, and costs. The judgment was titled "FINAL JUDGMENT"; it "denie[d] all relief no [sic] granted in this judgment"; and it stated "[t]his is a FINAL JUDGMENT." The County was included in the case caption. No one objected to the continuation of trial court proceedings despite the statutory stay.

Greenway appealed, and Roccaforte cross-appealed, raising as his only issues complaints regarding the trial court's JNOV on his claims against Greenway. The court of appeals affirmed in part and reversed in part, rendering judgment that Roccaforte take nothing. *Greenway v. Roccaforte*, 2009 WL 3460683, at \*6, 2009 Tex.App. LEXIS 8290, at \*15 (Tex.App.-Beaumont 2009, pet. denied). [1]

[1]     Today, we deny that petition for review.

In Roccaforte's separate interlocutory appeal, the court of appeals made the following notation:

Roccaforte notes that immediately after the dismissal order, the trial of the case proceeded to judgment without the County as a party. No one disputes that all the claims against all other parties have been resolved. The order of dismissal is therefore appealable whether or not the statute at issue is jurisdictional.

281 S.W.3d 230, 231 n. 1. The court ultimately concluded that Roccaforte's failure to notify the County of the suit by registered or certified mail mandated dismissal of his suit against the County, but not because the trial court lacked jurisdiction. *Id.* at 236–37. Accordingly, the court modified the dismissal order to reflect that dismissal was without prejudice and affirmed the order as modified. *Id.*

Roccaforte petitioned this Court for review, which we granted. [2] 53 Tex.Sup.Ct.J. 1061 (Aug. 27, 2010).

[2]     Dallas County submitted an amicus curiae brief in support of Jefferson County.

## II. Did the trial court's final judgment moot this interlocutory appeal?

Before turning to the merits, we must decide a procedural matter: What happens when a party perfects an appeal of an interlocutory judgment that has not been severed from the underlying action, and that action proceeds to trial and a final judgment? The trial court did not sever Roccaforte's claims against the County [3] and denied "all relief not granted" in its final judgment. Ordinarily, under these circumstances, Roccaforte would have to complain on appeal that the trial court erroneously dismissed those claims. Roccaforte, however, did not complain about the County's dismissal in his appeal from the final judgment. His separate interlocutory appeal, then, rests on a precipice of mootness.

[3]     "As a rule, the severance of an interlocutory judgment into a separate cause makes it final." *Diversified Fin. Sys., Inc. v. Hill, Heard, O'Neal, Gilstrap & Goetz, P.C.,* 63 S.W.3d 795, 795 (Tex.2001) (per curiam).

### **\*922  A. Roccaforte waived any complaint about the trial court's actions during the statutory stay.**

Although Roccaforte's interlocutory appeal was supposed to stay all proceedings in the trial court pending resolution of

the appeal,[4] Roccaforte did not object to the trial court's rendition of judgment while the stay was in effect. To the contrary, he affirmatively moved for entry of judgment. Because a final judgment frequently moots an interlocutory appeal,[5] we must decide whether the trial court's failure to observe the stay made the final judgment void or merely voidable. If the final judgment is void, it would have no impact on this interlocutory appeal. *Lindsay v. Jaffray,* 55 Tex. 626 (Tex.1881) ("A void judgment is in legal effect no judgment.") (quoting FREEMAN ON JUDGMENTS, § 117).[6] If voidable, then we must decide whether it moots this proceeding. *See Travelers Ins. Co. v. Joachim,* 315 S.W.3d 860, 863 (Tex.2010) (observing that voidable orders must be corrected by direct attack and, unless successfully attacked, become final). We conclude it is voidable.

[4]    TEX. CIV. PRAC. & REM.CODE § 51.014(b); *see also* TEX.R.APP. P. 29.5 (providing that "[w]hile an appeal from an interlocutory order is pending, the trial court retains jurisdiction of the case and *unless prohibited by statute* may make further orders, including one dissolving the order complained of on appeal") (emphasis added).

[5]    *See, e.g., Hernandez v. Ebrom,* 289 S.W.3d 316, 319 (Tex.2009) ("Appeals of some interlocutory orders become moot because the orders have been rendered moot by subsequent orders.").

[6]    *See also Travelers Ins. Co. v. Joachim,* 315 S.W.3d 860, 863 (Tex.2010) (noting that "[a] judgment is void ... when it is apparent that the court rendering judgment had no jurisdiction of the parties or property, no jurisdiction of the subject matter, no jurisdiction to enter the particular judgment, or no capacity to act") (quoting *Browning v. Prostok,* 165 S.W.3d 336, 346 (Tex.2005)).

Two of our courts of appeals have held that the failure to object when a trial court proceeds despite the automatic stay waives any error the trial court may have committed by failing to impose it. *See Escalante v. Rowan,* 251 S.W.3d 720, 724–25 (Tex.App.-Houston [14th Dist.] 2008), *rev'd on other grounds,* 332 S.W.3d 365 (Tex.2011) (per curiam); *Henry v. Flintrock Feeders, Ltd.,* No. 07–04–0224–CV, 2005 WL 1320121, at *1, 2005 Tex.App. LEXIS 4310, at *1 (Tex.App.-Amarillo June 1, 2005, no pet.) (mem.op.). In *Escalante,* the court of appeals held that a party's failure to object to a trial court's ruling on summary judgment motions during the statutory stay "failed to preserve error as to any objection that the summary judgment is voidable based on the stay."

*Escalante,* 251 S.W.3d at 725. In *Henry,* the court held that a party's failure to object to the trial court's action in violation of the stay waived any error resulting from that action. *Henry,* 2005 WL 1320121, at *1–2, 2005 Tex.App. LEXIS 4310, at *4 (holding that trial court's grant of summary judgment mooted interlocutory appeal challenging denial of special appearance). We find particularly instructive a case involving a trial court's rendition of final judgment while an interlocutory appeal of a class certification order was pending:

> [I]f a trial court proceeds to trial during the interlocutory appeal, the class action plaintiff must inform the court of section 51.014(b) and request that the stay be enforced. If a court proceeds to trial over the objection of a class action plaintiff, the class action plaintiff could request a mandamus and this court would grant it. However, if the class action plaintiff fails to inform the trial court of section 51.014(b), and allows the court to proceed to trial, as happened here, the **\*923** plaintiff waives the right to object or request any relief on appeal. *See* TEX.R.APP. P. 33.1(a). We see this as no different from any other trial court error that is not preserved—it is waived.

*Siebenmorgen v. Hertz Corp.,* No. 14–97–01012–CV, 1999 WL 21299, at *3, 1999 Tex.App. LEXIS 311, at *10–11 (Tex.App.-Houston [14th Dist.] Jan. 21, 1999, no pet.) (dismissing as moot interlocutory appeal of order denying class certification).

A third court of appeals has implicitly concluded that parties can waive the right to insist on a section 51.014(b) stay. *See Lincoln Property Co. v. Kondos,* 110 S.W.3d 712, 715 (Tex.App.-Dallas 2003, no pet.). In that case, the court observed that the trial court's grant of summary judgment while an interlocutory appeal was pending violated the statutory stay. Noting that "neither party requested a stay from this Court" and "both parties sought to commence the 'trial' below by filing and/or arguing motions for summary judgment while this appeal was pending," the court of appeals did not conclude that the trial court's summary judgment was void. *Id.* at 715. Instead, the appellate court held that the summary judgment mooted the interlocutory appeal. *Id.*

at 715–16 (noting that the interlocutory class certification order merged into the final judgment). The court concluded: "By rendering a final judgment during this appeal, the trial court also rendered itself powerless to reconsider its class certification ruling were we to conclude here the ruling was entered in error." *Id.* at 715.

We agree with those decisions that have held that a party may waive complaints about a trial court's actions in violation of the stay imposed by section 51.014(b). That stay differs from a situation in which the relevant statute vests "exclusive jurisdiction" in a particular forum. *See, e.g., Kalb v. Feuerstein,* 308 U.S. 433, 439, 60 S.Ct. 343, 84 L.Ed. 370 (1940) (noting that bankruptcy law in effect at the time "vested in the bankruptcy courts exclusive jurisdiction" and "withdr[ew] from all other courts all power under any circumstances"). For that reason, we have held that actions taken in violation of a bankruptcy stay are void, not just voidable. *Cont'l Casing Corp. v. Samedan Oil Corp.,* 751 S.W.2d 499, 501 (Tex.1988). [7]

[7] *But see Sikes v. Global Marine, Inc.,* 881 F.2d 176, 178 (5th Cir.1989) (holding that, under the 1978 Bankruptcy Act, "the better reasoned rule characterizes acts taken in violation of the automatic stay as voidable rather than void"); *see also Chisholm v. Chisholm,* No. 04–06–00504–CV, 2007 WL 1481574, at *2–3, 2007 Tex.App. LEXIS 3936, at *6–7 (Tex.App.-San Antonio May 23, 2007, no pet.) (noting conflict between *Sikes* and *Continental Casing* ); *In re De La Garza,* 159 S.W.3d 119, 120–21 (Tex.App.-Corpus Christi 2004, no pet.) (same); *Oles v. Curl,* 65 S.W.3d 129, 131 n. 1 (Tex.App.-Amarillo 2001, no pet.)(same); *Chunn v. Chunn,* 929 S.W.2d 490, 493 (Tex.App.-Houston [1st Dist.] 1996, no pet.) (same).

[1]   But as we have noted, "a court's action contrary to a statute or statutory equivalent means the action is erroneous or 'voidable,' not that the ordinary appellate or other direct procedures to correct it may be circumvented." *Mapco, Inc. v. Forrest,* 795 S.W.2d 700, 703 (Tex.1990); *cf. Univ. of Tex. Sw. Med. Ctr. v. Loutzenhiser,* 140 S.W.3d 351, 359 (Tex.2004) (noting that failure to comply with a non-jurisdictional statutory requirement may result in the loss of a claim, but that failure must be timely asserted and compliance can be waived). That is the case here. The trial court's rendition of final judgment while the stay was in effect was voidable, not void, and Roccaforte's failure to object to the trial court's actions waived any error related to the stay. We must, therefore, confront the fact that the trial **\*924**

court signed a final judgment disposing of all parties and all claims and that Roccaforte did not present in his appeal from that judgment the arguments he advances in this interlocutory appeal.

**B. The trial court's final judgment implicitly modified its interlocutory order, and we treat this appeal as relating to that final judgment.**

[2]   We have repeatedly held that the right of appeal should not be lost due to procedural technicalities. [8] Roccaforte timely perfected appeals from both the interlocutory order and the final judgment, and this is not a situation in which further proceedings mooted the issues raised in Roccaforte's interlocutory appeal. [9]

[8]   *See, e.g., Guest v. Dixon,* 195 S.W.3d 687, 688 (Tex.2006) ( "[W]e have repeatedly stressed that procedural rules should be construed and applied so that the right of appeal is not unnecessarily lost to technicalities."); *Crown Life Ins. Co. v. Estate of Gonzalez,* 820 S.W.2d 121, 121–22 (Tex.1991) (per curiam)(stating that procedural rules should be "liberally construed so that the decisions of the courts of appeals turn on substance rather than procedural technicality").

[9]   *See, e.g., Isuani v. Manske–Sheffield Radiology Grp., P.A.,* 802 S.W.2d 235, 236 (Tex.1991) (holding that final judgment mooted interlocutory appeal of order granting or denying temporary injunction); *Providian Bancorp Servs. v. Hernandez,* No. 08–04–00186–CV, 2005 WL 82197, at *1, 2005 Tex.App. LEXIS 288, at *2 (Tex.App.-El Paso Jan. 13, 2005, no pet.) (mem.op.) (dismissing as moot interlocutory appeal from order denying motion to compel arbitration, because trial court entered an order compelling arbitration); *Mobil Oil Corp. v. First State Bank of Denton,* No. 2–02–119–CV, 2004 WL 1699928, at *1, 2004 Tex.App. LEXIS 6940, at *2 (Tex.App.-Fort Worth July 29, 2004, no pet.) (dismissing as moot interlocutory appeal from class certification order, because trial court subsequently vacated order, decertified class, and dismissed class action); *Lincoln Property Co. v. Kondos,* 110 S.W.3d 712, 715–16 (Tex.App.-Dallas 2003, no pet.) (dismissing as moot interlocutory appeal of order granting class certification, as trial court subsequently granted summary judgment motion); *see also Hernandez,* 289 S.W.3d at 321 (acknowledging that a party may not, after trial and an unfavorable judgment, prevail on a complaint that the party's summary judgment motion should have been granted, nor could a party complain of a failure to dismiss a health care liability claim based on an inadequate expert

report, after a full trial and evidence establishing the elements of that claim).

[3] Our procedural rules provide that:

> After an order or judgment in a civil case has been appealed, if the trial court modifies the order or judgment, or if the trial court vacates the order or judgment and replaces it with another appealable order or judgment, the appellate court must treat the appeal as from the subsequent order or judgment and may treat actions relating to the appeal of the first order or judgment as relating to the appeal of the subsequent order or judgment. The subsequent order or judgment and actions relating to it may be included in the original or supplemental record. Any party may nonetheless appeal from the subsequent order or judgment.

TEX.R.APP. P. 27.3. Here, although the trial court's final judgment did not expressly modify its interlocutory order, it did so implicitly. Because the claims against the County had not been severed, the County remained a party to the underlying proceeding despite the interlocutory appeal. The final judgment necessarily replaced the interlocutory order, which merged into the judgment, [10] even though Roccaforte's interlocutory appeal remained pending. Under our rules, however, we may treat this interlocutory appeal as an **\*925** appeal from the final judgment. That permits us to reach the merits of Roccaforte's claims rather than dismiss the interlocutory appeal as moot.

[10]     See *Webb v. Jorns,* 488 S.W.2d 407, 408–09 (Tex.1972) (holding that interlocutory judgment merged into final judgment, which was then appealable).

Although not relying on rule 27.3, the court of appeals took a similar approach, treating Roccaforte's appeal as though it were from the final judgment. 281 S.W.3d at 231 n. 1. Similarly, we treat Roccaforte's appellate complaints about the trial court's grant of the County's jurisdictional plea as though they related to the appeal of the final judgment. We turn now to the merits of his claim.

## III. The post-suit notice requirements are not jurisdictional.

Local Government Code section 89.0041 provides:

(a) A person filing suit against a county or against a county official in the official's capacity as a county official shall deliver written notice to:

   (1) the county judge; and

   (2) the county or district attorney having jurisdiction to defend the county in a civil suit.

(b) The written notice must be delivered by certified or registered mail by the 30th business day after suit is filed and contain:

   (1) the style and cause number of the suit;

   (2) the court in which the suit was filed;

   (3) the date on which the suit was filed; and

   (4) the name of the person filing suit.

(c) If a person does not give notice as required by this section, the court in which the suit is pending shall dismiss the suit on a motion for dismissal made by the county or the county official.

TEX. LOC. GOV'T CODEE § 89.0041. In 2005, the Legislature amended the Government Code to provide that "[s]tatutory prerequisites to a suit, including the provision of notice, are jurisdictional requirements in all suits against a governmental entity." TEX. GOV'T CODE § 311.034.

The County contends section 311.034 makes Roccaforte's failure to comply with section 89.0041's notice requirements jurisdictional—an issue we have never decided. Our courts of appeals, however, have concluded that the notice requirements are not jurisdictional, even in light of section 311.034. *See El Paso Cnty. v. Alvarado,* 290 S.W.3d 895, 898–99 (Tex.App.-El Paso 2009, no pet.) (holding that section 89.0041 is not jurisdictional because section 311.034 applies only to prerequisites to file suit, not post-suit notice requirements); *Ballesteros v. Nueces Cnty.,* 286 S.W.3d 566, 570 (Tex.App.-Corpus Christi 2009, pet. denied) (same); 281 S.W.3d 230, 232–33 (same); *Dallas Cnty. v. Coskey,* 247 S.W.3d 753, 754–56 (Tex.App.-Dallas 2008, pet. denied) (same); *Dallas Cnty. v. Autry,* 251 S.W.3d 155, 158 (Tex.App.-Dallas 2008, pet. denied) (same); *Cnty. of Bexar v. Bruton,* 256 S.W.3d 345, 348–49 (Tex.App.-San Antonio 2008, no pet.) (same).

**[4]** We presume "that the Legislature did not intend to make the [provision] jurisdictional[,] a presumption overcome only by clear legislative intent to the contrary." *City of DeSoto v. White,* 288 S.W.3d 389, 394 (Tex.2009). The statutes' language reflects no such intent here. Section 311.034 applies to *prerequisites* to suit, not notice requirements that can be satisfied only *after* suit is filed. *Compare* TEX. GOV'T CODE § 311.034, with TEX. LOC. GOV'T CODEE § 89.0041 (requiring notice of cause number, court in which case is filed, and date of filing). Nor does Local Government Code section 89.0041 show such intent: that section states that a trial court may **\*926** dismiss a case for noncompliance only after the governmental entity has moved for dismissal. TEX. LOC. GOV'T CODEE 89.0041(c) ("If a person does not give notice as required by this section, the court in which the suit is pending shall dismiss the suit on a motion for dismissal made by the county or the county official."). The motion requirement means that a case may proceed against those governmental entities that do not seek dismissal—in other words, that a county can waive a party's noncompliance. This confirms that compliance with the notice requirements is not jurisdictional. *See Loutzenhiser,* 140 S.W.3d at 359 ("The failure of a non-jurisdictional requirement mandated by statute may result in the loss of a claim, but that failure must be timely asserted and compliance can be waived."). We find no basis upon which to conclude that the Legislature intended section 89.0041 to be jurisdictional.

**IV. Where the appropriate county officials receive timely notice of the suit, the case should not be dismissed if notice was provided by some means other than mail.**

Roccaforte provided timely notice of every item required by section 89.0041, and the requisite officials received that notice. Did the Legislature intend to bar Roccaforte's claim, merely because that notice was hand-delivered rather than mailed?

Roccaforte argues that the County's actual notice of the suit and his substantial compliance with section 89.0041 should suffice. A number of courts of appeals (though not the court of appeals in this case) agree with him.[11] The County disagrees, arguing that the statute requires strict compliance with its terms, and dismissal is mandated if those terms are not satisfied.

---

[11]     *Compare Howlett v. Tarrant Cnty.,* 301 S.W.3d 840, 847 (Tex.App.-Fort Worth 2009, pet. denied) (holding that substantial compliance with section 89.0041 was

sufficient because the purpose of the statute was to ensure notice, and that purpose was accomplished), *Ballesteros v. Nueces Cnty.,* 286 S.W.3d 566, 570 (Tex.App.-Corpus Christi 2009, pet. denied) (same), *Dallas Cnty. v. Coskey,* 247 S.W.3d 753, 757 (Tex.App.-Dallas 2008, pet. denied) (same), *and Dallas Cnty. v. Autry,* 251 S.W.3d 155, 158 (Tex.App.-Dallas 2008, pet. denied) (same), *with* 281 S.W.3d at 237 (holding that "[r]eading a broad actual notice or service exception into the statute—without any attempt by plaintiff to comply—would, in effect, largely eliminate the specified, additional written notice requirement of the statute"). That conflict gives us jurisdiction over this interlocutory appeal. TEX. GOV'T CODE § 22.225(c), (e).

**[5]** Section 89.0041 ensures that the appropriate county officials are made aware of pending suits, allowing the county to answer and defend the case. *See Howlett,* 301 S.W.3d at 846 ("The apparent purpose of section 89.0041 is to ensure that the person responsible for answering and defending the suit—the county or district attorney-has actual notice of the suit itself."); *Coskey,* 247 S.W.3d at 757 ("Section 89.0041's notice of suit requirement against a county serves the purpose of aiding in the management and control of the City's finances and property...."). That purpose was served here—the county judge and the district attorney had notice within fifteen days of Roccaforte's filing, and they answered and defended the suit. *Cf. Loutzenhiser,* 140 S.W.3d at 360 (observing that "if in a particular case a governmental unit were not prejudiced by lack of notice and chose to waive it, we do not see how the statutory purpose would thereby be impaired"). The statute was not intended to create a procedural trap allowing a county to obtain dismissal even though the appropriate officials have notice of the suit. *See* **\*927** *Southern Surety Co. v. McGuire,* 275 S.W. 845, 847 (Tex.Civ.App.-El Paso 1925, writ ref'd) (holding that failure to present written claim to commissioners' court as required by statute did not bar the claim, because "[t]he purpose of the statute was fully accomplished by [oral presentment]"); *see also Coskey,* 247 S.W.3d at 757 ("The manner of delivery specified by the statute assures that county officials will receive notice of a suit after it has been filed to enable it to respond timely and prepare a defense."). Because those officers had the requisite notice, we conclude that the trial court erred in dismissing Roccaforte's claims.

**V. Conclusion**

Roccaforte's claims against the County should not have been dismissed for lack of notice.[12] We reverse the court of appeals' judgment as to those claims and remand the case

to the trial court for further proceedings. TEX.R.APP. P. 60.2(d).

[12]    Because this issue is dispositive, we do not reach Roccaforte's argument that 42 U.S.C. § 1983 preempts section 89.0041's notice requirements.

Justice WILLETT delivered a concurring opinion.

Justice WILLETT, concurring in part.

I join Parts I–III of the Court's opinion. As for Part IV, I join the result but not the reasoning. There is a better approach, one more allegiant to the Legislature's words. Roccaforte's claim should proceed, but the reason is rooted not in his substantial compliance but rather the County's substantial dalliance.

* * *

Aristotle would have enjoyed this case, which perfectly illustrates the challenge he recognized of reconciling the "absoluteness" of the written law with equity in the particular case. [1] Believing that "the equitable is superior" and that rigid laws must bend, [2] Aristotle urged "a correction of law where it is defective owing to its universality." [3] From Athens, Greece to Athens, Texas (and beyond), judges still debate the bounds of interpretive discretion—whether it is appropriate to temper the "absoluteness" of statutory mandates and ameliorate their seeming harshness. Millennia may have passed since Aristotle's Lyceum, but this great philosophical and jurisprudential debate endures.

[1]    Aristotle, Nicomachean Ethics bk. V, ch. 10.

[2]    *Id.*

[3]    *Id.*

## I

As the Court persuasively explains in Part III, the post-suit notice requirements in Section 89.0041 are not jurisdictional, meaning a County can waive a plaintiff's noncompliance. [4] Here, the County objected to Roccaforte's noncompliance, prompting the Court to ask: "Did the Legislature intend to bar Roccaforte's claim, merely because that notice was hand-delivered rather than mailed?" [5] If phrased that way, our recent and unanimous precedent answers the question "yes,"

since "the surest guide to legislative intent" is the language lawmakers chose. [6] In other words, "Where text is clear, it is determinative of that intent." [7] The Court today agrees that nothing in Section 89.0041 relieves **\*928** Roccaforte from compliance. So, to escape the statute's emphatic "shall dismiss the suit" mandate, [8] the Court pivots on "actual notice" and "substantial compliance" and holds that the statute's purpose was fulfilled via hand-delivery.

[4]    341 S.W.3d 919, 926 (explaining that compliance with the notice requirements of Section 89.0041 of the Local Government Code "is not jurisdictional") (citation omitted).

[5]    341 S.W.3d at 926.

[6]    *Presidio Indep. Sch. Dist. v. Scott,* 309 S.W.3d 927, 930 (Tex.2010) (citation and quotation marks omitted).

[7]    *Id.*

[8]    *See* TEX. LOC. GOV'T CODEE § 89.0041(c).

Honoring a statute's plain words is indispensable, even if enforcing those words as written works an unpalatable result. To be sure, courts deviate from otherwise-clear textual commands to avert "absurd" results or to vindicate constitutional principles. [9] But as a general matter, if the legal deck is stacked via technical statutory requirements, the Legislature should reshuffle the equities, not us. [10]

[9]    The absurdity doctrine, rightly understood, is a safety valve reserved for truly exceptional cases, not just those where the mandated statutory outcome is thought unwise or inequitable. *See generally* John F. Manning, *The Absurdity Doctrine,* 116 HARV. L.REV.. 2387 (2003). As Chief Justice Marshall famously put it, a court's allegiance to the text ceases when applying the text "would be so monstrous that all mankind would, without hesitation, unite in rejecting the application." *Sturges v. Crowninshield,* 17 U.S. (4 Wheat.) 122, 203, 4 L.Ed. 529 (1819).

[10]    The Legislature can, of course, if it wishes, statutorily overturn today's holding that Section 89.0041 is nonjurisdictional and subject to an actual-notice exception.

As for whether Section 89.0041's use of phrases like "shall deliver," [11] "must be delivered," [12] "as required," [13] and "shall dismiss" [14] mandates strict compliance, I would take the statute at face value. Beyond that, those desiring

additional reassurance that lawmakers intended what they enacted can find it in a properly contextual reading of other notice-related statutes.

11      TEX. LOC. GOV'T CODEE § 89.0041(a).

12      *Id.* § 89.0041(b).

13      *Id.* § 89.0041(c).

14      *Id.*

First, the Legislature, while omitting an actual-notice exception from Section 89.0041, expressly included one in the Tort Claims Act, stating the Act's pre-suit notice requirements "do not apply if the governmental unit has actual notice...."[15] The Legislature understands how to let actual notice excuse technical noncompliance; it easily could have said actual notice suffices, thus obviating the need for service via certified or registered mail. Instead, it opted against actual notice, presumably on purpose. For better or worse, lawmakers enacted strict compliance, not substantial compliance. Our interpretive focus, both textual and contextual, must be on the law as written, and we should refuse to engraft what the Legislature has refused to enact.

15      TEX. CIV. PRAC. & REM.CODE § 101.101(c).

Second, reading "actual notice" into Section 89.0041's *post*-suit notice requirement robs it of any real meaning and also makes Section 89.004's *pre*-suit notice requirement redundant. Section 89.004 forbids someone from suing a county or county official "unless the person has presented the claim to the commissioners court and the commissioners court neglects or refuses to pay all or part of the claim...."[16] This presentment requirement assures actual notice of a claim before it is filed and was already on the books when Section 89.0041 was added in 2003. Logically then, Section 89.0041 must require something *in addition to* the preexisting notice and presentment requirements.[17]

16      TEX. LOC. GOV'T CODEE § 89.004(a).

17      Another point: As the Court notes, some courts of appeals have concluded that a substantial-compliance exception lies hidden within Section 89.0041, notwithstanding the statute's emphatic "shall dismiss" mandate. 341 S.W.3d at 928 (citing *Howlett v. Tarrant Cnty.,* 301 S.W.3d 840, 847 (Tex.App.-Fort Worth 2009, pet. denied) (holding that substantial compliance with Section 89.0041 was sufficient because

the purpose of the statute was to ensure notice, and that purpose was accomplished); *Ballesteros v. Nueces Cnty.,* 286 S.W.3d 566, 570 (Tex.App.-Corpus Christi 2009, pet. denied) (same); *Dallas Cnty. v. Coskey,* 247 S.W.3d 753, 757 (Tex.App.-Dallas 2008, pet. denied) (same); *Dallas Cnty. v. Autry,* 251 S.W.3d 155, 158 (Tex.App.-Dallas 2008, pet. denied) (same)). Two of the three courts of appeals even cite as support two of our decisions involving notice in other contexts. *Coskey,* 247 S.W.3d at 757 ("Both *Artco–Bell Corp.* and *Cox Enterprises, Inc..* support a standard of substantial compliance with notice requirements under certain circumstances, and we conclude that standard applies in these circumstances.") (citations omitted); *Ballesteros,* 286 S.W.3d at 571–72. A third court of appeals opinion in turn relies upon *Coskey. See Autry,* 251 S.W.3d at 158.

> Closer analysis reveals *Coskey* and *Ballesteros* offer feeble support, as they misinterpret this Court's holdings in *Cox Enters., Inc. v. Bd. of Trs. of Austin Indep. Sch. Dist.,* 706 S.W.2d 956 (Tex.1986), and *Artco–Bell Corp. v. City of Temple,* 616 S.W.2d 190 (Tex.1981). The issue in *Cox* involved *how much* particularity was required in notice. 706 S.W.2d at 960 (noting that "less than full disclosure is not substantial compliance" and that "the Open Meetings Act requires a full disclosure of the subject matter of the meetings"). *Artco–Bell* is likewise inapposite. In *Artco–Bell,* the Court simply invalidated the notice requirement in a city's charter and held the plaintiff had provided sufficient notice. 616 S.W.2d at 193–94 ("[W]e hold that the requirement of verification represents an unreasonable limitation on the City's liability and is invalid as it is contrary to the limitation of authority placed upon home rule cities....") (footnote omitted).
> *Cox* was about the specificity of notice; *Artco–Bell* resulted in the invalidation of notice. In neither case did the Court craft an *exception* for notice. The lower courts' treatment of these cases was thus strained, and should not be taken as a correct reading of our jurisprudence on statutory notice requirements.

**\*929** The requisite officials here received notice, but they did not receive "requisite notice," as the Court states.[18] The Court may deem it *adequate,* but it is irrefutably not *requisite.* As the Court reads Section 89.0041, it is not only nonjurisdictional (I agree on this point), but also nonmandatory. I acknowledge the statute's no-exceptions mandate works a harsh result,[19] but to the degree this seems a trap for the unwary, it is a trap the Legislature left well marked.

[18]    341 S.W.3d at 927.

[19]    Had the County "timely asserted" Roccaforte's noncompliance, dismissal would have been mandatory under the statute's rigid, no-discretion mandate, thus raising the question of whether Section 89.0041's notice regime is preempted by 42 U.S.C. § 1983. *See Univ. of Tex. Sw. Med. Ctr. v. Loutzenhiser,* 140 S.W.3d 351, 359 (Tex.2004) ("The failure of a non-jurisdictional requirement mandated by statute may result in the loss of a claim, but that failure must be timely asserted and compliance can be waived."). That question, while interesting legally, is not before us.

## II

Having said all that, I agree with the Court that Roccaforte ultimately wins his notice dispute, but on different grounds. Instead of asking whether the Legislature meant to bar Roccaforte's claim,

I would rephrase the question in a manner less assaultive to the statutory text: Did the County effectively *waive* Roccaforte's noncompliance by not timely asserting it? I believe so. [20]

[20]    Waiver may actually be the wrong term; it may be more accurate to call this forfeiture. As the United States Supreme Court explains: "Waiver is different from forfeiture. Whereas forfeiture is the failure to make the *timely assertion* of a right, waiver is the intentional relinquishment of a known right." *United States v. Olano,* 507 U.S. 725, 733, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) (emphasis added) (citations and quotation marks omitted). In any event, under our definition:

> "[W]aiver" is the intentional relinquishment of a right actually or constructively known, or intentional conduct inconsistent with claiming that right. The elements of waiver include (1) an existing right, benefit, or advantage held by a party; (2) the party's actual or constructive knowledge of its existence; and (3) the party's actual intent to relinquish the right or intentional conduct inconsistent with the right.

> *Perry Homes v. Cull,* 258 S.W.3d 580, 602–03 (Tex.2008) (citations omitted).

**\*930** True, the County, after waiting for limitations to expire, filed a motion for dismissal complaining that Roccaforte provided notice via personal service rather than registered or certified mail. I believe that obscures the key point, which on these facts is not *whether* the County sought dismissal, but *when*. A governmental body can raise a jurisdictional bar like immunity from suit whenever it pleases because "the trial court does not have—and never had—power to decide the case," [21] thus making judgments forever vulnerable to delayed attack. Not so with nonjurisdictional requirements like this, which are waived if not timely raised. Under our precedent, dismissal delayed is sometimes dismissal denied: "The failure of a non-jurisdictional requirement mandated by statute may result in the loss of a claim, but *that failure must be timely asserted* and compliance can be waived." [22] Moreover, "if a governmental unit is to avoid litigation to which it should not be subjected because of lack of notice, it should raise the issue as soon as possible." [23] On these facts, there was no timely assertion, much less one made "as soon as possible." [24]

[21]    *In re United Servs. Auto. Ass'n,* 307 S.W.3d 299, 306 (Tex.2010) (citation omitted).

[22]    *Loutzenhiser,* 140 S.W.3d at 359 (emphasis added).

[23]    *Id.* at 360. "Moreover, if in a particular case a governmental unit were not prejudiced by lack of notice and chose to waive it, we do not see how the statutory purpose would thereby be impaired." *Id.*

[24]    Reading Section 89.0041 in tandem with our settled precedent distinguishing mandatory requirements (waivable) from jurisdictional ones (nonwaivable) is consistent with a textualist approach that integrates established interpretive norms. For example, even the most ardent textualist would read a statute of limitations in light of the common-law rules of equitable tolling. *See Young v. United States,* 535 U.S. 43, 49, 122 S.Ct. 1036, 152 L.Ed.2d 79 (2002) ("It is hornbook law that limitations periods are customarily subject to equitable tolling, unless tolling would be inconsistent with the text of the relevant statute.") (citations and quotation marks omitted); *see also United States v. Beggerly,* 524 U.S. 38, 48, 118 S.Ct. 1862, 141 L.Ed.2d 32 (1998). As Justice Scalia noted in *Young,* a limitations period is subject to the principles of equitable tolling, so long as the statutory text does not preclude such tolling. 535 U.S. at 47, 122 S.Ct. 1036. Same here, where the Legislature drafts notice requirements in light of our decisions differentiating between mandatory and jurisdictional provisions and the consequences that flow from each characterization.

We have held that waiver is decided on a case-by-case basis, meaning courts look to the totality of the circumstances. [25]

Here, **\*931** the County sought dismissal based on imperfect notice more than two years after suit was filed; more than two years after the County filed its answer; more than two years after the County filed its special exceptions; after the County presented three County officials for deposition and defended those depositions; after the County sent written discovery requests; after the County deposed Roccaforte; and after the County filed a motion for continuance. If two-plus years qualifies as "timely asserted" or "as soon as possible"—at least in the context of a statutory notice requirement commanding action—then these phrases have been drained of all meaning. [26] Indeed, the only thing the County "timely asserted" was limitations. I would disallow the County's belated insistence on dismissal given its decision to defend the case for so long, asserting noncompliance only after seizing tactical advantage via limitations, and thus materially prejudicing Roccaforte. There is no countervailing prejudice in allowing Roccaforte's suit to proceed against the County, which can hardly argue at this late stage that imperfect notice has harmed its legal position (unlike its fiscal position, having underwritten years of legal and judicial expenses). On these facts, two-plus years of litigation activity to run out the limitations clock betrays the County's too-little, too-late request for dismissal and constitutes waiver.

[25] *See Perry Homes,* 258 S.W.3d at 589–91 (explaining that a party waives an arbitration clause by engaging in substantial litigation to the other party's detriment or prejudice).

In *Jernigan v. Langley*, the Court considered whether a defendant physician waived his statutory right to contest the adequacy of the plaintiff's expert reports by waiting too long. 111 S.W.3d 153, 153 (Tex.2003). The Court held that delay does not always result in waiver, but it does when the defendant's silence or inaction for such a long period shows an intent to yield a known right. *Id.* at 157. I would hold that the County's actions are inconsistent with the intent to assert its statutory right to up-front dismissal based on defective notice. Moreover, *Jernigan* predates our 2004 decision in *Loutzenhiser,* which speaks specifically to statutorily mandated notice requirements involving governmental units and says notice-based objections should be asserted "as soon as possible." 140 S.W.3d at 360.

[26] It is true that defendants may assert defenses like limitations in the trial court even following extensive discovery and other pre-trial activity. *See* TEX.R. CIV. P. 94 (affirmative defenses including limitations must be pleaded); TEX.R. CIV. P. 63 (pleadings may be amended without leave of court until seven days before trial). Today's case, though, involves a statutory notice requirement that mandates action within a prescribed time, something *Loutzenhiser* held should be raised "as soon as possible" since the statutory purpose is to avoid litigation altogether. 140 S.W.3d at 360.

Section 89.0041 may not be a prerequisite to bringing suit, but it is a postrequisite to maintaining suit. In my view, Section 89.0041, unlike the Tort Claims Act, does not allow actual notice to forgive defective notice, but that does not mean actual notice may not affect the *waiver* inquiry of whether a defendant "timely asserted" noncompliance. For reasons stated above, I believe a county that quickly asserts statutory noncompliance, even if it has actual notice, is entitled to dismissal under Section 89.0041. But a county with actual notice that untimely asserts noncompliance (here only after limitations had run two-plus years later) has waived its objection and is not entitled to dismissal. *See City of DeSoto v. White,* 288 S.W.3d 389, 400–01 (Tex.2009) (noting that a party that declines to act in light of "full knowledge" of a defect in a nonjurisdictional notice requirement generally waives any complaint). Any other result would incentivize counties to sit on their rights rather than assert them immediately. Here, the County would be rewarded for wasting over two-years' worth of judicial resources and taxpayer dollars in defending a suit it could have easily dismissed from the outset.

\* \* \*

The Court's understandable desire to work an eminently fair result has led it to revise the statute as desired rather than read it as enacted. I favor a different approach to the same outcome. Roccaforte should win not because the Court waived the Legislature's words but because the County did.

### All Citations

341 S.W.3d 919, 32 IER Cases 346, 54 Tex. Sup. Ct. J. 900

---

KeyCite Yellow Flag - Negative Treatment

**Declined to Follow by** [Neal v. Oakwood Hosp. Corp.,](#) Mich.App., December 12, 1997

652 S.W.2d 934
Supreme Court of Texas.

David Joe SCHEPPS et al., Petitioners,
v.
PRESBYTERIAN HOSPITAL
OF DALLAS, Respondent.

No. C–1591. | June 22, 1983.
| Rehearing Denied July 20, 1983.

Medical malpractice suit was brought against hospital and physician alleging malpractice as to plaintiffs' son. The District Court No. 192, Dallas County, Leftwith, J., granted defendants' motion for summary judgment and ordered that plaintiffs take nothing. The Court of Appeals, [638 S.W.2d 156,](#) reversed, and instructed dismissal of plaintiffs' cause. The Supreme Court, Kilgarlin, J., held that: (1) notice provision contained in Medical Liability and Insurance Improvement Act is mandatory, but (2) appropriate remedy when plaintiff fails to give notice is not a bar of further prosecution of suit, but rather, upon motion of defendant, cause should be abated for 60 days.

Remanded.

Pope, C.J., dissented and filed opinion.

West Headnotes (2)

**[1]** **Health**
 Notice

 198H Health
 198HV Malpractice, Negligence, or Breach of Duty
 198HV(G) Actions and Proceedings
 198Hk807 Notice
 (Formerly 299k18.20 Physicians and Surgeons)
 Notice provision contained in Medical Liability and Insurance Improvement Act, which requires giving 60 days' notice prior to filing suit, is mandatory. [Vernon's Ann.Texas Civ.St. art. 4590i, § 4.01.](#)

[46 Cases that cite this headnote](#)

**[2]** **Health**
 Notice

 198H Health
 198HV Malpractice, Negligence, or Breach of Duty
 198HV(G) Actions and Proceedings
 198Hk807 Notice
 (Formerly 299k18.20 Physicians and Surgeons)
 Barring further prosecution of medical malpractice action is not appropriate remedy for plaintiff's failure to give notice under provision of Medical Liability and Insurance Improvement Act requiring giving 60 days' notice prior to filing suit; rather, upon motion of defendant, cause should be abated for 60 days. [Vernon's Ann.Texas Civ.St. arts. 4590i, 4590i, § 4.01.](#)

[61 Cases that cite this headnote](#)

**Attorneys and Law Firms**

**\*935** Carp & Eddleman, William R. Eddleman, Dallas, for petitioners.

Jackson, Walker, Winstead, Cantwell & Miller, C. Steven Matlock, Thompson & Knight, Richard E. Gray and Gerald H. Grissom, Dallas, for respondent.

**Opinion**

KILGARLIN, Justice.

Two issues are presented by this case. Is the notice provision contained in the Medical Liability and Insurance Improvement Act, [1] which requires giving sixty days notice prior to filing suit, mandatory? If so, what is the appropriate remedy when a plaintiff fails to give notice?

1  [Tex.Rev.Civ.Stat.Ann. art. 4590i § 4.01.](#)

Mr. and Mrs. Schepps filed this suit against Presbyterian Hospital of Dallas and Patterson S. Reaves, M.D., alleging their malpractice as to Robert Allen Schepps, the Schepps'

sixteen-year old son. [2] Presbyterian Hospital and Dr. Reaves each moved for summary judgment, alleging that the Schepps failed to give at least sixty days notice prior to filing the suit. The trial court granted both motions and ordered that the Schepps take nothing. The court of appeals agreed that the notice provision was mandatory, but reversed on the basis that it was improper to render a take nothing judgment and instructed the trial court to dismiss the Schepps' cause. 638 S.W.2d 156. We affirm the judgment of the court of appeals insofar as it reverses the judgment of the district court. However, we reverse the judgment of the court of appeals with respect to the disposition ordered on remand.

[2] Likewise sued was James W. Cotter, M.D., who was non-suited by the Schepps.

On July 16, 1978, Robert Allen Schepps was involved in a motor vehicle accident in Dallas, Texas. He was taken by ambulance to Presbyterian Hospital where he was allegedly examined by Dr. Reaves. Some three hours later he was transferred to Parkland Memorial Hospital in Dallas. He died three days later. The Schepps filed their lawsuit on May 12, 1980. After the two year statute of limitations ran, Presbyterian Hospital and Dr. Reaves filed their motions for summary judgment. As stated, the district court granted the motions for summary judgment and ruled that the Schepps take nothing.

The sixty-day notice provision at issue in this case is contained in article 4590i, section 4.01, which reads as follows:

(a) Any person or his authorized agent asserting a health care liability claim shall give written notice of such claim by certified mail, return receipt requested, to each physician or health care provider against whom such claim is being made at least 60 days before the filing of a suit in any court of this state based upon a health care liability claim.

(b) In such pleadings as are subsequently filed in any court, each party shall state that it has fully complied with the provision of this section and shall provide such evidence thereof as the judge of the court may require to determine if the provisions of this Act have been met.

(c) Notice given as provided in this Act shall toll the applicable statute of limitations to and including a period of 75 days following the giving of the notice, and this tolling shall apply to all parties and potential parties.

(d) All parties shall be entitled to obtain complete and unaltered copies of the claimant's medical records from any other party within 10 days from the date of receipt of a written request for such records; provided, however, that the receipt of a medical authorization executed by the claimant herein shall be considered **\*936** compliance by the claimant with this section.

The Schepps argue that section 4.01 is merely directory rather than mandatory and that failure to comply with the notice provision should not result in the loss of their cause of action. They acknowledge that the word "shall" is used in the pertinent provision, but contend that the word should be treated as directory in application. *See Thomas v. Groebl,* 147 Tex. 70, 212 S.W.2d 625, 630 (1948). Presbyterian Hospital and Dr. Reaves argue that the word "shall" can only be construed in this case to be mandatory and, accordingly, failure to give notice is a bar to prosecution of this suit.

This Court stated the general guidelines for determining whether a statutory provision is mandatory or directory in *Chisholm v. Bewley Mills,* 155 Tex. 400, 287 S.W.2d 943 (1956):

> There is no absolute test by which it may be determined whether a statutory provision is mandatory or directory. The fundamental rule is to ascertain and give effect to the legislative intent. Although the word "shall" is generally construed to be mandatory, it may be and frequently is held to be merely directory. In determining whether the Legislature intended the particular provision to be mandatory or merely directory, consideration should be given to the entire act, its nature and object, and the consequences that would follow from each construction. Provisions which are not of the essence of the thing to be done, but which are included for the purpose of promoting the proper, orderly and prompt conduct of business, are not generally regarded as mandatory. If the statute directs, authorizes or commands an act to be done within a certain time, the absence of words restraining the doing thereof

afterwards or stating the consequences of failure to act within the time specified, may be considered as a circumstance tending to support a directory construction.

*Id.* at 945.[3] Keeping these guidelines in mind, we turn to the legislative history behind article 4590i, section 4.01. We additionally note that section 4.01 is a notice statute in derogation of the common law and, therefore, is to be strictly construed. *City of Waco v. Roberts,* 121 Tex. 217, 48 S.W.2d 577 (1932).

3    In addition to *Chisholm v. Bewley Mills,* 155 Tex. 400, 287 S.W.2d 943 (1956), and *Thomas v. Groebl,* 147 Tex. 70, 212 S.W.2d 625 (1948), other holdings of this Court employing similar tests with similar results are *Lewis v. Jacksonville Building and Loan Assoc.,* 540 S.W.2d 307 (Tex.1976); *Kilday v. Germany,* 139 Tex. 380, 163 S.W.2d 184 (1942); *Markowsky v. Newman,* 134 Tex. 440, 136 S.W.2d 808 (1940); *Federal Crude Oil Co. v. Yount-Lee Oil Co.,* 122 Tex. 21, 52 S.W.2d 56 (1932), and *Hess and Skinner Engineering Co. v. Turney,* 109 Tex. 208, 203 S.W. 593 (1918).

In 1975, physicians and other health care providers asked the Legislature to address the problem of the spiraling cost of medical malpractice insurance. As a remedial measure the Legislature enacted the Professional Liability Insurance for Physicians, Podiatrists and Hospitals Act, which became codified as article 5.82 of the Texas Insurance Code. At the time of the adoption of article 5.82, the Legislature specifically provided that the measure would be temporary in nature by allowing it to expire by its own terms on December 31, 1977. However, with a goal toward creating long-term legislation to provide relief for physicians and other medical care providers, the Legislature created the Texas Medical Professional Liability Study Commission and directed it to make a report to the 65th session of the Texas Legislature, scheduled to convene in January, 1977. That Commission became commonly known as the Keeton Commission, adopting the name of its Chairman, former University of Texas Law School Dean, W. Page Keeton.

In its findings[4], the Keeton Commission stated that a large percentage of the malpractice claims filed proved to be unmeritorious, **\*937** and that the handling and processing of those claims involved cost. The Commission also recognized, however, that a claim was not irresponsible and malicious simply because it was not subsequently established to be

meritorious. Therefore, the Commission recommended that a process be made available that would facilitate the early identification of unmeritorious suits.

4    Section 1.02(a)(13) of article 4590i, Texas Revised Civil Statutes Annotated (Medical Liability Insurance Improvement Act), explicitly states that the Legislature adopted the findings made by the Keeton Commission.

The Commission proffered two suggestions in this regard: (1) a period of time prior to the filing of suit should be set aside for discussion between the parties, in order that an amicable agreement might be reached without the necessity for formal action; and (2) in the event a settlement was not reached, a mandatory screening panel should be established to review claims prior to the filing of suit. The report indicates that the Keeton Commission sought to eliminate frivolous and unjustified claims from being filed as lawsuits so malpractice carriers would not be called upon to expend large sums of money in defense of such suits, which of necessity would affect premiums paid by health care providers. It is significant to note that the sixty-day notice provision and the screening panel provision would constitute a combined program to weed out the unmeritorious claims.

Numerous bills were subsequently introduced in both houses to implement the Commission recommendations. The final House version, H.B. 1048, provided for both the sixty-day notice provision and the health care screening panel, as recommended by the Commission. The bill additionally contained "intent" language in the notice section which stated:

It is the intention of this section that all parties attempt to dispose of a health care liability claim without the necessity of review by health care screening panel or the filing and pursuit of a lawsuit.

The final Senate version of H.B. 1048 completely removed the portion of the bill concerning the creation of screening panels and struck the "intent" language from the notice section. The House refused to concur in the Senate amendments and the bill was sent to conference committee. The conference committee accepted the Senate amendments with minor changes, which did not affect the elimination of screening panels or the intent language in the notice section. The conference committee report was enacted into law.

Certain conclusions can be drawn from this legislative history. First, the original notice provision was an attempt to provide for resolution of malpractice claims without the filing of suit. Senator Kent Hance of Lubbock County, in explaining his amendment that deleted the intent language from the notice section, noted that the bill "merely states that you would have to give notice to anyone before you file a lawsuit against them." Transcription, Senate proceedings, H.B. 1048, April 18, 1977. Second, the feature of the legislative proposal that might have best accomplished a resolution of malpractice claims was eliminated from the bill—the screening panel provision. We must conclude, therefore, that the Legislature in its final enactment upgraded the importance of the notice provision, for it remained as the only vehicle to encourage pre-suit negotiations.

Tending to support a directory interpretation is that medical malpractice laws enacted by other states at approximately the same time as the Texas act contain more explicit mandatory language. *See, e.g.,* Me.Rev.Stat.Ann. tit. 24 § 2903 ("No action ... *shall be commenced* "); N.H.Rev.Stat.Ann. § 507–C:5 ("No action ... *shall be commenced* "); Utah Code Ann. § 78–14–8 ("No malpractice action ... *may be initiated* "); Va.Code § 8.01–581.2 ("No action *may be brought* for malpractice ... unless the claimant notifies"). [5] Additionally, we note that no bill, including the one finally adopted, ever contained any provision as to the consequences of failure to give sixty days notice prior to filing suit. This is **\*938** significant because, as noted earlier, "the absence of words restraining the doing thereof afterwards or stating the consequences of failure to act within the time specified, may be considered as a circumstance tending to support a directory construction." *Chisholm v. Bewley Mills,* 155 Tex. at 403, 287 S.W.2d at 945.

[5]   The Keeton Commission report indicates consideration of Utah and Virginia materials. It may be presumed that Senator Hance, who was a Commission member, was aware of the language in the notice sections of those states' statutes. His final amendment of the notice section of our statute made no effort to incorporate such clearly mandatory language.

 **[1]**    Had section 4.01 contained only paragraph (a), we would be justified in concluding that the notice provision was merely directory. However, that section cannot be read in a vacuum. Paragraph (b) clearly evidences an intent upon the part of the Legislature that the giving of notice is mandatory. That paragraph contains two requirements: (1) an affirmative statement in the pleadings that there has been compliance with the notice provision, and (2) providing such evidence as the trial court may require as to proof of compliance. Had it not been the intent of the Legislature that the notice provision was mandatory, there would have been no need for the incorporation of paragraph (b) into the section. Accordingly, we conclude that the courts below were correct in construing the language of section 4.01 as being mandatory, and notice must be given at least sixty days before suit is filed.

In addition to the court of appeals in this cause, three other courts have written in an effort to interpret section 4.01 of article 4590i. *Wilborn v. University Hospital,* 642 S.W.2d 50 (Tex.App.—Amarillo 1982, no writ) followed the court of appeals holding in this cause and held that compliance with the notice requirement was mandatory and that the cause should be dismissed. Because of our decision in this case, we disapprove of the disposition made in Wilborn. *Burdett v. Methodist Hospital,* 484 F.Supp. 1338 (N.D.Tex.1980) reached a contrary conclusion, stating: "[I]f the Legislature had wanted to subject a suit to dismissal for failure to give the notice, the Legislature could, and likely would, have so said." *Id.* at 1341.

 **[2]**    Having decided that "shall" is mandatory, there remains our disposition of this case. The court of appeals would bar further prosecution because notice was not properly given. We disagree. We would observe that article 4590i, sections 1.02(b) and 1.02(b)(3) state: "[I]t is the purpose of the Act to improve and modify the system by which health care liability claims are determined ... [and to] do so in a manner that will not unduly restrict a claimant's right anymore than necessary to deal with the crisis." We conclude that to bar prosecution for failure to give notice would constitute such an undue restriction of claimant's right. The intent of the Keeton Commission and the Legislature was to encourage pre-suit negotiations so as to avoid excessive cost of litigation. This likewise can be accomplished by requiring an abatement of the cause of action for a duration of sixty days in the event that plaintiff fails to give the required notice, and at the same time protect plaintiff's right to maintain that lawsuit. For these reasons we find no inconsistency in holding the provision mandatory, yet only subjecting the cause to abatement.

Accordingly, we hold that in any medical malpractice action subject to article 4590i, where a plaintiff has failed to give notice sixty days prior to the filing of suit, upon motion of the defendant, the cause should be abated for sixty days. This case is remanded to the trial court for disposition not inconsistent with this opinion.

POPE, C.J., dissents.

POPE, Chief Justice, dissenting.

I respectfully dissent. I dissent because the majority, while holding that the statutory requirement that a medical malpractice claimant must give notice "at least 60 days before the filing of suit," also holds that it is all right if he does not give notice "at least 60 days before the filing of suit." The statute means nothing, says the majority.

I agree with the majority holding that the Medical Liability and Insurance Improvement Act expressly requires sixty **\*939** days notice prior to filing suit. Tex.Rev.Civ.Stat.Ann. art. 4590i, § 4.01. I agree that the legislative history demonstrates an intent to reject those claims that are groundless and unmeritorious—those that are filed as nuisance suits that are costly and embarrassing to the medical provider. I agree that the Keeton Commission found that malpractice claims, and especially the nuisance claims, magnify the costs for all users of medical services.

I agree that it was the surplus of nuisance and embarrassment claims that generated the excessive malpractice and premium costs. I further agree that the legislature intended to eliminate needless court costs and litigation by weeding out some of the spurious claims by requiring the patient to notify the physician or health care provider sixty days before filing suit. The purpose of the act was to keep cases from reaching the stage of a lawsuit, with its process, discovery, mag-card and mimeographed multiple interrogatories, requests for admissions, and depositions. These procedures constitute the per-hour costs of present litigation, even in the instance of the spurious suit. It was this evil that article 4590i, section 4.01 purposed to eliminate.

The Texas Legislature was at first presented with a two-step mechanism as a means to eliminate spurious claims. The first was the notice provision contained in section 4.01. The second was the proposal for a mandatory screening panel. That panel had to act before a suit was filed. The legislature determined that the pre-suit notice would be sufficient to accomplish the purpose of weeding out the false, sham, and meretricious claims. Both provisions, however, contemplated notice before suit was filed.

I agree that the legislature in eliminating the second pre-suit step determined that only one step was necessary to achieve its purpose. It determined that the sixty-day pre-suit notice would afford an opportunity for consultation, mediation, and adjustment in many instances. I agree that the legislature in eliminating the two-step pre-suit requirement, determined that the sixty-day notice provision was enough and would accomplish its objective.

The legislature intended the avoidance of nuisance suits. They clog dockets, stand in the way of meritorious claims, and constitute that vast body of lawsuits that are on the docket but are not being pressed for trial. *See* J. Lieberman, *The Litigious Society* 3–5, 66–68 (1981).

The modest purpose of the legislature was to clear the dockets for those cases that have merit to their claims. The whole statute is frustrated when we permit the claimant to ignore the statute, file the suit, and then let the case take its course.

I would hold up the arm of the legislature and affirm the judgment of the court of appeals, which instructs the trial court to dismiss the suit.

**All Citations**

652 S.W.2d 934

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 3637982
Only the Westlaw citation is currently available.
Court of Appeals of Texas,
Houston (1st Dist.).

The State of Texas, Appellant
v.
Titan Land Development Inc. and
Bauer–Hockley 550, L.P., Appellees

NO. 01–14–00899–CV    |
Opinion issued June 11, 2015

**Synopsis**
**Background:** State filed condemnation provision, seeking to acquire 85.02 acres out of a 549.643–acre tract for construction of a highway. Special commissioners were appointed, resulting in an award of $7,500,000 in compensation to the landowners. State filed the award with the trial court, and then filed objections. The County Civil Court at Law No. 4, Harris County, granted landowners' motion for entry of judgment in the absence of objections and entered judgment, finding that State's objections were untimely. State appealed.

**[Holding:]** The Court of Appeals, Laura Carter Higley, J., held that time within which State was required to object began to run on date State actually filed special commissioners' award in the trial court, rather than date several days earlier on which State should have filed award.

Reversed and remanded.

West Headnotes (1)

**[1]**    **Eminent Domain**
        👉 Objections and exceptions
    148   Eminent Domain
    148III   Proceedings to Take Property and Assess Compensation
    148k225   Assessment by Commissioners, Appraisers, or Viewers
    148k235   Objections and exceptions

Time within which State was required to object to special commissioners' award in condemnation proceeding, under statute requiring objections to be filed by the "first Monday following the 20th day" after commissioners filed their findings with the court, began to run on date State actually filed award in the trial court, rather than date several days earlier on which State should have filed award, despite contention that State should not benefit from its own tardiness; statute requiring award to be filed on day decision was made or next working day did not provide a remedy or penalty for late filing, and time to object was clearly linked to the date award was actually filed. U.S. Const. Amend. 5; Tex. Prop. Code Ann. §§ 21.018(a), 21.048(1).

Cases that cite this headnote

**On Appeal from County Civil Court at Law No. 4, Harris County, Texas, Trial Court Case No. 1042641**

**Attorneys and Law Firms**

Susan Desmarais Bonnen, Assistant Attorney General, Austin, TX, Randall K. Hill, Assistant Attorney General, Ken Paxton, Attorney General of Texas, Charles E. Roy, First Assistant Attorney General, James E. Davis, Deputy Attorney General for Civil Litigation, for Appellant.

Charles B. McFarland, McFarland PLLC, Houston, TX, for Appellees.

Panel consists of Justices Jennings, Higley, and Huddle.

**OPINION**

Laura Carter Higley, Justice

**\*1**  This eminent-domain case involves a dispute over whether the State of Texas timely filed objections to the special commissioners' award after the award was filed with the trial court. On appeal, the State challenges the trial court's "Judgment in the Absence of Objections to the Special Commissioners' Award." In one issue, the State asserts that the trial court erred when it determined that the State had not timely filed its objections to the condemnation award.

We reverse and remand.

## Background

The underlying facts are undisputed. The State filed a petition for condemnation, seeking to acquire 85.02 acres of land, out of a larger 549.643–acre tract, owned by Titan Land Development, Inc. ("Titan") and Bauer–Hockley 550, L.P. ("Bauer") for the construction of State Highway 99 in Harris County. The petition was filed in County Civil Court at Law No. 4 ("the trial court"), which appointed three special commissioners "to assess the damages occasioned by such condemnation."

On May 1, 2014, the special commissioners conducted a hearing at which the State's appraisal expert testified that "just compensation" for the taking was $5,808,994. Titan and Bauer's appraisal expert testified that the landowners should be compensated $7,950,780. That same day, the commissioners signed a written statement in which they determined that Titan and Bauer should be awarded $7,500,000 as damages for the condemnation of their property. The commissioners provided a copy of the written award to State's attorney in order for the State to file the written award with the trial court. The State filed the special commissioners' award with the trial court on May 7, 2014.

The trial court clerk sent a notice to the parties on May 9, 2014, stating "[t]hat the Award of Special Commissioners was filed on May 7, 2014 in the amount of $7,500,000. You have until the first Monday following 20 days in which to file Objections to this award and make an appeal for a Jury Trial."

On May 30, 2014, the State filed objections to the special commissioners' award, asserting that the award was excessive. The State also objected on the ground that the special commissioners "did not use the proper measure of damages in arriving at the amount set forth in their decision and award."

On June 11, 2014, Titan and Bauer filed their "Motion for Entry of Judgment in the Absence of Objections." They pointed out that, pursuant to section 21.048 of the Texas Property Code, the special commissioners' award was required to have been filed on the day the decision was made or the next working day. [1] Thus, the award should have been filed in the trial court on May 1, 2014 or May 2, 2014.

Titan and Bauer also pointed out that Property Code section 21.018(a)"provides that a party must object to the findings of the Special Commissioners 'on or before the first Monday following the 20th day after the day the commissioners file their findings with the court.' " [2] They reasoned that, because section 21.048 required the award to be filed no later than the next working day after its issuance, any objections to the award were required to have been filed by the first Monday after the expiration of 20 days following May 2, 2014. Titan and Bauer asserted,

> **\*2** The twentieth day following May 2, 2014 was May 22, 2014, which made the following Monday, May 26, 2014, the deadline to file objections. However, May 26, 2014 was Memorial Day, which is a legal holiday. Under such circumstances, the last day to file objections to the commissioners' findings was Tuesday, May 27, 2014.

[1]      See TEX. PROP. CODE ANN.. § 21.048 (Vernon 2014).

[2]      See id. § 21.018(a) (Vernon 2014).

Titan and Bauer claimed that the State's objections, filed on May 30, 2014, were filed too late. Finally, they pointed to Property Code section 21.061, which provides, if timely objections are not filed, the court shall adopt the special commissioners' findings as the court's judgment. [3] Titan and Bauer wrote, "This provision is mandatory in the absence of timely-filed objections, and the Court only has jurisdiction to perform its ministerial duty of entering judgment on the award of commissioners in this proceeding."

[3]      See id. § 21.061 (Vernon 2014).

The State responded to the motion to enter judgment. The State disagreed with Titan and Bauer's position that the period for filing objections to the special commissioners' award began to run from the date the award should have been filed pursuant to section 21.048. The State asserted that, pursuant to Property Code section 21.018, the period to file objections to the award is calculated from the date the award is actually filed, which in this case was May 7, 2014. Using this date, the State claimed that the deadline for filing objections to the award was June 2, 2014. Thus, its objections were timely filed on May 30, 2014.

Titan and Bauer replied, reiterating that section 21.048 requires the special commissioners' award to be filed on the day the decision is made or on the next working day. They pointed out that the State failed to file the award pursuant to section 21.048 because it had filed the award six days later than the date permitted by section 21.048. For this reason, Titan and Bauer asserted, "The State cannot take advantage of its own delay to extend the statutory period within which objections must be filed." They averred, "The State cannot enlarge this Court's jurisdiction by holding the Award of the Special Commissioners beyond the statutory period required for its filing."

The trial court granted Titan and Bauer's motion for entry of judgment. The trial court signed its "Judgment in the Absence of Objections to the Special Commissioners' Award." In the judgment, the trial court determined as follows: "On May 1, 2014, after having heard the evidence presented to them, the Special Commissioners entered an Award in the amount of $7,500,000.00. Objections were to have been filed by May 27, 2014. No objections to the Special Commissioners' Award were timely filed by any party to this lawsuit." The trial court's judgment awarded the State title to the condemned property and ordered that Titan and Bauer recover $7,500,000.00 from the State.

This appeal followed. In one issue, the State asserts, "The trial court erred in entering a judgment in absence of objections where the State's objections were filed within the statutory time period for the filing of objections."

On appeal, the parties maintain the positions they held in the trial court. The State asserts that it timely filed its objections to the special commissioners' award pursuant to Property Code section 21.018(a) because it filed the award before the first Monday following the expiration of 20 days from the date that the award was actually filed. In contrast, Appellees assert that, under the facts of this case, the period for filing objections began to run from the date the State should have filed the award, as specified in Property Code section 21.048.

### State's Deadline to File Objections to Special Commissioners' Award

**A. Standard of Review**

**\*3** Resolution of which date began the period for the State to file its objections to the special commissioners' award turns on the application of statutory language to the undisputed facts. We review questions of statutory construction de novo. *Molinet v. Kimbrell,* 356 S.W.3d 407, 411 (Tex.2011). Our fundamental objective in interpreting a statute is "to determine and give effect to the Legislature's intent." *Am. Zurich Ins. Co. v. Samudio,* 370 S.W.3d 363, 368 (Tex.2012). "The plain language of a statute is the surest guide to the Legislature's intent." *Prairie View A & M Univ. v. Chatha,* 381 S.W.3d 500, 507 (Tex.2012).

When statutory text is clear, it is determinative of legislative intent, unless enforcing the plain meaning of the statute's words would produce an absurd result. *Entergy Gulf States, Inc. v. Summers,* 282 S.W.3d 433, 437 (Tex.2009). The words of the statute cannot be examined in isolation, but must be construed based on the context in which they are used. *TGS–NOPEC Geophysical Co. v. Combs,* 340 S.W.3d 432, 441 (Tex.2011).

**B. Analysis**

The State asserts that, on May 30, 2014, it timely filed its objections to the special commissioners' award. The State relies on Property Code section 21.018(a) to support its position that the period for filing the objections is calculated from May 7, 2014, the date the State filed the commissioners' award in the trial court. According to the State, under section 21.018(a), it had until June 2, 2014 to file its objections.

Section 21.018, entitled "Appeal From Commissioners' Findings," provides:

> (a) A party to a condemnation proceeding may object to the findings of the special commissioners by filing a written statement of the objections and their grounds with the court that has jurisdiction of the proceeding. The statement must be filed on or before the first Monday following the 20th day after the day the commissioners file their findings with the court.

> (b) If a party files an objection to the findings of the special commissioners, the court shall cite the adverse party and try the case in the same manner as other civil causes.

TEX. PROP.CODE ANN. § 21.018 (Vernon 2014).

Appellees agree that the State had until the first Monday following the expiration of 20 days to file objections to the commissioners' award. However, Appellees assert that, in this case, the 20–day period began to run on the date that the

award was required to be filed under section 21.048(1) of the Property Code

Section 21.048(1) provides:

After the special commissioners in an eminent domain proceeding have assessed the damages, they shall:

(1) make a written statement of their decision stating the damages, date it, sign it, and file it and all other papers connected with the proceeding with the court on the day the decision is made or on the next working day after the day the decision is made[.]

TEX. PROP.CODE ANN. § 21.048(1) (Vernon 2014).

According to Appellees, the special commissioners fulfilled their duty under section 21.048(1) when they "entrusted" the State to file the award with the trial court in accordance with section 21.048(1). Under that provision, the State had until May 2, 2014, which was the next work day after the award was made, to file the award with the trial court. Had the State filed the award on May 2, 2014, the State's objections would have been due, pursuant to section 21.018(a), on May 27, 2014. However, the State did not file the award until May 7, 2014, six days after the date required by section 21.048(1).

 **\*4**  Appellees do not disagree that—pursuant to section 21.018(a)—had the commissioners, rather than the State, untimely filed the award on May 7, 2014, the State's deadline to file its objections would have been June 2, 2014. However, Appellees assert that, because the State, not the commissioners, "delayed" filing the award until May 7, 2014, the State should not benefit from its own tardiness; it should not be allowed "to enlarge" the period for filing its objections. Further, Appellees state that the statutory framework does not permit the State "[to] manipulate the time period within which its own objections could be filed by delaying in filing the award with the court, despite the mandatory obligation of Section 21.048 of the Texas Property Code."

As stated, "The plain language of a statute is the surest guide to the Legislature's intent." Chatha, 381 S.W.3d at 507. Here, the plain language of the statutory provisions reveals that only one provision governs when objections to the commissioners' award must be filed. That provision is section 21.018(a). SeeState v. Garland, 963 S.W.2d 95, 97 (Tex.App.–Austin 1998, pet. denied) (holding that, under plain statutory language, starting point for computing deadline to file objections to commissioners' award is actual

filing date of the award, irrespective of whether the State, which filed award for commissioners, had failed to timely file award pursuant to section 21.048).

Undeniably, section 21.048's language, requiring the award to be filed by the next work day after it is made, indirectly affects when a party's objections will be due. However, neither section 21.018 nor section 21.048 addresses the remedy, or any penalty, for the untimely filing of the commissioners' award, whether the untimely filing is made by the commissioners or by a party on the commissioners' behalf Rather, section 21.018 serves to ameliorate the effect of an untimely filing by directly linking the period during which a party must object to the date the award is filed. SeeTEX. PROP. CODE ANN.. § 21.018(a). In this way, the party desiring to object has the full time period in which to object even when the award is filed late.

If it had intended either (1) to make the starting point for the objection period the same date that the award was required to be filed under section 21.048 or (2) to restrict a party's ability to benefit from section 21.018's objection period when that party played a role in causing the award to be filed late, the Legislature could have enacted such provisions. SeeGarland, 963 S.W.2d at 99 ("Had the Legislature intended the time period to run from the signing of the actual award, or from the date that the award should have been filed in court, it could easily have said so."). Absent such provisions and given the plain language of section 21.018(a), we are without authority to shorten the length of time that the State had to file its objections to the award.

We are mindful that sections 21.018 and 21.048 speak to the special commissioners filing the award in the trial court, rather than the State filing the award. However, Appellees have not cited authority permitting a court to deviate from section 21.018's provisions when the party filing the award is the State rather than the commissioners. Thus, courts must enforce section 21.018 as it is written, giving either party until the first Monday following the expiration of 20 days after the commissioners' award is filed to object.

We note that, in support of their position, Appellees point to the following language in John v. State, 826 S.W.2d 138, 140 (Tex.1992):

[I]n a condemnation action, the landowner is given a single opportunity to recover damages for the taking of his property by the

state for the public benefit.... As a result, the procedures set forth in the condemnation statute must be strictly followed and its protections liberally construed for the benefit of the landowner.

 **\*5** In *John,* the trial court clerk did not mail notice of the commissioners' award to the property owners within the time period required in Property Code section 21.049. *Id.* at 139. The clerk mailed the notice 22 days late. *Id.* At that point, the time for filing objections under section 21.018(a) had elapsed. *Id.* Two days after the clerk mailed the notice of award, the property owners filed their objections. *Id.*

The Supreme Court of Texas held that the landowners' objections were timely filed because the period to object to the commissioners' award was tolled until the clerk mailed the notice of award as required by section 21.049. *Id.* The court characterized section 21.049 as being mandatory, determining that "in condemnation cases, the clerk must comply with the notice provisions." *Id.* at 140.

Here, Appellees assert that, similar to section 21.049, section 21.048 is mandatory. Appellees posit, "The language of Section 21.048 is mandatory, and a liberal construction of Section 21.048 for the benefit of the landowner does not permit a mechanical operation of Section 21.018 to trump the mandatory requirement of Section 21.048."

It logically follows that a liberal construction of the statutory scheme results in the tolling of the time for landowners to file their objections when they have not been given proper notice of the commissioners' award by the court clerk, as in *John.* However, a liberal construction of section 21.048's filing requirement does not logically result in a reduction of the amount of time in which the State may object. Section 21.018 appears to already anticipate noncompliance with the filing requirement of section 21.048 by providing that the starting point to calculate when objections must be filed is the date the award is actually filed rather than the date the award should have been filed under section 21.048.

Moreover, in *John,* the statute was liberally construed to alleviate the effects of section 21.018's time requirement for filing objections when the property owner had not received timely notice of the filing of the award. *Id.* The lack of notice had limited the property owner's statutory right to timely object to the award. *See id.* at 139. In contrast, here, Appellees do not request the statutory provisions be construed in a manner to aid them in preserving their statutory right to object, rather they seek to limit the State's right.

Given the plain language of section 21.018, we conclude that the State had until June 2, 2014 to file its objections to the special commissioners' award. The State's objections, filed on May 30, 2014, were timely. We hold that the trial court erred when it granted the Appellees' motion for entry of judgment and signed the "Judgment in the Absence of Objections to the Special Commissioners' Award."

We sustain the State's sole issue.

### Conclusion

We reverse the judgment of the trial court and remand for further proceedings.

### All Citations

--- S.W.3d ----, 2015 WL 3637982

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

397 S.W.3d 162
Supreme Court of Texas.

TEXAS DEPARTMENT OF TRANSPORTATION
and City of Edinburg, Petitioners,

v.

A.P.I. PIPE AND SUPPLY, LLC and Paisano
Service Company, Inc., Respondents.

No. 10–1020. | Argued Sept.
12, 2012. | Decided April 5, 2013.

**Synopsis**

**Background:** Alleged purchaser of property brought inverse condemnation action against city and Texas Department of Transportation (TxDOT), alleging that defendants removed dirt from area of drainage ditch easement without providing compensation. The County Court at Law No. 2, Hidalgo County, Jaime Palacios, J., denied defendants' plea to the jurisdiction, and defendants appealed. The Corpus Christi Court of Appeals, Thirteenth District, 2008 WL 99629, affirmed. Subsequently, the County Court denied defendants' second plea to the jurisdiction, and defendants appealed. The Corpus Christi Court of Appeals, Thirteenth District, 328 S.W.3d 82, affirmed. Defendants petitioned for review.

**Holdings:** The Supreme Court, Willett, J., held that:

[1] judgment nunc pro tunc, purporting to render void prior judgment granting city title to property, was void;

[2] innocent purchaser statute did not apply to alleged purchaser; and

[3] doctrine of equitable estoppel did not apply to bar city and TxDOT from relying on prior judgment granting title to city.

Reversed.

Lehrmann, J., filed a concurring opinion, in which Guzman, J., joined.

West Headnotes (13)

**[1]    Appeal and Error**
   ⬥ Cases Triable in Appellate Court

30   Appeal and Error
30XVI   Review
30XVI(F)   Trial De Novo
30k892   Trial De Novo
30k893   Cases Triable in Appellate Court
30k893(1)   In general
Whether a court has jurisdiction is a matter of law that an appellate court decides de novo.

7 Cases that cite this headnote

**[2]    Pleading**
   ⬥ Scope of inquiry and matters considered in general

302   Pleading
302III   Responses or Responsive Pleadings in General
302III(B)   Dilatory Pleas and Matter in Abatement
302k111   Decision of Issue, and Proceedings Thereon
302k111.36   Scope of inquiry and matters considered in general
Evidence can be introduced and considered at the plea to the jurisdiction stage if needed to determine a court's jurisdiction.

3 Cases that cite this headnote

**[3]    Eminent Domain**
   ⬥ Jurisdiction
**Eminent Domain**
   ⬥ Plea, answer and subsequent pleading

148   Eminent Domain
148IV   Remedies of Owners of Property; Inverse Condemnation
148k286   Jurisdiction
148   Eminent Domain
148IV   Remedies of Owners of Property; Inverse Condemnation
148k293   Pleading
148k293(2)   Plea, answer and subsequent pleading
In an inverse condemnation action, a trial court lacks jurisdiction and should grant a plea to the

jurisdiction where a plaintiff cannot establish a viable takings claim.

13 Cases that cite this headnote

**[4]**    **Eminent Domain**
    👉 Property and Rights Subject of Compensation

148   Eminent Domain
148II   Compensation
148II(B)   Taking or Injuring Property as Ground for Compensation
148k81   Property and Rights Subject of Compensation
148k81.1   In general
To recover under the constitutional takings clause, one must first demonstrate an ownership interest in the property taken. U.S.C.A. Const.Amend. 5.

2 Cases that cite this headnote

**[5]**    **Eminent Domain**
    👉 Matters concluded

**Judgment**
    👉 Allowing amendment nunc pro tunc

148   Eminent Domain
148III   Proceedings to Take Property and Assess Compensation
148k243   Conclusiveness and Effect of Award or Judgment in General
148k243(2)   Matters concluded
228   Judgment
228VIII   Amendment, Correction, and Review in Same Court
228k326   Allowing amendment nunc pro tunc
Judgment nunc pro tunc, purporting to render void prior judgment granting city title to real property, was void and could not affect validity of prior judgment, since alleged error it purported to correct was judicial, not clerical; prior judgment granted city fee simple ownership of property, judgment nunc pro tunc purported to turn city's ownership into a mere easement, there was no showing that prior judgment really meant to convey an easement rather than a fee simple, and prior judgment had been based on a special commissioners' award which had granted fee

simple title that city had sought in condemnation petition.

Cases that cite this headnote

**[6]**    **Judgment**
    👉 Allowing amendment nunc pro tunc

228   Judgment
228VIII   Amendment, Correction, and Review in Same Court
228k326   Allowing amendment nunc pro tunc
A judgment nunc pro tunc can correct a clerical error in the original judgment, but not a judicial one.

3 Cases that cite this headnote

**[7]**    **Judgment**
    👉 Allowing amendment nunc pro tunc

228   Judgment
228VIII   Amendment, Correction, and Review in Same Court
228k326   Allowing amendment nunc pro tunc
An attempted nunc pro tunc judgment entered after the trial court loses plenary jurisdiction is void if it corrects judicial rather than clerical errors.

3 Cases that cite this headnote

**[8]**    **Judgment**
    👉 Clerical errors

**Judgment**
    👉 Allowing amendment nunc pro tunc

228   Judgment
228VIII   Amendment, Correction, and Review in Same Court
228k302   Nature of Errors or Defects
228k306   Clerical errors
228   Judgment
228VIII   Amendment, Correction, and Review in Same Court
228k326   Allowing amendment nunc pro tunc
A "clerical error" in a judgment, which can be corrected by a judgment nunc pro tunc, is one which does not result from judicial reasoning or determination.

3 Cases that cite this headnote

**[9]** **Judgment**

👉 Allowing amendment nunc pro tunc

228 Judgment
228VIII Amendment, Correction, and Review in Same Court
228k326 Allowing amendment nunc pro tunc

Even a significant alteration to an original judgment may be accomplished through a judgment nunc pro tunc so long as it merely corrects a clerical error.

Cases that cite this headnote

**[10]** **Judgment**

👉 Clerical errors

**Judgment**

👉 Allowing amendment nunc pro tunc

228 Judgment
228VIII Amendment, Correction, and Review in Same Court
228k302 Nature of Errors or Defects
228k306 Clerical errors
228 Judgment
228VIII Amendment, Correction, and Review in Same Court
228k326 Allowing amendment nunc pro tunc

If a signed judgment inaccurately reflects the true decision of the court, then the error is clerical and may be corrected by entry of judgment nunc pro tunc.

Cases that cite this headnote

**[11]** **Eminent Domain**

👉 Real property in general

148 Eminent Domain
148II Compensation
148II(B) Taking or Injuring Property as Ground for Compensation
148k81 Property and Rights Subject of Compensation
148k82 Real property in general

Innocent purchaser statute, protecting purchasers from unrecorded property conveyances, did not apply to alleged purchaser of property, and thus alleged purchaser could not rely on judgment nunc pro tunc purporting to render void prior judgment granting city title to property, for purposes of determining whether alleged

purchaser could bring inverse condemnation action relating to property, where alleged purchaser had notice of city's adverse interest; alleged purchaser admitted that, prior to alleged purchase, it knew of recorded judgment in prior condemnation action granting city fee simple title to property. V.T.C.A., Property Code § 13.001.

1 Cases that cite this headnote

**[12]** **Estoppel**

👉 Particular state officers, agencies or proceedings

**Estoppel**

👉 Municipal corporations in general

156 Estoppel
156III Equitable Estoppel
156III(A) Nature and Essentials in General
156k62 Estoppel Against Public, Government, or Public Officers
156k62.2 States and United States
156k62.2(2) Particular state officers, agencies or proceedings
156 Estoppel
156III Equitable Estoppel
156III(A) Nature and Essentials in General
156k62 Estoppel Against Public, Government, or Public Officers
156k62.4 Municipal corporations in general

Doctrine of equitable estoppel did not apply to bar city and Texas Department of Transportation (TxDOT) from relying on judgment granting city fee simple title in property, for purposes of determining whether alleged purchaser could bring inverse condemnation action relating to property, where TxDOT employee had agreed to judgment nunc pro tunc purporting to reduce city's interest in property from fee simple to an easement; there was no showing that employee had acted to deliberately induce any action favorable to TxDOT, alleged purchaser could have examined the conflicting judgments and seen that judgment nunc pro tunc had been issued erroneously, and applying estoppel would impair government function of managing drainage project.

Cases that cite this headnote

**[13]    Estoppel**

👉 Estoppel Against Public, Government, or Public Officers

156    Estoppel

156III    Equitable Estoppel

156III(A)    Nature and Essentials in General

156k62    Estoppel Against Public, Government, or Public Officers

156k62.1    In general

For equitable estoppel to apply against the government, two requirements must exist: (1) the circumstances must clearly demand estoppel's application to prevent manifest injustice, and (2) no governmental function can be impaired.

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*164** Boone Channing Slusher, Slusher & Associates, McAllen, TX, for Amicus Curiae San Jacinto Title.

Aaron Daniel Day, Texas Land Title Association, Austin, TX, for Amicus Curiae Texas Land Title Association.

Daniel T. Hodge, First Asst. Attorney General, David C. Mattax, Director of Defense Litigation, Office of the Attorney General, Greg W. Abbott, Attorney General of Texas, James William Kirk II, Lisa Marie McClain, Office of the Attorney Gen., Jonathan F. Mitchell, Solicitor General Office of the Attorney General, Joseph David 'Jody' Hughes, Assistant Solicitor General Office of the Attorney General, Susan Desmarais Bonnen, Office of the Attorney General of Texas, William (Bill) J. Cobb III, Attorney General's Office, Deputy Atty. General for Civil Litigation, Austin, TX, for Petitioners Texas Department of Transportation.

Analisa Figueroa, Charles V. Willette Jr., Willette and Guerra LLP, Brownsville, TX, for Petitioner The City of Edinburg.

Mark Edward Wilkins, Rolando Quintana, Wilkins & Wilkins, McAllen, TX, for Respondents A.P.I. Pipe and Supply, L.L.C.

**Opinion**

Justice WILLETT delivered the opinion of the Court.

Texas legal rules governing real-estate transactions demand assiduousness, lest **\*165** uncertainty subvert the orderly transfer of property. This inverse-condemnation dispute over ten acres in Hidalgo County asks a simple question: Who has title to the parcel? The answer turns on the validity of conflicting recorded judgments:

1. *2003 Judgment*—which the Texas Department of Transportation (TxDOT) and the City of Edinburg claim gives the City fee-simple ownership, subject to a drainage easement granted to TxDOT.

2. *2004 Judgment*—which A.P.I. Pipe Supply, LLC and Paisano Service Company, Inc. (collectively API) claim gives API fee-simple ownership, subject to a drainage easement granted to the City (and, via subsequent conveyance, to TxDOT).

In 2005, TxDOT began its drainage project, and API, relying on the 2004 Judgment, brought a takings claim for the value of the removed soil. TxDOT counters that API lacks any ownership interest because the 2004 Judgment, which purports to declare the 2003 Judgment "null and void," is itself void—to which API replies, even if the 2003 Judgment controls, API is an "innocent purchaser" entitled to ownership under Property Code section 13.001.

We agree with TxDOT. The void 2004 Judgment cannot supersede the valid 2003 Judgment; API is statutorily ineligible for "innocent purchaser" status; and equitable estoppel is inapplicable against the government in this case. Because API's takings claim fails, we reverse the court of appeals' judgment and dismiss the suit.

## I. Facts

The chain of title contains conflicting records, so we first describe how the City, TxDOT, and API obtained their purported interests in the land.

### A. The 2003 Judgment Giving the City Ownership

Herschell White originally owned the land, and the City brought a condemnation action so it could dig a drainage channel. As compensation for the land, the commissioners awarded, and White accepted, $207,249 (plus $17,000 for damage to the remainder of the property). The special

commissioners' report described the interest conveyed as a "right-of-way" but also incorporated by reference the City's original petition for condemnation, which described the interest sought as a "fee title." No one objected to the special commissioners' award, and the trial court adopted it as the judgment of the court (the 2003 Judgment). [1]

1    See TEX. PROP.CODE § 21.061 (providing that if no party objects to the findings of the special commissioners, the trial court "shall adopt the commissioners' findings as the judgment of the court").

## B. The 2004 Judgment Nunc Pro Tunc Giving API Ownership

A year later, the same trial court entered a "Judgment Nunc Pro Tunc" (the 2004 Judgment), which was agreed to by the City's and White's attorneys. A TxDOT employee apparently also approved the 2004 Judgment by email. [2]

2    The record is unclear as to why the parties agreed to the 2004 judgment, or why TxDOT, which did not yet have an interest in the property, would agree to the nunc pro tunc judgment.

The 2004 Judgment purported to render the 2003 Judgment "null and void." The 2004 Judgment states that the City's interest in the land was a "right of way easement" obtained "for the purpose of opening, constructing and maintaining a permanent channel or drainage ease **\*166** ment...." Unlike the 2003 Judgment, the 2004 Judgment did not incorporate the special commissioners' report or the City's original condemnation petition. Rather, it referred to the City's interest *only* as an easement, not fee-simple ownership.

## C. Subsequent Title Transfers

Three months after the trial court signed the 2004 Judgment, White sold the ten acres and some surrounding property to API. [3] Both the 2003 Judgment and the 2004 Judgment were recorded in the county registry before API purchased the property. In 2005, the City granted TxDOT an easement to build a drainage ditch and to remove any excavated "stone, earth, gravel or caliche."

3    API paid $292,800 for approximately 34 acres, including the 9.869 acres at issue in this case.

## II. Proceedings Below

When TxDOT started digging, API filed an inverse-condemnation action against the City and TxDOT over the removed dirt. TxDOT and the City filed a plea to the jurisdiction, which the trial court denied. The court of appeals affirmed, holding the 2004 Judgment was void but saying the record was unclear as to whether API had notice of the 2003 Judgment. [4]

4    *Tex. Dep't of Transp. v. A.P.I. Pipe & Supply, LLC,* No. 13–07–221–CV, 2008 WL 99629, at *3–*5, 2008 Tex.App. LEXIS 276, at *8–*14 (Tex.App.-Corpus Christi Jan. 10, 2008, no pet.) (mem.op.).

Upon remand to the trial court, TxDOT and the City produced evidence that the 2003 Judgment was indeed recorded in the county registry. TxDOT and the City filed a second plea to the jurisdiction, arguing that, because the 2004 Judgment was void and API had notice of the 2003 Judgment, the City held fee-simple title to the land, subject only to TxDOT's easement. The trial court denied the second plea to the jurisdiction, and the court of appeals affirmed, concluding that API was a good-faith purchaser for value since the 2004 Judgment superseded the 2003 Judgment. [5]

5    328 S.W.3d 82, 90–92.

## III. Discussion

**[1]   [2]**   Whether a court has jurisdiction is a matter of law we decide de novo. [6] Evidence can be introduced and considered at the plea to the jurisdiction stage if needed to determine jurisdiction. [7]

6    *Tex. Dep't of Parks & Wildlife v. Miranda,* 133 S.W.3d 217, 226 (Tex.2004).

7    *Id.* at 227.

**[3]   [4]**   A trial court lacks jurisdiction and should grant a plea to the jurisdiction where a plaintiff "cannot establish a viable takings claim." [8] Further, "[i]t is fundamental that, to recover under the constitutional takings clause, one must first demonstrate an ownership interest in the property taken." [9] Thus, if API does not own the disputed land, the takings claim is not viable and the trial court lacks jurisdiction. Given that

the dispositive question is whether API is the property owner, the trial court was correct to consider the 2003 and 2004 Judgments as extrinsic, undisputed evidence.

8      *Hearts Bluff Game Ranch, Inc. v. State,* 381 S.W.3d 468, 491 (Tex.2012).

9      *Tex. Dep't of Transp. v. City of Sunset Valley,* 146 S.W.3d 637, 644 (Tex.2004).

For the reasons discussed below, we hold that API does not own the land and cannot assert the good-faith purchaser[10] **\*167** or equitable estoppel doctrines. We thus conclude that the trial court should have granted the plea to the jurisdiction.

10      We have jurisdiction over this interlocutory appeal under Texas Government Code section 22.225(c) because of a conflict between the court of appeals' decision and a decision of another court of appeals. *See* TEX. GOV'T CODE §§ 22.001(a)(2), .225(c). As explained below, the court of appeals' misapplication of the good-faith purchaser doctrine is inconsistent with *Wall v. Lubbock,* 52 Tex.Civ.App. 405, 118 S.W. 886, 888 (Tex.Civ.App.-Austin 1908, writ ref'd).

### A. The 2004 Judgment in Favor of the City Was Void.

[5]  [6]  [7]  [8]  [9]  [10]   A judgment nunc pro tunc can correct a clerical error in the original judgment, but not a judicial one.[11] An attempted nunc pro tunc judgment entered after the trial court loses plenary jurisdiction is void if it corrects judicial rather than clerical errors.[12] "A clerical error is one which does not result from judicial reasoning or determination."[13] Even a significant alteration to the original judgment may be accomplished through a judgment nunc pro tunc so long as it merely corrects a clerical error.[14] If "the signed judgment inaccurately reflects the true decision of the court," then "the error is clerical and may be corrected."[15]

11      *Andrews v. Koch,* 702 S.W.2d 584, 585 (Tex.1986) (per curiam).

12      *Dikeman v. Snell,* 490 S.W.2d 183, 186 (Tex.1973).

13      *Andrews,* 702 S.W.2d at 585.

14      *See id.* at 584–86 (using a nunc pro tunc judgment to add an easement to a deed; a prior court order had required the easement, so exclusion of the easement was clearly a clerical mistake).

15      *Id.* at 586.

Here, the change was undeniably significant. The 2003 Judgment granted a fee simple to the City, while the 2004 Judgment purported to turn the City's outright ownership into a mere easement. Again, the fact that the change was significant is not fatal to the 2004 Judgment's nunc pro tunc status. However, TxDOT and the City produced evidence showing that the 2003 Judgment correctly reflected the underlying judicial determination,[16] and no party produced any evidence indicating that the 2004 Judgment was merely correcting a clerical error. That is, nothing suggests that the 2003 Judgment really meant to convey to the City an easement rather than a fee simple.

16      There is circumstantial evidence that the 2003 Judgment intended to award a fee simple rather than an easement. The condemnation award approved by the court in the 2003 Judgment provided compensation of over $207,000 for 10 acres in April 2003, whereas API purchased that tract plus 20 more acres for approximately $90,000 more in August 2004.

Further, the trial court in this case was by law required to adopt the award of the special commissioners, who in turn granted the fee-simple title the City sought in its condemnation petition. If parties do not timely object to a special commissioners' report, the trial court is required to enter "the [special] commissioners' findings as the judgment of the court."[17] Objection is timely only if raised within 20 days of the special commissioners' award.[18] Here, the parties point to no evidence of a timely objection. Indeed, the 2003 Judgment indicated that no party objected to the award. Therefore, the trial court could "only perform its ministerial function and render judgment based upon the commissioner's **\*168** award."[19] The trial court did just that in the 2003 Judgment, awarding compensation for fee simple title. Conversely, the 2004 Judgment exceeded the scope of this "ministerial function" by shrinking the interest awarded by the special commissioners from a fee simple to an easement. As the special commissioners' award was not changed pursuant to timely objection, the 2004 Judgment was void.

17      TEX. PROP.CODE § 21.061.

18      *Id.* § 21.018. The time for making objections to the special commissioners' award is tolled if the parties are not given proper notice of the special commissioners' award. *John v. State,* 826 S.W.2d 138, 141 n. 5

(Tex.1992). However, there is no evidence here that there were any notice problems regarding the award.

[19] *John,* 826 S.W.2d at 141 n. 5. *See also Pearson v. State,* 159 Tex. 66, 315 S.W.2d 935, 938 (1958) (noting that if there are no objections to the special commissioners' award, "[n]o jurisdiction is conferred upon the court to do anything more than accept and adopt the [special commissioners'] award as its judgment, and this follows by operation of law and the ministerial act of the county judge").

One more timing issue cuts against API: the expiration of the trial court's plenary power. Such power usually lasts 30 days. [20] The 2004 Judgment, though labeled a Judgment Nunc Pro Tunc, was undeniably a substantive alteration to the 2003 Judgment. However, the trial court's plenary power to make substantive alterations had expired 300–plus days before the 2004 Judgment was rendered. [21]

[20] *See* TEX.R. CIV. P. 329b(d)–(f).

[21] Here, the 2004 Judgment was entered 351 days after the 2003 Judgment.

Because the 2004 Judgment was void, it did not convey anything to anyone. Instead, under the 2003 Judgment, the City continued to hold fee-simple title. White continued to have no interest in the land, and API could not buy from White what White did not own.

### B. The Innocent–Purchaser and Equitable Estoppel Doctrines Are Inapplicable.

API urges that, even if the 2004 Judgment is void such that White had no interest to convey, API should still prevail because it depended on the 2004 Judgment when it bought the land from White. API presents two theories, neither persuasive.

### 1. The Innocent–Purchaser Statute, by its Terms, Does not Apply to Recorded Judgments.

 [11]   The court of appeals held that API was a good-faith purchaser for value. However, we refused the writ of error in a case holding that this doctrine does not protect a purchaser whose chain of title includes a void deed: "One holding under a void title cannot claim protection as an innocent purchaser." [22]

[22] *Wall,* 118 S.W. at 888.

Codified at Property Code section 13.001, the innocent-purchaser doctrine is simply inapplicable here:

> A conveyance of real property or an interest in real property ... is void as to ... a subsequent purchaser for a valuable consideration without notice unless the instrument has been ... proved and filed for record as required by law. [23]

[23] TEX. PROP.CODE § 13.001(a).

By its terms, the statute protects purchasers from *unrecorded* property conveyances—covert, off-the-books transfers that leave buyers unaware of adverse interests. But one cannot be "innocent" of a *recorded* judgment, and here, API concedes it knew of the recorded 2003 Judgment before it purchased the property.

API essentially argues that the 2003 Judgment was superseded by the 2004 Judgment because the latter purported to nullify the former. But our caselaw does **\*169** not support the idea that earlier instruments in a chain of title can be rendered meaningless by later instruments that are contradictory. [24] Instead, we refused the writ of error in a case that explicitly held that the innocent-purchaser doctrine cannot protect those who claim under a void deed. [25] Further, the consistent theme in our cases is that "[a] purchaser is charged with knowledge of the provisions and contents of recorded instruments. Purchasers are also charged with notice of the terms of deeds which form an essential link in their chain of ownership." [26] That is, a purchaser is deemed to have notice of all recorded instruments, not just the most recent one. Thirty years ago, we stated in *Westland Oil Development Corp. v. Gulf Oil Corp.:*

[24] API does not argue, and we do not consider, whether the 2004 Judgment is a "correction instrument" under recently enacted sections 5.027–.031 of the Property Code.

[25] *Wall,* 118 S.W. at 888.

[26] *Cooksey v. Sinder,* 682 S.W.2d 252, 253 (Tex.1984) (per curiam).

*[A]ny* description, recital of fact, or reference to other documents puts the purchaser upon inquiry, and he is bound to follow up this inquiry, step by step, from one discovery to another and from one instrument to another, until the whole series of title deeds is exhausted and a complete knowledge of *all the matters referred* to and affecting the estate is obtained. [27]

[27]  637 S.W.2d 903, 908 (Tex.1982) (citations and quotations omitted) (emphases in original).

In other words, API, constructively and actually aware of the recorded 2003 Judgment, was responsible for squaring it with the contradictory 2004 Judgment.

*Slaughter v. Qualls,* [28] on which the court of appeals relied, is not to the contrary. Slaughter suggests that a recorded but void foreclosure sale could protect a subsequent good-faith purchaser. [29] However, the statement was dicta because the subsequent purchaser's claim was not before the Court. [30] In any event, the *Slaughter* dicta suggests that such purchasers merit protection under equitable estoppel principles (describing a contrary result as "inequitable" [31] ) and not under the innocent-purchaser doctrine codified in the Property Code. Section 13.001 defines the elements of innocent-purchaser status for all cases, and courts may not disregard or rewrite the statute when they believe straight-up application would be inequitable. The statute is categorical and makes no case-by-case exceptions: A purchaser with notice of an adverse interest cannot claim innocent-purchaser status.

[28]  139 Tex. 340, 162 S.W.2d 671 (1942).

[29]  *Id.* at 675.

[30]  *Id.* at 674.

[31]  That is, *Slaughter* says (in its explanation of its dicta):
> It is true that under circumstances such as we have here, those who purchased interests in or took liens on the land in good faith from [the purchaser of a deed voided by a wrongful foreclosure sale] acquired good title as against [the debtor who had originally executed the deed of trust]; but this is so *not on the theory that the title actually passed,* but rather on the theory that [the debtor], by the execution of the deed of trust, made it possible for the trustee to create the appearance of good title in [the purchaser at the foreclosure sale], and *it would be inequitable* to permit [the debtor] now to show

otherwise as against those who have purchased in good faith in reliance thereon.

*Id.* at 675 (emphases added).

### *170  2. API Cannot Prevail on Equitable Estoppel, Which Is Inapplicable Against the Government on These Facts.

 **[12]**  API argues that TxDOT's acquiescence to the 2004 Judgment bars it from objecting now to what it accepted then. While the argument has a certain force—purchasers should be able to rely upon facially valid judgments—this argument goes to equitable estoppel, a doctrine inapplicable against the government in this case.

 **[13]**  For estoppel to apply against the government, two requirements must exist: (1) "the circumstances [must] clearly demand [estoppel's] application to prevent manifest injustice," [32] *and* (2) no governmental function can be impaired. [33] Neither requirement exists here.

[32]  *City of White Settlement v. Super Wash, Inc.,* 198 S.W.3d 770, 774 (Tex.2006) (quotations omitted).

[33]  *Id.* at 776–78.

As to the first requirement, we have applied estoppel to prevent manifest injustice if, "officials acted deliberately to induce a party to act in a way that benefitted the [government]." [34] Here, no evidence suggests deliberate inducement (as opposed to mistaken acquiescence) by TxDOT or the City, or that they benefitted when the City's fee title was erroneously relegated to a mere easement. [35] (White benefitted handsomely, though, being paid twice for fee title to the same property.) This case stands in stark contrast to two cases where we have held the government estopped—cases where the government stalled private citizens from providing proper notice of claims until after the notice deadline had passed. [36]

[34]  *Id.* at 775.

[35]  Apparently for the first time, API argued at oral argument before this Court that TxDOT and the City *did* receive a benefit from their interest being merely an easement. API alleges that it let the government use other portions of API's property, which API thought was required so that the government could make reasonable use of its purported easement. However, we find this argument

unavailing. First, we note that this last-minute allegation of the government's benefit from the easement is not preserved for our review. TEX.R.APP. P. 33.1(a). Further, this last-minute allegation is not even enough to lead us to remand to allow API to amend its jurisdictional allegations. Any purported benefit to TxDOT and the City is minimal compared to the substantial loss to the government for giving up its right to fee-simple title. This purported benefit is "simply too attenuated to establish grounds for equitable relief." *Super Wash,* 198 S.W.3d at 775. Finally, availability of "alternative remedies weighs strongly against" estoppel against the government, *id.,* and API may well have other remedies available for the government's alleged wrongful use of API's surrounding property in digging the ditch.

36    *Super Wash,* 198 S.W.3d at 774–76 (explaining the significance of the only two cases where we have applied estoppel against the government, *Roberts v. Haltom City,* 543 S.W.2d 75 (Tex.1976) and *City of San Antonio v. Schautteet,* 706 S.W.2d 103 (Tex.1986)).

We have also held that the fact that a governmental error was "discoverable" militates against applying estoppel. [37] The error here was discoverable because API could have examined the conflicting judgments and seen that the 2004 Judgment was issued in error. Red flags were plentiful: (1) the 2004 Judgment was styled a nunc pro tunc even though it made a judicial change, not a clerical one; (2) it was issued long after the 2003 Judgment; (3) it nowhere mentioned the unobjected-to special commissioners' award. We thus conclude that the manifest-injustice requirement for applying estoppel against the government is not satisfied.

37    *Super Wash,* 198 S.W.3d at 775.

**\*171** The second requirement—that there is no impairment to a governmental function—is also absent. Designing and planning a drainage ditch is a governmental function, [38] and applying estoppel here would impair that governmental function. If TxDOT and the City are estopped, their ability to manage the drainage project would have to accommodate API's ownership of the land, complicating the government's ability to carry out its project. [39] The land was purchased through eminent domain for the precise purpose of digging a drainage ditch, and restricting the government's ability to freely dig on the land burdens that undisputed governmental function.

38    *City of Tyler v. Likes,* 962 S.W.2d 489, 501 (Tex.1997) (holding that, under common law, "design and planning"

of drainage ditches was a "quasi-judicial function[ ] subject to governmental immunity," whereas "the acts of constructing and maintaining a storm sewer are proprietary at common law"). The Texas Tort Claims Act also classifies governmental acts related to "sanitary and storm sewers" as "governmental functions." TEX. CIV. PRAC. & REM.CODE § 101.0215(9). While this legislative interpretation of "governmental functions" is binding only in the context of the Tort Claims Act, we have previously found that "the statute is helpful" in our interpretation of whether an activity is a "governmental function." *Super Wash,* 198 S.W.3d at 776–77.

39    If we found that the government was estopped, the government would have only a few options for removing dirt from the property, such as paying API to remove the dirt, relying on API to remove the dirt, or obtaining API's consent to let the government dump the dirt on API's surrounding land. Any of these options could impair plans to expand or improve the ditches by impeding the dirt-removal process.

## IV. Conclusion

The 2004 Judgment was void. The pleadings and evidence establish that API holds no interest in the land and thus "cannot establish a viable takings claim," [40] meaning the trial court lacked jurisdiction. [41] We reverse the court of appeals' judgment and dismiss the case.

40    *Hearts Bluff Game Ranch,* 381 S.W.3d at 491.

41    *Id.* at 491–92.

Justice LEHRMANN filed a concurring opinion, in which Justice GUZMAN joined.

Justice LEHRMANN, joined by Justice GUZMAN, concurring.

I join the Court's opinion because I agree that the 2004 Judgment, which was issued after the expiration of the trial court's plenary power, makes a judicial change to the 2003 Judgment and is therefore void. I write separately to clarify why I agree.

As the Court notes, "a significant alteration to the original judgment may be accomplished through a judgment nunc pro tunc so long as it merely corrects a clerical error." 397 S.W.3d at 167 (citing *Andrews v. Koch,* 702 S.W.2d 584, 584–86

(Tex.1986) (per curiam)). Indeed, clerical errors frequently concern matters of substance; they are simply errors "made in *entering* final judgment" and not "in *rendering* a final judgment." *Escobar v. Escobar,* 711 S.W.2d 230, 231 (Tex.1986). Thus, the fact that the change made in the 2004 Judgment—which awards the City an easement as opposed to the fee simple interest awarded in the 2003 Judgment— is undeniably significant has no bearing on the validity of the nunc pro tunc judgment. Rather, the change was invalid because the 2003 Judgment correctly reflects the true decision of the court, and the 2004 Judgment therefore improperly makes a judicial **\*172** change beyond the expiration of the court's plenary power such that the 2004 Judgment is void.

In many cases, depending on the state of the record, it may be difficult for an appellate court to discern which of two conflicting judgments accurately "reflects the true decision of the [trial] court," 397 S.W.3d at 167 (quoting *Andrews,* 702 S.W.2d at 586) (internal quotation marks omitted), and, in turn, whether a judgment nunc pro tunc is valid. However, this case does not present such a dilemma. The evidence establishing the fee simple nature of the conveyance reflected in the 2003 Judgment is conclusive. In that judgment, the trial court ordered that the special commissioners' award "is hereby made[ ] the judgment of this [c]ourt." In turn, the special commissioners "award[ed] to [the City] all rights described and prayed for in [the City]'s Original Statement and Petition for Condemnation." And the City's condemnation petition requested "a final judgment of condemnation vesting in the City of Edinburg the fee title to said land and the rights therein." Further, as noted by the Court, the trial court in this case essentially conducted a ministerial duty in entering judgment on the special commissioners' findings, to which no one had objected. 397 S.W.3d at 167–68. In light of this evidence, there is no question that the "true decision of the court" was to award fee simple title. Thus, the 2004 Judgment's award of an easement to the City did not merely correct a clerical error and could not be accomplished through a judgment nunc pro tunc.

API contends the use of the term "right-of-way" in the City's condemnation petition and the 2003 Judgment renders it unclear whether the 2003 Judgment was awarding fee simple title or an easement. For example, the 2003 Judgment awards the City "title (right of way) described in attached Exhibit 'A' [the special commissioners' award] and 'B' [condemnation petition]," and orders issuance of a writ of possession to allow the City to "enter upon said right-of-way." The commissioners' award notes that

the City sought a decree "vesting in [the City] a right-of-way ... more fully described in [the City]'s [p]etition." The condemnation petition, in the paragraph setting out the purpose for the action, alleges that the land is sought for the purpose of "laying out, opening, constructing, reconstructing, maintaining, and operating ... a certain right-of-way," specifically the U.S. Highway 281 Drainage outfall ditches project.

However, such language does not call into question the effect of the 2003 Judgment. The term "right-of-way," used alone, may mean either a "right of passage" over a parcel of land or the parcel of land itself that "is to be used as a right of way." *Tex. Elec. Ry. Co. v. Neale,* 151 Tex. 526, 252 S.W.2d 451, 454 (1952); *see also Lakeside Launches, Inc. v. Austin Yacht Club, Inc.,* 750 S.W.2d 868, 871 (Tex.App.-Austin 1988, writ denied). There is no indication that the condemnation petition, the special commissioners' award, or the 2003 Judgment used the term "right-of-way" synonymously with an easement or right of passage; rather, it was used to denote the property itself.

Further, the City's agreement with the issuance and recording of the 2004 Judgment nunc pro tunc, while potentially relevant to an equitable claim, does not call into question the true decision of the trial court in entering the 2003 Judgment. At that time, the trial court had before it the City's request for a judgment for "fee title" in the property and the unobjected-to special commissioners' award, which awarded all rights prayed for in the petition. Again, because the 2003 Judgment adopted the award as the judgment of the **\*173** court, it is clear that the 2003 Judgment awarded fee title to the City. Therefore, the 2004 Judgment purporting to award an easement, even if the City agreed to it, goes beyond the correction of a clerical error and is void.

It bears repeating that the invalidity of the 2004 Judgment is not evident from the fact that the two judgments are facially in conflict, which in and of itself does not raise suspicion. In reality, most nunc pro tunc judgments conflict substantively with the underlying judgments they are entered to correct. The nunc pro tunc judgment that merely corrects a misspelled word or a grammatical error is an anomaly. After all, reasonable parties do not generally file lawsuits to correct trivial mistakes such as missing commas or misspelled words. Rather, reasonable litigants go to court to correct clerical errors affecting substantive rights. A thorough review of this record, however, conclusively shows that the true decision of

the trial court, as reflected in the 2003 Judgment, was to award fee simple title to the City.

Given that the 2004 Judgment was void, API could not acquire legal title from White because the City owned the land. I agree with the Court that any recovery against TxDOT and the City would necessitate application of the doctrine of equitable estoppel, which does not apply against the government under the circumstances of this case. Accordingly, I concur in the Court's opinion and judgment.

**All Citations**

397 S.W.3d 162, 56 Tex. Sup. Ct. J. 449

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

---